# EXHIBIT 9
# REDACTED

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | Case No. 1:21-md-03010 (PKC) |

This Document Relates To:

| | |
|---|---|
| ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.,<br><br>          *Plaintiffs,*<br><br> -against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>          *Defendants.* | Case No. 1:21-cv-03446 (PKC) |
| GANNETT CO., INC.<br><br>          *Plaintiff,*<br><br> -against-<br><br>GOOGLE LLC and ALPHABET INC.,<br><br>          *Defendants.* | Case No. 1:23-cv-05177 (PKC) |

**REVISED EXPERT REPORT OF PROFESSOR DAVID SIBLEY, PH.D.**

*David Sibley* (signature)

Prof. David Sibley, Ph.D.
Dated October 11, 2024

36. Third, Google has not been constrained in its ability to maintain supracompetitive prices for its ad exchange. Since at least 2015, there have been several potential competitive threats to Google's ad exchange product (including price reductions by rivals) that have not disciplined Google's prices.

37. Finally, I analyze barriers to entry and expansion and identify two key barriers:

    a. **Indirect network effects:** For a new entrant to effectively compete with Google, it must simultaneously build a substantial base of both publishers and advertisers. This presents a chicken-and-egg problem for would-be competitors.

    b. **Data availability and scale advantages:** In the market for ad exchanges for open display inventory, a platform's ability to scale its business allows it to gather more data from both publishers and advertisers, which in turn further improves its performance compared to competitors**.** Due to the large number of impressions transacted through AdX relative to other exchanges, Google has a considerable scale advantage.

38. Finally, I find that a nascent threat such as header bidding did not become a significant competitor to Google, as evidenced by a review of the volume of impressions transacted through AdX relative to header bidding. Moreover, as I understand from the analysis in Professor Li's report, Google took various steps to thwart the adoption of this mechanism.[10]

    5. Geographic market definition

39. To define the relevant geographic market for both publisher ad servers and ad exchanges, I consider two criteria: (1) where each product's customers are located; and (2) whether suppliers of these products compete globally. I analyze each of these criteria based on qualitative information and data produced by Google.

40. Based on the location of publishers and suppliers, I conclude that the relevant geographic for both general publisher ad servers and ad exchanges for open display inventory is global.

---

[10] See Li Opening Report, Section III, for a summary of how different Google conduct has hindered the expansion of header bidding.

However, I exclude regions subject to economic or political sanctions, which have distorted competitive conditions.

6. <u>Google has created a tie between its product in the market for general publisher ad servers for open display inventory and real-time bids from its ad exchange</u>

41. Google implemented a technological tie that effectively required publishers to use its ad server, DFP, to access bids from its ad exchange, AdX, in real-time. By restricting third-party publisher ad servers from receiving real-time bids from AdX and restricting Google Ads to AdX, Google significantly undermined their ability to optimize yield. This arrangement persists to this day. I find that Google could have extended AdX real-time bidding to third party ad servers but chose not to do so to maintain a competitive advantage in the market for general publisher ad servers for open display inventory.

42. My empirical analysis shows that publishers value real-time bidding and thus, almost always use this mechanism to find buyers for their inventory when selling impressions through ad exchanges. Publishers and ad tech executives consistently emphasize that real-time bidding is the most effective way to monetize open display inventory.

43. Further, I establish that (1) Google has market power in the tying market (ad exchanges); (2) separate demand exists for AdX and DFP; but (3) the tie leaves publishers with little choice but to use DFP as their ad server for open display inventory. Specifically, the tie reduces monetization, imposes duplicative costs and requires a multi-homing set up if a publisher wants to access AdX real-time demand and still use a third-party ad server—reducing their attractiveness for publishers. I show that publishers have reduced their reliance on third-party ad servers to access AdX.

44. Finally, I show that the tie has harmed competition in the general publisher ad server market for open display inventory. Google has been able to dramatically capture market share. The tie has also increased the barriers to entry in the market, deterring potential rivals from exerting competitive pressure on Google. To conclude my analysis on the anticompetitive effects on the tie, I show that rivals have either left the market or have not emerged as a real challenger

13

    d. A **subscription-based revenue model** represents a completely different monetization strategy. Only a restricted group of publishers can afford to charge end users a subscription fee. Google itself describes these publishers as "disproportionally [both] large" and "top 10-20 tier publishers."[466] This type of publisher is substantially different from publishers like Daily Mail, for which subscriptions are inconsequential at most, and relies almost exclusively on ad revenue.[467]

256. I therefore conclude that general publisher ad servers for open display inventory cater for a different set of customers than the other candidate substitutes considered.

4. <u>Geographic market definition suggests that there is a relevant geographic market for general ad servers for open display inventory whose scope is the global (with certain exceptions)</u>

257. For the reasons I will set forth in the subsequent sections, my conclusion is that the scope of the geographic market definition for general publisher ad servers for open display inventory is **global.**

258. As explained in Section III.A.3, in my assessment, I consider three criteria: (1) whether customers of ad servers (i.e. publishers) are located around the world; (2) whether suppliers of general ad servers have a global presence; and (3) regional restrictions.

259. I will analyze each of these criteria based on qualitative information and data produced by Google.

---

[466] 

[467] Deposition of Matthew Wheatland (Chief Digital Officer DailyMail.com), June 12, 2024, 36:8-37:3. ("During the 2013 to present time frame, did subscriptions generate revenue for Daily Mail at any point? A. Subscriptions generate less than 1 percent of Daily Mail's revenues and at some point significantly less than 1 percent. Very inconsequential in our business right now. Q. Describe for me at a 10,000 foot level, if you will, how, if at all, that percentage you just described varied from 2013 to present? A. In the last few months we have been testing a digital subscription product on MailOnline in the U.K. However, the revenue on that is very small and the majority of the revenue that we generate is from display advertising. Subscriptions are difficult for our business.")

(i) Customers (publishers) of general publisher ad servers for open display inventory are located globally

260. Customers of general publisher ad servers for open display inventory are publishers that offer open display advertising. This mostly excludes publishers subject to certain illiberal regimes that impose onerous restrictions on the production and distribution digital content and promotion. For instance, China's government holds publishers accountable for any ads that violate content restrictions, disincentivizing publishers from relying on third-party ad tech tools for monetizing their ad inventory.[468] Industry experts have asserted that such policy ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆"[469]

261. In terms of the location of these customers, from the available documents and data provided to me, I understand that Google's ad server is **used by publishers in numerous countries**.[470] Google's GAM[471], which includes DFP, provides customers technical support in 22 languages, as depicted in Figure 13. The list includes widely spoken languages such as English, Chinese, Spanish, and French, as well as regional languages such as Polish and Turkish.



---

[468] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[469] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

[470] *See* ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[471] After unifying its ad exchange, AdX, and its publisher ad server, DFP, Google publicly started to refer to both as GAM. I explain this in-depth in Section VI.

**Figure 13: Screenshot of Google Help Center listing the languages supported by GAM[472]**



262. Moreover, publishers use ad servers to reach advertisers and users globally. I use two datasets to illustrate this below. ███████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████. This evidence shows that publishers on DFP attract and sell impressions for users worldwide.

---

[472] *Snapshot of the image is taken from:* "Contact Us," Google Ad Manager Help, accessed on August 30, 2024, https://support.google.com/admanager/gethelp.

[473] RFP 243 - ███████████████████████████████████████████████████████████
████████████████████ is used for the analysis. Specifically, ███████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████

123

**Figure 14: Histogram of the number of user countries for each publisher country**[474]



263. Similarly, using another Google produced dataset, I can identify where advertisers for Daily Mail U.S. impressions are located. I use the DV360 dataset, which provides information on impressions bought through DV360. But Daily Mail uses DFP, so this data shows which users Daily Mail reaches. Although this may not cover *all* the demand sources for Daily Mail U.S., I use this data only illustratively. Figure 15 below shows that Daily Mail's U.S. business sold impressions to advertisers from 95 countries (including the U.S.) in 2022. While around 84% of impressions were sold to U.S. advertisers, accounting for around 85% of the gross advertising revenue, advertisers from other countries also purchased impressions from Daily Mail.

---

[474] I identified each publisher and user country pair for observations without "Unknown" country codes to conduct the analysis. Additionally, I dropped observations with missing values. Then for each year and publisher country, I counted unique number of user countries to obtain the histogram.

**Figure 15: Sum of impressions served by Daily Mail to non-US advertisers in 2022 by Country**[475,476]



264. Although regulations on general publisher ad servers for open display inventory may vary between countries and regions, the product is "adapted" to comply with local regulation and is available to use for publishers even in those regions. For instance, the European Union's GDPR imposes restrictions on the use of behavioral data.[477] Google, however, notes that its publisher ad tools can be adapted to enable publishers to comply with GDPR through its ads

---

[475] Analysis is based on original RFP-243 █████████

[476] Using RFP 243 █████████

[477] Susan Akbarpour, "How Does GDPR Impact Advertising and E-Commerce?," Forbes, May 8, 2018, accessed on July 24, 2024, https://www.forbes.com/sites/forbesagencycouncil/2018/05/08/how-does-gdpr-impact-advertising-and-e-commerce/?sh=416c98bf3277. ("If you collect personal data or behavioral information from a person in an EU country, your company is subject to the requirements of the GDPR.")

125

personalization settings on DFP (using Google Publisher Tags) and AdX (using AdX ad tags).[478] Similarly, Google offers publishers the ability to comply with the European Union's Digital Services Act by using optional in-ad transparency settings.[479] Rivals such as Equativ also offer publishers tools to comply with the GDPR.[480]

(ii)     Suppliers of general ad servers for open display inventory have a global presence

265. Google understands ad servers to compete globally. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

266. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[478] "Tools to help Publishers Comply with the GDPR," Google Ad Manager Help, accessed on September 5, 2024, https://support.google.com/admanager/answer/7666366.

[479] "Supporting the Digital Services Act (DSA)," Google Ad Manager Help, accessed on July 24, 2024, https://support.google.com/admanager/answer/14335032.

[480] "Equativ Manage General Terms and Conditions," Equativ, accessed on September 6, 2024, https://equativ.com/sso-policy/.

[481] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

[482] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

[483] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

267.  This evidence underscores that Google's ambitions are global.

268. Google's rival ad servers for open display inventory also have a global reach. For example, Equativ is headquartered in France and has offices in 18 different countries, including the U.S.[485] Its publisher ad server product competes globally[486] in North America and Central Europe,[487] Southeastern Europe, Middle East, and Africa,[488] and Latin America. Moreover, Equativ competes against Google in the U.S., i.e., outside of its headquartered country, and has most of its team based there.[489]

269. [490]

(iii)   Certain regions are excluded from my geographic market

270. Finally, if a country is subject to economic or political sanctions, particularly from a nation where an international ad tech provider is based, the provider's ability to compete in these regions could be severely restricted. For example, the U.S Office of Foreign Assets Control has imposed economic embargoes on countries like Cuba, Iran, North Korea and Syria, and

---



[487] UK, Ireland, Nordics, Germany, Austria, Switzerland.

[488] France, Spain, Italy, Easter Europe, Turkey, Middle East and North Africa.

regions such as Crimea, Donetsk and Luhansk.[491] More recently, after the Russia/Ukraine war, Google also stopped serving ads to users located in Russia and has stopped permitting ads from advertisers based in Russia.[492] These restrictions impose significant competitive constraints on ad tech providers operating publisher ad servers, as they are barred from the internet in these regions and, therefore, cannot access or monetize through these markets.

271. For the reasons set forth above, I exclude these regions from my geographic market definition. The exclusion of these regions is likely to reflect a very small number of total open display transactions (although it isn't possible to estimate it) and, as a result, their inclusion or exclusion does not affect my opinions.

272. Hence, I define a relevant antitrust market for general publisher ad servers for open display inventory with a global geographic scope (with certain exceptions).

B. **Google has monopoly power in the market for general publisher ad servers for open display inventory.**

273. In this section of the report, I assess whether Google has monopoly power in the market for general publisher ad servers for open display inventory. I consider the following evidence: (1) Google's high market share; (2) Google's access to advertising demand; (3) barriers to entry and expansion; and (4) Google's actions to force rivals out of the market.

1. Google has a high market share in the market for general publisher ad servers for open display inventory, which is indicative of monopoly power

274. **Over the last five years, Google has persistently maintained market shares well in excess of 90%.** I have calculated DFP's share of eligible impressions on a monthly basis between January 2019 and December 2022. I have combined data disclosed by Google with data for third-party ad servers Microsoft's Xandr, Equativ, Kevel and Yahoo!. For Yahoo!, I have

---

[491] "Understanding Google Ads Country Restrictions," Google Ads Help, accessed on September 4, 2024, https://support.google.com/google-ads/answer/6163740.

[492] "Google Ads Policies and Guidelines," Google Transparency Center, accessed on August 23, 2024, https://transparency.google/intl/en_US/our-policies/product-terms/google-ads/. ("As part of our recent suspension of ads in Russia, we will also pause ads on Google properties and networks globally for advertisers based in Russia. Due to the ongoing war in Ukraine, we will be temporarily pausing Google ads from serving to users located in Russia.")

**HIGHLY CONFIDENTIAL**

435. As I explained in Section IV.A.4, there are certain exceptions that I consider for determining the geographic boundaries of the relevant market. The same criteria I discussed in Section IV.A.4 apply as well for the geographic market definition for ad exchanges for open display inventory. Most notably, my assessment of these factors rules out regions where economic sanctions may preclude ad tech vendors from serving publishers and advertisers on the open internet (e.g., Iran, North Korea, Russia).

436. In summary, I define a relevant antitrust market for ad exchanges for open display inventory with a global geographic scope (with exceptions).