**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION | No. 1:21-md-3010 (PKC) |

*This Document Relates To:*

| | |
|---|---|
| ASSOCIATED NEWSPAPERS LTD., *et al.* v. GOOGLE LLC, *et al.* | No. 1:21-cv-03446 (PKC) |
| GANNETT CO., INC. v. GOOGLE LLC, *et al.* | No. 1:23-cv-05177 (PKC) |

**DEFENDANTS GOOGLE LLC AND**
**ALPHABET INC.'S RESPONSE TO PLAINTIFFS**
**DAILY MAIL AND GANNETT'S STATEMENT OF**
**MATERIAL FACTS NOT IN DISPUTE PURSUANT TO LOCAL**
**RULE 56.1(A) AND STATEMENT OF SUPPLEMENTAL MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules for the Southern District of New York,

and for purposes of this motion only, Defendants Google LLC and Alphabet Inc. (together

"Google") hereby submit (1) the following response to the Statement of Material Facts Not in

Dispute Pursuant to Local Rule 56.1(a) of Plaintiffs Gannett Co., Inc. ("Gannett") and

Associated Newspapers Ltd. and Mail Media, Inc. (together "Daily Mail," and, collectively with

Gannett, "Plaintiffs"); and (2) Google's Statement of Supplemental Material Facts.

## PRELIMINARY STATEMENT

Google provides the responses below for purposes of its Opposition to Plaintiffs' Motion for Partial Summary Judgment on Google's Affirmative Defenses. To the extent Google does not dispute a particular statement, Google does not concede that Plaintiffs' statement relies on admissible evidence; Google reserves the right to object to any documents, testimony, or other evidence Plaintiffs may offer. All facts not disputed here are undisputed only for the purpose of resolving Plaintiffs' Motion. For the convenience of the Court, Google replicates below all headings as they appear in Plaintiffs Rule 56.1 Statement. Google disputes all statements in and all potential inferences from the headings.

References to Exhibit numbers in Plaintiffs' statements refer to the Exhibits attached to the Declaration of Eric J. Maier in Support of Plaintiffs Daily Mail and Gannett's Memorandum of Law for Partial Summary Judgment on Google's Affirmative Defenses. *See* ECF No. 1260. References to Exhibit numbers in Google's Responses and Statement of Supplemental Material Facts refer to the Exhibits attached to the Declaration of Caroline P. Boisvert in Support of Google's Memorandum of Law in Opposition to Plaintiffs Daily Mail and Gannett's Motion for Partial Summary Judgment on Google's Affirmative Defenses, filed herewith.

I.    **Background**

A.    **Plaintiffs' Claims**

1.    Plaintiffs claim that Defendants Google LLC and Alphabet Inc. (collectively "Google") have violated Section 2 of the Sherman Act, 15 U.S.C. § 2 by unlawfully acquiring and maintaining a monopoly in the market for publisher ad servers. MDL Dkt. No. 1196 ("DM TAC") ¶¶ 251-55; MDL Dkt. No. 1197 ("Gannett SAC") ¶¶ 260-64.

**Google's Response to No. 1:** Undisputed that Plaintiffs have made the allegations set forth in Paragraph 1.

2.    Plaintiffs claim that Google has violated Section 2 of the Sherman Act by unlawfully acquiring and maintaining a monopoly in the market for ad exchanges. DM TAC ¶¶ 256-59; Gannett SAC ¶¶ 265-68.

**Google's Response to No. 2:** Undisputed that Plaintiffs have made the allegations set forth in Paragraph 2.

3.    Plaintiffs claim that Google has violated Section 2 of the Sherman Act by attempting to monopolize the market for ad exchanges. DM TAC ¶¶ 260-64; Gannett SAC ¶¶ 269-73.

**Google's Response to No. 3**: Undisputed that Plaintiffs have made the allegations set forth in Paragraph 3.

4.      Plaintiffs claim that Google has violated Section 1 of the Sherman Act by unlawfully tying its AdX ad exchange to its DFP ad server. DM TAC ¶¶ 265-71; Gannett SAC ¶¶ 274-80.

**Google's Response to No. 4**: Undisputed that Plaintiffs have made the allegations set forth in Paragraph 4.

5.      Daily Mail claims that Google violated New York General Business Law § 349. DM TAC ¶¶ 272-84.

**Google's Response to No. 5**: Undisputed that Daily Mail has made the allegations set forth in Paragraph 5 except as to DM TAC ¶¶ 280(b), 280(g), and 282, which Daily Mail has since withdrawn. *See* ECF No. 1265.

6.      Gannett claims that Google violated New York General Business Law §§ 349-50. Gannett SAC ¶¶ 281-94.

**Google's Response to No. 6**: Undisputed that Gannett has made the allegations set forth in Paragraph 6 except as to Gannett SAC ¶¶ 289(c), 289(e), and 289(f), which Gannett has since withdrawn. *See* ECF No. 1265.

7.      Plaintiffs claim that Google defrauded them by making false representations regarding Google's publisher ad server, DFP, and its ad exchange, AdX. *See*, *e.g.*, DM TAC ¶¶ 110, 132-33, 153-55, 207, 279-89; Gannett SAC ¶¶ 131, 158-60, 184-86, 228, 281-99.

**Google's Response to No. 7**: Disputed. Plaintiffs have withdrawn their common-law fraud claims. *See* ECF No. 1265.

8.      Gannett claims that Google was unjustly enriched and benefited by manipulating its online advertising auctions. Gannett SAC ¶¶ 300-04.

**Google's Response to No. 8**: Undisputed that Gannett has made the allegations set forth in Paragraph 8.

B.      **Google's Defenses**

9.      Google first answered Daily Mail's and Gannett's complaints on March 29, 2024. MDL Dkt. Nos. 737 (Gannett Answer), 738 (Daily Mail Answer).

**Google's Response to No. 9**: Undisputed.

10.     Google has since filed two additional answers to Daily Mail's and Gannett's complaints. MDL Dkt. No. 829; MDL Dkt. No. 830; MDL Dkt. No. 1211; MDL Dkt. No. 1212.

**Google's Response to No. 10**: Undisputed.

11.     In each of Google's answers to Daily Mail's and Gannett's complaints, Google has claimed that Plaintiffs' claims "are barred, in whole or in part, by the doctrine of unclean hands" and has asserted that Plaintiffs have "failed to mitigate any alleged damages." MDL Dkt. No. 737 at 51; MDL Dkt. No. 738 at 47; MDL Dkt. No. 829 at 56; MDL Dkt. No. 830 at 54; MDL Dkt. No. 1211 at 56; MDL Dkt. No. 1212 at 53.

**Google's Response to No. 11**: Undisputed that Google's answers have asserted the defenses set forth in Paragraph 11.

**II.    <u>Material Facts Relevant to Google's Unclean Hands Defense</u>**

12.    In June 2024, Plaintiffs served separate sets of interrogatories requesting that Google "[i]dentify the material and/or primary facts and evidence in support of and the legal basis for [Google's] defense that [Plaintiffs'] claims are barred, in whole or in part, by the doctrine of unclean hands" (the "Unclean Hands Interrogatories"). Daily Mail's First Set of Interrogs. at 5 (Ex. 1); Gannett's First Set of Interrogs. at 5 (Ex. 2).

**Google's Response to No. 12**: Undisputed that Plaintiffs served interrogatories inquiring as to the topics set forth in Paragraph 12.

13.    Google's response on June 28, 2024, stated that Plaintiffs "engaged, or sought to engage, in conduct that was either similar to the alleged conduct underlying its claims against Google, or was otherwise inequitable and/or improper." Google's Resps. & Objs. to Daily Mail's First Set of Interrogs. at 12 (Ex. 3); Google's Resps. & Objs. to Gannett's First Set of Interrogs. at 12 (Ex. 4).

**Google's Response to No. 13**: Undisputed that Google responded and objected to Plaintiffs' interrogatories on June 28, 2024, and that Google's response included the statement Plaintiffs identify in Paragraph 13.

14.    Google's response to Gannett's Unclean Hands Interrogatory contained what Google called a "non-exhaustive list of documents sufficient to show support for" its unclean hands defense. Google Resps. & Objs. to Gannett's First Set of Interrogs. at 12 (Ex. 5). Google's response to Gannett's Unclean Hands Interrogatory listed the following documents and testimony: GANNETT_GOOG_0321812, GANNETT_GOOG_0043625,

GANNETT_GOOG_0183231, GANNETT_GOOG_0345929, GANNETT_GOOG_0247783, and Gannett 30(b)(6) Dep. Tr. 289:10-300:6. Google Resps. & Objs. to Gannett's First Set of Interrogs. at 12 (Ex. 5).

**Google's Response to No. 14**: Undisputed that Google responded and objected to Gannett's interrogatories on June 28, 2024, and that Google's response included the information Plaintiffs identify in Paragraph 14.

15.     Google's response to Daily Mail's Unclean Hands Interrogatory contained what Google called a "non-exhaustive list of documents sufficient to show support for" its unclean hands defense. Google Resps. & Objs. to Daily Mail's First Set of Interrogs. at 12 (Ex. 4). Google's response to Daily Mail's Unclean Hands Interrogatory listed the following documents and testimony: DM_GOOG_0260817, DM_GOOG_0880607, DM_GOOG_0045401, DM_GOOG_0089942, DM_GOOG_0368872, and 30(b)(6) Deposition of Daily Mail (Matthew Wheatland) at 239:11-252:8 (June 12, 2024). Google Resps. & Objs. to Daily Mail's First Set of Interrogs. at 12 (Ex. 4).

**Google's Response to No. 15**: Undisputed that Google responded and objected to Daily Mail's interrogatories on June 28, 2024, and that Google's response included the information Plaintiffs identify in Paragraph 15.

16.     Google served supplemental responses to Plaintiffs' interrogatories on August 30, 2024. Google Suppl. Resps. & Objs. to Daily Mail's First Set of Interrogs. (Ex. 6); Google Suppl. Resps. & Objs. to Gannett's First Set of Interrogs. (Ex. 7). Google's August 30, 2024 Supplemental Responses did not alter or supplement its June 28, 2024 Responses to the Unclean Hands Interrogatories. Google Suppl. Resps. & Objs. to Daily Mail's First Set of Interrogs. at 12-

14 (Ex. 6); Google Suppl. Resps. & Objs. to Gannett's First Set of Interrogs. at 13-14 (Ex. 7).

Google has not supplemented its responses to the Unclean Hands Interrogatories since it served

them on June 28, 2024.

**Google's Response to No. 16**: Undisputed.

### III.    <u>Material Facts Relevant to Google's Failure To Mitigate Defense</u>

17.    Daily Mail employee Matthew Wheatland testified during the trial in *United*

*States v. Google LLC*, No. 1:23-cv-108 (E.D. Va.). EDVA Tr. 130:11-24 (Sept. 18, 2024) (Ex.

9); EDVA Tr. 76:4-17 (Sept. 27, 2024) (Ex. 10). He testified that Daily Mail "would lose

roughly 28 percent of [its] programmatic revenue if [it] switched off AdX." EDVA Tr. 130:11-

24 (Sept. 18, 2024) (Ex. 9). Wheatland testified that Daily Mail was compelled to accede to

Google's unlawful tie because it needed AdX advertising demand. EDVA Tr. 76:4-17 (Sept. 27,

2024) (Ex. 10) ("[W]e're forced to purchase Google's ad server if we want to get access to AdX

demand . . . an[d] AdX demand is huge"; "[I]f we didn't have AdX demand, we would lose

money. And so because of that requirement to access ad demand, we need to purchase Google's

ad server.").

**Google's Response to No. 17**: Undisputed that Mr. Wheatland provided the quoted

testimony during the trial in *United States v. Google LLC*, No. 1:23-cv-108 (E.D. Va.), but this

testimony is contradicted by evidence in the record in this case. *See, e.g.*, Israel Supp. Report ¶

84 (Ex. 1) ("Google Ads buys on third-party exchanges via AwBid, and Plaintiffs substantially

overstate the extent to which any 'unique' demand on Google Ads represented by small

advertisers is a crucial revenue source for publishers."); Israel Report ¶¶ 654-56 (Ex. 2); GOOG-

AT-MDL-019215643 at -655 (Ex. 3) ("What: Awbid allows AdWords remarketing advertisers to

buy ads on Non-Google inventory. How: AwBid integrates with third party sell-side platforms and exchanges through real-time bidding interfaces. . . . When: AwBid has been operating since Q2 2013, but started accelerating rapidly in Q3 2015."); B. Bender Dep. Tr. 150:5-8 (Ex. 4) ("Q. What's AWBid? A. So AWBid stands for the AdWords bidder, and that was our effort to buy into a multi-exchange environment from the Google Display Network."); D. Taylor Dep. Tr. (Ex. 5) 358:20-359:2 ("Q. Are you familiar with the program or function known as AWBid? A. I am. Q. AWBid is a bidder that allows GDN to bid on inventory available on third-party exchanges, right? A. Correct."). Google also objects to the use of Mr. Wheatland's out of court statements at trial as hearsay. Google further objects to the materiality of Mr. Wheatland's statement to the several mitigation measures Google identifies beyond turning off AdX.

18.     Gannett employee Tim Wolfe testified during the trial in *United States v. Google LLC*, No. 1:23-cv-108 (E.D. Va.). EDVA Tr. 75:23-76:8 (Sept. 9, 2024) (Ex. 11). He testified that Gannett would suffer "revenue loss" if it did not have "direct access to the Google ad exchange as a demand source for our inventory." EDVA Tr. 75:23-76:8 (Sept. 9, 2024) (Ex. 11). In response to a question asking "why is it that Gannett can't switch away from using Google's ad exchange," he said that "Google represents about 50 percent of the programmatic revenue that Gannett generates." EDVA Tr. 104:9-23 (Sept. 9, 2024) (Ex. 11).

**Google's Response to No. 18**: Undisputed that Mr. Wolfe provided the quoted testimony during the trial in *United States v. Google LLC*, No. 1:23-cv-108 (E.D. Va.), but this testimony is contradicted by evidence in the record in this case. *See supra* Response to No. 17. Google also objects to the use of Mr. Wolfe's out of court statements at trial as hearsay. Google further objects to the materiality of Mr. Wolfe's statement to the several mitigation measures Google identifies beyond turning off AdX.

19.    Judge Brinkema issued a decision in *United States v. Google LLC*, No. 1:23-cv-108 (E.D. Va.), in which she found that Google "has ensured that publishers would lose significant revenue if they did not use AdX." *United States v. Google LLC*, 778 F. Supp. 3d 797, 863 (E.D. Va. 2025) ("E.D. Va. Op."). She further found that "it was not financially viable for large publishers to forgo using AdX and the access it offered to . . . unique advertising demand." *Id*. at 870. Judge Brinkema further found that "Google has largely limited AdWords exchange bidding to AdX" and that "[b]y so limiting AdWords, Google has ensured that publishers would view AdX as a 'must call' exchange." *Id*. at 854. Citing Wolfe's and Wheatland's testimony, Brinkema found that "Google has ensured that publishers would lose significant revenue if they did not use AdX." *Id*. at 863 (citing Section VI(B)(2) of the E.D. Va. Op., which references Wolfe's and Wheatland's testimony).

**Google's Response to No. 19**: Undisputed that Judge Brinkema issued the decision referenced in Paragraph 19, which Google intends to appeal, and which refers to Mr. Wolfe's and Mr. Wheatland's testimony. The decision nonetheless has no bearing on whether Plaintiffs could have mitigated their damages in the several ways identified by Plaintiffs' own expert, Prof. Hortacsu, Hortacsu Second Revised Reply Table Summation 2 & 4, Figure 7 (Ex. 6); Hortacsu Dep. Tr. 204:12-215:20 (Ex. 7); Hortacsu Second Revised Report Tables 42 & 76 (Ex. 8), as well as Profs. Milgrom and Chevalier, Milgrom Report ¶ 439.i (Ex. 9), Chevalier Report ¶ 360 (Ex. 10), and by Google in communications with Plaintiffs years ago. *See, e.g.*, DM_GOOG_0045401 at -403 (Ex. 11).

20.    Google LLC "is precluded from relitigating" certain "findings and conclusions in the E.D. Va. Action" including "that Google has unlawfully tied DoubleClick for Publishers and AdX." MDL Dkt. No. 1219 at 32.

**Google's Response to No. 20**: Undisputed that this Court entered the ruling referenced in Paragraph 20, which has no bearing on Plaintiffs' motion.

21.    No expert disclosed by Google in Plaintiffs' cases conducted a calculation of the amount of damages Plaintiffs suffered as a result of Google's Enhanced Dynamic Allocation.

**Google's Response to No. 21**: Undisputed that no expert disclosed by Google conducted a calculation of the amount of alleged damages Plaintiffs suffered as a result of Google's Enhanced Dynamic Allocation, but disputed insofar as Google's experts opine that Plaintiffs have failed to show damages from Enhanced Dynamic Allocation. *See, e.g.*, Chevalier Report ¶ 353 (Ex. 10) ("[Prof. Hortacsu's] analysis is incomplete at best, and inappropriate to examine the overall impact of EDA and to establish harm to publishers."). Google also objects to the materiality of this statement because affirmative expert testimony is not required in support of Google's failure to mitigate defense.

22.    No expert disclosed by Google in Plaintiffs' cases conducted a calculation of the amount of damages Plaintiffs would have suffered as a result of Google's Enhanced Dynamic Allocation if Plaintiffs had disabled AdX.

**Google's Response to No. 22**: Disputed that Google's disclosed experts do not determine by how much Plaintiffs could have reduced their damages from Enhanced Dynamic Allocation; indeed, they opine that Plaintiffs could have averted alleged damages from Enhanced Dynamic Allocation. Google disclosed the opinions of Prof. Milgrom who opines that Plaintiffs were able to disable several features of AdX, including addressing any effects of Enhanced Dynamic Allocation. Milgrom Report ¶ 439.i (Ex. 9) (responding to claim that "Publishers could not mitigate the effects of EDA," by opining, *inter alia*, "a publisher could set floor prices to re-

establish the pre-EDA process for its inventory."). Moreover, Google disclosed the opinions of

Prof. Chevalier who opines that "if publishers wanted to avoid the alleged negative impacts of

EDA, they could have limited their exposure to EDA by opting to sell through channels for

which EDA does not apply." Chevalier Report ¶ 360 (Ex. 10). Google also objects to the

materiality of this statement because affirmative expert testimony is not required in support of

Google's failure to mitigate defense.

23.    Plaintiffs' damages expert, Professor Ali Hortacsu, disclosed his opinion that

there are "no reasonable effective mitigation strategies for publishers to avoid the detrimental

impact of Google's EDA." Hortacsu Reply Rep. ¶ 31 (Ex. 1).

**Google's Response to No. 23**: Disputed. While Prof. Hortacsu disclosed this opinion, it

is disputed by other opinions in Prof. Hortacsu's own reports and testimony, as well as by other

evidence in the record. *See, e.g.*, Hortacsu Second Revised Reply Table Summation 2 & 4,

Figure 7 (Ex. 6); Hortacsu Dep. Tr. 204:12-215:20 (Ex. 7); Hortacsu Second Revised Report

Table 76 (Ex. 8) (███████████████████████████████████████████████

████████████████████████████████); Chevalier Report ¶ 360 (Ex. 10)

(publishers can "avoid the alleged negative impacts of EDA . . . by opting to sell through

channels for which EDA does not apply"); Milgrom Report ¶ 439.i (Ex. 9) (similar). Google also

objects to the use of Prof. Hortacsu's opinions for any purpose, including for summary judgment,

because his opinions are unreliable and unsupported, as will be explained in Google's

forthcoming Daubert motions.

24.    Hortacsu did not conduct a calculation of how turning off AdX would impact Daily Mail's and Gannett's damages from Enhanced Dynamic Allocation. Hortacsu Rep.; Hortacsu Reply Rep.

**Google's Response to No. 24**: Disputed. 

. Prof. Hortacsu also calculated the damages Gannett would suffer if it just stopped using AdX for indirect deals.

Hortacsu Second Revised Reply Table Summation 2 & 4, Figure 7 (Ex. 6); Hortacsu Dep. Tr. 204:12-215:20 (Ex. 7); Hortacsu Second Revised Report Table 76 (Ex. 8). Google also objects to the use of Prof. Hortacsu's opinions for any purpose, including for summary judgment, because his opinions are unreliable and unsupported, as will be explained in Google's forthcoming Daubert motions.

25.    Under Enhanced Dynamic Allocation, the DFP publisher ad server calculates a "temporary CPM" for direct deals. The temporary CPM can be lower than the contracted price that the direct-deal advertiser agreed to pay for the impression. GOOG-AT-MDL-008842393 (Decl. of N. Korula) ¶¶ 18-22 (Ex. 13) (noting that the "temporary CPM" could "approach[] 0" under certain circumstances).

**Google's Response to No. 25**: Undisputed.

26.    By operation of Enhanced Dynamic Allocation, even if a publisher turns off AdX, a non-Google exchange can win an ad impression that otherwise would have been won by a direct-deal advertiser, if the price from the non-Google exchange is higher than the temporary

CPM. GOOG-AT-MDL-008842393 (Decl. of N. Korula) ¶¶ 18-22 (Ex. 13) ("[W]ith Enhanced

Dynamic Allocation, the ad server calculated what is known as a temporary CPM for a

guaranteed deal" and an "indirect demand source" could "win [an] impression if the revenue to

be derived from that indirect demand source was higher than" the temporary CPM.).

**Google's Response to No. 26**: Undisputed, but Google objects to the materiality of a

non-Google exchange's ability to win an ad impression which would have been won by a direct-

deal advertiser. Plaintiffs theory of harm from EDA is that ███████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Li Revised Opening

Report ¶ 924 (Ex. 12); *see also* Hortacsu Second Revised Report ¶ 82 (Ex. 8) (similar). If AdX

cannot bid on or win impressions for Plaintiffs' inventory, such as if they turned off AdX, then

there can be no ███████████████

## GOOGLE'S STATEMENT OF SUPPLEMENTAL FACTS

**I.    Daily Mail's Content Issues**

1.    ███████████████████████████████████████████████████

███████████████████████████████████ DM_GOOG_0461720 at -742 (Ex. 13).

2.    ███████████████████████████████████████████████████

████████████████████████ DM_GOOG_0461761 at -771 (Ex. 14).

3.    ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ DM_GOOG_0461761 at -775 (Ex. 14).

4.    Daily Mail's Chief Digital Officer testified, both in his personal capacity and as

Daily Mail's corporate designee, that ███████████████████████████

████████████████████████████████████████████████████████

*See* M. Wheatland Dep. Tr. 160:5-161:21 (Ex. 15); Daily Mail 30(b)(6) Dep. Tr. 149:7-150:22

(Ex. 16).

5.    ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ DM_GOOG_0045401 at -402, -404 (Ex. 11).

6.    ██████████████████████████████████████████

██████████████████████████ DM_GOOG_0045401 at -403 (Ex. 11).

7.    ██████████████████████████████████████████

█████████████ DM_GOOG_0089942 at -942 (Ex. 17).

8.    ██████████████████████████████████████████

██████████████████████████████

DM_GOOG_0045999 at -999 (Ex. 18).

9. 

█████████████ DM_GOOG_0446371 at -371 (Ex. 19).

10. ████████████████████████████████████████████████████

█████████████████████ DM_GOOG_0884759 at -759 (Ex. 20).

11.    Alejandro Borgia, Director of Project Management for the Ads Safety team at Google, testified at trial in the Eastern District of Virginia that Google's content policies protect advertisers so that their brands are not associated with bad content. 2024.09.25 PM Tr. 112:7-19 (Ex. 21).

12.    Borgia testified that publishers with content issues like Daily Mail are "not going to be able to monetize their site successfully." 2024.09.25 PM Tr. at 104:1-5; *see also id.* at 118:17-25 (Ex. 21).

13.    When asked ████████████████████████████████████████████

████████████████████ Daily Mail's Chief Digital Officer testified under oath that █████████████████████ M. Wheatland Dep. Tr. 178:4-12 (Ex. 15).

## II.    Gannett's Mismanagement

14.    Gannett's response to the newspaper industry's decline was to merge with GateHouse Media. Berger Report ¶¶ 59-60 (Ex. 22) (describing a "continued overall decline" in "traditional news publishers"); ██████████████████████████████████████

██████████████████████████████████████████████████████████████████.

15.    This merger only accelerated the decline of Gannett's failing business and was marked by failures to even properly offer advertising inventory. ████████████████████

████████████████████████████████████████████████████████

███████; GANNETT_GOOG_0020207 at -207-209 (Ex. 24).

16. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

GANNETT_GOOG_0020207 at -207-209 (Ex. 24).

17. ████████████████████████████████████████████████████████

████████████████████████████ GANNETT_GOOG_0020207 at -207 (Ex. 24).

18. ████████████████████████████████████████████████████████████

GANNETT_GOOG_0020207 at -207 (Ex. 24).

19. ████████████████████████████████████████████████████████

████████████████████████████████████ GANNETT_GOOG_0020207 at -207 (Ex.

24).

20. ████████████████████████████████████████████████████████

████████████████████████████████████████████ GANNETT_GOOG_0646455 at -

456 (Ex. 25).

21. ████████████████████████████████████████████████████████

████████████████████████████████████████████ GANNETT_GOOG_0646455 at -

458 (Ex. 25).

22. ████████████████████████████████████████████████████████

████████████████████████████████ GANNETT_GOOG_0020207 at -207 (Ex. 24).

23.    There are numerous other examples in the record of Gannett's mismanagement.

*See* ████████████████████████████████████████████████████████

████████████████; GANNETT_GOOG_1586587 at -587 (Ex. 26) ████████████████

████████████████████████████████████; GANNETT_GOOG_0969246 at -

246 (Ex. 27) ████████████████████████████.

24.    Gannett employees raised concerns over █████████████████████

GANNETT_GOOG_0047811 at -811 (Ex. 28).

25.    Gannett employees raised concerns ███████████████████████

████████████ GANNETT_GOOG_1133714 at -714 (Ex. 29), ██████████████████

(Ex. 30).

26.    Gannett employees raised concerns ████████████████████████

█████████████████████████████ (Ex. 23).

### III.    Plaintiffs Could Have Turned Off
### or Limited Exposure to Google Products or Features

27.    ██████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ (Ex. 31); Daily Mail

30(b)(6) Dep. Tr. 78:18-81:21 (Ex. 16); ████████████████████ (Ex. 23).

28.    Plaintiffs state in interrogatory responses that they █████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████ Daily Mail's 2nd Supp. Resp. to Interrog. No. 23 (Ex. 32); Gannett Supp.

Resp. to Interrog. No. 23 (Ex. 33).

29.    Daily Mail's Chief Digital Officer testified that ████████████████

████████████████████████████████████ M. Wheatland Dep.

Tr. 102:13-21, 104:22-105:9 (Ex. 15).

30.    A Senior Director of Revenue Operations at Gannett testified that he ████████

████████████████████████████████████████████████

██████████████████████████████████ (Ex. 30).

31.      A Senior Director of Revenue Operations at Gannett testified that the █████████

████████████████████████████████████████████████████████████████████

███████ (Ex. 30).

32.      Gannett's corporate designee testified, ██████████████████████████████

█████████████████████████ Gannett 30(b)(6) Dep. Tr. 242:6-17 (Ex. 34).

33.      A Director of Programmatic Revenue Operations at Gannett ██████████████

████████████████████████████████████████████████████████████████████

(Ex. 35).

34.      A Senior Director of Revenue Operations at Gannett █████████████████

██████████████████████████████████████████████████████████(Ex. 30).

35.      Gannett and Daily Mail benefitted when they implemented solutions proposed by

Google. *See, e.g.*, GANNETT_GOOG_0969246 at -246 (Ex. 27) ████████████████████

█████████████████████████ DM_GOOG_0000031 at -031 (Ex. 36) ████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████

36.      But Gannett and Daily Mail did not implement solutions proposed by Google in

all instances. *Compare* DM_GOOG_0045401 at -403 (Ex. 11) ████████████████████

█████████████████████████████████████████████████████ *with*

DM_GOOG_0145191 at -192 (Ex. 37) ████████████████████████████████████

████████████.

37.      █████████████████████████████████████████████████████████████

████████████████████████████████████ Prof. Hortacsu also

estimated that if ████████████████████████████████████████████████████



█████████████████████ Hortacsu Second Revised Reply Table Summation 2 & 4, Figure 7 (Ex. 6); Hortacsu Dep. Tr. 204:12-215:20 (Ex. 7); Hortacsu Second Revised Report Table 76 (Ex. 8).

38.   ███████████████████████

████████████████████████████████ Hortacsu Second Revised Reply ¶ 200 (Ex. 6) ████████████████████████████████████████

39.   Plaintiffs' theory of harm from EDA is that ███████████████ ████████████████████████████████████████ Li Revised Opening Report ¶ 924 (Ex. 12).

40.   Google's expert Prof. Milgrom opines that Plaintiffs could have limited their exposure to EDA and avoided resulting damages by "set[ting] floor prices to re-establish the pre-EDA process for its inventory [or] assign[ing] direct deals to 100% sponsorship line items, to which EDA would not apply." Milgrom Report ¶ 439.i (Ex. 9).

41.   Google's expert Prof. Chevalier opines that "if publishers wanted to avoid the alleged negative impacts of EDA, they could have limited their exposure to EDA by opting to sell through channels for which EDA does not apply." Chevalier Report ¶ 360 (Ex. 10).

42.   There is similar mitigation evidence related to other challenged conduct. *See, e.g.*, Milgrom Report at ¶¶ 377 (Ex. 9) (describing ways to disable DA "without completely turning off AdX"), 765-67 (describing ways to favor non-Google exchanges post-UPR).

Dated: December 12, 2025                    Respectfully Submitted,

*/s/ Craig M. Reiser*
Craig M. Reiser
Denise Plunkett
Eva Yung
Christopher Erickson
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, New York 10111
Telephone: (212) 728-2200
Email: creiser@axinn.com
       dplunkett@axinn.com
       eyung@axinn.com
       cerickson@axinn.com

Bradley D. Justus
AXINN, VELTROP & HARKRIDER LLP
1901 L Street, NW
Washington, DC 20036
Telephone: (202) 469-3532
Email: bjustus@axinn.com

Daniel S. Bitton
AXINN, VELTROP & HARKRIDER LLP
55 Second Street, CA 94105
Telephone: (415) 490-1486
Email: dbitton@axinn.com

Caroline P. Boisvert
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
Telephone: (860) 275-8129
Email: cboisvert@axinn.com

*/s/ Justina K. Sessions*
Justina K. Sessions**
FRESHFIELDS US LLP
855 Main Street
Redwood City, CA 94063
Telephone: 650-618-9250
Email: justina.sessions@freshfields.com

Counsel for Defendants Google LLC and
Alphabet Inc.

*\*\*Except as to Associated Newspapers Ltd.,
et al. v. Google LLC, No. 1:21-cv-03446
(PKC)*