UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

IN RE GOOGLE DIGITAL ADVERTISING ANTITRUST LITIGATION — 21-md-3010 (PKC)

OPINION AND ORDER

-----------------------------------------------------------x

ASSOCIATED NEWSPAPERS LTD. and MAIL MEDIA, INC.,

Plaintiffs, — 21-cv-3446 (PKC)

-against-

GOOGLE LLC and ALPHABET INC.,

Defendants.

-----------------------------------------------------------x

GANNETT CO., INC.,

Plaintiff, — 23-cv-5177 (PKC)

-against-

GOOGLE LLC and ALPHABET INC.,

Defendants.

-----------------------------------------------------------x

IN RE: GOOGLE DIGITAL PUBLISHER ANTITRUST LITIGATION — 21-cv-7034 (PKC)

-----------------------------------------------------------x

INFORM INC.,

Plaintiff, — 23-cv-1530 (PKC)

-against-

GOOGLE LLC, ALPHABET INC. and YOUTUBE, LLC,

Defendants.

-----------------------------------------------------------x

Contents

BACKGROUND. ..... 5

SUMMARY JUDGMENT STANDARD. ..... 10

GOOGLE'S MOTION TO EXCLUDE THE OPINIONS OF GANNETT AND DAILY MAIL'S EXPERT WITNESSES WILL BE DENIED. ..... 11

I. Rule 702 and Daubert. ..... 11

II. The Motion to Exclude the Opinions of Shengwu Li Will Be Denied. ..... 13

III. The Motion to Exclude the Opinions of Ali Hortacsu Will Be Denied. ..... 17

GOOGLE'S MOTION FOR SUMMARY JUDGMENT AGAINST GANNETT AND DAILY MAIL WILL BE GRANTED AS TO THEIR NEW YORK GENERAL BUSINESS LAW CLAIMS BUT OTHERWISE DENIED. ..... 21

I. Google's Summary Judgment Motion Directed to Certain Bidding Practices Will Be Denied. ..... 21

A. Enhanced Dynamic Allocation. ..... 22

B. Minimum Bid to Win. ..... 23

C. "Bernanke" and "Alchemist." ..... 24

D. "Poirot." ..... 26

E. Other Acts. ..... 27

II. Plaintiffs Have Pointed to Evidence of Antitrust Injury Caused by Enhanced Dynamic Allocation. ..... 28

III. The FTAIA Does Not Apply to the Claims of Gannett and Daily Mail. ..... 30

IV. Google's Summary Judgment Motion Will Be Granted as to the New York General Business Law Claims. ..... 34

V. Google's Motion Directed to Gannett's Unjust Enrichment Claim Will be Denied. ..... 37

VI. Google's Motion for Summary Judgment on Statute of Limitations Grounds Will Be Denied. ..... 39

GANNETT AND DAILY MAIL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON GOOGLE'S AFFIRMATIVE DEFENSES WILL BE GRANTED IN PART AND DENIED IN PART. 43

GOOGLE'S SUMMARY JUDGMENT MOTION WILL BE DENIED AS TO THE CLAIMS OF THE AdX CLASS AND MIKULA BUT GRANTED AS TO THE CLAIMS OF THE PROGRESSIVE. ..... 46

I. Background. ..... 46

II. Google's Summary Judgment Motion Directed to the So-Called "Act 1" Product Tie Will Be Denied. ..... 47

III. Google's Summary Judgment Motion Directed to the AdX Class's So-Called "Act 2" Product Tie Will Be Denied. ..... 48

IV. Google's Summary Judgment Motion Asserting that the AdX Class Did Not Isolate Damages for Each Bidding Initiative Will Be Denied. ..... 55

V. Google's Summary Judgment Motion on the Statute of Limitations as Applied to the AdX Class Claims Will Be Denied. ..... 55

VI. The FTAIA Does Not Preclude an Award of Damages to MCM Firms. ..... 56

VII. The Court Need Not Address Equitable Relief at this Stage. ........ 57
VIII. Plaintiffs Reiterate that They Have Withdrawn Certain Claims. ........ 58
IX. Google's Summary Judgment Motion Will Be Granted as to The Progressive but Denied as to Mikula. ........ 59
A. Google's Motion for Summary Judgment Will be Granted as to The Progressive. ........ 59
B. Google's Motion for Summary Judgment Will Be Denied as to Mikula. ........ 62
GOOGLE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF EINER ELHAUGE AND ANAND DAS WILL BE DENIED. ........ 69
GOOGLE'S SUMMARY JUDGMENT MOTION DIRECTED TO INFORM WILL BE GRANTED. .. 71
I. Google's Motion to Strike Inform's Amended Summary Judgment Response of April 2, 2026 Will Be Granted. ........ 71
II. Google's Motion for Summary Judgment on Inform's Sherman Act Claims Will Be Granted. ........ 74
A. Overview of Inform's Claims. ........ 74
B. Inform Does Not Cite to Evidence that Would Permit a Reasonable Jury to Find that It Suffered Antitrust Injury Attributable to Google's Anticompetitive Activities in the Product Markets of the Open-Web Display-Ad Tech Stack. ........ 77
C. Inform Does Not Cite to Evidence that Would Permit a Reasonable Jury to Find that Google Had Monopoly Power in the Market for Online Advertising. ........ 81
D. Google's Summary Judgment Motion Directed to the YouTube Tie Will Be Granted. ........ 85
III. Inform and Google Shall Submit Letter Briefs on the Court's Exercise of Supplemental Jurisdiction. ........ 85
CONCLUSION ........ 87

CASTEL, Senior District Judge:

Motions for summary judgment have been filed in four cases that are being coordinated in this multidistrict litigation. Also filed are related motions to exclude the opinions of certain experts. Plaintiffs assert that Google LLC and Alphabet Inc. (collectively, "Google") violated sections 1 and 2 of the Sherman Act by unlawfully monopolizing or attempting to monopolize the product markets for publisher ad servers and ad exchanges. Most plaintiffs also assert that Google unlawfully tied its AdX ad exchange to publishers' use of Google's DoubleClick for Publishers ("DFP") ad server.

While plaintiffs' claims largely relate to Google's advanced DFP ad server and its AdX ad exchange, their theories of antitrust injury and damages vary. Some plaintiffs bring claims directed to different digital advertising products: The Progressive, Inc. ("The Progressive") and Mikula Web Solutions Inc. ("Mikula") bring individual monopolization and tying claims directed to Google's "basic" AdSense ad server and auction platform. Inform Inc. ("Inform") transacted almost exclusively in online video advertising and brings Sherman Act claims directed toward Google's conduct in online video advertising, in addition to claims involving the open-web display ads transacted by other plaintiffs.

For the reasons that will be explained, the Court concludes as follows:

- Associated Newspapers, et al. v. Google LLC, et al., and Gannett Co., Inc. v. Google LLC et al.: Google's motion to exclude the expert opinions of Shengwu Li and Ali Hortacsu will be denied. Google's summary motion will be granted as to plaintiffs' claims brought under the New York General Business Law but otherwise denied. Plaintiffs' motion for partial summary judgment will be granted to the extent that Google asserts that Daily Mail could have mitigated damages by publishing fewer "salacious" articles and that Gannett could have mitigated damages by making different business decisions but denied to the extent that Google urges plaintiffs could have mitigated damages by altering its use of the DFP ad server. Google's affirmative defense of unclean hands has been voluntarily dismissed.
- In re: Google Digital Publisher Antitrust Litigation: Google's motion directed to the claims of the AdX Class and Mikula will be denied. Google's motion directed

to the claims of The Progressive will be granted. Google's motion to exclude the expert opinions of Einer Elhauge and Anand Das will be denied.

- Inform Inc. v. Google LLC, et al.: Inform has not come forward with sufficient evidence that, if believed, would show antitrust injury in the markets for ad servers and ad exchanges that transact open-web display ads. It also has not come forward with sufficient evidence that, if believed, shows Google's market power in the market for online video advertising. Google's motion will be granted as to Inform's claims under the Sherman Act and Clayton Act. The parties shall file letter-briefs addressing the exercise of supplemental jurisdiction over Inform's two remaining claims brought under Georgia law.

BACKGROUND.

The underlying technology, product markets and claims have been described in prior rulings of this Court. This Opinion and Order assumes familiarity with the following: In re Google Digital Advertising Antitrust Litig., 627 F. Supp. 3d 346 (S.D.N.Y. 2022) (granting in part and denying in part Google's motion to dismiss claims brought by state attorneys general) ("Google I"); In re Google Digital Advertising Antitrust Litig., 721 F. Supp. 3d 230 (S.D.N.Y. 2024) (granting in part and denying in part Google's motion to dismiss claims brought by private plaintiffs) ("Google II"); In re Google Digital Advertising Antitrust Litig., 2025 WL 3012840 (S.D.N.Y. Oct. 27, 2025) (granting plaintiffs' motions for partial summary judgment and applying principles of issue preclusion to the findings and conclusions of the Hon. Leonie M. Brinkema following a bench trial in the Eastern District of Virginia (the "E.D. Va. Action")) ("Google III"); In re Google Digital Advertising Antitrust Litig., 2025 WL 3562687 (S.D.N.Y. Dec. 12, 2025) (granting motion to certify class of publishers who sold ads through AdX but

denying motion to certify class of publishers who sold ads through AdSense) ("Google IV"); and Inform Inc. v. Google LLC, 2024 WL 988966 (S.D.N.Y. Mar. 7, 2024) (granting in part and denying in part Google's motion to dismiss claims principally directed to online video advertising) ("Inform").

The Court also assumes familiarity with Judge Brinkema's written findings and conclusions in the E.D. Va. Action. United States v. Google LLC, 778 F. Supp. 3d 797 (E.D. Va. 2025) ("United States v. Google"). Google III granted in part the plaintiffs' motions for partial summary judgment and applied principles of issue preclusion to certain claims of Gannett Co., Inc. ("Gannett"), Associated Newspapers Ltd. and Mail Media, Inc. (collectively, "Daily Mail"), the AdX Class and Inform. 2025 WL 3012840, at *8-10. Google III precluded Google from relitigating "(1) the existence of separate and distinct markets for publisher ad servers and ad exchanges, (2) that the ad server and ad exchange markets are worldwide in scope, excluding countries restricting access to the internet or subject to U.S. sanctions, (3) that Google has engaged in the following anticompetitive conduct which supports the [plaintiffs'] claim that [Google] willfully acquired and maintained its monopoly power in the ad server and ad exchange markets: Unlawful Tying, First Look, Last Look and Dynamic Revenue Share, and (4) that Google has unlawfully tied DoubleClick for Publishers and AdX in violation of section 1 of the Sherman Act." Id. at *17-18. Google III also applied issue preclusion to the claims of Gannett, Daily Mail and the AdX Class asserting that Google willfully acquired and maintained monopoly power in the markets for ad servers and exchanges by implementing Unified Pricing Rules. Id. at *17.

Google III did not address any claim of The Progressive or Mikula relating to Google's "basic" ad server and auction-platform products or the online video advertising market

asserted by Inform. See id. at *3 n. 3 (noting that the E.D. Va. Action did not involve AdSense products); *10 n. 11 (noting Inform's claims relating to online video advertising). Google III also advised that "[n]othing in this Court's ruling on preclusion relieve the Moving Plaintiff's burden of proving antitrust injury and damages." Id. at *17.

There are marked differences to how Gannett and Daily Mail, on the one hand, and the AdX Class, on the other, propose to show antitrust impact and damages. They all rely on evidence and theories of liability that go beyond the findings of United States v. Google, including as to the implementation of Enhanced Dynamic Allocation ("EDA"), a Google initiative that purportedly channeled sales to AdX for ad impressions that were already set aside for more lucrative direct deals with advertisers. The Court will briefly summarize how the approach of Gannett and Daily Mail varies from that of the AdX Class.

Through their expert witnesses Shengwu Li, Ph.D., and Ali Hortacsu, Ph.D., Gannett and Daily Mail endeavor to show antitrust impact and damages attributed to each of an array of auction-related practices. For example, Dr. Li analyzes the effects of Google's "Last Look" initiative, opines that it foreclosed competition in the market for ad exchanges, compares Last Look to a counterfactual scenario in which AdX competes in real time with other ad exchanges on a unified first-price auction, and concludes that Last Look depressed publisher ad revenues. (Li. Rep. ¶¶ 262-398 (ECF 1529-2).) Dr. Hortacsu compares historical data for Last Look to 2024 data where auctions were run on a first-price format and concludes that bid depression caused by Last Look caused $8.36 million in damages to Daily Mail and $18.04 million in damages to Gannett. (Hortacsu Rep. ¶¶ 252-98 (ECF 1529-3).) He undertakes similar, individualized analyses for each of EDA, Bernanke, Alchemist, Dynamic Revenue Share ("DRS"), reduced auction pressure, Unified Pricing Rules and a purported take-rate overcharge,

and concludes that Daily Mail and Gannett respectively suffered $599,955,198 and $900,771,489 in damages. (Hortacsu Rep. ¶ 755.)

The AdX Class seeks to show antitrust impact and damages caused by what it claims is an inflated, supracompetitive take rate that Google charged publishers as a consequence of two anticompetitive product ties. The so-called "Act 1" tie is consistent with the tying arrangement found to be unlawful in the E.D. Va. Action, and asserts that in order to receive bids from AdX (the ad exchange in which ads are sold, which is the tying product), Google required publishers to use its DFP ad server (the ad sever used by publishers, which is the tied product). The so-called "Act 2" tie asserts that Google coercively required publisher customers of DFP (the tying product) to sell impressions on AdX (the tied product). The claimed "Act 2" tie is unique to the AdX Class, and no tying such claim was advanced in the E.D. Va. Action. The AdX Class asserts that Google implemented the "Act 2" tie through certain bid-manipulation initiatives – specifically EDA, Dynamic Allocation (including First Look and Last Look), Dynamic Revenue Sharing and Unified Pricing Rules. The AdX Class's expert economist, Professor Einer Elhauge, opines that the "Act 1" and "Act 2" product ties permitted Google to charge publishers a supracompetitive 19.67% take rate for transactions that cleared over AdX, in excess of a 10% "benchmark" or "yardstick" rate that Google would have charged in a but-for world where it did not impose such ties. See Google IV, 2025 WL 3562687, at *9-12 & n. 8. The AdX Class has not isolated damages for any of the individual bid-manipulation practices, such as Dynamic Allocation, and asserts that damages were caused by the combined effects of those practices in establishing and maintaining the "Act 2" tie and the separate "Act 1" tie. Elhauge calculates aggregate class-wide damages of $1.72 billion through March 31, 2024, with additional damages accruing thereafter. (Elhauge Rep. ¶¶ 455-56 (ECF 959-1).)

The Progressive and Mikula bring claims on their own behalf directed to the alleged anticompetitive product ties between Google's "basic" AdSense ad server and auction platform. AdSense's customers paste a piece of code (known as the "AdSense Tag") to their websites and do not have the wide range of ad-management options available to the more sophisticated customers of the advanced DFP ad server. Access to the AdSense ad server and basic ad-auction platform are typically sold as a single product, which the Court will call the "AdSense Package," and Google contends that this "AdSense Package" is a single, unitary product, not two separate products bundled together. In Google IV, the Court denied The Progressive's motion to certify a class of AdSense customers, concluding that The Progressive could not satisfy the typicality and adequacy requirements of Rule 23(a) because it transacted 99.9% of its sales through the DFP ad server and not AdSense. 2025 WL 3562687, at *23-27.

Inform's claims differ from those of the other plaintiffs. Inform primarily transacted for the sale of online video ads, and asserts that Google monopolized or attempted to monopolize the product market for online video advertising. It contends that in or around 2012 or 2013, Google viewed Inform as a dominant player in online video advertising, and sought to undermine it first by persuading it to become a customer of DFP and AdX and then starving it of ad sales by not serving its ad impressions or else selling them at a fraction of their premium value. Inform argues that Google ultimately succeeded in driving Inform out of business, and seeks damages based on an expert's calculation of Inform's value as a going concern in 2014. The summary judgment record indicates that, at most, 2.7% of Inform's transactions on AdX were for the open-web display ads that are the subject of other plaintiffs' claims, and that the technology used to serve and auction video ads does not fully overlap with the open-web ad-tech

stack. As will be discussed, Inform also has not come forward with the type of evidence needed to support a finding that Google had market power in the market for online video advertising.

SUMMARY JUDGMENT STANDARD.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. The party seeking summary judgment bears the burden of demonstrating that there is no genuine dispute of material fact. Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A genuine dispute as to a material fact precludes summary judgment where the evidence is such that a reasonable jury could decide in the nonmovant's favor." In re Verplanck Fire Dist., 175 F.4th 144, 149 (2d Cir. 2026) (quotation marks omitted); see also Lucente v. Cnty. of Suffolk, 980 F.3d 284, 296 (2d Cir. 2020) ("Summary judgment dismissing a claim is inappropriate when the admissible materials in the record make it arguable that the claim has merit.") (quotation marks omitted).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists, but when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to an absence of evidence on an essential element of the nonmovant's claim." McGucken v. Shutterstock, Inc., 166 F.4th 361, 368 (2d Cir. 2026) (quotation marks omitted). "Once a movant has made that showing, the nonmovant must set forth specific facts showing that there is a genuine issue for trial." Bustamante v. KIND, LLC, 100 F.4th 419, 432 (2d Cir. 2024) (quotation marks omitted). The nonmovant "must do more than simply show there is some metaphysical doubt as to the material

facts and they may not rely on conclusory allegations or unsubstantiated speculation" and "must offer some hard evidence showing that its version of the events is not wholly fanciful." Jeffreys, 426 F.3d at 554 (internal citations and quotations omitted).

A court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." Anderson, 477 U.S. at 247-48 (emphasis in original).

GOOGLE'S MOTION TO EXCLUDE THE OPINIONS OF GANNETT AND DAILY MAIL'S EXPERT WITNESSES WILL BE DENIED.

I. Rule 702 and Daubert.

Because Google's summary judgment motion directed to Gannett and Daily Mail turns in large part on the opinions of their expert witnesses, the Court first addresses Google's motion for the Court to exclude from its analysis the opinions of Dr. Li and Dr. Hortacsu pursuant to Rule 702, Fed. R. Evid., and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993). Dr. Li opines on whether Google engaged in anticompetitive conduct that impacted competition in general and Gannett and Daily Mail specifically. (See Li Report (ECF 1529-2).) Dr. Hortacsu's report quantifies the damages claimed by Gannett and Daily Mail. (See Hortacsu Report (ECF 1529-3).)

Google does not dispute that Dr. Li and Dr. Hortacsu derived their conclusions from methods that are accepted and well-understood in their fields of expertise. Its motion is principally directed to narrow and discrete applications of these methods that are fairly raised on

cross examination but do not undermine the admissibility of their opinions. The motion to exclude the opinions of these two experts will be denied.

Rule 702 establishes "a gatekeeping role for the judge" to ensure that the expert's testimony is useful for "the particularized resolution of legal disputes." Daubert, 509 U.S. at 597. A district court has "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. "Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Id. at 590.

A court considers "(1) whether a theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation'; and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." In re Mirena IUS Levonorgestrel-Related Products Liability Litig. (No. II), 982 F.3d 113, 123 (2d Cir. 2020) (quoting Daubert, 509 U.S. at 593-94). These factors also may guide a court's analysis of the opinions of a non-scientific expert. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149-51 (1999).

But the factors are not a "definitive checklist or test." Daubert, 509 U.S. at 593. A district court undertakes a flexible inquiry and exercises "the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact. To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002). "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method

by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand. A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." Id. (quotation marks omitted).

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." United States v. Napout, 963 F.3d 163, 187 (2d Cir. 2020) (quotation marks and brackets omitted). "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison. By contrast, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017) (internal citations, quotation marks, brackets and ellipses omitted).

## II. The Motion to Exclude the Opinions of Shengwu Li Will Be Denied.

Dr. Li is an economics professor at Harvard and an expert in auction theory. (Lee Report ¶¶ 1-2 (ECF 1529-2).) He applies a "consumer welfare standard" to evaluate whether Google engaged in anticompetitive conduct, then considers whether Google harmed competition in the relevant antitrust markets and whether it specifically harmed Gannett and Daily Mail. (Li Rep. ¶¶ 9, 162.)

Dr. Li summarizes the consumer welfare standard as follows:

> Under this framework, a conduct is evaluated according to whether it harms consumers in any relevant market. Specifically, the framework is employed to consider whether a conduct will reduce consumer welfare by raising prices or by 'reduc[ing] product quality, reduc[ing] product variety, reduc[ing] service, or diminish[ing] innovation.' Exclusionary conduct, therefore, is

> assessed on the extent it will reduce consumer welfare through both its effect on price and relevant non-price factors.

(Li Rep. ¶ 165.) "To quantify the effects of exclusionary conduct on market participants and consumers, it is necessary to establish a 'counterfactual' scenario. The counterfactual is the 'but-for' world where the anticompetitive conduct did not take place. Counterfactuals answer the question, 'what would market outcomes (e.g., prices or volumes) have been in absence of an anticompetitive act?'" (Li Rep. ¶ 167.)

Much of Google's motion is directed toward Dr. Li's citation to a 2022 FTC policy statement that summarized the FTC Act and not the Sherman Act. He quoted this FTC statement to explain economists' definition of what constitutes "exclusionary conduct":

> A firm engaging in legitimate competitive practices (e.g., setting a lower price) may reduce the market share of its rivals, but conduct that forecloses rivals and is, to quote a 2022 FTC policy statement, "coercive, exploitative, collusive, abusive, deceptive, predatory, or involve[s] the use of economic power of a similar nature" is exclusionary.

(Li Rep. ¶ 164 (quoting "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act, Commission File No. P221202").) Google argues that Dr. Li's reliance on the FTC statement renders his opinions unreliable because the FTC Act sets a higher standard than the Sherman Act, and that his use of this incorrect standard pervades his analysis.

But in his ensuing discussion of what constitutes exclusionary conduct and economists' approach to the "consumer welfare standard," Dr. Li cites to a variety of sources from the DOJ, the FTC and academic literature. (Li Rep. ¶ 165 & n. 246-250.) Even if the FTC's 2022 policy statement sets a higher standard than what the Sherman Act requires, its inclusion as one of several sources used to define exclusionary conduct and the consumer

welfare standard does not render his analysis so unreliable or unrealistic that his opinion should be excluded.

Google also argues that Dr. Li applies inapt and unreliable counterfactuals to assess competition on the merits. He uses counterfactual scenarios in an effort to measure the claimed harms caused by Google's alleged anticompetitive activities.

Google argues that Dr. Li deploys counterfactuals that improperly assume a but-for world where Google or its rivals would have created more-optimal product designs or created new products faster. For instance, instead of applying a counterfactual where Google never implemented Enhanced Dynamic Allocation, or EDA, Dr. Li's counterfactual assumes the existence of an optimized version of EDA in which publishers could use EDA on an exchange-by-exchange basis to bid on inventory otherwise earmarked for direct deals. (Li Rep. ¶ 958.) He hypothesizes a scenario in which publishers "would have been able to employ methods that would protect the value of direct deals by preventing cream skimming." (Li Rep. ¶ 959.) Google argues that no such version of EDA has ever existed and that this scenario is untethered from reality and therefore unreliable. But Dr. Li points out that one of Google's experts developed a patent that was intended to prevent "cream skimming" while also allowing direct deals to compete with open-auction inventory (Li Rep. ¶ 959 & n. 1512) and opines that Google's implementation of EDA on all inventory precluded rivals from creating alternatives to EDA. (Li. Rep. ¶ 882 ("As Google enforced EDA across all publisher inventory, with no ability to opt out, exchanges had no incentive to develop innovations that would have solved the cream-skimming problem.").) The persuasiveness of Dr. Li's counterfactual is appropriately considered by a jury and not excluded under Daubert.

Google argues that Dr. Li's counterfactuals sometimes impose a "duty to innovate" for optimal product design, and that the Sherman Act includes no requirement that a business release new or improved products. The Court has been unable to identify any passages of Dr. Li's report where he references a "duty to innovate." Instead, he opines that Google's implementation of EDA foreclosed rival ad exchanges from pursuing innovations that attempted to address the problem of "cream skimming." (Li Rep. ¶¶ 45-46, 882, 938-48, 957, 961, 998.)

Google's arguments about Dr. Li's other counterfactuals also are appropriately considered by a jury, such as whether AdX would have moved to a first-price auction prior to 2019 had it not implemented Last Look (Li Rep. ¶¶ 333-43) and whether Google would have encrypted user IDs without the DFP-AdX tie. (Li Reply ¶ 1176 (ECF 1529-5).)

Google argues that Dr. Li's opinions on the so-called "Bernanke" program should be excluded because they analogize Bernanke to predatory pricing and collusion, which are not claims advanced by Gannett and Daily Mail. (See Li Rep. ¶¶ 459-69.) Bernanke adjusted bids made by advertisers that used the Google Ads ad-buying tool, charged the winning bidder more than the price paid to AdX and deposited the difference into pools used to subsidize Google Ads bids on externally competitive impressions. (Li Rep. ¶¶ 408-09.) Dr. Li opines that Bernanke increased Google profits on Google Ads and AdX but decreased publisher revenues. (Li Rep. ¶ 410.) He concludes "that Global Bernanke and its successors harmed competition in the exchange market by enabling Google to secretly adjust bids as if Google Ads bidders were colluding as a cartel on impressions on which the two highest bidders were both from Google Ads." (Li Rep. ¶ 573.) He clarifies that, in his view, "Global Bernanke generates the outcomes of a cartel, not that Google Ads bidders were literally engaged in cartel behavior themselves." (Li Reply ¶ 427.) Dr. Li also includes a detailed discussion of his opinion that Bernanke was

"akin to predatory and anticompetitive pricing." (Li Rep. ¶¶ 457-85.) He opines that by secretly adjusting advertiser bids, Global Bernanke caused advertisers to unknowingly form "bidding rings" that resulted in bidders "behaving like a textbook cartel." (Li Rep. ¶¶ 428-52.) Dr. Li explains that Google concealed Bernanke from the advertisers whose bids were being altered and that Google used this practice to increase its own profits, not those of advertisers. (Li Rep. ¶¶ 400, 446, 452.)

At the summary judgment stage, the Court need not decide whether it would be appropriate to admit testimony before a jury that draw an analogy between Bernanke and other forms of predatory pricing, collusion or a cartel. Dr. Li's use of these legal labels does not render unreliable his descriptions of how Bernanke functioned or his opinions about its claimed anticompetitive effects.

Google's motion to exclude Dr. Li's testimony pinpoints disagreements with certain of his premises and conclusions but does not dispute that the use of counterfactuals and the "consumer welfare standard" are well-accepted methods for analyzing the impact of anticompetitive conduct. The motion to exclude Dr. Li's opinions will be denied.

III. <u>The Motion to Exclude the Opinions of Ali Hortacsu Will Be Denied.</u>

Dr. Hortacsu is an economics professor at the University of Chicago whose research focuses on empirical assessments of market efficiency. (Hortacsu Rep. ¶¶ 3-4 (ECF 1529-3).) Gannett and Daily Mail retained him to quantify damages caused by Google's alleged anticompetitive practices. (Hortacsu Rep. ¶ 1.) He concludes that Daily Mail incurred damages of $599,955,198 and that Gannett incurred damages of $900,771,489, respectively, plus interest and ongoing accrual. (Hortacsu Rep. ¶ 26.)

First, Google challenges Dr. Hortacsu's approach to calculating damages based on a benchmark comparator. Dr. Hortacsu opines that Google charged a supracompetitive take rate

for transactions on AdX, which caused $81.32 million in damages to Daily Mail and $106.10 million in damages to Gannett. (Hortacsu Rep. ¶ 520.) He uses as a benchmark the 5% take rate that Google charged publishers for transacting ads through AdX in programmatic guaranteed ("PG") sales, where a publisher and ad buyer negotiate a fixed price for a guaranteed number of impressions. (Hortacsu Rep. ¶ 588.) These PG sales are different than sales made over AdX for Open Auctions ("OAs") because in PG sales, the buyer is pre-selected through an existing deal with a publisher. (Hortacsu Rep. ¶ 589.) Dr. Hortacsu acknowledges that PG sales do not compete with OA sales and are not substitutes for OA sales. (Hortacsu Rep. ¶ 590.) However, PG sales, like OA sales, take place through "AdX Plumbing" and uses "the same pipes" and "same technology stack" as real-time auction bidding. (Hortacsu Rep. ¶ 592.) In Dr. Hortacsu's view, this shared infrastructure makes the PG take rate a useful benchmark for Google's take rate in real-time auctions. (Hortacsu Rep. ¶ 590-93.) He also states that because PG sales are in a different antitrust market than AdX auction sales, their take rate is not significantly influenced by the take rate used in AdX auctions. (Hortacsu Rep. ¶ 593.)

As the Court explained in Google IV, the use of benchmark models is a widely accepted method to calculate damages in an antitrust case, and courts permit some degree of flexibility in an expert's choice of benchmark, given the low likelihood of identifying a perfect comparison. See 2025 WL 3562687, at *9-10. Dr. Hortacsu acknowledges differences between PG and Open Auction ad sales but concludes that those differences do not explain the gap between take rates. (Hortacsu Rep. ¶¶ 589-93.) The PG benchmark is sufficiently similar to OA sales and does not render the analysis inadmissible. See, e.g., SourceOne Dental, Inc. v. Patterson Companies, Inc., 2018 WL 2172667, at *4-5 (E.D.N.Y. May 10, 2018) (Cogan, J.).

Google argues that Dr. Hortacsu does not link the purportedly inflated take rate to the individual practices that are claimed to be anticompetitive, such as EDA. But at Table 26 of his report, Dr. Hortacsu endeavors to "calculate[e] the take rate in the but-for world in which Google does not engage in the conducts but still wants to achieve its quantity goal in terms of the volume of transactions traded." (Hortacsu Rep. ¶ 579.) That table breaks down how certain Google practices (such as Bernanke, Dynamic Revenue Sharing ("DRS") and Unified Pricing Rules ("UPR")) increased the AdX win rate and the extent to which Google would have had to lower its take rate in order to obtain the same win rate.[1] (Hortacsu Rep. ¶¶ 579-81; see also Hortacsu Reply ¶ 402 (ECF 1529-6).)

Google also challenges Dr. Hortacsu's use of an "Auction Pressure Model" that purports to measure the "negative 'auction pressure' effect" that Google's conduct had on publisher ad-sale revenue. (Hortacsu Rep. ¶¶ 299-415.) Google argues that his model is based on faulty estimates of the opportunity costs of auction participants who used AdX and non-AdX ad-exchanges. The concept of "auction pressure" refers to the relationship between the highest bid and the number of total bidders, and is premised on widespread learning that when an auction has more participants, the winning bid will likely be higher compared to an auction with fewer participants. (Hortacsu Rep. ¶ 300.) Dr. Hortacsu opines that if more third-party ad exchanges had access to publisher inventory, more advertisers would have had bidding access to that inventory, and publishers would have received higher sale prices. (Hortacsu Rep. ¶ 301.) He

[1] "To generate the same win rate change as DRS (1.59 percent), Google would have had to lower its AdX take rate 4.35 percentage points, from 20 percent to 15.65 percent. To generate the same win rate change as UPR (6.48 percent), Google would have had to lower its AdX take rate 16.18 percentage points, from 20 percent to 3.82 percent." (Hortacsu Rep. ¶ 580.) "For Bernanke, Global Bernanke, Last Look, and Alchemist, the increase in the AdX win rate is so large that it would not be possible to achieve this change in the win rate through simple changing the AdX take rate. Since the combined AdX and DSP take rate is relevant, Google may have had to lower the combined take rate by more than 20 percentage points to achieve the comparable increase in the AdX win rate." (Hortacsu Rep. ¶ 581.)

concludes that since 2017, Google's anticompetitive conduct in the ad-exchange market was responsible for lower auction pressure that caused $234 million in damages to Daily Mail and $116 million in damages to Gannett. (Hortacsu Rep. ¶ 302.)

Google argues that Dr. Hortacsu's auction-pressure simulation is not based on sufficient data and should be excluded. Dr. Hortacsu explains that he "estimate[d] how many more third-party exchanges would have participated in auctions in the but-for scenario with higher auction pressure and I simulate the auction clearing prices with this increased exchange participation." (Hortacsu Rep. ¶ 353.) He opines that Google's auction manipulations favored AdX and Google's ad-buying tools, which increased AdX's likelihood of winning an auction and reduced third-party exchanges' opportunity to win. (Hortacsu Rep. ¶ 310.) He also opines that Google has used EDA to "throttle" header bidding and that Google's ad server forces header bidders into a "timeout" that often excludes their bids from auction. (Hortacsu Rep. ¶¶ 332-33.)

According to Google, Dr. Hortacsu's "auction pressure" model is unreliable because it assumes "a very low opportunity cost of entry to the auction" for advertisers who bid using AdX. (Hortacsu Rep. ¶ 374.) Dr. Hortacsu opines that non-AdX bidders, including those using header bidding, have a higher opportunity cost and are therefore less likely to bid. (Hortacsu Rep. ¶¶ 380-82.) In this context, "opportunity cost" refers to the relative costs of a bidder's auction participation. (See, e.g., Hortacsu Reply ¶ 145.) Google argues that Dr. Hortacsu's analysis of opportunity costs is based on unsupported assumptions, pointing to his observation that, as to Gannett, header bidders bid more frequently than AdX on Gannett's inventory, which suggests that header bidders did not have higher opportunity costs than AdX bidders. In his Reply Report, Dr. Hortacsu states that he based his opportunity-cost estimates on more than 2,000,000 data points from 800,000 auctions. (Hortacsu Reply ¶ 144.) He also states

that Google mistakenly aggregates the participation of multiple header bidder exchanges, and that AdX bid volume far exceeds that of any individual rival exchange. (Hortacsu Reply ¶ 161.)

Google's arguments about Dr. Hortacsu's auction-pressure simulation and his calculation of opportunity costs do not support preclusion and are proper grounds of cross-examination. Google's expert, Judith Chevalier, Ph.D., testified in her deposition that her criticisms of Hortacsu's analysis are limited to "informational assumptions" and that he selected a model that reasonably applies to ad tech. (Chevalier Dep. 184 (ECF 1529-16).) She stated in her deposition that Dr. Hortacsu's models are based on "very famous papers" and that "to the extent I have criticisms of Professor Hortacsu's report or his analysis, it's not because he misapplied Athey, Levin, and Seira or Guerre, Perrigne, and Vuong." (Chevalier Dep. 185-86.) Dr. Hortacsu's estimate of bidder opportunity costs in his auction-pressure analysis go to the weight and not the admissibility of his testimony. Restivo, 846 F.3d at 577.

Google's motion to exclude the opinions of Dr. Hortacsu will be denied.

GOOGLE'S MOTION FOR SUMMARY JUDGMENT AGAINST GANNETT AND DAILY MAIL WILL BE GRANTED AS TO THEIR NEW YORK GENERAL BUSINESS LAW CLAIMS BUT OTHERWISE DENIED.

I. Google's Summary Judgment Motion Directed to Certain Bidding Practices Will Be Denied.

Google moves for summary judgment in its favor as to claims based on bidding-related practices that were not part of Judge Brinkema's findings and conclusions in the E.D. Va. Action and therefore not subject to issue preclusion in Google III. The parties refer to these practices as the "Non-Precluded Acts." Google argues that no reasonable jury could find it liable for monopolization or attempted monopolization because there is no evidence that these practices harmed competition in the markets for ad servers or ad exchanges.

A. Enhanced Dynamic Allocation.

Gannett and Daily Mail have pointed to evidence that could permit a reasonable jury to conclude that Enhanced Dynamic Allocation, or "EDA," harmed competition in the ad-exchange market.

Gannett and Daily Mail assert that through EDA, Google redirected publishers' premium inventory away from negotiated direct deals and made them available for programmatic bids on AdX. (Li Rep. ¶ 878.) This creates a so-called "cream-skimming problem" that lets AdX poach publishers' direct deals, with the particulars of EDA allowing AdX to transact a sale no matter how high the direct price and causing adverse-selection problems that drove down advertisers' willingness to engage in direct deals. (Li Rep. ¶¶ 880-82, 885-95, 901-27.) Dr. Li concludes that EDA also advantaged AdX over third-party exchanges because only AdX had the ability to siphon off these high-value impressions. (Li Rep. ¶¶ 896-899, 928-35, 953-56.) Dr. Li also opines that EDA "probabilistically throttled" header bidders, "gave publishers no choice about which exchanges could bid on direct-deal inventory" and "leveraged" the DFP-AdX product tie. (Li Rep. ¶ 45.)

In an internal email chain of September 2016, Google employees discussed the competitive implications of EDA and what they generally viewed as unfair and inaccurate external criticisms of the practice. (ECF 1651-29.) One employee wrote, "The 'unfair advantage' comes from historically third-party exchanges cannot compete with AdX through EDA on the similar footing." (Id. at 3.) That employee elaborated, "[w]ith EDA on we set the reserve price at $1, and any AdX buyer including GDN [i.e., Google Display Network] can win over the query as long as they bid more than $1. This transaction happens before we actually call Pubmatic [i.e., a rival ad exchange] and get their actual bids." (Id.)

Gannett and Daily Mail have pointed to evidence that would permit a reasonable jury to conclude that EDA harmed competition in the ad-exchange market.

B. Minimum Bid to Win.

Google adopted the Minimum Bid to Win initiative, or "MBTW," when it transitioned to a first-price auction in 2019 and stopped employing the Last Look practice. Under MBTW, the DFP ad server shared with AdX bidders and participants in exchange bidding information on the lowest bid they would have needed to win a just-concluded auction, which had the effect of telling the winning bidder how much it overpaid. (Li Rep. ¶¶ 695-96.) A Google engineer specializing in advertisers' ad-buying tools has explained MBTW as follows:

> Using machine learning, Google Ads models expected competition in prospective auctions by constructing a distribution of the bid landscape on any given auction based on bid data from past auctions, including (since 2019) minimum-bid-to-win data. This modeling then enables Google Ads to calculate the probability of winning for different bids and subsequently the optimal bid(s) to submit to the ad exchange to generate the best returns for the advertiser subject to achieving the aggregate take rate that Google Ads targets.

(Jayaram Dec. ¶ 23 (ECF 1529-42).) Dr. Li opines that MBTW depressed the prices paid for publisher ad impressions and permitted advertisers who bid through AdX to predict with precision the amount required for a winning bid. (Li Reply ¶¶ 623-33, 657.) This informational advantage was unique to advertisers who transacted through AdX, and other exchanges did not share with advertisers the predicted minimum bid needed to win at auction. (Li Rep. ¶¶ 695, 697 n. 1067.)

Dr. Li opines that MBTW harmed competition in the market for ad exchanges because it discouraged advertisers from bidding on rival exchanges. (Li Rep. ¶¶ 731-33.) He also opines that MBTW is "allocatively inefficient" because advertisers who otherwise would

have placed the highest bid do not participate at auction, resulting in decreased overall welfare to all auction participants. (Li Rep. ¶ 754; see also Li Rep. ¶¶ 224-36.)

Gannett and Daily Mail have pointed to evidence that would permit a reasonable jury to find that MBTW harmed competition in the market for ad exchanges, and Google's challenges to Dr. Li's conclusions are best weighed by a jury. Google's summary judgment motion will be denied.

C. "Bernanke" and "Alchemist."

Google has implemented evolving iterations of a bidding practice that has the broad label of "Bernanke" and includes the original Project Bernanke (2013-2015), Global Bernanke (2015-2019), Project Bell v2 (2016-2019) and Alchemist (2019-present). (Li Rep. ¶ 403.)

Though the mechanics of how Bernanke operated are complex, Gannett contends Bernanke uses the Google Ads ad-buying tool to inflate and deflate advertiser bids on the AdX exchange to advantage the advertiser clients of Google Ads, "usually to the expense of a bidder in a different exchange." (Li Rep. ¶¶ 404-07.) Google subsidized the higher advertiser bids through dedicated pools, which initially were publisher-specific but transitioned to a single pool under Global Bernanke. (Li Rep. ¶¶ 409, 417.) Gannett and Daily Mail contend that as a result of Bernanke, AdX sold impressions at the expense of other exchanges, Google Ads won at the expense of other ad-buying tools bidding on AdX, and publishers received depressed revenues on their sales. (Li Rep. ¶¶ 408-12.)

Importantly, Gannett and Daily Mail are not urging that Bernanke is evidence of monopolization or attempted monopolization in the market for ad-buying tools, which they do not contend is an antitrust product market. Thus, the claim does not depend on a showing of

market power in ad-buying tools or injury to ad buyers. Rather, plaintiffs contend that Google used its ability to control the Google Ads ad-buying tool to manipulate bids in favor of AdX and increase AdX's share in the market for ad exchanges.

An internal Google memorandum suggests awareness that Bernanke gave AdX a competitive advantage over other ad exchanges:

> The current Bernanke increases the AdX win rate from 37% to 44% (match rate = 50%) and increases revenue by $290m. By removing the fixed publisher margin constraint we can increase the conversion volume for advertisers and increase GDN revenue by up to $200m resulting in an AdX win rate going up to ~51 % (match rate = 55%).

(ECF 1529-48 at 2 (emphasis omitted).) Other emails and documents within Google compared Bernanke to an unlawful "bidding ring" cartel. An email of February 17, 2017 stated in part, "IANAL [i.e., I am not a lawyer], but the buyers are currently implementing a 'bidding ring' which the FTC has declared illegal in many instances (wine auctions, art auctions, etc.). So I think we're on the right side of this in trying to fix it." (ECF 1530-10 at 2.) An apparent draft presentation dated July 18, 2017 included the following passage: "The strategy is reminiscent of a bidding ring in an auction: one member of the ring bids just enough to win the item, while the other players sit on their hands." (ECF 1530-12 at 8.)

Other emails emphasized the need to maintain secrecy around Bernanke. An email of June 15, 2017, stated, "We can't talk about this at all. I recognize this is frustrating and lacks an escalation path so I'll push this one more time, however i keep hitting a 'the first rule about Bernanke is we don't talk about Bernanke' situation.'" (ECF 1530-13 at 3.) A message in the same chain stated, "FYI - Recognizing that Bernanke shouldn't be spoken of in any way, shape, or form externally (or internally on the sales side) I'm still getting pressure to at least establish a Bernanke escalation path." (ECF 1530-13 at 2.)

Dr. Li opines that Global Bernanke functioned in a manner analogous to a bidding cartel, whereby a group of bidders shared information before an auction and coordinated bids to raise their collective profits. (Li Rep. ¶ 428.) He explains that the practice differed from a traditional bidding ring because instead of boosting the profits of advertiser clients, Global Bernanke increased the number of impressions won by Google Ads and AdX. (Li Rep. ¶¶ 429, 437.)

The Court concludes that Daily Mail and Gannett have pointed to evidence that would permit a reasonable jury to find that Google's implementation of Project Bernanke caused competitive harm in the ad-exchange market.

D. "Poirot."

With the so-called Poirot initiative, Google adjusted advertiser bids in the advanced DV360 ad-buying tool to reduce the volume of bids made on rival exchanges and increase the volume of bids on AdX. (Li Rep. ¶ 1296.) As described by Dr. Li, Poirot "shades bids" submitted to rival exchanges "that do not run a 'clean' second-price auction," meaning that they run a first-price auction or use "soft floors." (Li Rep. ¶ 1297.)

Plaintiffs contend that Poirot was an anticompetitive practice in the period of 2019 to 2022, when it adopted what Li calls a "pretextual 'risk aversion' parameter" that "raised DV360's bids on AdX." (Li Reply ¶ 1182; Li Rep. ¶ 1298; Google 56.1 ¶ 133; Pl. 56.1 Resp. ¶ 133.) Dr. Li opines that the risk-aversion parameter was "illogical" and that he found no evidence that bidders held different levels of risk aversion between AdX and other exchanges. (Li Rep. ¶¶ 1299-1300.) "As Poirot lowered DV360 bids on certain third-party exchanges, but not on AdX, the effect was to shift DV360 spend toward AdX and away from third-party exchanges." (Li Rep. ¶ 1307.) He opines that Poirot can only be explained as a measure

intended to increase AdX's win rate and deprive rival exchanges of scale, which enabled AdX to charge a supracompetitive take rate that lowered publisher revenues. (Li Rep. ¶¶ 1301, 1303.) Dr. Li also cites and summarizes internal Google documents observing that Poirot had "been quite effective" at counteracting header bidding while causing DV360 to spend 7% more on AdX and reducing spend on rival exchanges. (Li Rep. ¶ 1330.) Dr. Li calculates that Poirot increased AdX revenue by 7.5% and reduced spending on rival exchanges by 14.7%. (Li Rep. ¶ 1351.)

The Court concludes that Daily Mail and Gannett have pointed to evidence that would permit a reasonable jury to find that Google's implementation of Poirot caused competitive harm in the ad-exchange market.

E. Other Acts.

Google moves for summary judgment to the extent that Gannett and Daily Mail challenge Google's acquisition of Admeld and DoubleClick. In response, plaintiffs state that they are not advancing any claim based on the acquisitions, though indicate that they may seek to offer evidence pertaining to them. (See ECF 1662 at 6.) The Court will not address the possible relevance of such background evidence at this juncture.

Google also moves for summary judgment as to any claim asserting that the Google Ads ad-buying tool was restricted to bidding solely on AdX and did not allow for bidding on rival exchanges. But plaintiffs' complaints acknowledge that Google Ads has been bidding on non-AdX exchanges since 2016, though it called such activity "limited" and "immaterial." (See, e.g., Daily Mail Third Am. Compl't ¶ 95 (ECF 1196).) In opposition, Gannett and Daily Mail make the argument that this Court's application of issue preclusion in Google III estops Google from disputing the existence of "the AdX/Google Ads tie." (ECF 1662 at 15.) As will be shown, the Court made no such ruling, plaintiffs' complaints do not appear to

assert the existence of such a tie and instead describe a DFP/AdX tie, and Judge Brinkema did not find an "AdX/Google Ads tie." In reference to Google Ads, she concluded that inventory from Google Ads (f/k/a AdWords) was "largely limited" to AdX and that this "unique advertising demand . . . helped Google maintain the power to keep charging AdX publishers a 20% take rate." United States v. Google, 778 F. Supp. 3d at 854. This is not a finding of an unlawful tie between Google Ads and AdX. This Court's ruling in Google III did not apply issue preclusion to any purported AdX/Google Ads tie; it did estop Google, however, from denying the existence of an unlawful tie between DFP and AdX. Gannett and Daily Mail are not precluded from offering evidence on the relationship between Google Ads and AdX, but they have not asserted the existence of an unlawful product tie between the two.

## II. Plaintiffs Have Pointed to Evidence of Antitrust Injury Caused by Enhanced Dynamic Allocation.

Google argues that Gannett and Daily Mail do not have evidence that they suffered antitrust injury as a consequence of Enhanced Dynamic Allocation, or EDA. Plaintiffs contend that they were injured because Google used its monopoly power in the ad-server market to channel valuable impressions already sold in direct deals to AdX and set price floors for these impressions that were lower than the already agreed-upon price in the direct deal. Plaintiffs urge that a reasonable jury could find that they suffered antitrust injury because Google depressed their revenues for these impressions, using its monopoly power in the ad-server market to advantage AdX.

Google argues that there can be no antitrust injury based on the loss of direct ad sales because direct sales are neither included in a relevant product market nor a separate product market alleged in this case. But plaintiffs' theory of injury is that Google used its monopoly power in the ad-server market to channel direct sales onto AdX, where the

impressions' price floors were manipulated so that the sale could by cleared through an AdX transaction. Before EDA was implemented, DFP prioritized fulfilment of publishers' direct sales. (Hortacsu Rep. ¶¶ 72, 76.) Under EDA, AdX stopped prioritizing those direct deals and instead assigned a temporary price that was lower than what the publisher had already assigned to the direct deal. (Hortacsu Rep. ¶¶ 77-80.) Dr. Hortacsu concludes that EDA decreased the global value of direct sales by approximately 24.1%. (Hortacsu Rep. ¶ 119; Li Rep. ¶ 994.) Internally, Google described EDA as a way to let "AdX/AdSense buyers cherry-pick higher revenue impressions while respecting the delivery constraints of the reservation ads." (Hortacsu Rep. ¶¶ 82-83.) At least some publishers complained to Google that their business relationships with advertisers were being harmed by the failure to fulfill their direct sales to advertisers. (Hortacsu Rep. ¶ 78 n. 115, 116.)

Plaintiffs' theory of injury asserts that Google used monopoly power in the market for ad servers to coercively de-prioritize plaintiffs' direct sales to advertisers in favor of sales made through AdX at prices lower than what was agreed upon in the direct deal. The claimed injury was caused by programmatic ad sales carried out through the product markets of ad servers and ad exchanges, and occurred "within that area of the economy endangered by that breakdown of competitive conditions" caused by Google's monopoly power. See Blue Shield of Virginia v. McCready, 457 U.S. 465, 481 (1982) (quotation marks, brackets and ellipsis omitted); see also United States v. Live Nation Ent., Inc., 2026 WL 456804, at *33-34 (S.D.N.Y. Feb. 18, 2026) (denying defendant's summary judgment motion on issue of antitrust injury because plaintiffs who "directly interact" with an alleged price fixer are at the "fulcrum" of "the antitrust violation and the injury") (Subramanian, J.).

A reasonable jury could find that EDA caused antitrust injury to Gannett and Daily Mail, and Google's motion directed to EDA will be denied.

III. The FTAIA Does Not Apply to the Claims of Gannett and Daily Mail.

Google moves for summary judgment to the extent that Gannett and Daily Mail seek damages for losses outside of the United States, which they distinguish as "rest of world" or "ROW" damages. They argue that any such damages are wholly foreign in nature and do not fall within the exclusions of the Foreign Trade Antitrust Improvements Act ("FTAIA"), 15 U.S.C. § 6a.

Dr. Hortacsu provides different calculations for plaintiffs' United States damages and those for the rest of the world. (Hortacsu Rep. ¶ 26.) Dr. Hortacsu calculates that Daily Mail has suffered $216,880,035 in United States damages and $383,075,163 in rest-of-world damages, and that Gannett has suffered $797,831,266 in United States damages and $102,940,233 in rest-of-world damages. (Hortacsu Rep. ¶ 26.)

The Supreme Court has explained that the FTAIA "excludes from the Sherman Act's reach much anticompetitive conduct that causes only foreign injury. It does so by setting forth a general rule stating that the Sherman Act 'shall not apply to conduct involving trade or commerce . . . with foreign nations.' It then creates exceptions to the general rule, applicable where (roughly speaking) that conduct significantly harms imports, domestic commerce, or American exporters." F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 158 (2004) (quoting 15 U.S.C. § 6a) (ellipsis in original). The statute "seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets." Id. at 161. "Congress enacted the FTAIA in part 'to boost' American exports by making it clear to American exporters

and to firms doing business abroad that the Sherman Act does not prevent them from entering into anticompetitive business arrangements as long as only foreign markets are adversely affected." Biocad JSC v. F. Hoffmann-La Roche, 942 F.3d 88, 99 (2d Cir. 2019). Importantly, "the FTAIA's general rule applies where the anticompetitive conduct at issue is foreign." Empagran, 542 U.S. at 163.

The FTAIA states in relevant part:

> Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--
> **(1)** such conduct has a direct, substantial, and reasonably foreseeable effect--
> **(A)** on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> **(B)** on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
> **(2)** such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.

"The FTAIA generally excludes wholly foreign conduct from the reach of the Sherman Act, but brings such conduct back within the statute's scope where two requirements are met: (1) the foreign conduct has a 'direct, substantial, and reasonably foreseeable effect' on U.S. domestic, import, or certain export commerce, and (2) that effect 'gives rise to a claim under' the Sherman Act." Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 413-14 (2d Cir. 2014) (quoting 15 U.S.C. §§ 6a(1), 6a(2)).

Plaintiffs in Empagran included both foreign and domestic vitamin purchasers who asserted that foreign and domestic vitamin manufacturers and distributors entered into a price-fixing conspiracy. 542 U.S. at 159. The foreign purchasers bought vitamins from foreign

manufacturers for delivery outside of the United States and did not claim to transact in United States commerce. Id. at 159-60. The Supreme Court concluded that while domestic purchasers could bring a Sherman Act claim directed to the conspiracy, the FTAIA barred foreign purchasers' claims because they "rest[ed] solely on the independent foreign harm." Id. at 159. While some of the price-fixing conduct happened in the United States, the inflated foreign prices were not a consequence of that domestic anticompetitive conduct, and the FTAIA "sought to release domestic (and foreign) anticompetitive conduct from Sherman Act constraints when that conduct causes foreign harm. Congress, of course, did make an exception where that conduct also causes domestic harm." Id. at 165-66 (emphasis in original). The Supreme Court concluded that the FTAIA did not allow for the claims of foreign purchasers injured by foreign conduct even though the broader price-fixing conspiracy also had a domestic effect on domestic purchasers. Id. at 173-75.

Applying Empagran, the Second Circuit concluded in Lotes "that the domestic effect must proximately cause the plaintiff's injury." 753 F.3d at 414. In Lotes, a Taiwan plaintiff claimed to have been injured by foreign defendants' coordination and attempted monopolization in the USB-connector industry, specifically as to the licensing of patents and the foreign litigation activities of companies based in Taiwan and China. Id. at 401-02. The Second Circuit assumed that defendants' conduct had a direct, substantial and reasonably foreseeable effect on United States trade and commerce under section 6a(1), but concluded that this domestic effect did not give rise to plaintiff's claim under section 6a(2). Id. at 409-15. This is because defendants' foreign activities allegedly excluded plaintiff from the product market, resulting in higher prices to United States consumers. Id. at 414. Thus, the Lotes plaintiff's claimed injury

preceded any domestic effect, and plaintiff's claim did not arise out of the domestic effect. Id. at 414-15.

Google's activities and the claims of Gannett and Daily Mail do not resemble those at issue in Empagran and Lotes. First, the proposed "rest of world" damages are not directed to "wholly foreign conduct." See generally Lotes, 753 F.3d at 413-14. Defendants Alphabet Inc. and Google LLC are United States-based firms. (See, e.g., Daily Mail 3d Am. Compl't ¶¶ 13-14.) There is evidence that Google's monopolization of the product markets for ad servers and ad exchanges was planned and implemented from the United States. (Pl. 56.1 ¶¶ 93-99; Def. 56.1 Resp. ¶¶ 93-99 (ECF 1673).) Gannett and Daily Mail point to evidence that the DFP/AdX product tie caused rival ad servers in the United States to go out of business. (Pl. 56.1 ¶ 109; Def. 56.1 Resp. ¶ 109.) Among AdX's major rivals in the ad-exchange market, six are United States-based companies and two are based in foreign countries. (Pl. 56.1 ¶¶ 110-17; Def. 56.1 Resp. ¶¶ 110-17.) This is evidence that Google's conduct in monopolizing the ad-server and ad-exchange product markets was domestic in nature. There is no evidence of wrongdoing by a foreign defendant, as was the case in Empagran and Lotes, nor is Google's monopolization of the ad-server and ad-exchange markets directed to the foreign markets for those products. A reasonable jury could find that Google's conduct does not fall within the reach of the FTAIA because it is not "wholly foreign." Lotes, 753 F.3d at 413-14.

But even if Google's conduct is subject to scrutiny under the FTAIA, plaintiffs have pointed to evidence that would permit a reasonable jury to conclude that Google's conduct falls within the FTAIA's exemption because it had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, and that "that effect 'gives rise to a claim under' the Sherman Act." Lotes, 753 F.3d at 413-14; 15 U.S.C. § 6a(1), (2). The "domestic effects

exception" applies to "foreign conduct that has a direct, substantial, and reasonably foreseeable effect on import or domestic commerce and that gives rise to a Sherman Act claim." Biocad, 942 F.3d at 94. The domestic effects of Google's monopolization include the foreclosure of competition in the relevant product markets for ad servers and ad exchanges. Plaintiffs assert that Google exercised its unlawfully acquired monopoly power by depressing revenues from their ad sales and charging publishers inflated take rates. Some of those ad sales were for a domestic audience and others were for the "rest of world" audience, but the claimed anticompetitive conduct responsible for the loss had a "direct, substantial, and reasonable foreseeable effect" on domestic commerce. Lotes, 753 F.3d at 413-14; 15 U.S.C. § 6a(1).

Google's summary judgment motion premised on application of the FTAIA will be denied.

## IV. Google's Summary Judgment Motion Will Be Granted as to the New York General Business Law Claims.

Gannett and Daily Mail each bring claims under the New York General Business Law ("GBL"). Daily Mail brings a claim of deceptive business practices under GBL section 349 and Gannett brings the same claim under GBL sections 349 and 350. (Daily Mail 3d Am. Compl't ¶¶ 272-84 (ECF 1196); Gannett 2d Am. Compl't ¶¶ 281-94).) Because no reasonable jury could conclude that Google's alleged deceptions were consumer-oriented, Google's summary judgment motion directed to the GBL claims will be granted.

GBL section 349(a) states that "[u]nfair, deceptive or abusive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." Similarly, section 350 states that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." "The standard for recovery under General Business Law § 350,

while specific to false advertising, is otherwise identical to section 349." Goshen v. Mut. Life Ins. Co. of New York, 98 N.Y.2d 314, 324 n.1 (2002). "Given this overlap, 'courts have found that the scope of § 350 is as broad as that of § 349 . . . and that its essential elements are the same.'" Duran v. Henkel of America, Inc., 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (Engelmayer, J.) (quoting Braynina v. TJX Cos., 2016 WL 5374134, at *4 (S.D.N.Y. Sept. 26, 2016) (Failla, J.)).

"A plaintiff under section 349 must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." Stutman v. Chemical Bank, 95 N.Y.2d 24, 29 (2000). "[B]usiness entities can qualify as 'consumers' if the products or services purchased are consumer goods or their equivalent . . . ." Singh v. City of New York, 40 N.Y.3d 138, 148 (2023). "[A]n act or practice is consumer-oriented when it has a broader impact on consumers at large" and is not limited to products purchased "for personal, family, or household use." Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc., 37 N.Y.3d 169, 177 (2021). Whether an act or practice is consumer oriented does not "depend on the use to be made of the product." Id.

"Moreover, section 349 is aimed at 'modest' transactions rather than complex or unique arrangements in which 'each side was knowledgeable and received expert representation and advice.'" Singh, 40 N.Y.3d at 148 (quoting New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 321 (1995)). Singh concluded that entities that participated in auctions for yellow-cab medallions did not engage in a consumer-oriented transaction because they sought "a highly-conditioned government license to operate a taxi business" and because the auction was "not by any means a 'modest' transaction" but instead "a multi-hundred-million-dollar auction" in which

the plaintiffs were represented by "a sophisticated party with knowledge of and experience in the for-hire-vehicle industry." 40 N.Y.3d at 148; see also Genesco Entertainment v. Koch, 593 F. Supp. 743, 752 (S.D.N.Y. 1984) (section 349 does not apply to "a 'single shot transaction' involving complex arrangements, knowledgeable and experienced parties and large sums of money.") (Weinfeld, J.). Himmelstein, by contrast, concluded that defendant's sale of a manual on landlord-tenant law marketed to legal professionals was consumer-oriented conduct, noting that such conduct "need not be directed to all members of the public." 37 N.Y.3d at 177-78 (quotation marks omitted).

Google points to evidence that Gannett and Daily Mail are large, highly sophisticated companies with a strong understanding of the ad tech at issue, and that they entered into ad-tech arrangements tailored to their specific needs. Each has characterized itself as a "large publisher." (Def. 56.1 ¶¶ 22, 28; Pl. 56.1 Resp. ¶¶ 22, 28 (ECF 1522).) Gannett's Rule 30(b)(6) deponent described the company as "quite sophisticated" at "digital ad selling." (Def. 56.1 ¶ 23; Pl. 56.1 Resp. ¶ 23.) Gannett and Daily Mail both stated in interrogatory responses that they "constantly monitor[ ] the performance of [their] ad tech partners" and make changes if they are not providing added value. (Def. 56.1 ¶¶ 27, 31; Pl. 56.1 Resp. ¶¶ 27, 31.) Daily Mail has stated that it "operates a sophisticated tech stack" and that its advertising division employs "programmatic analysts," "infrastructure experts" and more than a dozen engineers. (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.) Daily Mail also conducts "research with due diligence" about its ad-tech tools. (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 32.)

Drawing every reasonable inference in favor of Gannett and Daily Mail as the non-movants, the Court concludes that no reasonable jury could find that Google's alleged deceptions about the functions of its ad tech products, such as their statements about the

implementation of EDA and Bernanke, were consumer-oriented activities. These highly sophisticated and well-resourced plaintiffs negotiated and entered into agreements to use Google's ad-tech products, which they used to sell billions of ad impressions and garner hundreds of millions of dollars in revenue. These were not "'modest' transactions" that fall under the GBL's ambit but "complex [and] unique arrangements" that were entered into and supervised by sophisticated experts. Singh, 40 N.Y.3d at 148. Plaintiffs may be correct that the claimed deceptions affected many other publishers and billions of individual transactions, but it has been asserted throughout this multidistrict litigation that customers of the DFP ad server tend to be sophisticated and well-resourced publishers, in contrast to the small publishers that use Google's simpler AdSense product. Even accepting the assertions of Gannett and Daily Mail that publishers suffered widespread harm based on Google's deceptions about bidding practices (e.g., EDA and Bernanke) the sophisticated customers of DFP retained at least some ability to fine-tune and adjust the ad server's settings to suit their needs. The magnitude of the transactions and the particulars unique to each publisher's use of the ad tech preclude any finding that Google's purported deceptions were consumer-oriented activity.

Google's summary judgment motion will therefore be granted as to Gannett and Daily Mail's claims brought under the New York General Business Law.

V. Google's Motion Directed to Gannett's Unjust Enrichment Claim Will be Denied.

Gannett brings a claim of unjust enrichment, asserting that Google manipulated its online advertising auctions in deceptive ways that went beyond the scope of Gannett's contracts with Google. (Gannett 2d Am. Compl't ¶¶ 300-04.) Specifically, it asserts that "Google employed Dynamic Allocation, Enhanced Dynamic Allocation, Project Bernanke, Uniform Pricing Rules, and other schemes to monopolize the ad-serving and exchange markets, and to

depress prices for publishers' inventory. In executing these schemes, Google used DFP to prevent publishers from soliciting competitive bids from rival exchanges and rigged AdX's bids by trading on inside information." (Gannett 2d Am. Compl't ¶ 301.)

Google argues that Gannett's unjust enrichment claim fails as a matter of law because the alleged deceptions are governed by Gannett's contracts for the use of DFP and AdX, which preclude the unjust enrichment claim and requires summary judgment in Google's favor.

"The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987). "[A] contract will displace an unjust enrichment claim only if the subject matter of the dispute is within the scope of the agreement." Edmar Fin. Co., LLC v. Currenex, Inc., 2023 WL 3570017, at *21 (S.D.N.Y. May 18, 2023) (Kaplan, J.) (citing Clark-Fitzpatrick, 70 N.Y.2d at 389; Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.")); see also Allianz Global Investments GmbH v. Bank of Am. Corp., 463 F. Supp. 3d 409, 433 (S.D.N.Y. 2020) ("where Plaintiffs allege a manipulation of the market overall, such conduct is not governed by ISDA Master Agreements because it does not arise out of the subject matter of the agreements.") (Schofield, J.).

Google has not pointed to language in its agreements with Gannett that go to the purported deceptions that form the basis of Gannett's unjust enrichment claim, with the exception of certain terms that purportedly relate to MBTW. (Def. 56.1 ¶ 115(b); Pl. 56.1 Resp. ¶ 115(b).) But the unjust enrichment claim does not reference MBTW, and Google does not

otherwise identify language that directly or impliedly governs the subject matter of the unjust enrichment claim. See Edmar, 2023 WL 3570017, at *21.

To the extent that Google challenges Hortacsu's calculation of damages for unjust enrichment, Google's arguments are more properly raised to a jury.

Google's motion for summary judgment as to Gannett's unjust enrichment claim will be denied.

VI. Google's Motion for Summary Judgment on Statute of Limitations Grounds Will Be Denied.

Google moves for summary judgment on the basis that Gannett and Daily Mail's claims are time-barred in their entirety. The motion will be denied.

Plaintiffs' Sherman Act claims are subject to a four-year limitations period. 15 U.S.C. § 15b. The limitations period is tolled in at least three circumstances.

First, "'the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class,'" including for plaintiffs who bring individual actions prior to resolution of a motion for class certification. In re WorldCom Securities Litig., 496 F.3d 245, 255 (2d Cir. 2007) (quoting Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 353-54 (1983)); see also American Pipe & Constr. Co. v. Utah, 414 U.S. 538 (1974).

Second, a Sherman Act claim may be timely if it falls within the continuing-violation rule, which provides that the limitations period "does not only run from a defendant's initial act" if defendant's violative conduct "inflicts continuing and accumulating harm." U.S. Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 67 (2d Cir. 2019) (quotation marks omitted; citing Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 502 n. 15 (1968)). The continuing-violation rule applies when the defendant commits a new overt act that inflicts a new and accumulating injury, as opposed to merely reaffirming a previous bad act. Id. at 67-69.

In "a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." Id. at 67. In U.S. Airways, however, plaintiff's claims were premised upon anticompetitive contracts that it entered with defendant, in which case each supracompetitive overcharge was not an independent act that supported a continuing violation but a manifestation of the underlying bad act that occurred when the parties entered their agreement. See id.

Additionally, the customer of a monopolist is injured whenever it makes an overpayment attributable to the unlawful monopoly power. "Although the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price." Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 (2d Cir. 1979). "So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide." Id. "[I]t would undercut enforcement of the Sherman Act to hold that, if a monopolist merely retains its illicit market control for four years after its last anticompetitive action, it may charge an exorbitant price until its power is eviscerated in an appropriate suit for equitable relief." Id. at 296. "We hold, therefore, that a purchaser suing a monopolist for overcharges paid within the previous four years may satisfy the conduct prerequisite to recovery by pointing to anticompetitive actions taken before the limitations period." Id.; see also Connecticut v. Sandoz, Inc., 2025 WL 3043397, at *8-11 (D. Conn. Oct. 31, 2025) (claim of years-long price-fixing

scheme was not time-barred because supracompetitive sales were overt acts constituting a part of the violation).[2]

Third, the limitations period is tolled if the plaintiff proves fraudulent concealment. "[A]n antitrust plaintiff may prove fraudulent concealment sufficient to toll the running of the statute of limitations if he establishes (1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." State of N.Y. v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988).

A table at Appendix A to Google's memorandum sets forth the dates of different publishers' putative class action complaints that asserted categories of anticompetitive conduct at issue. (ECF 1361-1.) A complaint of December 15, 2020 alleged claims directed to the DFP/AdX product tie, Last Look and Google's practice of restricting Google Ads bids to AdX. (Id.) A complaint of December 23, 2020 first alleged claims directed to the Dynamic Allocation and EDA. (Id.) A complaint of December 4, 2022 first alleged claims directed to the existence of Dynamic Revenue Share and its variants. (Id.) Pursuant to American Pipe principles, Daily Mail and Gannett's Sherman Act claims are timely if they accrued within four years of the filing of these complaints.

Gannett and Daily Mail have pointed to evidence that would permit a reasonable jury to conclude that their claims are timely. Gannett and Daily Mail each signed contracts in 2017 for the use of AdX and DFP. (Pl. 56.1 ¶ 189; Def. 56.1 Resp. ¶ 189.) On the tying claim,

[2] On remand from the Second Circuit, Judge Schofield distinguished Berkey Photo from U.S. Airways, noting that U.S. Airways involved the parties' performance under an anticompetitive contract, which was not at issue in Berkey. U.S. Airways, Inc. v. Sabre Holdings Corp., 2022 WL 1125956, at *6 (S.D.N.Y. Apr. 15, 2022)

the DFP/AdX product tie was first implemented in 2010 but was contractually renewed in 2018. (See ECF 1533-1 ("In order to continue using AdX and DFP, you will need to sign a new combined contract that includes terms for both products. This will replace your current individual AdX and DFP contacts.").) Gannett and Daily Mail point to evidence that Google continued to re-impose the tie after 2018 through various agreements and took additional overt acts to strengthen the product tie, such as taking design steps that made it difficult for publishers to use AdX without DFP. (Pl. 56.1 ¶¶ 175-76; Def. 56.1 Resp. ¶¶ 175-76.) A reasonable jury could conclude that the contracts of 2018 were overt acts showing that the product tie was a continuing violation. A reasonable jury also could conclude that the overcharges attributable to the product tie were additional overt acts that support a finding of a continuing violation under Berkey, 603 F.2d at 295-96.

Google implemented its alleged auction-manipulation practices in the following years: Last Look and EDA in 2014; Dynamic Revenue Sharing in 2015; "Truthful Dynamic Revenue Sharing" in 2018; and Unified Price Rules, Alchemist and Minimum Bid to Win in 2019. (Pl. 56.1 ¶¶ 177; Def. 56.1 Resp. ¶¶ 177.) Google points to evidence that EDA and Dynamic Revenue Sharing were updated and modified throughout their existence, including since January 1, 2017. (Pl. 56.1 ¶¶ 185, 186, 188; Def. 56.1 Resp. ¶¶ 185, 186, 188.) A reasonable jury could conclude that these modifications were overt acts that bring these practices within the limitations period. Alternatively, because there is evidence that these practices were implemented on an auction-by-auction basis, a reasonable jury could conclude that each time they were used in an auction involving Gannett and Daily Mail, Google committed an overt act that supports the finding of a continuing violation.

In addition, there is evidence that Google took steps to fraudulently conceal the existence and/or effects of certain of these practices. Gannett and Daily Mail point to public and private statements in which Google allegedly misrepresented to publishers the effects of EDA, asserting that EDA's functions remained unknown until revealed by government investigations in or around 2020, and that EDA was not widely understood even within Google. (Pl. 56.1 ¶¶ 190-93; Def. 56.1 Resp. ¶¶ 190-93.) Gannett and Daily Mail point to similar evidence as to DRS and Last Look. (Pl. 56.1 ¶¶ 194-99; Def. 56.1 Resp. ¶¶ 194-99.) As to these practices, plaintiffs have pointed to evidence that could permit a reasonable jury to conclude that the limitations period was tolled by the fraudulent concealment doctrine.

GANNETT AND DAILY MAIL'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON GOOGLE'S AFFIRMATIVE DEFENSES WILL BE GRANTED IN PART AND DENIED IN PART.

Gannett and Daily Mail have moved for partial summary judgment as to Google's affirmative defenses of unclean hands and failure to mitigate its damages. The motion will be granted in part and denied in part.

In response to the motion, Google has voluntarily withdrawn the affirmative defense of unclean hands. (See ECF 1275 at 5.) The unclean hands defense will be voluntarily dismissed.

As to Google's failure to mitigate defense, "[a]n antitrust plaintiff has a duty to mitigate damages." Litton Sys., Inc. v. Am. Tel. & Tel. Co., 700 F.2d 785, 820 n. 47 (2d Cir. 1983). An injured party "bears an obligation to make reasonable efforts to mitigate its damages and failure to do so may cause a court to lessen the recovery." APL Co. PTE v. Blue Water Shipping U.S. Inc., 592 F.3d 108, 111 (2d Cir. 2010). "Failure to mitigate damages is properly considered in determining damages rather than liability." Aetna Cas. & Sur. Co. v. Aniero

Concrete Co., 404 F.3d 566, 608 (2d Cir. 2005). A mitigation defense "focuses on the plaintiff's duty to prevent the aggravation of injuries already received and to effect a recovery from such injuries." Miller v. Lovett, 879 F.2d 1066, 1070 (2d Cir. 1989) (quotation marks omitted), partially abrogated on other grounds by Graham v. Connor, 490 U.S. 386 (1989).

In response to the motion, Google points to certain evidence that has no discernable connection to the antitrust damages asserted by plaintiffs. Regarding Daily Mail, Google argues that advertisers were reluctant to buy ad space because its web sites featured "salacious, explicit, and violent" content similar to that of "irreputable tabloids." (ECF 1275 at 6.) Whether advertisers were reluctant to be associated with "salacious" content and therefore diverted spend from Daily Mail is unrelated to any damages attributable to the asserted Sherman Act violations. See Miller, 879 F.2d at 1070.

As to Gannett, Google points to evidence that it undertook the "Hail Mary play" of effecting a corporate merger with GateHouse Media. It argues that this merger accelerated Gannett's business losses. (ECF 1275 at 8.) Google also argues that Gannett "failed to properly offer its advertising inventory for sale on multiple occasions," citing four ad campaigns where Gannett failed to place ads or make them viewable, and a nine-month period when Gannett gave advertisers inaccurate information about ad placements on its websites. As with Google's arguments about Daily Mail's "salacious" content, any argument about Gannett's corporate merger and its mistakes in ad placement and viewability have no discernable relationship to the claimed Sherman Act damages.

But the motion for partial summary judgment will be denied as to evidence that Gannett and Daily Mail could have mitigated damages attributable to EDA by altering their settings for certain DFP and AdX features. Google points to the opinions of plaintiffs' expert,

Professor Hortascu, who calculates that Gannett suffered $348.9 million in U.S. damages and $434.8 million in worldwide damages as a result of EDA. At the same time, Hortacsu estimates that if Gannett had stopped using AdX for indirect ad sales, its indirect revenue would have declined by 27%, resulting in a $193.5 million drop in U.S. revenue and $217.4 million in worldwide revenue. Google argues that if Gannett could have mitigated by $191.4 million its claimed damages attributable to EDA if it had not used AdX for indirect sales.

Google also points to the testimony of Professor Milgrom, who opines that plaintiffs could have limited their exposure to EDA by setting price floors to "re-establish the pre-EDA process for [their] inventory" or by assigning direct deals "to 100% sponsorship line items," in which case EDA would not apply. (Milgrom Report ¶ 439.i.) Milgrom also opines that plaintiffs could have disabled Dynamic Allocation to favored third-party ad exchanges after Google implemented Unified Pricing Rules, or UPR. (Milgrom Rep. ¶¶ 377, 765-67.)

Plaintiffs urge that Google is estopped from arguing that they could have mitigated their damages by not using AdX, citing Google III and the finding of the unlawful DFP/AdX product tie in the E.D. Va. Action, including the finding that "it was not financially viable for large publishers to forgo using AdX" because of its access to advertiser demand. United States v. Google, 778 F. Supp. 3d at 863, 870. But Google's damages-mitigation argument is consistent with a finding that the tie is unlawful and caused damages to the plaintiffs. According to Google, the damages suffered by leaving AdX would have been lower than the damages that Gannett and Daily Mail incurred due to EDA.

Accordingly, the motion for partial summary judgment will be granted as to Google's assertions about Daily Mail's "salacious" content and Gannett's purportedly deficient business management but denied as to Google's argument that plaintiffs could have mitigated the

damages attributable to EDA and Dynamic Allocation. Google's affirmative defense of unclean hands will be voluntarily dismissed.

GOOGLE'S SUMMARY JUDGMENT MOTION WILL BE DENIED AS TO THE CLAIMS OF THE AdX CLASS AND MIKULA BUT GRANTED AS TO THE CLAIMS OF THE PROGRESSIVE.

I. Background.

Google moves for summary judgment in its favor on claims brought by The Nation Company, LLC ("The Nation") and Genius Media Group, Inc. ("Genius") on behalf of the AdX Class. The AdX Class consists of publishers who sold open-web ad impressions on AdX. Google also moves for summary judgment in its favors on claims brought by The Progressive and Mikula on their own behalf, which involve a different set of ad tech products, including Google's AdSense basic ad server (often called the "AdSense Tag") and its basic ad-auction platform. Though the parties' submissions typically refer to "Publishers" in the aggregate, the claims of the AdX Class, The Progressive and Mikula turn on different arguments and evidence and require separate analysis.

Google III applied issue preclusion to certain claims of the AdX Class, including the assertion that ad servers and ad exchanges are separate product markets and that Google has willfully acquired or maintained monopoly power in the ad server market and the ad exchange market. 2025 WL 3012840, at *8-9. This included the finding in the E.D. Va. Action that Google "prohibited publishers from receiving real-time bids from AdX (the tying product) unless they also used DFP (the tied product)." See United States v. Google, 778 F. Supp. 3d at 860-64. "The Unlawful Tying was evidence of willfully maintaining a monopoly in aid of the plaintiffs' section 2 claim but it also supported the separate section 1 claim." Google III, 2025 WL 3012840, at *8. The AdX Class asserts the same tying claim, labeling it the "Act 1" claim.

Google III also applied issue preclusion to the finding that Google willfully acquired and maintained monopoly power in the ad-exchange market through Dynamic Revenue Share, Unified Pricing Rules, and the First Look and Last Look features of Dynamic Allocation. Google III, 2025 WL 3012840, at *9; United States v. Google, 778 F. Supp. 3d at 864-65. The AdX Class asserts that these practices, along with Enhanced Dynamic Allocation, had the cumulative effect of creating an anticompetitive product tie that compelled the customers of DFP (Google's publisher ad server, the tying product) to sell their ad impressions on AdX (Google's ad exchange, the tied product). (Pl. 56.1 ¶ 59-60; Def. 56.1 Resp. ¶ 59-60 (ECF 1668).) The AdX Class calls this product tie the "Act 2" claim. The Act 2 claim is unique to the AdX Class, which does not otherwise rely on these underlying bidding practices in support of its monopolization claims.

The E.D. Va. Action did not involve the AdSense products that are subject to the claims of The Progressive and Mikula, and Google III noted that no principle of issue preclusion applied to their claims. 2025 WL 3012840 at *3 n. 3. The Court previously denied The Progressive's motion to certify a subclass consisting of AdSense customers. Google IV, 2025 WL 3562687, at *23-27. The Progressive and Mikula bring claims solely on their own behalf.

II. Google's Summary Judgment Motion Directed to the So-Called "Act 1" Product Tie Will Be Denied.

The AdX Class asserts that Google unlawfully tied its DFP ad server (the tied product) to the AdX ad exchange (the tying product), and refer to the claim as the "Act 1" product tie. As noted, the Court has applied issue preclusion to the AdX Class's claim that this "Act 1" product tie violated sections 1 and 2 of the Sherman Act but noted that the plaintiffs were still required to prove antitrust injury and damages. Google III, 2025 WL 3012840, at *8-9, 17.

Google argues that summary judgment should be granted in its favor on the "Act 1" tie because the AdX Class seeks damages premised on the foreclosure of competition in the ad-exchange market (the tying product) as opposed to the ad-server market (the tied product). The Court already rejected a version of this argument in Google IV, 2025 WL 3562687, at *18-19, explaining:

> Elhauge expressly opined on how the two-way product tie affected the price of DFP, concluded that the tie resulted in an overcharge for DFP use both in isolation and in combination with AdX, and concluded that in a competitive market without tying, the price of DFP would be lower. It is not necessary to finally determine the proper model for antitrust injury and damages. A model that isolates the impact of the charges of DFP and a model that assesses the combined impact on the DFP-AdX package could each produce[ ] a reliable assessment of injury and damages.

2025 WL 3562687, at *19.

Google separately argues that the AdX Class has not isolated damages attributable to the "Act 1" tie alone, and that if summary judgment is granted on the "Act 2" tie, the plaintiffs' damages model "fail[s] to measure damages resulting from the particular antitrust injury on which [Google's] liability in this action is premised." Comcast Corp. v. Behrend, 569 U.S. 27, 36 (2013). For reasons that will be explained, summary judgment will be denied as to the "Act 2" tie, and the Court need not reach this issue.

Google's summary judgment motion directed to the "Act 1" tying claim will be denied.

## III. Google's Summary Judgment Motion Directed to the AdX Class's So-Called "Act 2" Product Tie Will Be Denied.

The so-called "Act 2" tie asserted by the AdX Class was not at issue in the E.D. Va. Action and was not subject to the Court's application of issue-preclusion principles in Google III. This "Act 2" tie claimed by the AdX Class asserts that Google coerced customers of

DFP or DoubleClick for Publishers (the tying product) into selling ad impressions on AdX, Google's ad exchange (the tied product). (Pl. 56.1 ¶¶ 59-60; Def. 56.1 Resp. ¶¶ 59-60.) The tying claim at issue in the E.D. Va. Action, by contrast, was premised on the assertion "that Google tied DFP, its publisher ad server, to AdX, its ad exchange." United States v. Google LLC, 778 F. Supp. 3d at 860. No party urges that principles of issue preclusion apply to the "Act 2" tie. As Google explains, "Although the Act 2 tie involves the same products (DFP and AdX) as the tie analyzed by the Virginia Court, the direction of the Act 2 tie (i.e., which products are the tied and tying products) is reversed." (Def. Mem. at 9 n. 9.) In his deposition, the AdX Class's expert economist, Professor Elhauge, testified that his damages calculation would be the same regardless of whether a jury finds liability on the "Act 1" tie, the "Act 2" tie, or both. (Elhauge Dep. 182-83 (ECF 959-4).)

The AdX Class asserts that Google created and enforced this "Act 2" product tie through its implementation of certain bid-manipulation practices – specifically, Enhanced Dynamic Allocation, Dynamic Allocation (including First Look and Last Look), Dynamic Revenue Sharing and Unified Pricing Rules – that coerced customers of DFP to sell impressions on AdX. (Pl. 56.1 ¶¶ 59-60; Def. 56.1 Resp. ¶¶ 59-60.) Judge Brinkema concluded that the underlying "Act 2" restraints of First Look, Last Look, Dynamic Revenue Sharing and Unified Pricing Rules were "anticompetitive policies, practices, and technology changes . . . that were not in its publisher customers' best interests" and constituted evidence that Google engaged in anticompetitive conduct by willfully acquiring and maintaining monopoly power in the market for ad exchanges. United States v. Google, 778 F. Supp. 3d at 864. The AdX Class acknowledges that "Judge Brinkema's decision did not address whether these restraints constituted a tie because DOJ did not allege a tie from DFP to AdX." (Pl. Mem. at 6 n. 4.)

Google moves for summary judgment in its favor as to liability for the "Act 2" tie, arguing that the AdX Class cannot point to evidence of actual coercion, and that the nature of the restraints could not support the finding of an unlawful product tie.

To prevail on a tying claim, a plaintiff must prove "that: i) the sale of one product (the tying product) is conditioned on the purchase of a separate product (the tied product); (ii) the seller uses actual coercion to force buyers to purchase the tied product; (iii) the seller has sufficient economic power in the tying product market to coerce purchasers into buying the tied product; (iv) the tie-in has anticompetitive effects in the tied market; and (v) a not insubstantial amount of interstate commerce is involved in the tied market." Kaufman v. Time Warner, 836 F.3d 137, 141 (2d Cir. 2016).

"Actual coercion by the seller that in fact forces the buyer to purchase the tied product is an indispensable element of a tying violation." Unijax, Inc. v. Champion Int'l, Inc., 683 F.2d 678, 685 (2d Cir. 1982). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 12, (1984). "The element of actual coercion is designed to weed out the many cases where the bundling of separate products is due to consumer demand. If a consumer wants to purchase a bundle of the alleged tying and tied products, the seller is simply satisfying consumer demand and monopolization concerns are irrelevant." Kaufman, 836 F.3d at 142. "[S]trong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce [a buyer] to buy its full line of products does not . . . amount to

actual coercion," which is present only if the seller "goes beyond persuasion and conditions its [buyer's] purchase of one product on the purchase of another product." Unijax, 683 F.2d at 685 (quotation marks omitted).

The AdX Class emphasizes the effects of Dynamic Allocation, including First Look and Last Look. First Look "required publishers using DFP to offer AdX a first right of refusal for each impression." Id. In addition, DFP "permitted AdX to bid in real-time, whereas other exchanges were required to make static bids that were set in advance and could not account for contemporaneous information about the value of the specific impression." Id. at 826. With First Look, an advertiser's bid would win on AdX even if advertisers on other exchanges were bidding more for the same impression. Id. at 826-27. First Look gave preference to AdX over rival ad exchanges at the expense of Google's publisher customers and "exacerbated the anticompetitive effect of the unlawful AdX-DFP tie . . . ." Id. at 864.

Last Look, which also was implemented through DFP, "gave AdX the ability to see competing exchanges' bids in an otherwise sealed auction before AdX would bid," which "harmed publishers, rival ad exchanges, and advertisers using non-Google ad buying technologies." Id. "In what was otherwise a sealed auction, Last Look let AdX open the envelope for the winning bid, know what the winning bid was, and be able to bid after everybody else." Id. at 829 (quotation marks and alterations omitted). Last Look advantaged AdX and Google's advertising customers but harmed other ad exchanges and DFP customers "who were not compensated as much as they would have been for their inventory had Google's AdX demand been required to compete with third-party exchanges (i.e., non-Google exchanges) on a level playing field." Id. Judge Brinkema credited expert opinions that Last Look created inefficiencies, reduced publisher revenue, reduced the number of impressions won by non-

Google exchanges, and used Google's market power in the ad-server market to diminish ad-exchange rivals. Id. at 865.

The AdX Class contends that Dynamic Revenue Share and Unified Pricing Rules bolstered the coercive effect of Dynamic Allocation. Dynamic Revenue Share adjusted AdX's standard 20% take rate depending on whether the impression received more or less competition on rival ad exchanges in order to clear more bids through AdX. Id. at 829-30. Google implemented Unified Pricing Rules after it halted the use of Last Look, and it barred DFP customers from setting higher price floors for AdX than for other exchanges. Id. at 830-31. Before implementation of UPR, publishers set higher price floors for AdX in pursuit of "revenue diversity" and to screen out low-quality ads. Id. UPR increased the number of impressions won by AdX and lowered publisher revenues. Id. at 831. Judge Brinkema found that "publishers viewed Unified Pricing Rules as not in their best interests, but felt stuck using DFP given its tie to AdX." Id. at 865.

The AdX Class asserts that EDA augmented these other practices by identifying publishers' highest-value impressions for indirect sales, in a way that advantaged AdX but deprived rival exchanges of inventory and caused publishers to receive bids that were lower than if rival exchanges had access to this inventory. (Elhauge Rep. ¶¶ 293, 305, 324-33.) Elhauge opines that EDA increased AdX's market share and increased its revenues by more than $250 million a year. (Elhauge Rep. ¶ 333.)

The AdX Class analogizes these "Act 2" restraints to the "preferential routing" clauses held to be an unlawful tying arrangement in Northern Pacific Railway Co. v. United States, 356 U.S. 1, 6-8 (1958), where the defendant railroad company conditioned its lease or sale of land containing valuable mineral and agricultural resources to the buyer or lessee's

agreement to ship its commodities via the defendant railroad. The "preferential routing" clauses were an unlawful product tie amounting to a per se violation of section 1 because they conferred no benefits to the buyers or lessees and stifled competition from competing railway lines. Id. at 8. It also relies upon International Salt Co. v. United States, 332 U.S. 392, 397-98 (1947), which concluded that the defendant was per se liable under section 1 for requiring lessees of its salt-utilization machines to also purchase defendant's industrial-salt product for use in the machines, provided that defendant sold the salt product at a price equal to the lowest available market price. This provision harmed competitors whose sales were foreclosed by vendor fiat, not product quality. Id. at 398.

Google argues that no reasonable jury could find that Publishers who used the DFP ad server were actually coerced into transacting on AdX. They rely principally on the trial testimony in the E.D. Va. Action of Nitish Korula, a Google engineer who oversees ad-tech product development. Korula testified that Google vetted publishers before giving them access to AdX inventory and stated that "the publisher has to affirmatively take some step to provide that access like creating an AdX line item." (Def. 56.1 ¶¶ 74-77 (ECF 1642).) He also testified that publishers have the ability to turn off AdX for portions of their inventory. (Def. 56.1 ¶ 78.) Elhauge concluded that DFP publishers made "significant sales" on non-AdX exchanges:

> These tying restraints did not impose an absolute requirement that DFP publishers use AdX for all their sales. DFP publishers made significant sales via rival ad exchanges, as is evident from the fact that DFP's share of the relevant ad server market was significantly higher than AdX's share of the ad exchange market. Nonetheless, Google tied DFP access to various restraints that discouraged the use of rival ad exchanges relative to but-for levels, and thus further inflated AdX's market share and market power.

(Elhauge Rep. ¶ 303 (ECF 959-1).) In response, the Publishers point to evidence that the "Act 2" restraints channeled impressions to AdX at the expense of publisher choice, that AdX competed

for 80-90% of DFP-served impressions, and that publishers viewed turning off AdX access as an "option to starve to death" by "bypassing the largest demand pool in the industry." (Pl. 56.1 Resp. ¶¶ 74-77.)

There are factual distinctions between Northwest Pacific and International Salt and the tying theory advanced by the "Act 2" claim. Crucially, the Publishers contracted for the use of the DFP ad server and the AdX ad exchange independent of the "Act 2" restraints. (See, e.g., ECF 1355-38 (Google Services Agreement of January 24, 2013 between Google and The Nation governing "Google DoubleClick AdX/Admeld Services").) Google emphasizes that the restraints underlying the "Act 2" claim are not separate, standalone products that Publishers were compelled to buy in order to use the DFP ad server.

But given the nature of the transactions conducted through ad servers and ad exchanges, the Court concludes that a reasonable jury could find that the restraints underlying the "Act 2" tying claim functioned as a product tie that coercively required DFP customers to transact inventory on AdX in order to use the full functions of DFP. A publisher's contract for the use of AdX and DFP was not like the purchase of a discrete good or parcel of real property but a step to facilitate potentially billions of subsequent ad sales that occurred through the ad exchange and ad server. As described by the AdX Class, the "Act 2" restraints coercively required DFP customers to transact individual impressions on AdX based upon Google's dictate even though Publishers were receiving less-beneficial outcomes than if they could have accessed bids across a range of ad exchanges that included AdX as one of several options. It would be roughly akin to the defendant in Northwest Pacific adopting a policy that coerced its already-existing land lessees to make shipments on its rail carrier under threat of economic punishment.

Google's motion for summary judgment as to the so-called "Act 2" product tie will be denied.

## IV. Google's Summary Judgment Motion Asserting that the AdX Class Did Not Isolate Damages for Each Bidding Initiative Will Be Denied.

Google separately seeks summary judgment on the basis that the AdX Class has not isolated damages specific to the bidding practices cited in support of the "Act 2" tie. It also argues that to the extent that the AdX Class claims to have been injured by Enhanced Dynamic Allocation, or "EDA," it cannot point to evidence showing that EDA had an anticompetitive impact on publishers.

In response, the AdX Class emphasizes that it is not advancing any claim in isolation that is premised on Dynamic Allocation, Dynamic Revenue Sharing, Unified Pricing Rules or EDA, and that their combined effect forms the basis of the claimed "Act 2" tie. The AdX Class does not contend that EDA was anticompetitive conduct in itself, and argues instead that EDA "extended the reach of Dynamic Allocation" alongside First Look and Last Look, and allowed AdX to compete for 80 to 90 percent of DFP demand at the exclusion of rival exchanges. (Pl. Mem. at 38; Pl. 56.1 ¶¶ 190-91.) It argues that EDA strengthened the Act 2 tie by requiring publishers to route inventory to AdX that was otherwise reserved for direct sales. (Pl. 56.1 ¶ 194.) The AdX Class is explicit that it does not seek damages attributable to EDA in isolation and that it view its EDA a practice that enforced the Act 2 tie. (Pl. 56.1 ¶ 197.)

Google's motion for summary judgment will be denied.

## V. Google's Summary Judgment Motion on the Statute of Limitations as Applied to the AdX Class Claims Will Be Denied.

For the reasons explained as to the claims of Gannett and Daily Mail, Google's motion for summary judgment on timeliness grounds will be denied. Like Gannett and Daily

Mail, the members of the AdX Class were customers of Google and not competitors, and the reasoning of Berkey Photo, 603 F.2d at 295-96, applies broadly to the conduct underlying the monopolization claim. No remaining claim is premised on a discrete anticompetitive act alleged to cause injury, comparable to the anticompetitive contract executed by the parties in Sabre, 938 F.3d at 67; see also Chalmers v. Nat'l Collegiate Athletic Ass'n, 2025 WL 1225168, at *9 (S.D.N.Y. Apr. 28, 2025) (Sherman Act claims premised on the single overt act of entering into an anticompetitive agreement were time-barred) (Engelmayer, J.). The AdX Class has pointed to evidence of Google's complementary and evolving anticompetitive conduct that resulted in the AdX Class's claimed injuries and permitted Google to extract a supracompetitive take rate. Google's motion for summary judgment on timeliness grounds will therefore be denied.

VI. The FTAIA Does Not Preclude an Award of Damages to MCM Firms.

Google argues that the FTAIA bars recovery to AdX Class members that are Multi-Customer Management ("MCM") firms that acted on behalf of so-called "child" publishers located outside of the United States. An MCM firm manages ad inventory on behalf of a publisher, and is known as the "parent" publisher while its client is known as the "child" publisher. See Google IV, 2025 WL 3562687, at *20-21. In some MCM relationships, Google directly pays the parent MCM firm for inventory sold by the child publisher, and in other MCM relationships, the child publisher directs Google to pay some portion of sales revenue to the MCM parent as a commission. Id. at *21. The Court concluded in Google IV that the AdX Class properly included MCM Firms that were direct sellers of ads, explaining that their claimed injuries were identical to those of any open-web publisher operating a website. Id. at *22.

The AdX Class does not purport to include foreign MCM firms or any foreign party whatsoever. It consists of "all persons or entities in the United States that directly paid

Google, through payment of fees directly to Google or reductions in advertising revenue received directly from Google, for services associated with selling advertising impressions on websites via Google's AdX Ad Exchange . . . ." Id. at *38 (emphasis added). But Google points out that while the AdX Class and Elhauge's damages analysis are limited to MCM firms located in the United States, Elhauge's damages analysis includes losses attributable to MCM firms from the websites of foreign "child" publishers. (Def. 56.1 ¶ 209.) Google's expert, Professor Chevailer, has calculated that $152.05 million of Elhauge's damages calculation for the AdX Class is attributable to the websites of "child" foreign child publishers. (Def. 56.1 ¶ 210.) Google argues that the FTAIA bars this recovery for these transactions.

But Google expressly acknowledges that "[t]he AdX Class's damages calculated by Prof. Einer Elhauge are based on sales of ad inventory on websites corresponding to AdX accounts with a billing address located in the United States." (Def. 56.1 ¶ 209.) "[T]he FTAIA's general rule applies where the anticompetitive conduct at issue is foreign." Empagran, 542 U.S. at 163. Google's argument is directed to domestic anticompetitive conduct that is claimed to have harmed its domestic customers. That certain MCM firms may have had clients that are foreign "child" publishers does not implicate the FTAIA. To the extent that Google seeks summary judgment as to any damages claimed by MCM firms attributable to their work on behalf of a foreign client, the motion will be denied.

VII. The Court Need Not Address Equitable Relief at this Stage.

Google moves for summary judgment to the extent that the AdX Class seeks equitable or injunctive relief directed to EDA, Dynamic Allocation or Dynamic Revenue Sharing, asserting that it no longer employs these programs and that plaintiffs cannot "demonstrate a significant threat of injury from an impending violation of the antitrust laws or

from a contemporary violation likely to continue or recur." Zenith Radio Corp. v. Hazeltine Rsch., Inc., 395 U.S. 100, 130 (1969). A Stipulation and Order of October 7, 2024 provides that expert discovery on equitable remedies will be deferred until after any findings on liability. (ECF 885.) Separately, the Memorandum Opinion of September 2, 2026 in the E.D. Va. Action ordered a series of equitable remedies that include an injunction against tying DFP to AdX, barring Google from reimplementing First Look, Last Look and UPR, and forward-looking relief such as requiring Google to integrate AdX and DFP with header bidding. (23-cv-108 (LMB/JFA) (E.D. Va.) (ECF 1858).) The issue of equitable relief in this action is more appropriately considered in light of a trial record and careful review of the relief ordered in the E.D. Va. Action.

VIII. Plaintiffs Reiterate that They Have Withdrawn Certain Claims.

Google moves for summary judgment as to certain claims that it characterizes as "abandoned." A December 12, 2025 letter filed by the AdX Class, The Progressive and Mikula expressly withdrew "the following anticompetitive acts, allegations, or claims": 1) Count III, which asserted a claim under California's unfair competition law, 2) Count IV, which asserted a claim under California's Cartwright Act, 3) Project Bernanke, 4) Line-Item Capping, 5) Redaction of Auction Data, 6) Project Poirot, 7) Project Elmo, 8) Minimum Bid to Win and 9) discriminatory risk aversion coefficients. (ECF 1269 at 2.) The letter also stated or implied that the Publishers were not pursuing any claim that Google monopolized a product market for ad networks, that the AdX Class was not pursuing any claim involving any AdSense product tie, that The Progressive and Mikula were bringing claims premised solely on the claimed AdSense product ties and that plaintiff JLaSalle Enterprises LLC ("JLaSalle") was no longer pursuing any claim for relief. (See Def. Mem. at 43-44; ECF 1269.)

In response to Google's summary motion, the Publishers have reiterated that they are not pursuing any of these claims or theories of liability and that JLaSalle is not pursuing any claim in this case. (Opp. Mem. at 36 n. 55; Pl. 56.1 ¶¶ 256-57.)

The Publishers have now expressly and unambiguously stated their positions in multiple court filings. There is no need to enter summary judgment in Google's favor as to these withdrawn claims and theories. The Court will instruct the Clerk to terminate JLaSalle as a plaintiff in this case and note that certain claims of the AdX Class have been withdrawn.

## IX. Google's Summary Judgment Motion Will Be Granted as to The Progressive but Denied as to Mikula.

### A. Google's Motion for Summary Judgment Will be Granted as to The Progressive.

Plaintiffs The Progressive and Mikula bring claims on their own behalf directed to claimed anticompetitive conduct relating to the AdSense basic ad server and Google's basic ad-auction platform. The AdSense basic ad server consists of a piece of code that publishers embed on their websites, called the "AdSense Tag," which does not give publishers the range of management options available to them through DFP ad server but performs basic ad-server functions. (Def. 56.1 ¶¶ 20, 94, 96; Pl. 56.1 Resp. ¶¶ 20, 94, 96.) Google sells the AdSense ad server and access to the basic ad-auction platform through a single product, which the Court will refer to as the "AdSense Package."

The "AdSense Tying Claims" consist of an "Act 3" and an "Act 4." The "Act 3" claim asserts that Google used its monopoly power in basic ad-auction platforms to coerce publishers using the AdSense auction platform (the tying product) to use either the DFP or AdSense ad server (the tied products), which harmed competition in the ad-server market. (Pl. 56.1 ¶ 214.) The "Act 4" claim asserts that Google used its monopoly power in basic ad servers

to tie the AdSense Tag (the tying product) to the basic AdSense ad auction platform (the tied product), impairing competition in the market for ad networks. (Pl. 56.1 ¶ 215.)

The Court addresses at the outset certain unique characteristics of The Progressive's transactions and the reasons why a reasonable jury could not find in The Progressive's favor on the Act 3 or Act 4 tying claim. As detailed in Google IV, "The Progressive sold ad impressions almost exclusively through the advanced DFP ad server and not through the AdSense basic ad server," with approximately 99.9% of its sales transacted through DFP. 2025 WL 3562687, at *23. The Progressive used the DFP ad server to access "AdSense Backfill" inventory, which is a type of ad inventory sold to a publisher who unsuccessfully offered a sale to multiple sources, such as through direct sales. Id. at *24 & n. 14. There is no evidence that The Progressive's website included the AdSense Tag. Id. at 24. In concluding that The Progressive did not satisfy the typicality required of Rule 23(a)(3), the Court observed:

> The Progressive does not now challenge [the] assertion that its website does not include an AdSense tag, the use of which is fundamental to the tying claim and the definition of an AdSense Class consisting of publishers who transacted through the "AdSense Package." Because The Progressive was not a consumer of the AdSense ad server except to a negligible degree, its claims are not typical of a class premised on a tie between that ad server and the AdSense auction platform. . . .
>
> The Progressive has no basis to prove that it was coerced to use the basic AdSense ad server as either the tied or tying product. Unijax, Inc. v. Champion Int'l, Inc., 683 F.2d 678, 685 (2d Cir. 1982) (an "indispensable element of a tying violation" is "[a]ctual coercion by the seller that in fact forces the buyer to purchase the tied product ...."). The Progressive cannot satisfy typicality when it did not use one of the two products in the claimed tying arrangement.

Id. at 26.

Though Google IV addressed whether The Progressive satisfied the typicality and adequacy requirements of Rule 23(a), the record at summary judgment is no different. The

Progressive acknowledges that it used the DFP ad server to sell more than 99.9% of its ad impressions. (Def. 56.1 ¶ 104; Pl. 56.1 Resp. ¶ 104.) The Progressive seems to contend that it was possible that its remaining transactions were made through the AdSense basic ad server but it does not point to evidence to support that conclusion. (Def. 56.1 ¶ 105; Pl. 56.1 Resp. ¶ 105.)

The Progressive does not point to evidence that would permit a reasonable jury to find that it sold impressions through the basic AdSense ad server. It nevertheless urges that a reasonable jury could find in its favor on the Act 3 and Act 4 tying claims based on its use of the DFP ad server. It is true that the Publishers have continued to claim the existence of product ties between the advanced DFP ad server and the AdSense basic ad-auction platform. (Pl. 56.1 ¶ 214.) But in Google IV, the Court observed that "the Publishers' experts did not analyze the existence of such a tie . . . ." 2025 WL 3562687, at *26. In opposition to Google's motion, The Progressive cites only passing references from Elhauge about publishers' use of the DFP ad server to access ad inventory available through Google's basic advertising auction platform. (Pl. 56.1 ¶ 214 (citing Elhauge Rep. ¶ 311; Elhauge Rebuttal ¶¶ 415).)[3] The Publishers' experts appear to have undertaken substantial analysis of the relationship between the AdSense ad server and its basic ad auction platform but given little attention to the relationship between the DFP ad server and the basic ad auction platform. In opposition to Google's motion, The Progressive does not cite to additional evidence that could support a finding that it was coerced into using DFP in order to access Google's basic ad auction platform or that it was coerced into using the basic ad auction platform in order to access DFP.

---

[3] See, e.g., Elhauge Rep. ¶ 311 ("Given that small to medium-sized publishers could generally access Google's indispensable GDN advertiser demand only through a Google ad auction platform, this tie also generally required that those publishers use Google's basic AdSense ad server (or DFP for small publishers) to access GDN ad demand.").

Because The Progressive has not pointed to evidence that it was subject to any product tie between the AdSense ad server and the AdSense basic ad-auction platform, no reasonable jury could find that it suffered antitrust injury from the alleged product ties. Google's summary judgment motion will therefore be granted in favor of Google on The Progressive's tying claims. Because The Progressive does not advance any other claim for relief, the Court will direct the Clerk to enter judgment in favor of Google and terminate The Progressive as a plaintiff.

B. Google's Motion for Summary Judgment Will Be Denied as to Mikula.

1. Google Had Sufficient Notice of Mikula's Proposed Basic Ad Server Product Market.

Mikula is positioned differently than The Progressive. There is no dispute that Mikula was a customer of the AdSense basic ad server and transacted on Google's basic auction platform. (See, e.g., Paulino Dep. 30 ("We use AdSense to access the Google ad network.") (ECF 1355-14).)

To prove a tying claim, a plaintiff must "offer[ ] evidence defining the relevant market" and "prov[e] that [defendants] possess power within it." Illinois Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 46 (2006). Google first moves for summary judgment on the grounds that the Publishers, including Mikula, never pleaded an antitrust product market for "basic ad servers" and did not articulate the existence such a market until after the close of fact discovery. Instead, the Second Amended Complaint described a product market for ad servers as a whole, one that encompassed both DFP and AdSense. (See ECF 1192.) Google argues that if it had known that Mikula was asserting a distinct product market for basic ad servers, it would have pursued fact discovery into an array of subjects going toward market definition, monopoly power and actual coercion.

It is true that the allegations about the Act 3 and Act 4 ties were not a model of clarity, and their descriptions of these product ties now vary significantly from what was originally alleged. Most prominently, instead of alleging product ties involving a basic ad exchange product, Publishers originally alleged product ties between Google's ad servers and the Google Display Network ("GDN"). (See, e.g., Pub. 2d Am. Compl't ¶¶ 18, 19, 398.) The Publishers now explain that the references to GDN were in error and instead should have identified the product as Google's AdSense ad auction platform. (Pl. 56.1 ¶ 18; Def. 56.1 Resp. ¶ 18.) Google does not claim prejudice from the complaints' apparently erroneous references to GDN or otherwise challenge the error.

It is also true that, as Google emphasizes, Publishers alleged that ad servers were a single product market and did not expressly allege a submarket for basic ad servers in which AdSense has monopoly power. But the allegations still distinguished the customer base and functions of the DFP ad server and the AdSense ad server. (Pub. 2d Am. Compl't ¶ 234 ("Act 3 and Act 4 principally pertain to tools offered and targeted to small- and medium-sized publishers that do not qualify for Ad Exchange participation."), ¶ 235 ("Most small- and medium-sized publishers use Google's AdSense product. AdSense is a 'closed' product that provides Ad Server services to publishers that use it and connects exclusively to advertisers purchasing ad impressions through the Google Display Network.") ¶ 237 (distinguishing AdSense from the "more sophisticated" DFP ad server).) It asserted that Google principally enforces the Act 3 and Act 4 ties by "bundling" the two products into a single publisher-facing product called AdSense. (Pub. 2d Am. Compl't ¶ 236.) On the Act 4 tie, it asserted that the combined AdSense Package sells publisher impressions exclusively through Google and does not permit publishers to sell on rival ad networks. (Pub. 2d Am. Compl't ¶ 239.)

Elhauge's expert report explicitly describes two ad-server submarkets. He describes the ad-server market as consisting of an "advanced ad server" submarket that includes DFP and a "basic ad server" submarket that includes AdSense. (See Elhauge Rep. ¶¶ 188-92.) Elhauge explains that advanced ad servers are designed for large publishers and provide significant flexibility in managing their inventory, whereas the AdSense basic ad servers lets publishers paste the AdSense Tag to their websites and provides a limited range of options as to where and how ads will be shown. (Elhauge Rep. ¶¶ 188-90.) He opines that these differences prevent publishers from substituting between basic and advanced ad servers. (Elhauge Rep. ¶ 192.) In response to Elhauge's expert report, Google's expert, Mark A. Israel, Ph.D., opines on the issue of market definition and concludes that the AdSense Package is a single, integrated ad network and not two separate product markets. (Israel Rep. ¶¶ 51, 364-75 (ECF 983-18).)

The Second Amended Complaint did not expressly distinguish "basic" and "advanced" ad servers or allege that they constituted separate antitrust product submarkets, but it distinguished their customer bases and product functions. Whatever shortcomings exist in the Publishers' pleadings, Google cannot claim to have been unfairly surprised that the Publishers ultimately narrowed the Act 3 and Act 4 claims to focus on the AdSense ad server as a product market. For instance, Google argues that the AdSense ad server and auction platform are not separate product markets at all, and constitute a single, fully integrated ad network, and that ad networks constitute an entirely separate product market.[4] (See, e.g., Israel Rep. ¶¶ 51, 149 ("Prof. Elhauge artificially divides Google's ad network, AdSense, into a 'basic ad auction platform' and a 'basic ad server.'"), 364.) Whatever deficiencies were present in the Publishers'

[4] Judge Brinkema characterized AdSense as the publisher-facing side of "the largest digital ad network in the world." United States v. Google, 778 F. Supp. 3d at 824.

pleadings, they gave notice of a tying claim premised upon certain unique traits of an AdSense ad server that differed from the DFP ad server and were used by a different customer base.

To the extent Google's summary judgment motion argues that the pleadings did not provide sufficient notice that the AdSense ad server was alleged to be a relevant antitrust product market, the motion will be denied.

2. Google's Market Power in the Market for Basic Ad Servers.

Google challenges Elhauge's reliance on data from a website called "6sense" to calculate AdSense's share of a basic ad server market, arguing that Elhauge could not explain how 6sense reached its calculations or why 6sense showed large variations in its market-share calculations over a four-month period. (Def. 56.1 ¶¶ 108-16.) In response, Mikula argues that other evidence would permit a reasonable jury to conclude that Google had monopoly power in the market for basic ad servers, including Google's fifteen-year imposition of a supracompetitive take rate, the high barrier to entry in the market for basic ad servers and the absence of rivals with a significant market presence. (Pl. 56.1 ¶¶ 226-37.) Mikula also points to testimony from a Google deponent who made a heavily qualified observation that it was possible that AdSense was "the only major player" in its "small market," and that Elhauge also relied on an internal 2020 document to calculate the AdSense market share. (Pl. 56.1 Resp. ¶ 108.) A reasonable jury could afford little or no weight to Elhauge's reliance on 6sense and instead rely on other evidence to conclude that Google had market power in the market for basic ad servers. Google's motion for summary judgment will be denied.

3. Whether the AdSense Package Is a Single Product.

Google also argues that Mikula cannot prove that the AdSense Package consists of two separate products, comprised of a basic ad server and a basic ad-auction platform,

pointing out that it has never been possible to separately purchase the AdSense ad server and a separate basic ad-auction product. "The 'separate product' element requires that the alleged tying product and tied product be separate, i.e., they must exist in separate and distinct product markets." Kaufman v. Time Warner, 836 F.3d 137, 141 (2d Cir. 2016). "This is because if there is no separate market for the allegedly tied product, there can be no fear of leveraging a monopoly in one market to harm competition in a second market." Id. at 142. "Relevant evidence of separate and distinct consumer demand for the tying product and the tied product is, inter alia, the history of the products being, or not being, sold separately, or the sale of the products separately in similar markets." Id. (internal citation omitted).

Google points out that Elhauge stated in his expert report that "Google's AdSense always bundled its basic and server with its basic ad auction platform" and confirmed that view in his deposition. (Elhauge Rep. ¶ 97; Elhauge Dep. at 54, 59 (ECF 959-4).) It also notes that the only competing product identified by plaintiffs (Microsoft pubCenter) has similarly integrated an ad server and ad network into a single product. Google argues that the historical practice of selling the AdSense Bundle as a single, unified product precludes a jury from finding that the AdSense ad server and GDN ad network are two separate products capable of being tied.

In response, Mikula points to internal Google documents reflecting that Google perceived there to be customer demand for an unbundled product that permitted publishers to access non-Google ad inventory. (Pl. 56.1 ¶¶ 219-20.) In her deposition, Pamela Mikula Paolino, the sole employee of Mikula, testified that Mikula would have preferred to have the option to access Google's ad inventory without using the AdSense basic ad server. (Paolino Dep. at 34.) Mikula points to evidence that Google considered whether to add a "yield management" function to the AdSense tag that would provide access to non-Google auction

platforms but elected not to do so because it would encourage publishers to sell impressions through non-Google platforms. (Pl. 56.1 ¶¶ 221-22.)

The Court concludes that plaintiffs have identified evidence that would permit a reasonable jury to conclude that the basic ad server and basic ad exchange are separate product markets. That Google characterizes plaintiffs' evidence as "overblown" (Reply Mem. at 13 (ECF 1570)) underscores that its weight should be considered by a jury. While the historical fact that Google and Microsoft have sold basic ad servers and ad exchanges in a unitary bundle weighs in Google's favor, the apparent lack of competition and the relative novelty of products constituting the ad tech stack could lead a reasonable jury to afford less weight to the history of the AdSense ad server and the basic ad auction platform not being sold separately, particularly if the jury were to credit plaintiffs' evidence of customer demand for unbundled products.

Google's motion for summary judgment will be denied.

4. A Reasonable Jury Could Find Actual Coercion.

For similar reasons, Google's motion for summary judgment will be denied on the issue actual coercion. "The element of actual coercion is designed to weed out the many cases where the bundling of separate products is due to consumer demand. If a consumer wants to purchase a bundle of the alleged tying and tied products, the seller is simply satisfying consumer demand and monopolization concerns are irrelevant." Kaufman, 836 F.3d at 141. "[T]he 'separate product' and 'market power' requirements are usually essential to the coercion element . . . ." Id. "'[A]n unremitting policy of tie-in, if accompanied by sufficient market power in the tying product to appreciably restrain competition in the market for the tied product constitutes the requisite coercion.'" Live Nation, 2026 WL 456804, at *25 (quoting Hill v. A-T-O, Inc., 535 F.2d 1349, 1355 (2d Cir. 1976)).

Google points to evidence that The Progressive and other publishers accessed the basic ad-auction platform without utilizing the AdSense Package in order to access "AdSense backfill" advertiser inventory. It also points to statements from a Google ad engineer explaining that Google permits "Authorized Buyers" to access AdSense ad inventory, though Google does not permit third-party ad exchanges to bid on ad inventory due to technical limitations. (Berntson Dec. ¶ 6 (ECF 1355-21).) In response, Mikula cites to the deposition testimony of Google's Rule 30(b)(6) witness for AdSense topics, who stated that "there are two ways to use AdSense: There's either using it through AdSense itself – or via an AdSense line item within Ad Manager." (Pl. 56.1 ¶ 214.) He also stated that he was "not aware of any features in AdSense" that allows a publisher to "book AdSense into a third-party ad server." (Pl. 56.1 ¶ 214.) Google also points to testimony from the same witness and trial testimony in the E.D. Va. Action stating that a publisher using the AdSense ad server could bid only on the inventory of Google's basic auction platform. (Pl. 56.1 ¶ 215.)

The Court concludes that Mikula has identified evidence that would permit a reasonable jury to find actual coercion.

5. Google's Summary Judgment Motion on the Statute of Limitations as Applied to Mikula's Claims Will Be Denied.

Google argues that the Act 3 and Act 4 tying claims are time-barred. Similar to the claims previously discussed, Mikula's claims are not premised on the parties' agreement to an anticompetitive contract and describe an ongoing violation. Google's motion for summary judgment will be denied.

GOOGLE'S MOTION TO EXCLUDE THE EXPERT OPINIONS OF EINER ELHAUGE AND ANAND DAS WILL BE DENIED.

Pre-Trial Order No. 19 provided that "[t]he briefing in support of and in opposition to Google's summary judgment motions may address in a separate brief not to exceed 15 pages why certain experts should be excluded from the Court's consideration on the motions." (ECF 1248 ¶ 5.) After the Publishers filed their response to Google's summary judgment motion, Google filed a Daubert motion directed to certain opinions of Elhauge and Das. (ECF 1578.) The Publishers responded. (ECF 1612.) Google's Daubert motion directed to certain opinions of Professors Elhauge and Das will be denied.

First, Google argues that Elhauge's expert report calculated damages for the combined Act 1 and Act 2 ties in the aggregate and did not isolate damages solely attributable to the Act 1 tie. Google argues that because the AdX Class cannot prove the Act 2 tie, Elhauge's opinion on damages attributable to the Act 1 tie should be excluded. For the reasons previously discussed, the Court will deny Google's motion for summary judgment on the Act 2 tie. Because liability on both the Act 1 and Act 2 ties must be decided by a jury, the Court need not decide at summary judgment whether Elhauge's expert report adequately modeled damages solely for the Act 1 tie.

Second, Google argues that the Court should exclude at summary judgment the opinions of Elhauge and Das that the AdSense ad server and Google's basic ad-auction platform are separate products rather than a single "AdSense Package" product. It argues that their opinions are not based on sufficient facts or data, Rule 702(b), Fed. R. Evid., and that there is an analytical gap between their conclusions and the evidence that they cite. Specifically, Google argues that Elhauge did not place sufficient weight on internal analyses about the technical barriers to modifying the AdSense ad server in order to facilitate bidding on third-party ad

networks or exchanges and internal Google perceptions about low publisher demand for such an option. It also argues that if AdSense had added options for yield management and open bidding, as Elhauge proposes, these measures still would not have separated the AdSense ad server from the AdSense auction platform.

As to Das, Google argues that he relied upon underlying documents that described the AdSense Package as a single product, not as two separate products bundled together for sale. The Court concludes these arguments are properly the subject of cross examination and the weight that should be afforded to the conclusions of Elhauge and Das, and do not require exclusion of their opinions at the summary judgment stage.

Third, Google argues that the Court should exclude Elhauge's opinion that Google requires publishers to use the AdSense ad server to access the AdSense auction platform. It argues that Elhauge relied upon equivocal testimony from Google's Rule 30(b)(6) witness, Stuart May, to definitively conclude that third-party ad servers could not access the AdSense auction platform. Elhauge's reliance upon May's testimony about the AdSense auction platform is properly the subject of cross examination and does not require exclusion of his opinion at the summary judgment stage.

Lastly, Google argues that Elhauge's opinions should be excluded to the extent that his expert report describes Google's conduct as a "scheme" that was effectuated through mutually enforcing, anticompetitive conduct. Google argues that the existence of a scheme is a matter of factfinding for the jury. The use of the word "scheme" has had no bearing on Google's summary judgment motion and the issue of whether an expert may opine to a jury on the existence of a scheme need not be decided at this stage.

Google's Daubert motion directed to the opinions of Elhauge and Anand will be denied.

GOOGLE'S SUMMARY JUDGMENT MOTION
DIRECTED TO INFORM WILL BE GRANTED.

I. Google's Motion to Strike Inform's Amended Summary Judgment Response of April 2, 2026 Will Be Granted.

Google's motion to strike Inform's "Second Correct Memorandum in Opposition to Defendant's Motion for Summary Judgment" will be granted.

Pre-Trial Order No. 19 set a briefing schedule on Google's motion for summary judgment. (ECF 1248.) Google timely filed its motion on January 23, 2026. (ECF 1358.) Inform filed its response on March 7, 2026, one day after the March 6, 2026 deadline. (ECF 1525.) On March 14, 2026, without explanation or leave of court, Inform filed a revised Memorandum in Opposition to Google's motion. (ECF 1549.) Google notes that this March 14 Memorandum principally corrected typographical and citation-formatting errors. (ECF 1604 at 2.) Google made no application directed to the March 14 Memorandum and timely filed its reply on March 27, 2026. (ECF 1567.)

But, then, on April 2, 2026, Inform filed without leave of court a third version of its Memorandum in Opposition (the "Third Memorandum"). (ECF 1592.) The Third Memorandum was filed 27 days after the Court-ordered deadline and six days after Google filed its reply. An attached letter stated in its entirety:

> With apologies to the Court for the oversight, it has recently come to our attention that some of the intended citations in Inform's Memorandum in Opposition to Defendants' Motion for Summary Judgment did not appear in the document filed. We have now corrected those citations (at pages 2-5, 17) in Plaintiff Inform Inc.'s Second Corrected Memorandum in Opposition to Defendants' Motion for Summary Judgment, copy filed under seal here. No changes have been made to the substance of the brief, nor has any

> new material been added to the record before the Court. Again, we apologize to the Court for the oversight.

(ECF 1592-1.)

The letter was not particularly revealing. It did not adequately explain why Inform considered itself entitled to file the third version of the memorandum after Google had filed its reply to the second version and without first seeking permission from the Court. Perhaps Inform credited the Court with remembering, upon its letter, that Google already had filed its reply brief on a motion in this MDL, or did not think it was important to mention it.

Google reports that the Third Memorandum added 27 footnotes, each containing a citation to the record, and rewrote additional eight citations to the record. (ECF 1604 at 2.) A redline that compares the Third Memorandum to the March 14 Memorandum records 417 total changes (ECF 1604-1), though many appear to be trivial and non-substantive. Inform's new record citations were principally added to a background section in which Inform gives a broad overview of the summary judgment record. (See id.)

On April 8, 2026, Google filed a pre-motion letter seeking leave to move to strike the Third Memorandum. (ECF 1604.) The Court deemed the pre-motion letter a motion to strike and directed Inform to respond. (ECF 1606.) Inform filed a response. (ECF 1623.)

Inform emphasizes that the Third Memorandum does not revise the substantive arguments of its prior memoranda and adds citations previously "omitted due to inadvertent error." (ECF 1623 at 1.) It argues that the Third Memorandum's revised citations point to already-existing paragraphs of its Local Civil Rule 56.1 Statement and do not supplement the factual record. It urges that the Court should accept the Third Memorandum as filed in order to fully adjudicate the merits of Google's summary judgment motion.

But Inform provides no elaboration about the "inadvertent error" that necessitated the Third Memorandum or the reason for its delay in correcting the error. Inform's failure to diligently correct the error is perplexing because, at some point between March 7 and March 14, Inform's counsel recognized that its initial opposition brief included minor errors and filed a corrected memo without explanation or comment. During that exercise, Inform should have identified whatever "inadvertent error" prompted the Third Memorandum. Had Inform timely written to the Court before Google's reply was due, explained its mistake and sought leave to file an amended memorandum, the Court may have granted the application and extended Google's time to reply. Instead, Inform waited until six days after Google filed a reply to file its unauthorized and untimely Third Memorandum.

A court's scheduling order "may be modified only for good cause and with the judge's consent." Rule 16(b)(4), Fed. R. Civ. P. "Whether good cause exists turns on the diligence of the moving party." Callahan v. County of Suffolk, 96 F.4th 362, 370 (2d Cir. 2024) (quotation marks omitted). Inform's unelaborated reference to "inadvertent error" does not support a finding of diligence. Inform did not seek the Court's leave prior to filing the Third Memorandum. Google would be prejudiced if the time, labor and expense required to prepare its reply memorandum were rendered a nullity due to the untimely and unauthorized Third Memorandum. Google would be further prejudiced if the Court were to accept an opposition brief that was redrafted after counsel had the benefit of receiving and reviewing Google's reply.

The motion to strike the Third Memorandum will be granted. The Court will base its adjudication of this motion on Inform's opposition brief of March 14, 2026 (ECF 1549). The Court notes that even if the motion to strike were not granted, none of the revisions contained in

the Third Memorandum would alter the Court's analysis of Google's summary judgment motion or affect the outcome.

II. Google's Motion for Summary Judgment on Inform's Sherman Act Claims Will Be Granted.

A. Overview of Inform's Claims.

The thrust of Inform's claims is different from those brought by the open-web publishers previously discussed in this Opinion and Order. Inform was in the business of online video advertising and it used Google products almost exclusively to sell online video ads. There are two types of online video ads: instream ads, which run as part of a longer video in a style similar to a TV commercial, and outstream ads, which automatically play as a visitor scrolls a website. See Inform, 2024 WL 988966, at *2 n. 1.

Inform was in business from approximately 2008 to 2017. (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14.) It syndicated video clips to online publishers and coordinated the placement of ads within those videos on the publishers' websites. (Pl. 56.1 Resp. ¶ 12.) "For example, alongside a newspaper's story about wildfires, a reader could view an Inform-produced video about wildfire risks that featured an advertisement for property insurance." Google III, 2025 WL 3012840, at *10. Inform's clients included newspapers and other online publishers, such as CBS, Reuters and the Associated Press. (Peters Dec. ¶ 4 (ECF 1706-2).) Historically, Inform had arranged for direct ad sales, which were more profitable than sales made via programmatic advertising. (See, e.g., Jardin Rep. ¶¶ 14, 36 (ECF 1362-1); Peña Rep. at 6 (ECF 1362-3); Peters Dep. at 70 (ECF 1362-11).)

On October 5, 2012, Inform and Google entered into an agreement for Inform to sell video ads through AdX. (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15.) Inform initially used a third-party ad server called Auditude but became a customer of DFP in December 2013. (Def. 56.1 ¶¶

16-17; Pl. 56.1 Resp. ¶¶ 16-17.) Google asserts that approximately 97.3% of Inform impressions filled by AdX were for instream video ads, though Inform asserts that it also transacted on AdX for outstream video ads and banner ads, and that Google's records do not include "the event-level data" required to identify a precise breakdown of instream ads versus outstream ads. (Def. 56.1 ¶¶ 33-34; Pl. 56.1 Resp. ¶¶ 33-34.)

Inform contends that in or around 2012 or 2013, Google recognized that its own video-advertising product was a poor one relative to Inform and began to strategize ways to overtake Inform. (See Pl. 56.1 Resp. ¶¶ 15, 50; Pl. Mem. at 2.) Inform argues that Google adopted a strategy to sabotage Inform and usurp its customer base by persuading Inform to become a customer of DFP and AdX. (See Pl. Mem. at 2-3.) According to Inform, Google then eroded Inform's business by not serving its ads and manipulating auction outcomes to disfavor Inform and favor Google, while also misleading Inform about the causes of its declining ad sales. (See Pl. Mem. at 3-4.) Inform asserts that after it began to use Google products, its advertising fill rate plummeted, as did revenue from third-party ad exchanges. (See Pl. Mem. at 4.) Google eventually overtook Inform as the leading source of news video and then opted not to renew Inform's contract for DFP, leaving Inform fatally weakened until it went out of business. (See Pl. Mem. at 4.)

Inform's claims differ from those of the open-web publishers in other important respects. Google points to evidence that instead of principally relying on AdX for its ad sales, Inform, in fact, earned more revenue from third-party ad exchanges Rubicon, SpotXChange, Optimatic, Collective, BrightRoll, 495, Adap.tv and Ad Karma than it did from AdX. (Def. 56.1 ¶ 20.) Inform argues that inaccuracies in billing summaries make it difficult to calculate these figures with precision (Pl. 56.1 Resp. ¶ 20), but it does not point to contradictory evidence or

assert that it relied on AdX as its primary or exclusive ad exchange. Google's expert concludes that between December 2013 and November 2019, AdX filled just 1.3% of Inform's impressions served through DFP, and that from December 2013 through May 2017, only 1% of Inform's revenue was derived from AdX. (Def. 56.1 ¶¶ 25-26.) While Inform purports to dispute these calculations, it does so vaguely, pointing to Inform's importance to Google as a client, the billions of ad impressions that Google allegedly refused to fill, and argues that a small number of impressions can generate substantial revenue. (Pl. 56.1 Resp. ¶¶ 25-26, 20, 23.)

In addition to bringing monopolization and tying claims directed to the markets for open-web display-ad ad servers and ad exchanges, Inform identifies online video advertising as a relevant antitrust market and has alleged that Google has monopoly power in that market. (See, e.g., Inform 4th Am. Compl't ¶¶ 108-16 (ECF 1195).) In the E.D. Va. Action, Judge Brinkema found that the product market for open-web display-advertisement ad servers does not include ad servers for instream video advertising. 778 F. Supp. 3d at 836 ("publisher ad servers for . . . instream video advertising are not reasonably interchangeable with, or significantly substitutable for, publisher ad servers for open-web display advertising.").

Inform's theory of damages is based on the expert opinion of David Kennedy, a certified public accountant employed by Berkeley Research Group. (ECF 1362-2.) Kennedy's damages analysis is premised on Inform's projected value as a going concern if it had not gone out of business, and is based on his estimate of Inform's value as of 2014, which he calculates as $479 million. (Kennedy Rep. ¶¶ 27, 124.) Thus, Inform seeks damages based on its estimated value in a but-for world where it had not driven out of business by Google's allegedly anticompetitive conduct that deprived it of ad sales. (Def. 56.1 ¶ 119; Pl. 56.1 Resp. ¶ 119.)

B. Inform Does Not Cite to Evidence that Would Permit a Reasonable Jury to Find that It Suffered Antitrust Injury Attributable to Google's Anticompetitive Activities in the Product Markets of the Open-Web Display-Ad Tech Stack.

Google argues that Inform can point to no evidence that it was harmed by reduced competition in markets for open-web display ad servers and ad exchanges. It points out that Inform's theory of antitrust injury and damages is premised entirely on the demise of its business, and that Inform has adduced no evidence to support a finding that it was harmed by Google's anticompetitive conduct in the ad-tech stack for open-web display ads.

Google cites the calculations of its expert, Jeffrey T. Prince, Ph.D., who concludes that the overwhelming majority of Inform's transactions on DFP and AdX were for video ads. Specifically, Prince concludes that 97.3% of Inform's impressions filled by AdX from December 2012 through May 2017, and 99.6% of Inform's impressions filled by AdX from December 2013 through May 2017, were for instream video ads. (Prince Dec. ¶ 6 (ECF 1362-95).) As to the DFP ad server, Prince concludes that 99.9% of Inform's impressions transacted through DFP were for video ads, though he was unable to determine whether the ads were for instream or outstream video. (Prince Dec. ¶¶ 7-8.) Consistent with these calculations, Inform's Rule 30(b)(6) witness, Gregory Peters, testified that Inform's "primary focus" was instream video advertising, although it would sometimes arrange for a static display ad to be shown next to its video player. (ECF 1362-11 at 83-85; see also id. at 55 ("we were focused on video advertising, not display advertising, but we deliver display advertising as desired by an ad buyer.").)

As noted, Judge Brinkema found that "publisher ad servers for open-web display advertising" are "not reasonably interchangeable with" "publisher ad servers for . . . instream video advertising . . . ." United States v. Google, 778 F. Supp. 3d at 836. As to ad exchanges, Judge Brinkema found that "ad exchanges that facilitate the sale of only instream video, mobile

app, or social media ads are not helpful for publishers seeking to monetize their open-web display inventory." Id. at 839. She cited an internal Google document that categorized "its 'display web' business as distinct from its . . . 'video instream' business." Id. at 839-40. Other parties to this MDL have distinguished the technology used for open-web display advertising from the technology used for instream video advertising.[5]

In Google III, the Court applied issue preclusion as to Inform's claim that Google has monopoly power in the product markets for publisher ad servers and ad exchanges but it did not address any distinction between how those products transacted open-web display ads versus video ads. 2025 WL 3012840, at *10. It noted that Inform had separately alleged the existence of antitrust product markets for online video advertising and a submarket for instream video advertising. Id. at *10 n. 11.

In response to Google's motion, Inform does not explain how Google's monopoly power in the ad-tech stack for open-web display ads affects transactions for instream video advertising, and specifically the instream video ads that Google calculates as making up 97.3% to 99.6% of Inform's transactions on AdX. Inform does not describe the competitive landscape as it relates to ad servers or ad exchanges that transact video ads. Inform's Rule 30(b)(6) witness described differences in ad servers' abilities to transact display ads and instream video ads. Peters testified that Inform initially used Auditude as its ad server because it had video capabilities that DFP did not, explaining that at the time Google's DFP ad server was "having problems with video" and "trying to get up to speed in video" until approximately 2011. (Peters

[5] See, e.g., Pub. 2d Am. Compl't ¶ 110 ("Google provides tools to both publishers and advertisers to participate in what the industry calls 'display advertising'—as opposed to video advertising or search advertising, which use different technologies that are not substitutable with the technologies publishers use for their display advertising across the Internet."); Israel Rep. ¶ 170 (defining "open web display" advertising as "display advertising . . . excluding instream video advertising."); Elhauge Rep. ¶ 213 (in the context of describing ad-buying tools, observing that "the lion's share of video ads are outside the relevant market because they are either sold non-programmatically or directly or in walled gardens.").

Tr. 71.) He also testified that DFP had been "delivering display ads, but the display ads couldn't morph in or transfer – or couldn't deliver video. So at the time there was not a lot of video players for us to deal with." (Peters Tr. 73.) In addition to Auditude, Inform also used ad servers and ad networks that included Adap.tv, SpotXchange, LKQD and SpringServe. (Peters Dep. 139-40; Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19.) It transacted more video ads on third-party ad exchanges that included Rubicon, SpotXChange, Optimatic, Collective, BrightRoll, 495, Adap.tv and Ad Karma than it did on AdX. (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20.)

As the non-movant, Inform "must set forth specific facts showing that there is a genuine issue for trial." Bustamante, 100 F.4th at 432. Inform's arguments in opposition neither identify an injury attributable to Google's monopoly power in the ad-tech stack for open-web display ads nor point to evidence showing that open-web display-ad technology overlaps with the technology for serving and selling instream video ads. The Court is unaware of any evidence in the summary judgment record that describes the market for ad servers and ad exchanges that transacted in online video ads. Inform argues that as soon as it became a client of Google, Google failed to serve Inform's ads, resulting in as many as billions of unfilled ads per day, and that it sold Inform's premium ad inventory valued at $15 to $20 cost per mille for as little as $.80 cost per mille.[6] (Pl. 56.1 Resp. ¶¶ 22, 23.) Inform asserts that after it became a DFP customer, Google failed to serve $23,542,500 worth of impressions each year. (Pl. 56.1 Resp. ¶ 41.) But accepting the truth of these figures, they do not identify an antitrust injury caused by Google's monopoly power in the market for *open-web display-ad* ad servers and ad exchanges. They describe an initiative specifically targeted toward Inform that involved ad tech for serving and

[6] "Cost per mille," or "cpm," is the price paid by an advertiser per thousand of impressions viewed.

transacting online *video advertisements*, not monopoly power in the ad tech stack of *open-web display ads*.

Though its phrasing is somewhat vague, Inform also seems to argue that even if approximately 3% of its AdX transactions involved the sale of open-web display ads, the Court's application of issue preclusion to the E.D. Va. Action precludes Google from re-litigating its liability for auction-manipulation practices, noting that even a small number of transactions "could translate into a significant amount of revenue." (Opp. Mem. at 8 n. 8.) But Google III made plain that "[n]othing in this Court's ruling on preclusion relieve the Moving Plaintiff's burden of proving antitrust injury and damages." 2025 WL 3012840, at *17. The possibility that Inform "could" have been driven out of business by harm to its open-web display-ad sales does not meet its burden as a party opposing summary judgment. Inform has not pointed to evidence, in the form of expert opinion or otherwise, that isolates antitrust injury or damages attributable to its transactions in open-web display ads. Comcast, 569 U.S. at 36. Inform's damages model is based upon the estimated value of its business as a going concern in 2014, and, unlike the open-web publisher plaintiffs, does not purport to ascertain damages based upon more discrete anticompetitive acts.

In short, Google has moved for summary judgment on the basis that no reasonable jury could find on the summary judgment record that Inform suffered antitrust injury caused by Google's anticompetitive conduct in the product markets of open-web display-ad ad servers and ad exchanges. In response, Inform cites to harms that it claims it suffered as a result of Google's conduct writ large, without identifying antitrust injury attributable to the ad-tech stack used to serve and sell open-web display ads. Because Inform has not pointed to evidence that would permit a reasonable jury to find that it suffered antitrust injury caused by Google's

anticompetitive conduct in the product markets for open-web display-ad ad servers and ad exchanges, Google's motion for summary judgment will be granted.

### C. Inform Does Not Cite to Evidence that Would Permit a Reasonable Jury to Find that Google Had Monopoly Power in the Market for Online Advertising.

Inform also brings claims asserting that Google monopolized or attempted to monopolize the market for online video advertising. Inform defines the market for online video advertising as "video advertising on the open web, which among other things includes instream online video advertising and excludes ads displayed on social media platforms or connected TV services . . . ." (Peña Rep. at 11 (ECF 1362-3).) On this motion, Google does not challenge Inform's market definition. Google argues that Inform has no evidence that would permit a reasonable jury to find that it had monopoly power in the market for online video advertising.

"To establish a § 2 violation for completed monopolization, a plaintiff must produce evidence sufficient to prove the defendant: (1) possessed monopoly power in the relevant market; and (2) willfully acquired or maintained that power." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 97 (2d Cir. 1998). "Monopoly power is 'the power to control prices or exclude competition.'" Geneva Pharms. Tech. Corp. v. Barr Laboratories Inc., 386 F.3d 485, 500 (2d Cir. 2004) (quoting United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956)). It "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." Tops Markets, 142 F.3d at 98. "While market share is not the functional equivalent of monopoly power, it nevertheless is highly relevant to the determination of monopoly power. A court may infer monopoly power from a high market share." Id. (internal citation omitted). "A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics.

These characteristics include the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand." Id. (internal citations and quotation marks omitted).

As to a claim of attempted monopolization, a plaintiff "must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455 (1993). "In considering the likelihood of achieving monopoly power, we employ the same concept of market power as that used in a completed monopolization claim, i.e., one which considers the defendant's relevant market share in light of other market characteristics, including barriers to entry." Tops Markets, 142 F.3d at 100. "[T]he conduct of a single firm, governed by § 2, is unlawful only when it threatens actual monopolization." Spectrum, 506 U.S. at 456 (quotation marks omitted).

Google argues that summary judgment should be granted in its favor because Inform has adduced no evidence of Google's market power in the market for online video advertising. It asserts that Inform has no ordinary-course evidence of Google's market power and that Google's expert economist, Pablo A. Peña, Ph.D., an economics professor at the University of Chicago, describes Google's market power in two paragraphs that lack analysis or evidentiary support. (See Peña Rep. at 19.) Google argues that Inform can point to no evidence of Google's market share, supra-competitive pricing or market-output restrictions.

In his expert report, Dr. Peña opines that the market for online video advertising "was directly affected by the ad exchange market because it was comprised of ads transacted on ad exchanges as well as ads transacted via direct deals." (Id.) He states that because Google had market power in the ad-exchange market, "it necessarily follows that Google had market power

in the online video advertising market. This simply is a corollary." (Id.) Dr. Peña then observes that "a large fraction of publishers" use the DFP ad server and repeats his observation that Google's market power in ad exchanges "translates into market power in the online video advertising market." (Id.) "To put it plainly, Google's power in the online video and ad exchange market was made possible because DFP was widely used by publishers who did not have realistic alternatives, and were deceived by Google into believing that DFP was executing their directions when it was not." (Id.)

Dr. Peña's report makes no calculation of Google's market share in the online video advertising market. He does not opine on other indicia of market power, such as the strength of competition, the development of the product market, barriers to entry, the nature of Google's alleged anticompetitive conduct or the elasticity of consumer demand. See Tops Markets, 142 F.3d at 98. His opinion about Google's market power boils down to the conclusory assertion that Google's market power in ad servers and ad exchanges automatically translated to market power in online video advertising. This is not a self-proving proposition, and Dr. Peña cites no data or analysis that supports it. Cf. In re Set-Top Cable Television Box Antitrust Litig., 2011 WL 1432036, at *12 (S.D.N.Y. Apr. 8, 2011) ("It would be as if a plaintiff had adequately alleged a product market consisting of orange juice, but relied on the defendant's position in the overall beverage industry as evidence of market power.").

In opposition to Google's motion, Inform also cites an internal Google analysis about potentially acquiring Inform, which stated that "the YouTube platform is the world's great infrastructure for web and mobile video." (Pl. 56.1 Resp. ¶ 50.) Inform calls this "compelling circumstantial evidence that YouTube had a dominant market share . . . ." (Pl. 56.1 Resp. ¶ 50.) No reasonable jury could find that this internal puffery about the quality of YouTube is evidence

of market share. It does not speak to the relevant factors for proving market power and is merely internal, opinion-based praise of Google's own product.

Other evidence cited by Inform is off the mark. Inform argues that Google diverted Inform's more lucrative direct ad sales to less-profitable programmatic sales, and argues that Google's ability to "supplant" more lucrative direct deals with programmatic sales is evidence of market power. Inform does not label this as a function of EDA, though the description is consistent with EDA. Inform also argues that Google favored YouTube when it transitioned its Chrome browser from Adobe Flash to HTML5, explaining that Inform and other publishers utilized Flash. (See generally Pl. 56.1 ¶¶ 156-67 (summarizing evidence about Google's adoption of HTML5 for video ads (ECF 1666).) But accepting Inform's contentions that Google acted to supplant direct deals and favored itself in the transition to HTML5, this conduct would not be evidence of Google's monopoly power. Inform does not link these actions to an increase in Google's market share, imposition of anticompetitive pricing or reduced output.

Much of Inform's responsive memorandum argues that there is sufficient evidence to support its definition of an antitrust product market in online video advertising. (Opp. Mem. at 14-15, 17-19.) But Google's motion does not challenge Inform's market definition.

In summary, Inform's expert economist did not attempt to calculate Google's market share in the market for online video advertising, and his analysis of Google's monopoly power is conclusory and unsupported. Additional evidence cited by Inform would not permit a reasonable jury to find that Google had monopoly power in the market for online video advertising. Google's motion for summary judgment on Inform's claims that Google monopolized or attempted to monopolize the market for online video advertising will be granted.

D. Google's Summary Judgment Motion Directed to the YouTube Tie Will Be Granted.

Inform also brings a tying claim asserting that in order to access the inventory of video ads available on YouTube (the tying product), it forces advertisers to use its DV360 and Google Ads ad-buying tools (the tied product). (Inform 4th Am. Compl't ¶¶ 178-83, 382-86.) Because Inform has not pointed to evidence that would permit a reasonable jury to find that Google "has sufficient economic power in the tying product market to coerce purchasers into buying the tied product," Kaufman, 836 F.3d at 147, Google's summary judgment motion will be granted. The motion will also be granted because Inform has not defined a product market for ad-buying tools, and because Inform has not pointed to evidence that the claimed product tie has had an anticompetitive effect in the product market for ad-buying tools. See id. at 141.

Inform's memorandum in response makes no effort to address the evidentiary shortcomings identified by Google. It argues that its YouTube-based tying claim "fits squarely within the tying framework" of the AdX-DFP tie found in the E.D. Va. Action. (Opp. Mem. at 19-20.) But the E.D. Va. Action made no findings about the markets for online video advertising, YouTube or anticompetitive conduct in a market for ad-buying tools.

Because Inform has not cited to evidence that would permit a reasonable jury to find in its favor, Google's motion for summary judgment will be granted on the tying claim directed to YouTube and Google's ad-buying tools.

III. Inform and Google Shall Submit Letter Briefs on the Court's Exercise of Supplemental Jurisdiction.

Inform also brings claims under of tortious interference and common-law fraud under Georgia law. The Complaint identifies Inform as a Delaware corporation with its principal place of business in Georgia. (Inform 4th Am. Compl't ¶ 19.) It identifies defendant Alphabet

Inc. as a Delaware corporation with its principal place of business in California. (Inform 4th Am. Compl't ¶ 21.) The citizenship of defendants Google LLC and YouTube LLC is not alleged. (Inform 4th Am. Compl't ¶¶ 20, 23.) The Complaint asserts federal question jurisdiction and supplemental jurisdiction over the state law claims. (Inform 4th Am. Compl't ¶¶ 26-27.) Because a Delaware plaintiff is bringing claims against a Delaware defendant, there is no federal diversity jurisdiction. 28 U.S.C. § 1332.

District courts "may decline to exercise supplemental jurisdiction over a claim" where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). District courts are instructed "that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims.'" Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (ellipsis omitted) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)). The relevant factors are "the traditional 'values of judicial economy, convenience, fairness, and comity.'" Id. (quoting Cohill, 484 U.S. at 350).

Parties are entitled to notice and the opportunity to be heard on a court's exercise of supplemental jurisdiction. Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 82-84 (2d Cir. 2018). Neither Google nor Inform has addressed whether the Court should exercise supplemental jurisdiction over the two claims brought under Georgia law in the event that Inform's federal claims are dismissed. Within seven days of this Opinion and Order, Inform shall submit a letter-brief setting forth its views over whether the Court should exercise supplemental jurisdiction over its state law claims. Google may respond within seven days thereafter.

CONCLUSION

For the reasons explained, the Court concludes as follows:

1. Associated Newspapers v. Google LLC, and Gannett Co., Inc. v. Google LLC: Google's motion to exclude the opinions of Shengwu Li and Ali Hortacsu is DENIED. Google's summary judgment motion is GRANTED as to plaintiffs' claims brought under the New York General Business Law but otherwise DENIED. The partial summary judgment motion of Gannett and Daily Mail is GRANTED to the extent that Google asserts that Daily Mail could have mitigated damages by publishing fewer "salacious" articles and that Gannett could have mitigated damages by making different business decisions but otherwise DENIED to the extent that Google urges plaintiffs could have mitigated damages by adjusting their use of the DFP ad server. Google's affirmative defense of unclean hands is voluntarily dismissed.

2. In re: Google Digital Publisher Antitrust Litigation: Google's summary judgment motion is DENIED as to the claims of the AdX Class and Mikula but GRANTED as to the claims of The Progressive. The Clerk is respectfully directed to enter judgment in favor of Google LLC and Alphabet Inc. solely as to the claims of The Progressive Inc. The claims of JLaSalle Enterprises LLC have been voluntarily dismissed and the Clerk is respectfully directed to terminate it as a plaintiff. Plaintiffs have voluntarily dismissed Count III and Count IV, and do not rely on the following as to their remaining claims: Project Bernanke, Line-Item Capping, Redaction of Auction Data, Project Poirot, Project Elmo, Minimum Bid to Win and discriminatory risk aversion coefficients. Google's motion to exclude the expert opinions of Einer Elhauge and Anand Das is DENIED.

3. Inform Inc. v. Google LLC: Google's motion for summary judgment is GRANTED as to Counts I through V. Within seven days of this Opinion and Order, Inform shall file a letter-brief setting forth its views on whether the Court should exercise supplemental

jurisdiction over its claims for tortious interference and fraud brought under Georgia law. Google may respond within seven days thereafter.

The Clerk is respectfully directed to terminate the following motions: In re: Google Digital Advertising Antitrust Litigation, 21-md-3010 (PKC): ECF 1255, 1352, 1357, 1358, 1576 and 1581; Associated Newspapers Ltd. et al. v. Google LLC et al., 21-cv-3446 (PKC): ECF 218 and ECF 346; In re Google Digital Publisher Antitrust Litigation, 21-cv-7034 (PKC): ECF 291 and ECF 350; Inform Inc. v. Google LLC et al., 23-cv-1530: ECF 148; and Gannett Co., Inc. v. Google LLC et al., 23-cv-5177 (PKC): ECF 159 and ECF 284.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 30, 2026