# Exhibit 15

## Redacted Pursuant to
## MDL Dkt. Nos. 1784 and 2076

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE GOOGLE DIGITAL : Civil Action No.
ADVERTISING ANTITRUST : 1:21-md-03010-PKC
LITIGATION :

______________________________

VIDEO DEPOSITION OF SCOTT SPENCER

Tuesday, June 25, 2024

9:12 a.m. Eastern

Reported by: Dana Welch, CSR, RPR, CRR

Job No.: 2024-944400

Tuesday, June 25, 2024

9:12 a.m. Eastern

Video Deposition of SCOTT SPENCER, appearing at Le Meridian Hotel, 20 Sidney Street, Cambridge, Massachusetts 02139, reported by Dana Welch, a Registered Professional Reporter, Certified Realtime Reporter, and notary public of the Commonwealth of Massachusetts.

APPEARANCES OF COUNSEL:

On behalf of Associated Newspapers:
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK
Christopher Goodnow, Esq.
1615 M Street, NW, Ste 400
Washington, DC 20036
202-326-7907
cgoodnow@kellogghansen.com

On behalf of MDL Plaintiffs' Discovery Steering Committee:
BOIES SCHILLER FLEXNER LLP
Sean Phillips Rodriguez, Esq.,
Izaak Earnhardt, Esq.
44 Montgomery Street, 41st Floor
San Francisco, CA 94107
srodriguez@bsfllp.com
Iearnhardt@bsfllp.com

On behalf of Inform Inc. and News Distribution Network:
HERMAN JONES LLP
Serina M. Vash, Esq. (Via Zoom)
153 Central Avenue #131
Westfield, New Jersey 07090
404-504-6516
svash@hermanjones.com

Counsel for Defendants Google LLC, Alphabet Inc., and YouTube LLC:

FRESHFIELDS BRUCKHAUS DERINGER US LLP
Julie Elmer, Esq.
Claire Leonard, Esq.
Matthew Steyl, Esq. (Via Zoom)
700 13th Street NW, 10th Floor
Washington, DC 20005
(202) 777-4500
julie.elmer@freshfields.com
clair.leonard@freshfields.com
matthew.steyl@freshfields.com

APPEARANCES CONTINUED:

On behalf of Google LLC:
AXINN, VELTROP & HARKRIDER LLP
Kenina Lee, Esq. (Via Zoom)
1901 L Street NW
Washington, DC 20036
202.912.4700
klee@axinn.com

On behalf of Plaintiffs:
AHDOOT & WOLFSON, PC
Henry Jan Kelston,Esq. (Via Zoom)
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
310.474.9111
hkelston@ahdootwolfson.com

Also Present: Justin Cohen, Esq.(GOOGLE)
Dan Lohaus, Videographer
Darrel Exline, Technician

I N D E X

WITNESS:

SCOTT SPENCER


| EXAMINATION: | PAGE: |
| --- | --- |
| BY MR. GOODNOW | 6 |
| BY MR. EARNHARDT | 189 |
| BY MS. VASH | 235 |
| BY MR. KELSTON | 311 |

EXHIBITS MARKED:

| NO. DESCRIPTION | PAGE: |
| --- | --- |
| Exhibit 1, LinkedIn profile Scott Spencer | 18 |
| Exhibit 2, Document Bates labeled GOOG-DOJ-09916600 | 44 |
| Exhibit 3, Document Bates labeled GOOG-AT-MDL-014082831 - 2832 | 63 |
| Exhibit 4, Document Bates labeled GOOG-DOJ-14271826 - 1830 | 73 |
| Exhibit 5, Document Bates labeled GOOG-AT-MDL-014515755 - 5757 | 88 |
| Exhibit 6, Document Bates labeled GOOG-AT-MDL-014627597 - 27598 | 104 |
| Exhibit 7, Document Bates labeled, GOOG-DOJ-14849643 - 9644 | 116 |

INDEX CONTINUED:

EXHIBITS MARKED:


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8, Document Bates labeled GOOG-AT-MDL-004344298 - 299 | | 139 |
| Exhibit 9, Document Bates labeled GOOG-AT-MDL-004344300 - 4314 | | 139 |
| Exhibit 10, Document Bates labeled GOOG-AT-MDL-013405085 - 5101 | | 165 |
| Exhibit 11, Document Bates labeled GOOG-AT-MDL-010668643 - 656 | | 183 |
| Exhibit 12, Document Bates labeled GOOG-DOJ-15600216 - 218 and attachment | | 198 |
| Exhibit 13, Document Bates labeled GOOG-DOJ-15616116 - 117 and attachment | | 208 |
| Exhibit 14, Document Bates labeled GOOG-DOJ-14257049, | | 225 |
| Exhibit 15, Document Bates labeled GOOG-DOJ-08479873 | | 245 |
| Exhibit 16, Document Bates labeled GOOG-DOJ-32031835 | | 250 |
| Exhibit 17, Document Bates labeled GOOG-AT-MDL-015997478 | | 254 |

INDEX CONTINUED:

EXHIBITS MARKED:

| NO. DESCRIPTION | PAGE |
|---|---|
| Exhibit 18, Document Bates labeled, GOOG-AT-MDL-015997478 (slipsheet for Ex. 17) | 255 |
| Exhibit 19, Document Bates labeled GOOG-AT-MDL-0003083652 - 003083655 | 260 |
| Exhibit 20, Document Bates labeled GOOG-AT-MDL-014624939 through 014624940 | 265 |
| Exhibit 21, Document Bates labeled GOOG-DOJ-32039637 | 273 |
| Exhibit 22, Document Bates labeled GOOG-DOJ-13327124 - 131 | 280 |
| Exhibit 23, Document Bates labeled GOOG-DOJ-03756034 | 282 |
| Exhibit 24, Document Bates labeled GOOG-DOJ-14271324 - 14271328 | 284 |
| Exhibit 25, Chrome Blog article, "Better Battery Life for Your Laptop," | 286 |
| Exhibit 26, Document Bates labeled GOOG-DOJ-02849873 - 9874 | 288 |
| Exhibit 27, Document Bates labeled GOOG-DOJ-07482759 - 2761 | 289 |

INDEX CONTINUED:

EXHIBITS MARKED:

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit 28, | GOOG-DOJ-03064429 - 3064439 | 299 |
| Exhibit 29, | GOOG-DOJ-14367640 - 14367643 | 302 |
| Exhibit 30, | GOOG-DOJ-13357360 - 13357363 | 308 |

Exhibits retained by reporter and portions electronically transmitted.

P R O C E E D I N G S

THE VIDEOGRAPHER: We are now on the record. My name is Dan Lohaus, I'm a videographer retained by Lexitas. This is a video deposition for the U.S. District Court for the Southern District of New York. Today's date is June 25th, 2024, and the time on the video monitor is 9:12 a.m.

This deposition is being held at 20 Sidney Street in Cambridge, Massachusetts in the matter of In Re: Google Digital Advertising Antitrust Litigation. The deponent is Scott Spencer.

All remote counsel will be noted on the stenographic record. Would counsel present please identify yourselves and state whom you represent, beginning with the taking attorney.

MR. GOODNOW: Good morning. My name is Chris Goodnow, I'm with the firm of Kellogg Hansen. We represent Daily Mail and Gannett, who are two of the plaintiffs in this case.

MR. EARNHARDT: My name is Izaak Earnhardt, from Boies Schiller & Flexner and we represent plaintiffs in this litigation.

MS. ELMER: Julie Elmer. I represent Google and the witness, from the firm Freshfields, Bruckhaus, Deringer.

MS. LEONARD: Claire Leonard, also representing Google and the witness from Freshfields.

MR. COHEN: Justin Cohen, in-house at Google.

THE VIDEOGRAPHER: The court reporter today is Dana Welch and she will now swear in the witness and counsel may then proceed.

SCOTT SPENCER,

having been identified and sworn on oath, testified as follows:

EXAMINATION

BY MR. GOODNOW:

Q. Good morning, Mr. Spencer. Could you please state and spell your name for the record?

A. My name is Scott Spencer, S-c-o-t-t S-p-e-n-c-e-r.

Q. And do you recall you were deposed by the Department of Justice on August 21, 2021?

A. I know I was deposed. I couldn't tell you the date.

Q. On or around August 21st, 2021?
A. That sounds about right.
Q. What was that deposition about?
A. About advertising.
Q. Do you understand the Department of Justice since has sued Google regarding its advertising technology?
A. I understand --
MS. LEE: Objection to form.
A. I understand there's a case, but I don't know the details.
Q. So you haven't read the complaint in that case?
A. No.
Q. Do you have any understanding of what that case is about?
A. Only at high level.
Q. What's your high-level understanding of that case?
A. That there's questions about what Google did with regards to ad serving technology over a long period of time.
Q. And you understand that the State of Texas also has sued Google regarding its ad

serving technology?
MS. LEE: Objection to form, and I'm sorry to interject, I just want to say that with respect to this line of questioning, Mr. Spencer, you can answer to the extent that doing so would not reveal any privileged communications that you've had with your attorneys, Google's lawyers. But you may answer.
A. I'm sorry, the question was again?
Q. Sure. And do you understand that the state of Texas also has sued Google regarding its ad serving technology?
MS. LEE: Objection.
A. I believe I've heard that.
Q. Have you read the complaint in that case?
A. No, I have not.
Q. Have you been deposed since August 2021, regarding Google's advertising technology?
A. Not regarding this case.
Q. Okay. Have you been deposed regarding any case?
A. Yes.
Q. Which one?
A. There was a patent case.

Q. And when was that?
A. About two weeks ago.
Q. Okay. So then these will be familiar to you, but I want to start with a handful of ground rules just to make sure we're on the same page, if that's okay. You understand there's a court reporter transcribing your testimony today?
A. Yes.
Q. Because your testimony will be written in a transcript, please make sure to give audible answers, no head shakes, uh-huh, um-hum. Does that work?
A. Yes.
Q. And to make sure the record is clear, please allow me to finish my questions before you answer and I will try to make sure I let you complete your answers before I ask the next question. If we talk over each other, that makes it difficult for the court reporter. Does that sound okay?
A. Yes.
Q. When I ask a question, I'm going to assume you understood it unless you tell me otherwise. Do you understand that?

A. I understand that.

Q. So if something in my question is unclear, please let me know and I will do my best to clarify. Okay?

A. Okay.

Q. And as you already heard, your attorney may object to some of my questions today. In response, I might restate my question or I might stand on the question as I originally asked it. Either way, you must answer my question unless your attorney specifically instructs you not to answer it on the basis of privilege. You understand that?

A. I understand that.

Q. If you need a break, let me know, we'll take a break as soon as we can. If we're in the middle of a topic, I'll probably try to wrap that up before we take a break, but otherwise, I'll do my best to accommodate when you ask. How does that sound?

A. Understood.

Q. Earlier, the court reporter swore you in. Do you recall that?

A. Yes.

Q. You understand you are under oath and have sworn to tell the truth just as if you were testifying in court in front of a judge and jury?

A. Yes.

Q. Do you agree it's important to be transparent when you make representations in a legal case?

A. Of course.

Q. And do you agree --

MS. LEE: Form.

Q. -- it's important to be candid and forthcoming when you make statements to a court under penalty of perjury?

A. Yes.

MS. LEE: Same objection.

Q. Do you agree you are required to testify to the best of your knowledge?

THE WITNESS: I'm sorry. I keep hearing chirps, but I don't know what she's saying.

THE VIDEOGRAPHER: She's objecting.

MS. LEE: I just objected to form and please let mow me know if I'm not clear on the audio.

MR. GOODNOW: Thanks.

Q. Okay. So the question was, do you agree you are required to testify to the best of your knowledge?
A. Yes.
Q. Is there anything that would prevent you from giving full, complete, and honest testimony today?
A. No.
Q. How many hours did you spend preparing for this deposition?
A. About six.
Q. Over how many sessions?
A. One.
Q. When was that preparation session?
A. Yesterday.
Q. Who was at that session?
A. These three -- two, sorry.
Q. Anyone other than the two lawyers seated next to you?
A. I think there might have been a third, but I don't recall.
Q. A third lawyer?
A. Yes.
Q. Was there anyone other than a lawyer

present at your preparation session?
A. No.
Q. Did you review any documents during that session?
A. Yes.
Q. How many documents did you review?
A. Maybe five or six.
Q. Have you reviewed any other documents in preparation for this deposition outside of that session?
A. No.
Q. Did your attorneys provide you the documents that you reviewed during that session?
A. Electronically.
Q. Have you reviewed any documents not provided you by your attorneys in preparation for this deposition?
A. No.
Q. Did any of the documents that you did review refresh your recollection?
A. There were acronyms that I probably wouldn't have remembered had I not seen them.
Q. Which acronyms, if you recall?
A. Silence my phone.

One acronym was "NES Review."
Q. What does "NES Review" stand for?
A. Neal, Eisar, [redacted] Review.
Q. Who is Neal Eisar [redacted]?
A. Those were three of the leads for the Google ads team at the time.
Q. What was that review about?
A. It was the review forum.
MS. LEE: Objection to form.
A. It was a review forum.
MS. ELMER: I think there's a delay in hearing Kenina's objections because she's remote, so maybe wait a beat.
Q. What is a review forum?
A. A review forum is a meeting.
Q. And when did this review forum take place?
A. During the period when Neal, Eisar, and [redacted] were the leads, they held a forum for reviewing decisions.
Q. And which [redacted] is included in Neal, Eisar, and [redacted]?
A. That would be [redacted].
Q. Did you work for [redacted]?

A. No. I reported to Neal Mohan.
Q. Directly to Neal Mohan?
A. At that time of the forum, I think I reported to Jonathan Bellack to Neal Mohan, but maybe at times to Neal Mohan directly.
Q. And when was the period when Neal, [redacted], and Eisar were the leads?
A. Around 2015, '16.
Q. And they were the leads of what?
A. The ad serving business.
Q. What's the ad serving business?
A. The business that had our ad serving products.
Q. And what were Google's ad serving products?
A. During which time period?
Q. During the time period of this forum.
A. That would be Ad Manager and DV360.
Q. Did Ad Manager exist around the time of 2015 or 2016?
A. I'm trying to remember.
MS. LEE: Objection to form.
A. I'm trying to remember the time frame for when the name changed.

Q. If I told you the name changed in 2018, would that sound right?

MS. LEE: Objection to form.

A. It would not surprise me. It's hard to remember the dates.

Q. And what was Google Ad Manager before the name change?

A. Google Ad Manager was the -- I think it was called at the time DoubleClick For Publishers Product and the DoubleClick Ad Exchange.

Q. And what did you discuss about the DoubleClick For Publishers Product and the DoubleClick Ad Exchange during that forum?

MS. LEE: Objection to form.

A. As I said, it's an ongoing meeting, so it would be many decisions.

Q. Do you recall any of the decisions?

A. Not in particular.

Q. Did anything in the document remind you of any of the decisions?

A. No.

MR. GOODNOW: I'll note for the record that we'll ask that document to be produced if it hasn't already been produced in the litigation,

but I'll move on.
MS. ELMER: All documents shown to the witness were produced in the litigation.
MR. GOODNOW: Thank you.
Q. And you are no longer employed by Google; is that correct?
A. That's correct.
Q. When did you leave?
A. About a year and a half ago.
[redacted]
MS. LEE: Objection to form. Sorry, Mr. Spencer, I'm going to object to the line of questioning regarding any attorney retention related to Mr. Spencer as privileged communications.
MR. GOODNOW: The objection is baseless and not well taken, but let me move on.
[redacted]

[redacted]

Q. And do you know how many --

MR. GOODNOW: Excuse me. Rephrase.

[redacted]

MS. LEE: Objection to form.

You may answer.

[redacted]

Q. Okay. All right. Mr. Spencer, let's start with our first exhibit, and this should look familiar to you.

(Exhibit 1, LinkedIn profile Scott spencer, marked for identification.)

Q. So Mr. Spencer, take a second to look at the document I just handed you, which has been marked as Exhibit 1. I will represent to you this is the profile of your LinkedIn page that we printed out off the Internet.

Take a look and when you've had a chance to review, let me know if it seems accurate.

A. This appears accurate.

Q. Okay. Great.

So let's just do a little bit of background history here. You have two bachelors in economics, one from MIT and another from the London School of Economics?

A. No, it's one bachelors.

Q. Okay. So there's a second BS Economics listed under the London School of Economics on the third page.

Do you see that?

A. Yes.

Q. What does that represent?

A. That represents junior year abroad.

Q. Okay. Gotcha. Thanks.

Then if we go to page 2, we see that you joined DoubleClick in 2000, as a vice president

of product management?

A. That was my title when I finished DoubleClick.

Q. What was your title when you joined DoubleClick?

A. Product manager.

Q. How long were you a product manager for?

A. I forget all the title changes that occurred at DoubleClick, but about two years.

Q. Okay. How long were you a vice president of product management at DoubleClick?

A. I was a vice president of product management roughly a year and a half before the acquisition.

Q. So that would have been about mid 2006, to March 2008?

A. That sounds about right.

Q. Okay. And is the description here starting "VP product management," a description just of your responsibilities while you were a VP of product management?

A. That's a compilation of the time that I was at DoubleClick.

Q. In its entirety, the full eight year

period?
A. Yes.
Q. So here you wrote that you were responsible for the development of all ad serving related products at DoubleClick, including DART For Publishers.
Do you see that?
A. Yes.
Q. And when did you have that responsibility?
A. DART For Publishers was the first product that I managed when I joined DoubleClick.
Q. So you were responsible for DART For Publishers during your full eight years at DoubleClick?
A. Yes.
Q. What is DART For Publishers?
A. DART For Publishers is an ad serving solution designed for publishers to use.
Q. Okay. And is another word for an ad serving solution designed for publishers to use, a publisher ad server?
MS. LEE: Objection to form.
A. Some people may refer to it as a

publisher ad server.
Q. Would you?
A. I tend to call it an ad server for publishers.
Q. What is an ad server for publishers?
A. Ad servers are technology to manage the placement of creatives on a publisher's site app or whatever content they have so that they can deliver them, build them, report on them.
Q. And does "DART" stand for something?
A. At the time, it did.
Q. Do you recall what it stood for?
A. Yes.
Q. What was it?
A. Dynamic ad serving, reporting and targeting.
Q. Okay. Google acquired DoubleClick around 2008?
A. That's when it closed, yes.
Q. And after that acquisition, did Google rebrand DART as DoubleClick For Publishers?
A. I don't remember if the rebranding was before or after the acquisition, but around that time.

Q. Would Google have rebranded before the acquisition?
A. Google --
MS. LEE: Objection to form.
A. Google would not have rebranded it, but DoubleClick would have rebranded it.
Q. So the name DoubleClick For Publishes came either from DoubleClick or Google and you can't recall which?
MS. LEE: Objection to form.
A. I cannot recall if that was done -- I think it was actually done by the DoubleClick team, but I'm not a hundred percent sure.
Q. Okay. And then you joined Google after the acquisition in 2008?
A. I was -- joined as part of the acquisition.
Q. When you joined, were you a director of product management at Google?
A. When I joined, the title they gave me, I believe, was director of product management.
Q. And you kept that title from 2008, until November of 2019?
A. That sounds about right. I don't

remember the title changes.

Q. Okay. Well, there was no title change during that period from 2008 to November 2019?

A. The titles at Google were different than the titles at DoubleClick, so there was product director versus director of product, things of that nature.

Q. Did your title change between the years of 2008, and November of 2019, at Google?

A. I believe it did.

Q. Okay. So here you have listed director product management on your LinkedIn profile.

Do you see that?

A. Yes.

Q. What other titles did you have during your time at Google between 2008, and November 2019?

A. Product management director or I think product director, they called it.

Q. So one title was product director and another title was director of product management?

A. That's correct.

Q. Were there any other titles?

A. I don't remember when I was promoted to a

VP.
Q. Okay. And while you were in this 11 year period between 2008 and 2019, were you responsible for the development of the DoubleClick Ad Exchange business?
A. The DoubleClick Ad Exchange was developed before Google at DoubleClick and I maintained oversight of that product through the transition.
Q. Up to and including November 2019?
A. Approximately.
Q. Okay. Do you recall if Google had an ad exchange product before the acquisition?
A. Yes.
MS. LEE: Objection to form.
Q. Did they have a product before the acquisition, an Ad Exchange product?
A. They didn't have a product that was called an Ad Exchange. They had an ad network.
Q. Is there a difference between an ad network and an Ad Exchange?
A. Yes.
Q. What is that difference?
A. An Ad Exchange uses an auction with multiple buyers, an ad network of which there's

many forms, either is for representation of inventory, for selling it through an outsource sales team or for, in the case of referrals, it can be based off of conversion optimization.

Q. And who are the multiple buyers on an Ad Exchange?

MS. LEE: Objection to form.

A. The types of buyers on ad exchanges changed from when it was originally created until today.

Q. Okay. Who are the buyers on ad exchanges when they were originally created?

A. The original intent was that advertisers would directly buy on the Ad Exchange.

Q. Okay. And that changed at some point?

A. Yes.

Q. When did that change?

A. About 2008, there was a realization that advertisers didn't have the sophistication or tools to buy directly.

Q. Okay. So around 2008, who did start buying on ad exchanges?

A. The agencies started to buy on ad exchanges instead of direct advertisers, though

some direct advertisers still did.

Q. Anyone other than agencies that buys on ad exchanges after 2008?

A. Certainly. After 2008, it became more sophisticated and so the buyers would include DSPs, trade desks, even networks.

Q. What's a "DSP"?

A. A DSP is a demand side platform.

Q. Does Google have demand side platforms?

A. Yes.

Q. What are they?

A. It was called Bid Manager at the time and I believe now is part of DV360.

Q. Are you familiar with Google AdWords?

A. Yes.

Q. Since then rebranded as Google Ads?

A. I believe that's correct.

MS. LEE: Objection to form.

Q. Is Google Ads a DSP?

MS. LEE: Objection to form.

A. Today, in a manner, all networks have become DSPs.

Q. What do you mean by that?

A. Over time, the function of bidding became

available to more and more players, so that today, as I said before, networks can be bidders, DSPs can be bidders, large advertisers can be bidders, agencies can be bidders, so multiple types can become bidders.

Q. When you say all networks have become DSPs, are you saying that every buyer on an exchange is a DSP?

MS. LEE: Objection to form.

A. No. I'm saying that over time, the ability to buy and that sophistication became more available, and so perhaps not all, but many ad networks also became buyers on exchanges.

Q. And the networks became buyers on exchanges by developing the sophistication of a DSP?

MS. LEE: Objection to form.

A. They became buyers on networks by developing bidder technology.

Q. And a DSP has bidder technology?

A. Yes.

Q. Okay. Is there anyone else other than DSPs, trade desks, ad networks, and large advertisers that bid on exchanges?

A. I believe I also said agencies.
Q. And agencies.
Does Google disallow others from bidding on their Ad Exchange?
MS. LEE: Objection to form.
A. I don't understand the question.
Q. Is it a Google policy that no one other than the entities you've named are not allowed to bid on the Google Ad Exchange?
MS. LEE: Objection to form.
A. I don't know of any other type of entity that would want to buy on an exchange.
Q. Okay. So if we look at your LinkedIn page, sort of toward the top third, we're still talking about the director of product management period. It says here that you set the strategic direction for the product.
Do you see that?
A. Yes.
Q. The product there is the DoubleClick Ad Exchange?
A. Which line?
Q. You see where it says director product management in the top third of the page there?

A. Yes.
Q. And you see the second line there says DoubleClick Ad Exchange business?
A. Yes.
Q. And you see the third line there says, "Setting the strategic direction for the product"?
A. Yes.
Q. And the product there refers to the DoubleClick Ad Exchange business?
A. Yes. But it also -- there were other products as well.
Q. What were the other products?
A. This is for -- from my time at Google, I worked on the Ad Exchange, I worked on the coalition for better ads and I worked on ads privacy and safety.
Q. Did you work on the coalition for better ads during the period of 2008, to 2019?
A. Trying to remember which dates are which dates. This is just the 2019, how it's broken out. The coalition for better ads started about 2019.
Q. And did you -- and you didn't work for

ads privacy and safety from 2008, until November of 2019; is that correct?

A. Ads privacy and safety started in 2019. The coalition for better ads work was at the tail end of my work as the director of product management.

Q. Okay. When you say the ads privacy and safety work started in 2019, is that November 2019, when you moved to a vice president role?

A. I can't remember if the title change and the role change coincided exactly.

Q. Okay. So if we look at strategic direction again in the 2008, to 2019 period, what does it mean that you set the strategic direction for the DoubleClick Ad Exchange business?

MS. LEE: Form.

A. My role was to --

THE WITNESS: Was that a --

MS. LEE: Go ahead.

A. My role was to help figure out what was the set of features, functionality that we would put into the exchange and ensure that it was all cohesive.

Q. And in determining the set of features and functionality that you would put into the exchange, did you talk to publishers?
A. Yes.
Q. How often would you talk to publishers?
A. As often as they'd let me.
Q. How often was that?
A. We would periodically have user groups meet with customers when they had issues. I don't know, maybe once a month.
Q. And what did you learn from publishers when you met with them once a month?
MS. LEE: Objection to form.
A. When I met with publishers, I would learn what their needs were.
Q. What their needs were from the Ad Exchange?
A. What their needs were --
MS. LEE: Objection to form.
A. What their needs were for ad serving, which would include the Ad Exchange.
Q. Did you learn how publishers used the ad server and the Ad Exchange?
MS. LEE: Objection to form.

A. I learned many different perspectives of how they were using both ad serving and the Ad Exchange.

Q. Did you learn anything about rival ad servers and rival ad exchanges during these conversations?

A. Yes.

MS. LEE: Objection to form.

Q. What did you learn about them?

A. I learned that -- what kinds of features and functionality publishers liked about other solutions that they were using.

Q. Did you have any oversight responsibility for sales teams in your role as director of product management?

A. No.

Q. What was your relationship with sales teams during your time as director of product management?

A. The relationship with sales was to ensure they had the materials to talk about the features and functionality that was being developed so that they were able to deal with questions from customers, prospects.

Q. And did you advise publishers on how to use the DoubleClick Ad Exchange?
A. I didn't do training, if that's what you're asking.
Q. In any way, did you advise publishers on how to use the DoubleClick Ad Exchange?
MS. LEE: Objection to form.
A. The product management team would provide materials that would be used to create help center articles or to create marketing materials for how to use the exchange.
Q. And that was also true of the ad server?
A. Yes.
Q. Are you familiar with unified pricing rules?
A. Unified pricing rules? I don't recall that name.
Q. Do you recall when AdX migrated to a unified first price auction?
MS. LEE: Objection to form.
A. The move to a first price auction was after I was no longer working on the exchange.
Q. Did you do any work on the unified first price auction?

A. I was aware that it was happening, but it was not what I was working on at the time.

Q. What were you working on at the time of roughly 2018, let's say?

A. At that time, I was working on the coalition for better ads and moving over to ads privacy and safety.

Q. Is that also true in 2017?

A. I don't remember the specifics of the date, but about that time was when I was working on the coalition.

Q. When you moved to the coalition, did you stop working on the Ad Exchange?

A. Yes. It was my primary focus.

Q. So from 2017 to 2019, what was your role with respect to the Ad Exchange?

A. I was an advisor on the Ad Exchange. There was a team, for part of the time reported to me, for part of the time didn't.

Q. Also true of the ad server?

MS. LEE: Objection to form and sorry, I know there's a little bit of a delay, so I apologize for that. But it might be good to take a pause for it to come through. But you may

answer, unless I tell you otherwise, you may answer the question after I object.

THE WITNESS: Understood.

A. The ad server was under Jonathan Bellack, the exchange was under me until it transitioned.

Q. For the period of 2017 to 2019, did you serve as an advisor on the ad server?

MS. LEE: Objection to form.

A. On 2017, approximately when I was more focused on the Ad Exchange and the Ad Exchange was working with DFP, then I would be involved in some of those decisions, towards the latter end of that period, less so.

Q. Okay. And then here it lists in November 2019, VP product management, privacy, and user trust.

Do you see that there on your LinkedIn page?

A. Yes.

Q. What were your responsibilities in that role?

A. In that role, I was responsible for inventory quality, ad quality, antifraud, and privacy related to Google's ads products.

Q. Did you continue to work on Google's Ad Exchange during the period from November 2019 to January 2023?

A. Only to the extent that it was one of the ads products that we were providing privacy and safety for.

Q. Okay. And same for the ad server?

A. That's correct.

Q. Did you keep --

MS. LEE: Objection to form. Sorry.

Q. Did you keep up-to-date on developments with the Ad Exchange during the period you were VP?

A. At a distance.

MS. LEE: Objection to form.

Q. And same answer about the ad server?

MS. LEE: Same objection.

A. Yes.

Q. Okay. If we go to the top of page 2 and the bottom of page 1, it looks like you're involved in two different ventures right now; is that correct?

A. Sorry. Where are you?

Q. Top of page 2, you see where it says "ad

tech strategist"?
A. Yes.
Q. On the bottom of page 1, you see where it says "Rewarded Interest"?
A. Yes.
Q. These are two different ventures that you're involved with right now?
A. Yes.
Q. What is Ad Tech Strategists?
A. That is the name I've used for my consulting.
Q. So you're the owner of Ad Tech Strategists?
A. Yes.
Q. Is it just you?
A. Yes.
Q. What does Ad Tech Strategists do as a consulting business?
A. I advise start-ups.
Q. Do you advise Google?
A. No.
Q. Have you ever advised Google?
A. No.
Q. Do you want to advise Google?

A. No.
Q. Why not?
MS. LEE: Objection to form.
Q. My question is why do you not want to advise Google?
MS. LEE: Same objection.
A. I'm focused more now on Rewarded Interest.
Q. In your role as strategic advisor to Ad Tech Strategists, do you want to advise Google?
MS. LEE: Same objection.
A. It's never come up.
Q. It's never come up in your mind?
MS. LEE: Objection to form.
A. It's never come up as a possibility.
Q. Do you want it to be a possibility?
MS. LEE: Objection to form.
A. As I said, I'm focused now on Rewarded Interest.
Q. Have you shut down Ad Tech Strategists?
A. No. I still advise some start-ups.
[redacted]
MS. LEE: Objection to form.

[redacted]

Q. Okay. So what's Rewarded Interest?

A. It's a start-up company.

Q. What does it do?

A. Nothing yet. Hopefully it will help provide consumers an ID for advertising.

Q. What does it mean to provide consumers an ID for advertising?

A. It will give consumers their own ID that they own and control that they can license for targeting events.

Q. When you say consumers, who are you talking about?

A. General people on the street.

Q. Does Rewarded Interest have a business relationship with Google?

A. No.

Q. Do you want it to have a business relationship with Google?

MS. LEE: Objection to form.

A. Perhaps sometime in the long future, sure.

Q. And why would you want to have a business relationship with Google sometime in the long

future?

MS. LEE: Objection to form.

A. Because DoubleClick still serves ads.

Q. And you think DoubleClick needs the user ID technology you're working on?

MS. LEE: Objection to form.

A. I think it's a possibility. We'll have to see.

Q. Have you talked to anyone at Google about Rewarded Interest?

A. I've talked to people who left Google.

Q. Have you talked to anyone who is currently at Google?

A. Yes.

Q. Who?

A. I think I mentioned it to [redacted], my former boss.

Q. When was that?

A. About a year ago.

Q. And what did you discuss?

A. If he felt the idea was crazy.

Q. What did he tell you?

A. It wasn't crazy.

Q. Do you think it's crazy?

A. No.
Q. Why not?
MS. LEE: Objection to form.
A. I think it can provide value to consumers.
Q. What value?
A. Ownership over the means by which they're targeted online.
Q. And why is that a value to consumers?
A. Because today, it happens, and consumers like online targeted ads, but they don't have control and can't really manage how it's happening.
Q. Google's tools today don't let consumers manage how targeted advertising is happening?
MS. LEE: Objection to form.
A. I'm not talking about Google. I'm talking about the general industry.
Q. I'm asking you a question about Google. Do Google -- does Google today let customers manage how targeted advertising is happening?
MS. LEE: Objection to form.
A. As I understand it, Google has some tools to enable that.

Q. So why would Google need your tools?
MS. LEE: Objection to form.
A. I never said that Google would need my tools.
Q. Is it a possibility that Google one day would need your tools?
A. Yes.
MS. LEE: Objection to form.
Q. Why is it a possibility?
MS. LEE: Same objection.
A. Because if consumers like my solution, they'll have an ID they can control and it will be their choice.
Q. Mr. Spencer, just one more question on this document. Do you see there's a first paragraph of the summary at the top of the first page?
A. Yes.
Q. You see there's a sentence there that says, "I am privileged," and it goes on?
A. Yes.
Q. You see it mentions that you have a unique 360 perspective of the ecosystem?
A. Yes.

Q. Are you talking about the digital advertising ecosystem?
A. Yes, I'm talking about digital advertising.
Q. What is your unique 360 perspective on digital advertising?
A. I mean that I've worked on buy side products, sell side products, exchanges, direct sales, privacy, user aspects, a whole bunch of different elements of the ad serving world.
Q. In your role with ad tech strategists, are you keeping up-to-date on how all of those technologies operate?
A. As best I can.
MS. LEE: Objection to form.
A. As best as I can publicly.
Q. All right. We can put that document aside.
(Exhibit 2, Document Bates labeled GOOG-DOJ-09916600, marked for identification.)
Q. I'm handing you what I've just marked as Exhibit 2. You can review that for a moment and I'm going to read the Bates number into the record. This is both for the record and for your

defending lawyer. So Mr. Spencer, what I've just marked as Exhibit 2 is a document produced by Google in this litigation. It has a Bates number GOOG-DOJ-0991660.

MS. LEE: Counsel, I thank you for -- I appreciate you reading the document into the record, the Bates number. It seems like your paralegal was able to provide electronic copy of the exhibit. Is there any way for your team to provide copies in real-time in addition to providing the Bates number?

MR. GOODNOW: No. I don't have someone available to sit on the line with us right now and send documents as they become available. So we'll have to do the best we can with the Bates numbers.

MS. ELMER: Counsel, we will need time then to e-mail the document to defending counsel, so please give us a minute to do that.

MR. GOODNOW: Can we go off the record, please.

THE VIDEOGRAPHER: One moment. We are now going off the record. The time is 9:56 a.m.

(Proceedings interrupted at 9:56 a.m. and

reconvened at 9:57 a.m.)
THE VIDEOGRAPHER: We are now going back on the record. The time is 9:57 a.m.
BY MR. GOODNOW:
Q. Okay. Great. Mr. Spencer, did you have time to review the document that I marked as Exhibit 2?
A. Yes.
Q. Okay. Great. What is this document?
A. It looks like it's an e-mail.
Q. An e-mail from you to a number of others?
A. An e-mail from me to about six people -- no, plus the ccs, ten people.
Q. And you see there in the first paragraph where it starts, "I want to provide"?
A. Yes.
Q. You mention the AwBid project?
A. Yes.
Q. What is the AwBid project?
A. AwBid was an internal code name for the bidding by AdWords on other exchanges.
Q. When you say "other exchanges," you're referring to exchanges other than AdX?
A. Yes, that's correct.

Q. Okay. You have reference here to non-budget constrained remarketing spend.
Do you see that?
A. Yes.
Q. What is non-budget constrained remarketing spend?
A. Remarketing is the act of finding users that have visited a site and indicated interest in a product on other sites and non-budget constrained refers to a type of creative that is not constrained by its budget.
Q. Okay. And during your time at Google, was that the only kind of ad word spend that flowed to non-Google exchanges?
MS. LEE: Objection to form.
A. I don't know it was the first that flowed to non-Google exchanges.
Q. Are you aware of any other kinds of ad word spend that flowed to non-Google exchanges?
MS. LEE: Object.
A. I believe there were changes to AwBid over time, but I don't recall the specifics.
Q. Do you recall generally what the changes were to AwBid over time?

MS. LEE: Objection to form.
A. Over time, depending on quality of exchanges and creative type, they looked at multiple different changes to AwBid. I don't know specifics.
Q. When you say they looked at multiple different changes, are you aware of any changes that were made to AwBid?
A. I don't recall all the changes. I didn't manage AwBid.
MS. LEE: Objection to form.
Q. Okay. So if we go to the second paragraph there, you see the sentence starts "This change will impact"?
A. Yes.
Q. And there's a mention of "a historical AdX differentiator for publisher sales team"?
A. Yes.
Q. What is a historical AdX differentiator for publisher sales team?
A. In this case, it's referring to the fact that there was no bidding by AdWords on other exchanges.
Q. And why was that a historical AdX

differentiator for the publisher sales team?
A. Because up until this point it had not happened.
Q. Why was it a differentiator for the sales team?
A. The sales team had to explain the product to publishers, so they needed to know how it worked.
Q. Had the sales team told the publishers before AwBid that AdX was the only exchange with bid based AdWords Demand?
MS. LEE: Objection to form.
A. I can't speak for the entire sales team, but that was the state before AwBid.
Q. Are you aware of anyone on the sales team who told publishers that AdX was the only exchange with bid based AdWords Demand?
A. I'm not aware of any.
MS. LEE: Objection to form.
A. I'm not aware of any specific conversations from the sales team.
Q. Are you aware of any general conversations?
MS. LEE: Same objection.

A. Sure.

Q. What were they?

A. The sales team would talk to clients about all the features and functionality of the suite of products Google had, the quality of advertisers that they could get through AdWords, the types of creatives and formats that it supported, all of the elements that would make someone want to use the product.

Q. And when the sales team would talk to clients about the features and functionality of the suite of products, was one of those features that AdX was the only exchange with bid based AdWords Demand?

MS. LEE: Objection to form.

A. I don't think that was ever a high-level feature point, but it was true before AwBid.

Q. Was it communicated to publishers?

MS. LEE: Objection to form.

A. I would assume at least one publisher was told that at some point.

Q. Why?

A. Because there were thousands of publishers and thousands of salespeople.

Q. And why do you think one of those salespeople would have told one of those publishers at some point that AdX was the only exchange with bid based AdWords Demand?

MS. LEE: Objection to form.

A. Because they probably got the question from a customer and told them that that's where the AdWords Demand was available.

Q. Without a question from a customer, would Google promote that AdX was the only exchange with bid based AdWords Demand?

MS. LEE: Objection to form.

A. I don't know.

Q. What is bid based AdWords Demand?

A. Bid based AdWords Demand was taking creatives that were put into AdWords and making them -- bidding it on inventory from exchanges.

Q. Did AdWords have non-bid based demand?

MS. LEE: Object to form.

A. Yes. AdWords originally was not set up to be a bidding system.

Q. At the time of this e-mail, did AdWords have non-bid based demand?

A. Yes.

Q. What was it?
A. Inventory that would match to elements that were not being offered through auction.
Q. Where did that inventory come from?
A. AdSense publishers.
Q. And was that non-bid based AdWords Demand available on any exchange or any Google product other than AdSense?
A. If it's not --
MS. LEE: Objection to form.
A. If it's not bid based, it can't be purchased on an exchange.
Q. Can it be purchased on a network?
A. AdSense and AdWords combined was a network.
Q. It could not be purchased on any other network than AdSense?
MS. LEE: Objection to form.
A. It's its own network. The advertisers could, of course, go work with another network.
Q. Could they go work with another network if they wanted the non-bid based AdWords Demand?
MS. LEE: Objection to form.
A. The advertisers were the demand, so the

advertisers could choose wherever they wanted to buy ads.

Q. Could publishers go to a different ad network if they wanted the non-bid based AdWords Demand?

A. Publishers also could go to any ad network that they chose.

MS. LEE: Objection to form.

If you could just give me a second to object.

A. Publishers could go also go to any ad network that they chose.

Q. And could they go to any ad network that they chose and have access to non-bid based AdWords Demand?

MS. LEE: Objection to form.

A. By definition, AdWords Demand is the set of advertisers buying on AdWords. Those advertisers may be on other networks, many were, some weren't. It's thousands of advertisers.

Q. Okay. So if we go down the e-mail, you identify some key points.

Do you see that?

A. Yes.

Q. What's Project Aristotle?
A. I don't remember what Project Aristotle was.
Q. Do you remember when it started or ended, if it did?
A. Sorry. I don't remember the code word.
Q. And do you see "BDM" at the end of that sentence?
A. Yes.
Q. Do you know what that stands for?
A. That might be a typo for DBM.
Q. I thought so, too. What is DBM?
A. DoubleClick Bid Manager.
Q. That's a precursor to Display & Video 360?
A. Display & Video 360 was a rebrand.
MS. LEE: Objection to form.
Q. And at the time AdWords spent via DBM?
MS. LEE: Objection to form.
A. No. AdWords was the buy side of the ad network. DBM was the bid managing product.
Q. So here you write, AdWords spend has already been going to competing exchanges via, and I'll say DBM.

Do you see that there?

A. Yes.

Q. So what does it mean that AdWords spend goes via DBM?

A. Again, advertisers have at this time 20 different bidders to choose from, hundreds of networks to choose from, and they're all starting to buy on each other, and so the advertisers spend, which is transferrable to any network or bidder that they want, would end up on other exchanges through our tool, DBM, or other tools.

Q. So when you write AdWords spend here, you're referring to advertisers that use AdWords?

A. Yes, that's correct.

Q. And if their spend goes to competing exchanges via DBM, that means they're also using DBM?

A. If it's going via DBM, then yes.

Q. Are there advertisers that use both AdWords and DBM?

A. As much as Google tried to help customers figure out which channel, yes, some advertisers use both.

Q. Google didn't want advertisers to use

both?

MS. LEE: Object to form.

A. In theory, they were overlapping functionality, so you wouldn't need to, and if you were as an advertiser, you could end up competing against yourself.

Q. So which channel, in Google's view, was appropriate for which kind of advertiser?

A. The best --

MS. LEE: Object to form.

A. The best analogy is that DBM is like driving a manual transmission race car and using AdWords would be like driving an automatic. If you're a more sophisticated driver, you'll want to use DBM. If you're more simplistic, you'll want to use AdWords.

Q. Okay. And the second bullet point there says, other exchanges already put AdWords into their yield management solution.

Do you see that?

A. Yes.

Q. What does that mean?

A. So at this time, yield management products are appearing which would route

inventory to multiple ad networks, estimating their yield, and mixing them together, so sometimes the AdWords spend would be going through those networks in combination with others.

Q. What is the difference between a yield management product and an ad network?

A. A yield management product is a tool publishers would use to manage multiple ad networks simultaneously. So if I'm a publisher and I have five ad networks that I'm working with, I would use a yield manager to estimate what their CPM is for any given impression and put that potentially in competition with direct sales and an exchange.

Q. And what's the difference, if any, between a yield management product and an ad server?

A. Ad servers started off being focused on direct sales, that's sales through the sales team, and ad networks were the outsourcing process -- oh, sorry -- you said ad yield managers. Yield managers were looking specifically at estimation of the network yield

but the underlying -- some of the underlying decision processes were similar.

Q. Did ad servers go beyond their focus on direct sales into programmatic sales?

MS. LEE: Objection to form.

A. Over time all of these things merged together. And at this time, it was just starting to overlap and get complicated where from a publisher perspective they wanted all the elements, direct ad serving, yield management of ad networks, exchange functionality, and they were putting things in multiple tools. So you just had lots of overlap.

Q. Was it ever against Google policy to put AdWords into a yield management solution in the way you described?

A. Yes. I believe it was.

MS. LEE: Objection to form.

Q. And when did that start, that policy?

MS. LEE: Same objection.

A. I don't recall the particular dates for when the policies were created.

Q. Would it have been after this e-mail in August of 2013?

MS. LEE: Objection to form.
A. No. I think the policy existed before this.
Q. Okay. So there were violations of the policy going on at the time?
MS. LEE: Objection to form.
A. It was a hard policy to enforce.
Q. Yeah, how did Google try to enforce it?
A. At the time I wasn't part of the policy team. But my under --
MS. LEE: Form.
A. -- my understanding was --
MS. LEE: I'm sorry. Please give me time to object, but please continue.
A. My understanding was they would look at where the inventory was being sort of advertised by different entities as being available.
Q. Sorry. What do you mean when you say "they would look at where the inventory was being sort of advertised by different entities as being available"?
A. You asked the question how was the policy enforced, and as I understood it, one of the ways that it was looked at was if a yield manager was

advertising, that they had AdSense as one of the networks that was available.

Q. And if a yield manager was advertising that they had AdSense as one of the networks that was available, what did Google do in response?

MS. LEE: Objection to form.

A. I think the only thing they could do was to tell that yield manager that that was against policy.

Q. Was there anything technologically that Google could do to stop the yield manager from calling AdSense?

MS. LEE: Objection to form.

A. I guess there probably was, but I don't know offhand.

Q. All right. Then you see where it says, sort of the second black bullet point in this list, AdWords will not bid the same on other exchanges?

A. Yes.

Q. Okay. And with AwBid, AdWords bid only once on other exchanges; is that right?

MS. LEE: Objection to form.

A. I'm sorry. I don't understand the

question.

Q. Sure.

So you see the second white bullet point underneath that second black bullet point that starts "On other exchanges"?

A. Yes.

Q. And it says, on other exchanges AdWords will only bid once?

A. Yes.

Q. So is it correct that AdWords bid only once on other exchanges?

A. That's correct, at this time.

Q. Did that ever change?

A. I have no idea.

Q. Okay. And the next bullet point says, on other exchanges AdWords will attempt to counter any non-second pricing behaviors.

Do you see that?

A. Yes.

Q. Did AdWords ever attempt to counter any non-second pricing behaviors on AdX?

MS. LEE: Objection to form.

A. On AdX they knew the specifics of exactly how the auction worked, so there was no need to

counter on AdX.

Q. How did AdWords know the specifics of exactly how the AdX auction worked?

A. It was owned by the same company, and so they knew that we weren't lying when we said it was a second price auction.

Q. Okay.

MR. GOODNOW: How long have we been on the record?

THE VIDEOGRAPHER: Sure. Roughly 1 hour and 10 minutes.

MR. GOODNOW: All right. I propose maybe we take a break, if that's good with you, Mr. Spencer, since we've been on about an hour? Or I can keep going if you'd like.

MS. LEE: I think -- it's up to you, Mr. Goodnow, but maybe it's make sense to take a break since it's been an hour.

MR. GOODNOW: All right. Let's take a break.

THE VIDEOGRAPHER: We are now going off the record. The time is 10:17 a.m.

(Proceedings interrupted at 10:17 a.m. and reconvened at 10:32 a.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 10:32 a.m.

BY MS. GOODNOW:

Q. All right. Mr. Spencer, you can set that document aside. And I have just marked as Exhibit 3 our next document.

(Exhibit 3, Document Bates labeled GOOG-AT-MDL-014082831 - 2832, marked for identification.)

Q. All right. You can take a second to review that and --

MS. ELMER: Are there copies for counsel?

MR. GOODNOW: Yes. Indeed there are.

All right. I'm going to read the Bates into the record. So what I've marked as Exhibit 3 is a document produced by Google in this litigation with Bates numbers GOOG-AT-MDL-014082831 through GOOG-AT-MDL-014082832.

Q. Mr. Spencer, what is this document?

A. It appears to be an e-mail.

Q. It starts with an e-mail --

MS. LEE: I'm sorry. Just want to make sure that you've taken the time to review the

document.

MR. GOODNOW: Yes, counsel, he did take the time to review the document, and I'd prefer if you didn't continue to interrupt this examination with the side remarks. You can make objections when questions arise. But he actually --

MS. LEE: It's not a side remark. I just wanted to make sure that the witness has been able to review the entirety of the document and if he has, then please feel free to proceed. And I wanted to confirm.

MR. GOODNOW: Yeah, since I'm in the room, he actually looked up at me when he was finished reading the document.

Q. So Mr. Spencer, when you're done reading, could you tell me what the document is?

A. It's an e-mail asking my thoughts on AwBid.

Q. Okay. And who is [redacted]?

A. I don't recall who [redacted] was.

Q. Do you recall who [redacted] was?

A. [redacted] was a product manager.

Q. Okay. And this e-mail from [redacted]

[redacted] that is forwarded to you, do you see it mentions [redacted] and [redacted]?
A. No. Sorry. Where is that?
Q. Sure.
So you see the e-mail at the bottom that [redacted]?
A. Yes.
Q. The first line of the e-mail is "Summary"?
A. Yes.
Q. The second e-mail has a sentence that starts in the middle "We have a major renewal"?
A. Yes.
Q. Then there's a mention of [redacted] and [redacted]?
A. Uh-huh.
Q. Do you know what [redacted] and [redacted] are?
A. I think they are -- no, I don't remember exactly what they are.
Q. Okay. Is [redacted] a publisher?
A. As I said, I don't -- I think these are publishers.
Q. You think [redacted] is a publisher

as well?
A. Yes.
Q. Okay. So you see your response to this e-mail up top?
A. Yes. I see it responded.
Q. Okay. And here you describe AwBid as cross exchange buying for non-budget constrained remarketing spend?
MS. LEE: Objection to form.
A. I say AdWords is looking to do cross exchange buying.
Q. And then you say specifically it includes non-budget constrained remarketing spend?
A. Yes, that's correct.
Q. And that's the same concept of non-budget constrained remarketing spend we discussed earlier?
A. Yes.
MS. LEE: Objection to form.
Q. Okay. Can you go to the first sentence that starts "AdWords is looking"?
A. Yes.
Q. And at the end of that sentence where it starts on the second line in the paragraph, it

says "their spend"?
A. Yes.
Q. "Their" refers to AdWords?
A. Yes.
MS. LEE: Form.
Q. So here you describe non-budget constrained remarketing spending as a small subsection of AdWords spend?
MS. LEE: Objection to form.
A. That's how it's being qualified.
Q. And you put a percentage on that small subsection in this e-mail?
MS. LEE: Objection to form.
A. I see it's around 10 percent of GDN.
Q. Non-budget constrained remarketing spend is around 10 percent of GDN spend?
MS. LEE: Same objection.
A. Yes.
Q. What's GDN?
A. GDN is the construct for the inventory set available to AdWords to buy.
Q. Are you using GDN and AdWords here interchangeably?
MS. LEE: Object to form.

A. When saying GDN spend perhaps, but GDN is the inventory set. AdWords is the buying platform.

Q. Okay. And you see the sentence this is around 10 percent of GDN?

A. Yes.

Q. You're talking about GDN spend in that sentence?

MS. LEE: Object to form.

A. It's unclear. You know, the implication is it's talking about the spend.

Q. Okay. And then can you look at that last paragraph that starts "I would propose"?

A. Yes. I see the paragraph.

Q. You see there's a reference at the top to the leaders of the Benelux region?

A. Yes, I see the reference.

Q. And the Benelux region is Belgium, Netherlands, and Luxembourg?

A. I believe that's what Benelux refers to.

Q. Who were the leaders of the Benelux region?

A. This would be referring to the sales leadership.

Q. And then you go on to mention familiarizing the leaders of the Benelux region with the talking points.
You see that?
A. Yes, I see that.
Q. Okay. Were the talking points about AwBid?
MS. LEE: Object to form.
A. I assume so, given this e-mail is referring to AwBid.
Q. And what were the talking points about AwBid?
A. I don't remember what the official talking points about AwBid ended up being.
Q. Do you have any recollection of what drafts of talking points were about AwBid?
MS. LEE: Objection to form.
A. I don't recall what we decided to say externally about AwBid.
Q. Do you have a recollection of what you considered internally about AwBid before you decided to say anything externally?
MS. LEE: Objection to form.
A. I know there was considerable discussion

about what was the right way to explain what AwBid was doing to both the buy side and the sell side.

Q. Were you part of that discussion?

A. Yes.

Q. And what was your view about what Google should explain to the buy side and the sell side about what AwBid is doing?

MS. LEE: Object to form.

A. I don't recall which position I had at the time.

Q. You see there's parentheses there on the second line of that final paragraph and it starts "Not too broadly"?

A. Yes.

Q. And the full thing says, "Not too broadly so we don't cause a leak ourselves"?

A. Yes.

Q. What are you referring to when you say "not too broadly"?

A. The concern of a leak, and the reference to broadly is so that there wasn't a story we had in the press about what was happening before talking points were available.

Q. So you were concerned about a leak to the press?
A. Yes.
MS. LEE: Objection to form.
Q. And were you talking about circulating too broadly within Google?
MS. LEE: Objection to form.
A. Yes. That would be the concern.
Q. And why would circulating broadly within Google give rise to a risk of a leak to the press?
MS. LEE: Objection to form.
A. The more people that know about something, the higher the potential that that information gets leaked externally.
Q. And what did Google ultimately tell publishers and advertisers about AwBid?
A. Again, I don't remember offhand the --
MS. LEE: Form.
A. I don't remember offhand the talking points that were provided.
Q. Do you remember any representations that Google made to publishers and advertisers about AwBid?

MS. LEE: Same objection.
A. AwBid changed over time, so the initial talking points or the later ones, I couldn't remember the differentiation.
Q. Do you remember when AwBid was released?
MS. LEE: Objection to form.
A. Based on these documents, it looks like it was released roughly at the end of 2013.
Q. And do you remember what Google said when AwBid was released to publishers and advertisers?
MS. LEE: Objection to form.
A. Again, I don't remember the specific points that were said.
Q. Do you remember any general points that were said?
MS. LEE: Same objection.
A. The availability would have to be clear before people saw in the reports where spend was going, but I don't remember.
Q. And then back to this paragraph and the second line there in the middle there's an end dash, do you see that?
A. Yes.
Q. And you write, hopefully when they see

how small this spend is, we'll be able to move forward without a concern that it harm our sell side business?

A. Yes.

Q. The sell side business refers to AdX?

A. The sell side business refers to not just AdX, but AdX and inventory -- any ad serving.

Q. And when you say "how small this spend is," you're referring to the non-budget constrained remarketing spend referenced in the first paragraph there?

MS. LEE: Objection to form.

A. The spend referred to is the spend of AwBid.

Q. And that's the non-budget constrained remarketing spend?

MS. LEE: Same objection.

A. At the time, the start was with non-budget constrained remarketing spend.

Q. Okay. Great. We can set that document aside. Move on to our next one.

(Exhibit 4, Document Bates labeled GOOG-DOJ-14271826 - 1830, marked for identification.)

MR. GOODNOW: So what I've just marked as Exhibit 4 is a document produced by Google in this litigation. It has Bates numbers GOOG-DOJ-14271826 and it goes through GOOG-DOJ-14271830.

Q. And Mr. Spencer, take a moment to familiarize yourself with the document.

MS. LEE: I'll just note, Counsel, I have not received the document yet but I will let you know once I have it.

I have the exhibit. Whenever the witness has had an opportunity to review it, I'm good to go on my end.

A. Okay. I've had a chance to review it.

Q. Great. Mr. Spencer, what is this document?

A. This is an e-mail chain.

Q. Between you and others at Google?

A. This is an e-mail chain between others that eventually reached me that I replied to.

Q. All right. You all were corresponding on this e-mail chain in the ordinary course of business?

A. No. The e-mail chain was without me and

then eventually someone forwarded it to me.
Q. Right.
And when you joined the chain and corresponded on the chain, you were doing so in the ordinary course of business?
A. Yes.
Q. Okay. So if we go to page Bates 828, actually sort of where the e-mail thread starts, and there's an e-mail sort of in the top third there from [redacted] that starts [redacted]?
A. Yes.
Q. Okay. Who is [redacted]
A. [redacted] was a product manager.
Q. Who is [redacted]?
A. [redacted] was an analyst.
Q. Okay. And here [redacted] is asking [redacted], "Do you happen to know what share of AdX inventory is won by GDN both on desktop and mobile?"
Do you see that?
A. Yes.
Q. And then he says, "I believe we aren't allowed to share that data externally, but it would be good to know"?

A. Yes.
Q. If we go to the bottom of page 827, as we move forward in the thread, there's an e-mail from you there towards the bottom dated May 6, 2015 at 5:52 p.m.?
A. Yes.
Q. And you write, "We don't like to promote the percent of AdX won by GDN externally as it creates a perceived overreliance on GDN."
Do you see that sentence?
A. Yes.
Q. When you say "externally," who are you referring to?
A. People outside of Google.
Q. Including publishers?
A. Sure.
Q. Advertisers?
A. Anyone external.
MS. LEE: Objection to form.
Q. Okay. Had Google ever promoted externally the percent of AdX won by Google -- by GDN? Excuse me.
A. No.
MS. LEE: Objection to form.

A. No, I don't believe it was ever promoted.

Q. Had Google ever told publishers externally the percent of AdX won by GDN?

MS. LEE: Objection to form.

A. When you say "ever," I don't know. There could have been some instance when it was stated.

Q. Did you ever tell publishers about the percent of AdX won by GDN?

A. No.

Q. And you expected that if publishers knew about the percentage of AdX won by GDN it would create a perceived overreliance on GDN?

MS. LEE: Objection to form.

A. One of the reasons why you wouldn't share that is because of the perception it could create.

Q. And why would you expect a perception of overreliance on GDN if you told publishers?

MS. LEE: Objection to form.

A. Because publishers wanted to believe that that was a key factor, and so any number given to them they might perceive as an overreliance.

Q. So when you say because publishers want to believe that that was a key factor, what are

you referring to when you say "key factor"?
A. An attribute of the exchange.
Q. What do publishers want to believe was an at attribute of the exchange?
A. That GDN --
MS. LEE: Objection to form.
A. They wanted to -- the GDN spend.
Q. What did they want to believe about the GDN spend, in your view?
MS. LEE: Objection to form.
A. Many publishers had preconceptions about what the spend was coming from AdWords, and so whatever numbers were given they could misconstrue.
Q. What were the preconceptions that publishers had that you just referred to?
MS. LEE: Objection to form.
A. It's a highly competitive -- it's a competitive area where publishers are always looking at what each of the exchanges in the time period of this provide. And so they're always looking for different aspects of what each exchange may have.
Q. What preconception did publishers have,

in your view, about the percent of AdX won by GDN?

MS. LEE: Objection to form.

A. Some publishers may think that it's higher than it is, some publishers may think that it's lower than it is.

Q. Here you mentioned a perceived overreliance on GDN?

A. Yes.

Q. So you were referencing there that publishers who thought that the percent of AdX won by GDN was lower than it actually was?

MS. LEE: Objection to form.

A. Here I'm stating that some publishers may perceive that there was an overreliance on the spend coming from AdWords, whatever idea of that spend they have.

Q. And they would have that perception of overreliance if they knew what the percent AdX won by GDN was?

MS. LEE: Objection to form.

A. No. They had that perception before knowing the number.

Q. So the number would confirm their

perception of an overreliance on GDN?
MS. LEE: Objection to form.
A. My point was any number would potentially confirm their idea.
Q. Any number of the percent of AdX won by GDN would confirm preconceived notion of overrereliance on GDN?
MS. LEE: Objection to form.
A. Yeah. So some would, they'd be like, oh, 10 percent, that's way too much, or some could be 50 percent, oh, that's way too much. They could all have their own preconceived ideas.
Q. And Google did wanted to promote the percent of AdX won by GDN because it didn't want to confirm their preconceived ideas?
MS. LEE: Objection to form.
A. Yeah. The data -- the data would be -- could be misconstrued.
Q. How could publishers misconstrue a percentage of AdX won by GDN?
A. Again --
MS. LEE: Objection to form.
A. Again, for some publishers the idea that it was 1 percent could be, oh, look it's

1 percent. For some it could be some other number. People get different perspectives. There's lots of competitors pushing different stories. And so putting out numbers, they almost always get misconstrued.

Q. How would a publisher misconstrue a percentage of GDN winning on AdX?

MS. LEE: Objection to form.

A. If you have a idea that you're trying to prove and you have a thought that you're trying to think about and you get some number, you can make it fit whatever story you want.

Q. So Google didn't want publishers to take the number and make it fit whatever story they wanted?

MS. LEE: Objection to form.

A. I was concerned that there was a possibility that people would misunderstand the data.

Q. And so Google withheld the data?

MS. LEE: Objection to form.

A. I'm suggesting that this is where we don't like to promote the percentage of AdX won by GDN.

Q. Okay. If we go up that page, you see there's a table there?
A. Yes.
Q. So just a few questions here on how to read the table. So DBM is referenced in several of the columns.
Do you see that?
A. I see DBM.
Q. That's the DoubleClick Bid Manager we discussed earlier?
A. Yes, that's DoubleClick Bid Manager.
Q. Okay, and are these percentage numbers reflected here U.S. or worldwide?
A. I have no idea.
Q. Do you have an expectation one way or the other?
MS. LEE: Objection to form.
A. I don't know what the query is that was pulled here.
Q. Okay. So on the left you see there's "desktop high-end mobile tablet"?
A. Yes.
Q. Okay. What is high-end mobile?
A. At the time, high-end mobile would be --

this is 2015 -- would be referring to like an iPhone kind of device.

Q. Anything other than iPhones?

A. There were still -- so high-end mobile differentiates between say regular phones that could still access the Internet and what you would think of today as a modern smartphone.

Q. Okay. So the second column there says "GDN percent of revenue on AdX pubs"?

A. Yes.

Q. AdX pubs refers to publishers who used AdX?

A. AdX pubs would refer to a publisher offering inventory via AdX.

Q. And when it says "GDN percent of revenue on AdX pubs," is that the percentage of all revenue that publisher gets or only the revenue that the publisher gets through AdX?

MS. LEE: Objection to form.

A. I didn't come up with the table, but my interpretation of this is that it's referring to the percentage of revenue coming through AdX to the pub, not all revenue.

Q. Okay. So the -- if we take the desktop

entry there, then GDN accounted for 55 percent of revenue through AdX to a publisher using AdX?

A. That's what the table says.

Q. Okay. And so then the grand total is 65 percent there at the bottom?

A. The grand total meaning the average.

Q. Right.

Of the three percentages above it?

A. Correct.

MS. LEE: Please give me a second to object. Thank you.

Q. Okay. And if we look over, this is the fifth column but I'll say it's "GDN percent winning of total AdX pub matched queries."

Do you see that?

A. Yes.

Q. So if we look at the grand total of 79 percent, you see that number?

A. Yes.

Q. Okay. So GDN won 79 percent of queries that AdX won?

MS. LEE: Objection to form.

A. No. This appears to say the number of matched queries, so the percentage of matched

queries from AdX was 79 percent.
Q. What do you mean by that?
A. The percentage of AdX queries that were won by GDN were 79 percent.
Q. So GDN won 79 percent of all queries by a publisher using AdX?
A. Again, I don't know --
MS. LEE: Objection.
THE WITNESS: Sorry.
A. Again, I don't know that call of the data but that's what this table said.
Q. So if we go back to the text above the table, do you see that there?
A. Yes.
Q. And you see there's a sentence that says "Here are match rates"?
A. Yes.
Q. And the full sentence says, "Here are match rates both of total queries, what we win and do not win, and of matched queries, either GDN, DBM, or another AdX buyer won."
Do you see that?
A. Yes.
Q. So if we look at that column again, GDN

percent winning of total AdX pub matched queries?
A. Yes.
Q. And the matched queries there refers to the matched queries in that sentence above it?
MS. LEE: Objection to form.
A. David put together the table, so I assume so.
Q. And so matched queries is defined as either GDN, DBM or another AdX buyer won?
MS. LEE: Objection to form.
A. I think it's -- I'm not sure.
Q. Okay. So this 79 percent number there at the bottom, in your view, reflects that GDN won 79 percent of all queries sold by an AdX publisher regardless of which exchange?
MS. LEE: Objection to form.
A. AdX is an exchange.
Q. Yeah. My question is -- publishers work with several exchanges, correct?
A. At this time, yes.
Q. And so that 79 percent number reflects what GDN won as a percentage of overall publisher inventory, no matter which exchange it went through?

MS. LEE: Objection to form.
A. No. I believe it's talking about AdX inventory, inventory offered via AdX.
Q. So GDN won 79 percent of inventory offered via AdX?
MS. LEE: Objection to form.
A. Again, I don't --
THE WITNESS: Sorry --
A. Again, I don't know the data polled, but that's what this table implies, based on the data.
Q. Okay. And then see the column to the left there, GDN percent winning of total AdX pub queries?
A. Yes.
Q. Okay. And that sentence up above from [redacted] says, "Match rates of both of total queries (what we win and do not win)"?
A. Yes, that's what it says.
Q. So that 32 percent number in desktop -- or rather, let's just go to the grand total. The grand total of the 37 percent represents what?
MS. LEE: Objection to form.
A. This is not a table I put together, but

based on my understanding, it looks like that is the percentage of the queries of the publisher -- no, it's still AdX pub queries. It's not clear if that's the publisher or if that's the AdX portion.

Q. So do you think that GDN could have -- the 37 is substantially larger than the 79, right?

MS. LEE: Objection to form.

A. Yes, 37 is less than 79.

Q. So the 79 we described was the win rate through AdX, right?

MS. LEE: Objection to form.

A. Again, to the best of my knowledge, interpreting the data on this table, that I didn't put together, that's what that implies.

Q. Okay. So the 37 percent would then be all impressions sold by publishers that use AdX?

MS. LEE: Objection to form.

A. I've looked at this table for five minutes, but possibly, I guess so.

Q. We can set that document aside. I'm tired of the table, too.

(Exhibit 5, Document Bates labeled

GOOG-AT-MDL-014515755 - 5757, marked for identification.)

Q. All right. Mr. Spencer, I've just marked Exhibit 5. I'll read this into the record. So this is a document produced by Google in this litigation. It starts with the Bates number GOOG-AT-MDL-014515755 and it goes through GOOG-AT-MDL-014515757.

MS. LEE: Counsel, I do not yet have the document and I will let you know once I do.

So I have the document now, so once Mr. Spencer has had an opportunity to finish his review, I'm ready on my end.

Q. Are you finished reading the e-mail, Mr. Spencer?

A. Yes.

Q. Couple of background questions first. At this time, AdX charged a 20 percent revenue share in the open auction?

A. In 2013 --

MS. LEE: Objection to form.

A. In 2013, yes.

Q. Have you ever known that revenue share to change?

A. Yes. When new features were deployed, the rev shares were different.
Q. New features in the open auction were deployed?
MS. LEE: Objection to form.
A. No. New features like preferred deals, private auctions, and guaranteed direct.
Q. Do you know what the open auction is?
A. Yes.
Q. What is it?
A. The open auction is when a publisher offers their inventory to almost every buyer they control what they want in terms of buyers and can set their min prices.
Q. For that auction, AdX charged a 20 percent revenue share at this time?
A. Yes.
Q. Do you know that percentage to have ever changed?
A. Not during the time that I was involved with the Ad Exchange.
Q. That was from 2008 until 2019?
A. No. As I mentioned, I left before 2019, from working in the Ad Exchange until about say

2017.
Q. Do you know if the revenue share has changed since 2017?
A. I have no idea.
Q. Okay. And at the time, GDN charged a 15 percent revenue share?
A. I believe --
MS. LEE: Objection to form.
A. I believe at the beginning GDN had a 15 percent revenue share.
Q. Okay. Do you know that to have changed?
A. I don't know what GDN's -- I don't know.
Q. Did it change between 2013 and 2017, to your knowledge?
A. I don't know what GDN's rev share changed, I don't know.
Q. Okay. So at the time, GDN charges 15 percent and then AdX charges 20 percent, that means there's an overall take rate of 32 percent if you used both the exchange and sell to GDN?
MS. LEE: Objection to form.
A. The combined rev shares of the 20 and 15 percent results in a 32 percent rev share.
Q. Do you recall what GDN's take rate was

when it bought on third party exchanges through AwBid?

MS. LEE: Objection to form.

A. I do not know what their rev share was when they bought via AwBid.

Q. Do you recall if it was the same as or different from 15 percent?

MS. LEE: Same objection.

A. No.

Q. Okay. You see here at the very bottom of 755 on what I marked as Exhibit 5, it's the very start of an e-mail from [redacted] that goes on in substance to page 756.

Do you see that?

A. Yes.

Q. Who is [redacted]?

A. [redacted] was a product manager for the ad network at the time.

Q. The Google display network?

A. He was on the -- yes, on the Google display network.

Q. And then you see the first paragraph that starts "in theory"?

A. In theory.

Q. The very top of page 756.
A. "Yes.
Q. And there he's talking about varying GDN's rev share on third-party exchanges.
MS. LEE: Objection to form.
A. There he's talking about varying the buy side rev share.
Q. And you see the second line there starts "minimum buy side"?
A. Yes.
Q. And it says, "Buy side rev fair for GDN spend into other exchanges"?
A. Yes.
Q. Those other exchanges are other than AdX?
A. I assume that's what he's referring to.
Q. So you understand this to be talking about GDN changing its rev share when spending on other exchanges?
MS. LEE: Objection to form.
A. It's a theoretical idea.
Q. And the second paragraph there, you see that, if you start factoring in considerations?
A. Yes.
Q. Okay. So the fist paragraph you say was

a theoretical idea; is that right?
A. Yes. He starts with "in theory."
MS. LEE: Objection to form.
Q. And the second is also a theoretical idea?
MS. LEE: Same objection.
A. The second paragraph is again talking about an idea.
Q. Okay. And the idea in the first paragraph starts, "In theory, if we're strictly looking out for GDN advertisers' best interest."
Do you see that?
A. Yes.
Q. And if that's what Google was doing, it would be happy to buy an impression on other exchanges even with a very small nominal rev share like 1 percent?
MS. LEE: Objection to form.
A. I see the statement.
Q. Okay. And then in the second paragraph, it talks about factoring in considerations for the AdX business.
Do you see that?
A. Yes.

Q. And he writes that factoring in considerations for the AdX business, the argument would be to lower GDN's buy side rev share only to the point where the net payout to the publisher is no more than what it would have been for the advertiser's buy on that impression had the publisher offered the inventory through AdX?

A. Yes. I see the statement.

Q. And that rev share is higher than a nominal rev share like 1 percent?

MS. LEE: Objection to form.

A. That's what he's saying.

Q. So I want to go to now page 755, which is just the first page of the document, and you see there's an e-mail from you there responding?

A. Yes.

Q. Okay. And you add Jonathan Bellack, that's why you add "plus Bellack"?

A. That's correct.

Q. And then the first line in the e-mail says, "If we go to a variable revenue share."

Do you see that?

A. Yes.

Q. Are you talking about a GDN variable

revenue share?

A. No. I'm talking about both AdSense and AdX.

Q. Okay. And then you write, "I think we need the ability to drop the AdSense and AdX revenue shares."

Do you see that?

A. Yes.

Q. Okay. So if Google went to a variable revenue share, why would it need the ability to drop the AdSense and AdX revenue shares?

MS. LEE: Objection to form.

A. So the theory being talked about here is if you charge no rev share to advertisers, of course, advertisers are happy. If you charge no rev share to publishers, publishers would be happy. The question becomes where do you charge rev share?

Q. So if you charged no rev share --

MR. GOODNOW: Strike that. Hold on.

Q. So are you talking here, when you mentioned charging no rev share to advertisers, are you talking about charging no rev share to advertisers when they buy on AdX or when they buy

on a third-party exchange?

MS. LEE: Objection to form.

A. I believe I was talking about -- to both.

Q. Okay. So if GDN did not charge a buy side revenue share when GDN bid on a third-party exchange, would it need to drop the AdSense and AdX revenue shares?

MS. LEE: Objection to form.

A. You're crossing products in that question, so I don't understand.

Q. Why don't you understand?

A. Because we're talking about one product applying to the other.

Q. And that's my question, if GDN dropped its revenue share on third-party exchanges, would that require a drop in the revenue share on AdX?

MS. LEE: Objection to form.

A. That could potentially require an increase to the revenue share on AdX, otherwise, you're making less money.

Q. So if GDN lowered its revenue share on third-party exchanges, AdX would increase its revenue share?

MS. LEE: Objection to form.

A. The hypotheticals talked about here are trying to figure out where rev share could be on the buy side, on the sell side, and at the moment, it's 32 percent and if that 32 percent makes sense. So if you decrease it in one place, you may have to increase it the other or you can decide to make less money, those are the debates.

Q. Okay. I want to look at the -- staying on this first paragraph, I want to look on this third sentence here that says, "We don't want to be in a position."

Do you see that sentence?

A. No. Sorry. Where?

Q. So I'm still on the same sort of first small paragraph and it's the last sentence, so it starts on the right side of the second line. "We don't want to be in a position."

A. Apologies. First page?

Q. Yes. Still on the same e-mail. You see the paragraph, "if we go to a variable revenue share"?

A. Yes.

Q. So you look at the second line of that paragraph, you go all the way to the right?

A. Yes.
Q. And you see, "We don't want to be in a position"?
A. Yes.
Q. So that sentence mentions PubMatic.
Do you see that?
A. Yes.
Q. What is PubMatic?
A. PubMatic was a yield manager that eventually became an exchange.
Q. It was a competitor AdX?
A. It was a competitor to AdX and to some extent AdSense and DFP.
Q. And how would a publisher get AdWords Demand cheaper via PubMatic than via AdX?
MS. LEE: Objection to form.
A. If AdWords is bidding in other exchanges, then -- and it's bidding at a different price point than it bids when it bids on the Ad Exchange, then it would have a different price.
Q. And why did Google not want to be in a position where a publisher would get GDN at a different price on a third-party exchange than on AdX?

MS. LEE: Objection to form.

A. Because the price charged -- if the price charged by a bidder is different by the exchange, it distorts the market.

Q. What do you mean when you say, distorts the market?

A. If you take a different percentage when -- if you have a different tax rate that you're going to charge if you're buying at Home Depot than if you're buying at Lowe's, you could create an advantage for one over the other.

Q. So publishers would go to PubMatic if GDN was charging a lower revenue share there?

MS. LEE: Objection to form.

A. Potentially, yes.

Q. Okay. So publishers consider the sell side and buy side rev shares when deciding where to buy?

MS. LEE: Objection to form.

A. Publishers care about the total yield that they're going to get. The rev share is just one of many factors.

Q. What's total yield?

A. The amount of money they're making on

their inventory.
Q. It's the difference between the price paid by the advertiser and the price received by the publisher?
A. No. It's the revenue as a publisher of what you're getting for your inventory.
Q. When you said the rev share is just one of many factors, are you referring to the buy and sell side rev shares?
MS. LEE: Objection to form.
A. For publishers, they want to just get the most money possible, that's the goal of the exchange and all these pieces for the publisher. And so if the buyer is differentiating across different solutions based on their rev share, it could affect that.
Q. Affect that in what way?
A. By biassing spend to one channel or another.
Q. When you say channel, you mean an exchange?
A. Exchange or network.
MS. LEE: Objection to form.
A. Exchange or network yield manager.

Q. Okay.
MS. LEE: Please give me a second to object, Mr. Spencer.
THE WITNESS: I'm trying.
Q. So if we go to the middle now, staying on this same paragraph, you see it says "currently AdSense"?
A. Yes.
Q. Okay. It reads, "Currently AdSense and AdX to a lesser degree subsidizes the buy side."
Do you see that?
A. Yes.
Q. How did AdSense subsidize the buy side?
MS. LEE: Objection to form.
A. So this is a concept, which is why I put subsidize in quotes. But basically, in AdSense there was no clear differentiation between a buy side rev share and a sell side rev share because there was no need.
Q. Okay. So if there was no differentiation between buy side and sell side, what does it mean for AdSense to subsidize the buy side?
MS. LEE: Objection to form.
A. So AdSense had a rev share, but AdWords

had 0 rev share. So there's no rev share being charged on the buy side, the sell side is the only rev share, so the sell side is, therefore, effectively paying for the work done by the buy side.

Q. Okay. And then you also mention that AdX subsidizes the buy side?

A. Yes.

MS. LEE: Objection to form.

Q. And what does it mean that AdX subsidizes the buy side?

MS. LEE: Same objection.

A. So, again, the same concept holds where the rev share in total is, in the case of AdX, it's split between the sell side and the buy side, and so how is that balance done is the question of whether or not one is subsidizing the other.

Q. Do you know how that balance was done?

A. It was done --

MS. LEE: Objection to form.

A. It was done as 20 percent for the sell side, 15 percent for the buy side.

Q. Do you know why that balance was struck?

MS. LEE: Same objection.
A. The balance was struck because when DoubleClick was acquired and had the exchange, the rev share was 20 percent and so the rev share was maintained at 20 percent. And the rev share for AdSense was 32, that implies 15.
Q. Okay. Okay. You can set that document aside, Mr. Spencer. Thank you.
I believe we are now up to Exhibit 6.
(Exhibit 6, Document Bates labeled GOOG-AT-MDL-014627597 - 27598, marked for identification.)
Q. And hearing no objections, I'll say I counted right. All right. So Mr. Spencer, what I've just marked as Exhibit 6 is a document produced by Google in this litigation with Bates numbers GOOG-AT-MDL-014627597 through GOOG-AT-MDL-014627598.
MS. LEE: As with the other exhibits, I will let you know as soon as I have it.
Q. Have you had a chance to view the document, Mr. Spencer?
A. Yes.
Q. Okay.

MS. LEE: I still don't have the document just to let you know.

MR. GOODNOW: Can we go off the record, please.

THE VIDEOGRAPHER: We are now going off the record. The time is 11:26 a.m.

(Proceedings interrupted at 11:26 a.m. and reconvened at 11:27 a.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 11:27 a.m.

BY MR. GOODNOW:

Q. Mr. Spencer, you have Exhibit 6 in front of you. Could you tell me what it is?

A. It's an e-mail.

Q. It's an e-mail between you and [redacted]?

A. Yes.

Q. Who is [redacted]?

A. [redacted] was a product manager for DBM at the time.

Q. And your discussion here is about something called Facebook Exchange?

A. Yes.

Q. Also called FBX?

A. Yes.
Q. Is FBX around today?
A. Not quite the same as it was then.
Q. Okay. What's the difference between now and then?
A. Since 2013, the ecosystems evolved quite a bit. So Facebook didn't end up making their exchange into a multiproperty piece. They focused on to being a publisher.
Q. Okay. So I want to go -- you see there's an e-mail, again, that kind of starts at 597, but actually in substance it spills on to page 598. Are you on 598, do you see that e-mail?
A. Yes.
Q. And [redacted] writes to you, "In our group conversations, you are typically the one person who voices some skepticism about the impact of FBX and the reaction of our advertisers."
Do you see that?
A. Yes.
Q. Was [redacted] correct about that?
MS. LEE: Objection to form.
A. I don't know if I was the only one who

was skeptical about FBX, but I was certainly skeptical about FBX.

Q. Now let's go to the first page again, 597, and you see you write a response e-mail?

A. Yes.

Q. And at the bottom, there's a paragraph that starts "separately"?

A. Yes.

Q. Okay. And your first sentence there reads, "Separately, I think that strategically it's important to note that FBX is not an exchange."

Do you see that?

A. Yes.

Q. And the next couple of sentences speak to why FBX is not an exchange?

MS. LEE: Objection to form.

A. Yes. They continue my explanation.

Q. All right. So the third sentence of this paragraph, so it's in middle of that second line, "to be an exchange."

Do you see that?

A. Yes, I see that.

Q. Okay. So to be an exchange, they need to

sign up third-party publishers; is that right?
A. That's what I see.
MS. LEE: Objection to form.
Q. And that was your understanding of what an exchange was?
MS. LEE: Objection to form.
A. Yes. My definition of an exchange was an entity that had both multiple buyers and multiple sellers.
Q. If we go to prior sentence, you write -- and it starts at the right side of the first line of that paragraph, "They are a publisher that has enabled their inventory via RTB."
Do you see that?
A. Yes. I see that.
Q. What is RTB?
A. Real-time bidding.
Q. What is real-time bidding?
A. Real-time bidding is a protocol that allows the attributes of inventory to be passed over to a buyer so that they can assess what they want to spend to purchase the inventory.
Q. And you write at the beginning of the sentence, "They are a publisher that has enabled

their inventory via RTB," right?
A. Yes, that's what I say.
Q. And just their own inventory, not third-party inventory?
MS. LEE: Objection to form.
A. Here I'm referring to the fact that Facebook has only enabled their inventory via RTB.
Q. Was Facebook a walled garden?
A. Colloquially, that's what they're referred to today.
Q. Was it a walled garden at the time when it was not an exchange?
MS. LEE: Objection to form.
A. What is your definition of a "walled garden"?
Q. What is your definition of a walled garden, maybe I'll start there?
A. I don't have a particular definition of a walled garden, that's why I call it a colloquial term.
Q. Do you have a different term you would use that represents the colloquial term of walled garden?

MS. LEE: Objection to form.
A. I think each of the really large publishers are fairly unique, so it's probably better to look at each one.
Q. You see now back at the first line of this paragraph you have the word "strategically" there?
A. I'm sorry, you're on the same page?
Q. Same page, yeah, the same paragraph, it starts, "separately"?
A. Yes, strategically.
Q. And you thought it was strategically important to note that Facebook FBX is not an exchange?
MS. LEE: Objection to form.
A. I thought it was important for people to understand that FBX was not an exchange.
Q. You thought it was strategically important?
MS. LEE: Objection to form.
A. In the context of a strategic conversation you need to understand what you're talking about.
Q. Okay. Why was it strategically important

to note that FBX is not an exchange?

MS. LEE: Objection to form.

A. FBX was marketing themselves as an exchange, so it would be easy to think of them as an exchange, but they weren't an exchange.

Q. Why was it strategically important to note the fact that it was not an exchange?

MS. LEE: Objection to form.

A. Because if you're having a conversation about Facebook's Exchange and you think of it as an exchange, you'll think of it incorrectly, which was one of the challenges that I was trying to highlight to [redacted].

Q. AdX was an exchange, correct?

A. Yes.

Q. And FBX was not an exchange?

MS. LEE: Objection to form.

A. Not according to my definitions.

Q. Why is it important to point out that AdX is an exchange and FBX is not?

MS. LEE: Objection to form.

A. Because an exchange should have multiple publishers.

Q. Why is it important to point that fact

out?

MS. LEE: Same objection.

A. Because if you're thinking about where you're buying and the inventory set and you understand that it's an individual publisher, it means that it's much more heterogenous than if you're buying on an exchange representing multiple.

Q. You think that matters to publishers?

MS. LEE: Objection to form.

A. I think that that matters to advertisers.

Q. Why does it matter to advertisers?

A. Because if an advertiser is buying inventory and they expect that inventory to be all one publisher, they may buy differently than if they're buying inventory across multiple publishers.

Q. How would they buy differently?

MS. LEE: Objection to form.

A. Well, for one, they might use different targeting relying more on their own targeting than the publisher's targeting.

Q. Publishers other than Facebook could not use FBX, is that right, as their exchange?

MS. LEE: Objection to form.
A. At the time, FBX was only for Facebook's inventory. I believe they opened it up at one point and then closed it down.
Q. Do you know when they closed it down?
A. I don't remember their dates.
Q. Okay. And publishers could used AdX as their exchange to sell their inventory at this time?
A. Yes, AdX was available for publishers to offer their inventory.
Q. Thank you. You can set that document aside.
Are you familiar with AdX Direct?
A. Yes.
Q. What is AdX Direct?
A. So I believe AdX Direct is referring to one of the deal types for being able to buy inventory through AdX but with special terms to a given publisher.
Q. You said buy inventory through AdX but with special terms for a given publisher?
A. Correct.
Q. Why would a publisher have terms about

how inventory is bought on AdX?

MS. LEE: Objection to form.

A. AdX is an exchange typically managed by an auction and if you're doing something different, the buyer would need to know.

Q. What were the special terms given a publisher with AdX Direct?

A. I forget --

MS. LEE: Objection to form.

A. I forget the parameters you could set for AdX Direct.

Q. Would you use AdX Direct to call AdX from a third-party ad server?

MS. LEE: Objection to form.

A. I don't know that -- that doesn't seem right to me.

Q. Why not?

A. If I'm thinking about AdX Direct correctly, it's more for how a publisher would offer inventory to a buyer.

Q. What does it mean in the context of a publisher offering inventory to a buyer via AdX direct?

A. Again, I may be getting my terms

confused, but it's the buyer knowing how they're buying the inventory.

Q. You mean like directly versus programmatically?

A. Well, a form of programmatic because it's on the exchange, but the terms could be different.

Q. Are you familiar with an AdX tag?

A. Yes.

Q. What is an AdX tag?

A. An AdX tag would refer to a tag that you would pull out of the sell side interface and put on a page or in another ad server.

Q. Would you use an AdX tag to call AdX from a third-party ad server?

I'll restate my question. Would you use an AdX tag to call AdX from a third-party ad server?

A. An AdX tag could be used to put directly on a page or put into a third-party ad server.

Q. Is there any other way to call AdX from a third-party ad server than putting an AdX tag in the ad server?

MS. LEE: Objection to form.

A. At the time AdX tags were prominent, that would be the way you would integrate with another ad server. I don't know about today.

Q. Are you aware of any other way in which AdX would integrate with the third-party ad server?

A. I think they had other innovations after I left about how to do integrations, but I'm not sure.

Q. When you say after you left, are you talking about 2017, 2019 or 2023?

A. After 2017.

Q. Okay. Let's pull up a document. I think we're up to Exhibit 7 now.

(Exhibit 7, Document Bates labeled, GOOG-DOJ-14849643 - 9644, marked for identification.)

Q. Mr. Spencer, take a second to familiarize yourself and I'll read some information into the record here. So what I have just marked as Exhibit 7 is a document produced by Google in this litigation with Bates numbers GOOG-DOJ-14849643 through GOOG-DOJ-14849644.

MS. LEE: Counsel, I do no

GOOG-DOJ-14849643 - 9644, t yet have the document. I will let you know as soon as I have it.

MR. KELSTON: Can you repeat that Bates number, please?

MR. GOODNOW: GOOG-DOJ-14849643, that's the Bates. It goes through 644.

MS. LEE: Counsel, I have the document now, whenever Mr. Spencer and you are ready.

Q. You ready to go?

A. I'm ready.

Q. What is this document?

A. This is an e-mail.

Q. Between you, [redacted], and others?

A. Yes.

Q. Who is [redacted]?

A. [redacted] was in sales in France.

Q. Okay. So let's start with [redacted] e-mail to you at the bottom part of this page. And actually, I'm not planning to flip the page over, so we can focus our attention on 643 unless you need to cross-reference something.

We see here the first paragraph starts as "you may remember"?

A. Yes.
Q. And at the bottom there, there's a dash and next to it, it says [redacted].
A. Yes.
Q. Is [redacted] a French publisher?
A. It looks like [redacted] is a French publisher.
Q. And it says that [redacted] was using AppNexus?
A. That's what it says, yes.
Q. What's AppNexus?
A. AppNexus was another Ad Exchange at the time and bidder and ad server.
Q. Is AppNexus still an ad server today?
A. They were acquired by somebody, but yes, they're still -- do both, ad serving and exchange work.
Q. If we go now two paragraphs down, you see it starts, "We recently had a meeting"?
A. Yes.
Q. Okay. And "we" in the beginning refers to the French sales team?
MS. LEE: Objection to form.
A. I'm assuming "we" is referring to [redacted]

and his team.
Q. And then, had a meeting with him, you see "him"?
A. Yes. I see "him."
Q. And is that a reference to the [redacted] at the very end of the prior paragraph?
MS. LEE: Objection to form.
A. It looks like the "him" he's referring to is the managing director of [redacted].
Q. So "MD" stands for managing director?
MS. LEE: Objection to form.
A. Typically, as I understand it, that's what MD stands for.
Q. And then he is asking, "if we could backfill its private exchange."
Do you see that?
A. Yes.
Q. What's a private exchange?
A. A private exchange is an exchange where you're limiting the set of buyers to a small set.
Q. What does it mean to backfill a private exchange?
MS. LEE: Objection to form.
A. The concept of backfill is to take

inventory that's not been sold.

Q. So you call the private exchange first and if it doesn't sell, it then goes to the backfill?

A. Whether or not it's implemented as a call going in that order or if it's done through other logic, it's the idea that what's not sold gets sold through another means.

Q. Not sold where?

A. In this case, through the private exchange.

Q. Okay. So if private exchange doesn't take the inventory, then backfill?

MS. LEE: Objection to form.

A. Yes. If the private -- this is the question that was being asked is that if we could take the inventory not sold to the private exchange.

Q. Okay. So "we could backfill" is a reference to AdX?

MS. LEE: Objection to form.

A. We could backfill I think is talking about any Google product.

Q. Including AdX?

A. Yes. AdX was a Google product.
Q. That could backfill a private exchange?
MS. LEE: Objection to form.
A. Well, no. At the time, it wasn't a product that could backfill a private exchange.
Q. So let's go down to -- you see, "not allowed"?
A. Yes.
Q. And it's not allowed for AppNexus to call AdX as if it were a bidder on their exchange.
Do you see that?
A. Yes.
MS. LEE: Form.
Q. And [redacted] statement was correct?
MS. LEE: Objection to form.
A. The current policy was not to have one exchange called by another exchange. So not to call AdX as a buyer for another exchange.
Q. Okay. Did that policy change while you were at Google?
A. No, I don't think it did.
Q. Okay. Are you aware if the policy has ever changed?
MS. LEE: Objection to form.

A. I left the area in 2017, but I don't know.
Q. You don't know today as part of your consulting business?
A. I don't know.
MS. LEE: Objection to form.
Q. So then we go down, we see "allowed."
A. Yes.
Q. Okay. And it says, "The AppNexus ad server can call AdX using our tag if they want to place it on the page."
Do you see that?
A. Yes.
Q. Okay. And is that statement correct?
MS. LEE: Objection to form.
A. I believe at the time, that was a way that you could call AdX from the AppNexus ad server.
Q. Are you aware of any other way you could call AdX using the AppNexus ad server?
A. You could call AdSense, but not if you wanted to call AdX.
Q. Okay. And that AdX tag is the tag we were discussing earlier?

MS. LEE: Objection to form.

A. The AdX tag referred to here is the tag you would get from going into the AdX sell side.

Q. You see the second sentence, it starts on the far right side of the first line, "this would be just like"?

A. Yes.

Q. Okay. "This would be just like DFP putting an AdX tag on the page."

Do you see that?

A. Yes.

Q. For a publisher using DFP, did it need to put an AdX tag on the page to call AdX?

MS. LEE: Objection to form.

A. In neither case you actually put the tag on the page. You're putting the tag in the ad server.

Q. Did DFP -- did a publisher using DFP need to put an AdX tag in the ad server to call AdX?

MS. LEE: Objection to form.

A. In 2013, yes.

Q. Okay. Did that change at some point?

A. I can't talk to after 2017.

Q. Did it change between 2013 and 2017?

A. I believe it was made easier to do it, but it was still effectively a tag call.

Q. How was it made easier?

A. The UIs became easier to work together.

Q. And when DFP called AdX via the tag in the ad server, that was done by dynamic allocation?

MS. LEE: Objection to form.

A. So DFP -- when you put the tag in DFP, the decision logic used the dynamic allocation was simply passing a min price.

Q. So then if we go on to the next sentence there you say, "and if Audience Square." You see that sentence?

A. Sorry, I lost it.

Q. No problem. In the paragraph that starts, "allowed."

A. Yes.

Q. In the middle of that paragraph on the second line, there's a sentence that starts, "and if Audience Square"?

A. Yes.

Q. And the sentence reads, "And if Audience Square calls AdX through the AppNexus ad server,

they have to accept the winning bid."
You see that part?
A. Yes.
Q. And that statement was accurate?
MS. LEE: Objection to form.
A. The exchange was not set up to deal with the idea that it was being assessed for a bid, but that the bid was not shown. It assumed that if the bid wins, the price is disclosed, the ad is actually shown.
Q. When you say that if the bid wins, the price is disclosed, what does that mean?
A. So it's an auction, asking for bids, the winning bid is -- winning buyer is determined, which has a price. They want the price to be able to understand whether or not they want to offer or take the inventory, but the exchange assumes once it's bid and the price has been determined, because it's second price, that the winner is set.
Q. You're talking about the winner internal to the AdX auction?
A. Correct.
Q. So once the AdX auction returns a price,

the expectation was that the winning bidder in the AdX auction would serve the impression?

MS. LEE: Objection to form.

A. That's correct.

Q. And that was Google's policy?

MS. LEE: Objection to form.

A. That wasn't the policy, that was the technology.

Q. Okay. And so in so far as, and if Audience Square calls AdX through the AppNexus ad server, they have to accept the winning bid, that was correct?

MS. LEE: Objection to form.

A. Again, if they don't, the exchange is broken because it's assuming that the ad is then delivered and if the ad is not delivered, then it's calling, it's assuming it's delivered, but it's broken.

Q. So is that statement accurate?

MS. LEE: Same objection.

A. It's explaining to the situation of -- it's repurposing the statement of saying if they don't accept the winning bid, then it's going to be broken, so they should accept the winning bid.

Q. They have to accept the winning bid, correct?
A. Otherwise, they break the exchange.
Q. Then there's a parens there, "as long as it passes any mines that Audience Square has set in AppNexus."
Do you see that?
A. Yes.
Q. And "mines" there, do you understand that to be price wars?
A. I believe he meant "mins."
MS. LEE: Form.
Q. Mins, okay.
Is that price wars?
MS. LEE: Objection to form.
A. So I think the mins there is referring to a price floor, but that wouldn't be accurate because AdX doesn't know the min from AppNexus.
Q. Okay. So we go up to -- and sorry, mins there, as you're saying, m-i-n-s?
A. Yes, it looks like an auto correct.
Q. Okay. So if we go back up to your e-mail, you see you respond?
A. Yes.

Q. There's the paragraph there in the middle that starts, "our policy"?
A. Yes.
Q. And it actually says "out" policy. Did you mean "our" policy?
A. Yes.
Q. Okay. So it starts, "Our policy is that AdX not be yield manager."
Do you see that?
A. Yes. It should be "yield managed."
Q. So "Our policy is that AdX not be yield managed"?
A. Correct.
Q. What does that mean?
A. The Ad Exchange assumes that when it's called, it's delivering an impression. Yield managers don't. So yield managers are estimating the CPM first and then deciding to call. And so when it's yield managed, it breaks the exchange.
Q. Okay. What do you mean, breaks the exchange?
A. The mechanism that the exchange is relying on to deliver an ad doesn't function properly.

Q. And then it says, "or put in competition with another RTB call-out."

You see that?

A. Yes.

Q. What's an RTB call-out?

A. A real-time bidding request for a bid.

Q. So what does it mean that AdX --

MR. GOODNOW: Strike that. Let me start over.

Q. So Google's policy is that AdX cannot be yield managed or put in competition with another RTB call-out; is that right?

MS. LEE: Objection, form.

A. That's correct.

Q. And my question is, what does it mean for AdX to be put in competition with another RTB call-out?

A. That would mean that for a given piece of inventory, there are two RTB call-outs going to bidders, one through the exchange and one in parallel to it.

Q. And it was against AdX policy for one call-out to go to AdX and another one to go out in parallel to a different exchange?

MS. LEE: Objection to form.

A. So AdX is a second price auction and if you have multiple call-outs going on in parallel and yield manage them or compare them, you break the second price auction.

Q. Okay. And it was against AdX policy for one call-out to go to AdX and another one to go out in parallel to a different exchange; is that right?

A. Correct.

MS. LEE: Objection to form.

Q. All right. Then there's a sentence there that says, "in addition."

Do you see that?

A. Yes.

Q. Okay. "In addition, we have a policy that any AdX call for which we return an ad (we have a winner), the ad is displayed."

Do you see that?

A. Yes, I see that.

Q. So that is a policy that Google had for AdX?

MS. LEE: Objection to form.

A. Again, the policy is requiring that the

ads are split so you don't break the exchange.

Q. So how does Google enforce that policy?

MS. LEE: Objection to form.

A. It was unfortunately a very complex policy to enforce.

Q. So if the ad server called a different exchange first and then passed back to AdX, would it be in violation of that policy?

MS. LEE: Objection to form.

A. If the ad server is -- yes. If the ad server is calling to one exchange and then another call, then that creates a parallel call.

Q. Okay. And if the ad -- third-party ad server calls AdX first and AdX does not return a bid and then the ad server calls a second exchange, does that violate this policy?

MS. LEE: Objection to form.

A. You can't call AdX without getting a bid, so it would still result in the AdX call. I don't follow the question.

Q. Every time AdX is called a bid, it returns a bid?

MS. LEE: Objection to form.

A. Yes. Every time the exchange is called

for an impression, it will deliver an impression.

Q. Okay. Suppose that the bid returned by AdX is below the price floor set in AdX, do you have that in mind?

A. Sorry. If there's a min price set and there's no bid above the min price, then it will not return a bid.

Q. Okay. And then if the ad server then calls a second exchange, would that violate this policy?

MS. LEE: Objection to form.

A. If the -- then calls another one, it would still violate the policy because then why did you have the min.

Q. Okay. So you can't recall AdX first and another exchange second under this policy?

MS. LEE: Objection to form.

A. That policy was to not call two exchanges, the first or second, doesn't matter.

Q. And that policy applied to third-party ad servers?

MS. LEE: Objection to form.

A. That policy applied to any ad server, including DFP.

Q. Including third-party ad servers?

MS. LEE: Objection to form.

A. That policy applied to all ad servers.

Q. Now there's three points underneath this paragraph here. Do you see those three points?

A. Yes.

Q. Are these rules that you have to follow to stay in compliance with the policies we just discussed?

MS. LEE: Objection to form.

A. No. Those are methods to do a call, to try and find a way to make it work without violating policy.

Q. Okay. So the first point here reads, "AdX would need to be called without any min CPM controls being determined by AppNexus (a min CPM could be set within AdX, however)"; is that correct?

A. Yes, that's correct.

Q. And how did Google enforce that?

MS. LEE: Objection to form.

A. Again, Google would be challenged to enforce it, but the problem with a min afterwards is that the exchange expects to deliver an

impression, but then AppNexus is not delivering the impression, which means the exchange is broken.

Q. Did that rule change between 2013 and 2017 when you stopped working on these issues?

MS. LEE: Objection to form.

A. I don't think that that changed.

Q. Are you aware if it changed after 2017?

A. I'm not aware.

Q. So you see point number 2 there?

A. Yes.

Q. "Any impression that goes to AdX could not also go to AppNexus's RTB callouts. It needs to be an either/or decision"?

A. Yes, I see that.

Q. And that's an accurate statement?

MS. LEE: Objection to form.

A. The exchange is a second price auction, if you're doing parallel calls to two different auctions, you'll break the expectation of the advertiser for a second price.

Q. Okay. And the third point here is "AdX's eCPM could not be computed and used as competition with the AppNexus auction."

Do you see that?
A. Yes.
Q. What's an eCPM?
A. In this case it's the estimated CPM.
Q. And what's an estimated CPM?
A. The scenario here that they could be doing is to try and estimate what the yield is you'll get from the exchange and then put that in competition with another exchange, but because advertisers expect a second price auction and that breaks a second price auction, it doesn't make sense to do.
Q. Okay. And when you say "breaks a second price auction," are you talking about it impacts the functionality of the AdX second price auction in some way?
A. It impacts --
MS. LEE: Objection to form.
A. It impacts the expectation that the second price auction is actually second price.
Q. Okay. All right. Just a couple of questions to wrap up this document. The publishers mentioned in [redacted] e-mail are French. Am I right about that?

MS. LEE: Objection to form.
A. I believe they were operating in France.
Q. Okay. DFP works for publishers around the world?
A. DFP has customers in almost every country.
Q. Is that also true of AppNexus?
MS. LEE: Objection to form.
A. I have no idea where AppNexus operates or doesn't at this time.
Q. Are you aware of any other ad service that operate throughout the world?
MS. LEE: Objection to form.
A. There are -- there have been many ad servers over the years that have operated in many countries. I don't know which ones were in which countries or how broad they were or weren't.
Q. Does DFP compete against ad servers based in countries other than the United States?
A. Yes.
Q. Why do you think that?
MS. LEE: Objection to form.
A. Because we've had customers in other countries.

Q. I'm asking a question about DFP competing against ad servers in other countries. And why do you think that DFP competes against ad servers in other countries?

MS. LEE: Objection to form.

A. Because there are ad servers that are offered in other countries, and so if a customer in France or Australia wants an ad server, they could consider DFP or they could consider another ad server.

Q. Is it the same for exchanges?

MS. LEE: Objection to form.

A. So, yes, over time there have been more and more exchanges available, so yes, they have a choice as to which exchange to use.

Q. So the Google AdX exchange competes against exchanges from other countries?

A. I don't know if there were other countries that produced it, but in other countries they were available.

Q. Are you familiar with Criteo?

A. Yes.

Q. Is it an exchange?

A. No.

Q. What is it?
A. It's a bidder.
Q. Are you aware of any exchange that is based in a foreign country?
MS. LEE: Objection to form.
A. At this point there is so many exchanges, I'm sure there is one, but none of the big ones were. They were all U.S. companies.
Q. Is that still true today about the big exchanges, they're all U.S. companies?
MS. LEE: Objection to form.
A. I think so. I don't know.
Q. Okay. All right.
MR. GOODNOW: I think let's go off the record and take a break and I'll caucus with my colleagues.
THE VIDEOGRAPHER: We are now going off the record. The time is 12:04 p.m.
(Proceedings interrupted at 12:04 p.m. and reconvened at 12:17 p.m.)
THE VIDEOGRAPHER: We are now going back on the record. The time is 12:17 p.m.
BY MS. GOODNOW:
Q. All right. Mr. Spencer, we're going to

move on. I'm actually marking two separate documents as Exhibit 8 and Exhibit 9. You'll see that Exhibit 8 is an e-mail, and I'll represent to you that Exhibit 9 was the attachment with the e-mail.

(Exhibit 8, Document Bates labeled GOOG-AT-MDL-004344298 - 299, marked for identification.)

(Exhibit 9, Document Bates labeled GOOG-AT-MDL-004344300 - 4314, marked for identification.)

Q. So I'll give you both of these together so you can see them.

All right. And while you're taking a look, I'll read some Bates information into the record of that, Exhibit 8 and Exhibit 9. So Exhibit 8 is a document produced in this litigation by Google. It has Bates numbers GOOG-AT-MDL-004344298 and it goes through GOOG-AT-MDL-004344299. That's Exhibit 8.

And then Exhibit 9, which is the attachment to the e-mail, starts at GOOG-AT-MDL-004344300 and it goes through GOOG-AT-MDL-004344314.

So Mr. Spencer, take a minute to familiarize yourself with both of those documents and then we can get started. And we will start with the e-mail first, if that helps with anything.

MS. LEE: Counsel, have Exhibit 8. I'm just waiting to pull up Exhibit 9.

Q. Did you read the documents, Mr. Spencer?

A. I have.

Q. Okay. So let's start with the e-mail here as Exhibit 8. Could you tell me what this document is?

A. This is an e-mail, it looks like to the DRX-PM team.

Q. Okay. And it was sent by you, this e-mail at the top?

A. Yes.

Q. And then [redacted] forwarding an e-mail to you?

A. Yes, that's correct.

Q. Okay. And that original e-mail was from [redacted]?

A. It looks so, yes.

Q. All right. And you see the subject line

of the e-mail which reads "Preread upcoming research BCG study on publisher profitability"?

A. Yes, I see the line.

Q. Okay. And then you see in [redacted] e-mail there's a TLDR in italics there?

A. Yes, I see that.

Q. And the sentence reads, "Attached is a summary of findings from a new study BCG will be presenting in a PBS leadership meeting later this week."

Do you see that sentence?

A. Yes.

Q. Okay. And is Exhibit 9 the summary of findings from the BCG study on publisher profitability that was presented at the PBS leadership meeting?

MS. LEE: Object to form.

A. I don't know if it's referring to the bullet points below or that the attachment is the summary of findings.

Q. And you see the sentence reads, "Attached is a summary of findings"?

A. Yes, I see that.

Q. Okay. So the e-mail attachment I marked

as Exhibit 9 is the summary of findings referenced in that sentence?

MS. LEE: Objection to form.

A. I'm not [redacted], so I don't know if she's meaning that the attachment is the summary because it doesn't say "summary," or if these summary bullet points are her summary, so I don't know.

Q. Okay. What is Exhibit 9?

A. A presentation from BCG.

Q. About what?

A. It appears to be a presentation about large publisher programmatic profitability.

Q. All right. So let's go to in the e-mail the bullet points, the first two bullet points there that starts with "Publishers can see up to."

Do you see that there?

A. Yes.

Q. Okay. So this was one of the findings of the BCG study?

MS. LEE: Objection to the form.

A. It appears that that is one of the claims as one of the findings.

Q. Okay. That was a 24 percent uplift in CPMs with EDA. You see that reflected there?
A. Yes, I see the words.
MS. LEE: Objection.
Q. What's a CPM?
A. A CPM is cost per thousands impressions.
Q. Okay. And Google communicated this finding to publishers?
MS. LEE: Objection to form.
A. I don't know based on this.
Q. You see below "Up Next" there?
A. Yes.
Q. And the first bullet point says, "Presentation of finding at PMG off-site in London this week by BCG"?
A. Yes.
Q. What is a PMG off-site?
MS. LEE: Objection to form.
A. I'm not quite sure what the PMG acronym refers to, but it looks like an internal sales conference of some sort.
Q. And you see the next bullet point is a reference to a PBS leadership meeting?
A. Yes.

Q. What's a PBS leadership meeting?
A. PBS is the sales team, so sales team leadership meeting.
Q. Are there publishers that attend the PBS leadership meeting?
A. No.
Q. And then if we go to the next, it says "Review of findings at the DoubleClick leadership summit breakout session"?
A. Yes.
Q. What's a DoubleClick leadership summit?
A. That would be where the leaders of the DoubleClick business would get together.
Q. Okay. And were there publishers at that meeting?
A. No.
Q. Okay. And you see at the top --
MS. LEE: Object.
Q. -- where your e-mail, and there's a parens there which says "Potentially for use in DLS decks."
Do you see that?
A. Yes.
Q. All right. And DLS, does that stand for

DoubleClick Leadership Summit?
A. Yes.
MS. LEE: Objection to form.
Q. Okay. And then if we go to the paragraph back in this e-mail originally from [redacted], you see the second paragraph that starts "Led by the Boston Consulting Group"?
A. Yes.
Q. Okay. And it says, "The study is based on data and interviews conducted in early Q2 with 25 nearly global publishers."
Do you see that?
A. Yes. I see the sentence.
Q. Okay. So being based on data and interviews conducted with 25 global publishers, did Google communicate the results of the study to those publishers?
MS. LEE: Objection to form.
A. I don't know.
Q. Do you think that Google enlisted the help of 25 global publishers in the study but did not communicate the results to them?
MS. LEE: Objection to form.
A. I don't know.

Q. You have no understanding one way or the other whether Google would enlist the help of 25 publishers for a study and never give them the results?

MS. LEE: Objection to form.

A. This study was done by BCG, so I don't know what they communicated to whom.

Q. Okay. If we go to your e-mail at the top, do you see it starts "FYI"?

A. Yes.

Q. And you write, "This is the study commissioned by Google"?

A. Yes.

Q. Google paid for the study?

A. That's my understanding.

MS. LEE: Objection to form.

Q. And what gives you that understanding?

A. It was prepared for Google, and therefore, I assume we paid for it.

Q. Okay. And the study prepared for Google, are you aware whether Google communicated any of the findings of the study to publishers?

MS. LEE: Objection to form.

A. I'm not aware of whether or not they were

communicated.

Q. Okay. So if we go back to the e-mail about the 24 percent uplift in CPMs --

You see that?

A. Yes.

Q. -- do you think Google made that finding and then didn't communicate it to publishers?

MS. LEE: Objection to form.

A. Again, I don't know if they did or didn't.

Q. Do you think this is the kind of finding that Google would not share with publishers?

MS. LEE: Objection to form.

A. I think it's a great finding.

Q. And is it the kind of finding that you would expect Google to share with publishers?

MS. LEE: Objection to form.

A. Again, I don't know for sure if they did or didn't. It's a good finding, so perhaps.

Q. Okay. And you see underneath there "discrepancies fall from up to 10 percent to less than 0.5 percent on a unified stack"?

A. Yes.

Q. Is that another great finding?

MS. LEE: Objection to form.
A. That is another finding that would be a positive for publishers.
Q. And would Google have communicated this finding that's positive for publishers to publishers?
MS. LEE: Objection to form.
A. Again, I don't know if they did or didn't.
Q. Would you have expected them to?
MS. LEE: Objection to form.
A. I can't predict what the sales marketing team would do.
Q. You have no expectation of what the sales marketing team would do?
MS. LEE: Objection to form.
A. I don't know what they would do.
Q. Okay. So let's just make sure we have the testimony clear. You see the BCG had a study commissioned by Google with nearly 25 global publishers, correct?
A. Yes.
Q. Those publishers provided data to the study, correct.

MS. LEE: Objection to form.
A. I have no reason to dispute that they -- those 25 publishers provided the data.
Q. They sat for interviews for this study?
MS. LEE: Objection to form.
A. Again, I didn't do the survey, so I can only speculate based off of it being a survey.
Q. And there were two great findings that are put in this e-mail here, the two bullet points we've been discussing?
MS. LEE: Objection to form.
A. I describe them as great findings. They're listed as highlights.
Q. And despite the publisher's provision of data, sitting for interviews, and the two great findings that Google made, you don't have a view or you do not know whether Google communicated these findings to publishers?
A. I do not know for certain.
MS. LEE: Objection to form.
A. I do not know that they were communicated or not.
Q. You do not know for certain. Do you have any expectation?

MS. LEE: Objection to form. Counsel, you've asked it three times already.
A. I don't know what that means. Like it's not my data to have an expectation about.
Q. Okay. Who is [redacted]?
A. [redacted] was -- at this time, she was doing commercialization, I believe.
Q. And what does that mean?
A. Helping to ensure products were like best utilized and adopted once they were developed.
Q. Okay. Did she work for you?
A. No.
Q. Were you colleagues?
A. Yes.
Q. Okay. And why did she forward the study to you?
MS. LEE: Objection to form.
A. I assume she wanted me to see it.
Q. And you thought it would be good for DLS decks?
MS. LEE: Objection to form.
A. Yes.
Q. Why?
A. The display leadership summit we were

putting together different presentations to describe products, what's going on with the products, and how they're working, and so the data here could be useful for that.

Q. And you sent this e-mail to [redacted] at [redacted]?

A. That's correct.

Q. Who's on that LISTSERV?

A. That would be the product managers for DRX, which would be the Ad Exchange and DFP.

Q. And would the product managers discuss with the sales teams the results of this Google commissioned study?

MS. LEE: Objection to form.

A. I don't know. That was suggesting they could use it for their DLS decks.

Q. Okay. Did Google make sure that the study was accurate?

MS. LEE: Objection to form.

A. It's a survey from a third-party group.

Q. And did Google make sure that the results of this survey were accurately ascertained?

MS. LEE: Objection to form.

A. I have no idea.

Q. Okay. Let's go to the next page of this e-mail, dash 299. Just the other side. You see where it says "A large global cross functional team"?
A. Yes.
Q. It's talking about a Google team?
MS. LEE: Objection to form.
A. And those appear to be people from Google.
Q. And they were involved in vetting the findings, methodology of the study, and the story line in the report?
MS. LEE: Objection to form.
A. That's what it says.
Q. You think it's accurate?
A. I have no reason to believe it isn't.
Q. Okay. All right. Let's spend a little bit of time here with the slide deck itself. So that is now our Exhibit 9. And if we go to dash 301 at the bottom, so it's just the first, I'll call it, substantive slide.
You see that?
A. Yes.
Q. And you see the box that says "Context"?

A. Yes.
Q. And it says that Google engaged the Boston Consulting Group to conduct an independent research study.
Do you see that?
A. Yes.
Q. Do you have an understanding what an independent research study is?
A. Independent would mean likely that it was done separately from Google and without disclosing it was coming from Google.
Q. Independent would mean it was done separately from Google and without disclosing it was coming from Google?
A. Potentially without disclosing it was from Google.
Q. So Google commissioned this independent study without telling publishers that it commissioned the study?
A. I'm not saying that. You asked what that would mean, and that's what that could mean.
Q. Okay. Is that what you expect that to mean, in your experience?
MS. LEE: Objection to form.

A. It's clearly independent because it's coming from the Boston Consulting Group. It could have been done with the expectation that it's coming from Google or not. I don't know.

Q. And you see "Study Objects" there in the next box?

A. Yes.

Q. And the second big bullet point there is "Identify ways to improve net margin."

Do you see that?

A. Yes.

Q. What does "net margin" mean?

MS. LEE: Objection to form.

A. I assume net margin here is referring to the margin of Google.

Q. So one of the objectives of this study was to identify ways to improve Google's net margin?

MS. LEE: Objection to form.

A. Actually, reading through this research allocation, yes, it looks like it is referring to ways to potentially improve Google's net margin.

Q. Okay. Let's go to the next page, dash 302. And you see at the top it says "Recruited

25 Large Publishers"?
A. Yes.
Q. Do you have any idea what Google did to recruit these large publishers?
A. My understanding is that the Boston Consulting Group did this.
Q. Do you have any understanding what the Boston Consulting Group did to recruit the large publishers?
A. No.
MS. LEE: Objection to form.
Q. Okay. You see "North America" there?
A. Yes. I see North America.
Q. You [redacted] is listed as one of the content publishers?
A. Yes. I see [redacted].
Q. It was a participant in the study?
MS. LEE: Objection to form.
A. That's the implication of their name being listed.
Q. Okay. Same for [redacted]?
MS. LEE: Same objection.
A. Yes.
Q. You see [redacted] is listed also in

EMEA on the right-hand side?
A. Oh, yes, there it is.
Q. Okay. All right. Now, if we go forward to 304, there's a slide at the top that says "Executive Summary."
A. Sorry. Which slide?
Q. 304.
A. Yes.
Q. All right. And so there's bold text sort of in the second chunk, "Publishers must navigate."
Do you see that?
A. Yes.
Q. And below there there's a bullet point that starts "Clear benefits"?
A. Yes.
Q. And it says, "Clear benefits to using a unified stack, i.e., integrated ad server and SSP"?
A. Yes.
Q. And then you see a line beneath there that says "Discrepancies"?
A. Yes.
Q. So the reduction in discrepancies of the

benefit identified here from a unified stack?
MS. LEE: Objection to form.
A. Discrepancies appears to be one of the benefits list.
Q. Okay. And who else at the time had an integrated ad server and SSP other than Google?
A. I'm sorry. What is the time period for this --
MS. LEE: Form.
Q. If you go back to the very first page of the slide deck -- excuse me -- you see it says the 29th of May, and then if you go to the e-mail that I showed you we marked as Exhibit 8, the dates on the e-mail are June 1st, 2015.
A. So others had unified stacks in 2015.
Q. Who did?
A. AppNexus I believe had a full stack, and I think Rubicon had developed their bidder at the time.
Q. Had developed their what, sorry?
A. Bidder.
Q. And what is their bidder?
A. A technology to buy on exchanges.
Q. And that makes Rubicon a full stack that

had technology to buy on exchanges?
MS. LEE: Object to form.
A. Any company that had both a -- well, if they had an ad server and exchange, a bidder would be considered a full stack.
Q. So let's look back here in "Unified Stack."
Do you see that at the bullet point?
A. Yes.
Q. And it says, "i.e., integrated ad server and SSP"?
A. Yes.
Q. What's an SSP?
A. SSP was the term in 2015 used to refer to the combination of an ad server and a yield manager, oh sorry, an exchange yield manager.
Q. So the use of "unified stack" here means an integrated ad server and SSP?
MS. LEE: Objection to form.
A. That's what they're defining it as here.
Q. Okay. So we mentioned Google offering a unified stack. AppNexus also offered a unified stack under this definition?
A. Under this definition in 2015, yes, they

would have both pieces.
Q. Okay. Did anyone else?
A. PubMatic would have both pieces.
Q. Anyone else?
A. Probably there were like ten or so in the market at that time that were combining.
Q. Okay. And then to the right of it, it says "and leveraging decisioning technology."
Do you see that?
A. Yes.
Q. What is decisioning technology?
MS. LEE: Object to form.
A. I'm not a hundred percent sure.
Q. Okay. Does decisioning technology refer to enhanced dynamic allocation?
MS. LEE: Objection to form.
A. It could.
Q. What is enhanced dynamic allocation?
A. Enhanced dynamic allocation was the subsequent improvement to dynamic allocation which helps publishers get more money between what they sell directly and what they sell programmatically.
Q. Okay. And now, you see where it says "we

recommend" just a little bit further down?
A. No. I'm sorry. Where?
Q. Sure.
Just two chunks of text down this slide, it's the last bolded language, "we recommend publishers"?
A. Yes.
Q. Okay. And then you see that there's sort of two indented points there beneath?
A. Yes.
Q. And the second one starts "Use technology."
Do you see that?
A. Yes.
Q. And it says, "Use technology as a decision engine to maximize revenue."
A. Yes.
Q. And you see "e.g., Google's EDA"?
A. Yes.
Q. So EDA is an example of technology as a decision engine to maximize revenue?
MS. LEE: Objection to form.
A. According to the Boston Consulting Group.
Q. According to you?

MS. LEE: Objection to form.
A. EDA was technology specifically to help optimize revenue between publishers direct sold and programmatic.
Q. And the study recommended that publishers use EDA?
MS. LEE: Objection to form.
A. No. It's recommending that they use technology to maximize revenue and EDA is an example.
Q. Did you ever recommend publishers that they use EDA?
A. Sure.
Q. When?
A. Whenever I talked to them about using the publisher stack.
Q. And did you tell them that using EDA maximizes revenue?
A. I would explain that EDA was the tool to help put your direct sales and programmatic together because originally publishers didn't want to use programmatic, they were scared of it. They wanted to ensure that they would never lose money when calling the exchange, and so dynamic

allocation made sure that took the price you're about to sell it for and made that the floor to offer the exchange so they wouldn't lose money.

Q. And did you tell publishers that if they used EDA they would maximize revenue?

MS. LEE: Objection to form.

A. I would explain to publishers what EDA was to help them get the most revenue, but it doesn't necessarily maximize all of the revenue.

Q. What do you mean by that?

A. There's a lot of variables to that. It's a specific feature for putting direct sales and programmatic together.

Q. Under what circumstances would EDA not maximize revenue?

MS. LEE: Object to form.

A. It will maximize between two channels, but it's only aware of what it knows and there's many other factors for a publisher.

Q. What other factors are you alluding to?

A. How many ads do they have on a page, what's the size of those ads, what they're doing for reach, what they're doing to continue to get people to use their site. There are many factors

that publishers looked at to get higher yield.
Q. And depending on those factors, EDA may or may not maximize revenue?
MS. LEE: Objection to form.
A. Those factors could be far more important to a publisher than anything EDA is doing.
Q. Okay. So if we go back up to the Clear Benefits bullet point we were talking about before --
A. Yes.
Q. -- and you see the "decisioning technology to allocate impressions across demand, e.g., direct and programmatic"?
A. Yes.
Q. That's what EDA did, allocated impressions across direct and programmatic demand or, excuse me, inventory?
MS. LEE: Objection to form.
A. So EDA explicitly looked at the question of what you're about to sell your direct sold for and made sure that you wouldn't sell it through programmatic at a lower price.
Q. Okay. And that may or may not have maximized publisher revenue?

MS. LEE: Objection to form.

A. It will maximize that decision between the two, but that's only one factor for a publisher.

Q. Okay. Let's fast-forward a little bit to slide 314. You see the chart on the left?

A. Yes. I see the chart.

Q. And that shows the uplift on programmatic revenue and EDA inventory versus control?

A. Yes. I see that.

Q. And is this chart depicting an increase in overall programmatic revenue or just programmatic revenue by AdX?

MS. LEE: Objection to form.

A. I don't know. I assume it's looking at the programmatic revenue through AdX.

Q. And what makes you think that?

A. Because that's what EDA was looking at.

Q. Okay. So the study didn't consider whether CPMs increased or decreased from other exchanges?

MS. LEE: Objection to form.

A. I don't know what the study incorporated or didn't incorporate.

Q. Okay. You can set that document aside.
(Exhibit 10, Document Bates labeled GOOG-AT-MDL-013405085 - 5101, marked for identification.)
MR. GOODNOW: So I'm going to mark now as Exhibit 10 a document that Google produced in this litigation. And so it has a Bates number starting GOOG-AT-MDL-013405085 and that goes through GOOG-AT-MDL-013405101.
MS. LEE: I'm still pulling up the document. I'll let you know when I have it.
Q. Had a chance to review?
A. Yes.
Q. Great.
So what is this document?
A. It appears to be a draft of the other presentation.
Q. Okay. You think it's a prior draft?
MS. LEE: Objection to form.
A. This is from April and the other one appears to be from May, so yes.
Q. Can you go to the slide that ends dash 09 --
MR. GOODNOW: One moment, let me find

myself.
Q. 095. 095. It says "Report Framework 1/2" on top?
A. Yes.
Q. Do you see on the left-hand side there's a box with the number 2 in it?
A. Yes.
Q. Okay. And beneath that box there's a line of text that starts "Orange text'?
A. Yes. I see that.
Q. And it says, "Orange text equals highlights Google USP for potential advantage."
A. Yes.
Q. What is a USP?
MS. LEE: Objection to form.
A. We didn't really use that term, so I'm not really sure.
Q. Unique selling point, does that ring a bell?
A. Perhaps.
Q. All right. It's referring to some kind of advantage?
MS. LEE: Objection to form.
A. Well, it says "or potential advantage."

Q. Okay. And a potential advantage for Google?

MS. LEE: Objection to form.

A. I'm sorry. I don't understand the question.

Q. Sure.

So it says, "Orange text equals highlights Google USP or potential advantage," correct?

A. Yes.

Q. So we're talking about Google USPs or potential advantages?

MS. LEE: Objection to form.

A. I think it's talking about things that are special and unique to Google.

Q. Okay. And so if we --

MR. GOODNOW: I'll step back for a second.

Q. So this slide identifies some advantages that are special and unique to Google?

MS. LEE: Objection to form.

A. This slide is a draft that seems to claim some subpoints that are listed as the orange text could be that, but it's from the Boston

Consulting Group.
Q. Okay. So the Boston Consulting Group was identifying special and unique advantages for Google?
MS. LEE: Objection to form.
A. The Boston Consulting Group was creating a presentation. I don't know what they were trying to do.
Q. Okay. You said there were Google advantages reflected on this page?
A. No, I didn't say that.
Q. You said there are Google advantages in BCG's view that are expressed on this page?
MS. LEE: Objection to form.
A. I said this is a draft slide that BCG put together, which was a bunch of points, some of which they flagged as being potentially highlighted as Google USPs for potential advantages.
Q. Okay. And which points did they highlight?
A. It looks like they highlighted starting with "especially" and maybe the one started with "data" but the color is lost here.

Q. Yeah. I searched high and low for a color copy for you but there was only this one in the production. But okay, we can go along with the gray scale. So especially when multiple demand source is used, that was flagged by BCG?

MS. LEE: Objection to form.

A. It looks like that was highlighted by BCG.

Q. And there's a footnote there, you see 1?

A. Yes, I see the footnote.

Q. And if we go down, there's a little number 1. That's the text of the footnote?

A. It looks like that's what it's referring to.

Q. And it reads, for Google as any publisher rationalizing SSPs will likely maintain AdX due to scale and unique demand.

Do you see that?

A. Yes, I see that.

Q. Do you have an understanding of what "rationalizing SSPs" means?

MS. LEE: Objection to form.

A. My guess is that they're talking about deciding to consolidate or maybe to use one, I

don't know.

Q. Okay. And in making the decision to consolidate or use one, BCG wrote that AdX had an advantage?

MS. LEE: Objection to form.

A. That BCG looks like they're footnoting what they think is an advantage listed here.

Q. Okay. And that advantage is scale and unique demand?

MS. LEE: Objection to form.

A. According to BCG, they're saying Google, as any publisher's rationalization, likely maintain AdX due to scale and unique demand.

Q. Mr. Spencer, could you try that again? The real-time I don't think quite captured it correctly. Let me re-ask my question.

The advantage identified by BCG in this footnote for AdX is its scale and unique demand?

MS. LEE: Objection to form.

A. So the BCG footnote states on the slide that AdX due to scale and unique demand.

Q. And it states that was an advantage for Google?

MS. LEE: Objection to form.

A. That's what BCG is claiming.
Q. And that would be an advantage for Google when a publisher is rationalizing SSPs in the way you and I just discussed?
MS. LEE: Objection to form.
A. Again, we're talking about the semantics of the bullet point here, but this is what BCG wrote.
Q. Okay. So let's go to the next slide, which is dash 096. And you see again at bottom it says, and one of those is including EDA number 1 build text equals highlights Google USP or potential advantage?
A. Yes. I see that.
Q. Okay. So BCG identified other advantages for Google on this slide?
MS. LEE: Objection to form.
A. BCG highlighted other things that they thought could be, as they term it, a USP or potential advantage.
Q. Okay.
MS. LEE: Objection to form.
A. "Including EDA" is highlighted.
Q. Okay. And number 3, "Strategic decision

on ad stack number SSPs, how to set up, that's identified as an advantage.

MS. LEE: Objection to form.

A. They identify as a feature strategic decision on tech stack (number SSPs, how to set up).

Q. They identify it as potential advantage, correct?

MS. LEE: Objection to form.

A. They are highlighting it as a Google USP or potential advantage.

Q. And on the right-hand side under "Data," you see number 3?

A. Yes. I see number 3.

Q. Okay. And it is also identified -- actually, there's two number 3s. You see there are two number 3s?

A. Do you mean on the right side?

Q. Yeah. On the right-hand side.

A. Ah, yes.

Q. And that second number 3 is "Discrepancy analysis"?

A. It looks like it's referring to the first one.

Q. Okay. So there's two number 1s, correct, at the top? Yes, let's start from top to bottom. There's two number 1s?
A. Yes. There are two number 1s.
Q. Okay. And the second number 1 starts "EDA uplift"?
A. Yes.
Q. Okay. And that's identified as an advantage to Google?
MS. LEE: Objection to form.
A. I believe the EDA uplift data from that one is referring to the data to support their point on the left.
Q. Okay. But it's highlighted in orange, correct?
A. Yes.
MS. LEE: Objection to form.
Q. Okay. And then there's that second number 3, and says "Discrepancy analysis"?
A. Yes.
Q. Also highlighted as an advantage by BCG?
MS. LEE: Objection to form.
A. Again, highlighted by BCG as either a Google USP or potential advantage.

Q. Okay. And the number 5 where it says "Mobile video opportunity easier with consolidated platform"?

A. Yes. I see that.

Q. Also highlighted as a Google advantage?

MS. LEE: Objection to form.

A. Again, BCG has highlighted this is as a Google USP or potential advantage.

Q. Okay. Great. Thanks, Mr. Spencer. You can set that document aside.

MS. LEE: And I'm just going to set out an objection to the questioning on this document to the extent you were asking Mr. Spencer whether certain text was highlighted or providing Mr. Spencer with the black and white copy.

MR. GOODNOW: Obviously, we oppose that objection, but no need to argue about it on the record.

Q. Okay. So Mr. Spencer, earlier we discussed the DOJ in Texas had filed lawsuits against Google arising from its digital advertising business?

A. Yes.

Q. Do you expect to be called as a witness

in the DOJ cause?
A. I thought I was being called as a witness here.
Q. Do you expect to testify at trial in the DOJ case?
A. I have no idea.
Q. Has anyone at Google asked you to be a witness in their case?
A. I don't think so.
Q. Has anyone at Google discussed with you the possibility of being a trial witness in the DOJ case?
MS. LEE: Just going to object to please don't answer to the extent that answering would reveal privileged communications.
MR. GOODNOW: Maybe privileged communications from his own lawyer, but I'm just asking if anyone at Google has discussed with him the possibility of being a witness in the DOJ case.
A. I don't know.
Q. You don't know or you don't recall?
MS. LEE: Objection to form.
A. I don't know the difference between this

and I was asked to do this.
Q. You understand what a trial is?
A. Isn't this part of a trial?
Q. This is a deposition. Is there a judge in this room?
MS. LEE: Objection to form.
A. There's no judge in the room, to my knowledge.
Q. Okay. Are you aware of any trials that are held without judges?
MS. LEE: Objection to form.
A. I'm not a lawyer.
Q. Okay. So if I ask you if you expect you're -- do you expect to be a trial witness in the DOJ case, do you understand that question?
A. I have no expectation to be a trial witness or not.
Q. Have you discussed at Google, excluding their in-house or outside counsel, whether you'll be a trial witness in the DOJ case?
A. Any discussion would be --
MS. LEE: Objection to form.
A. Any discussion would be with counsel.
Q. Okay. If you were asked to testify,

would you say yes?
MS. LEE: Objection to form.
A. I don't -- I don't know.
Q. Why don't you know?
A. I don't know what it would entail.
Q. What would be too much for you?
MS. LEE: Objection to form.
A. It's hard to say, when it would be, how much time it would be, where it would be, I don't know.
Q. Do you have travel plans in September or October of this year?
A. That's far in the future. I'd have to look at my calendar. I don't know.
Q. Are you aware that Bloomberg reported in February 2023, that you are viewed as a likely witness in the DOJ case?
MS. LEE: Objection to form.
A. No. I was not aware of that.
Q. Today's the first time you're hearing about it?
A. Yes.
Q. Are you surprised?
MS. LEE: Objection to form.

A. Yes.
Q. Why?
MS. LEE: Same objection.
A. Because I'm surprised I didn't hear about my name being mentioned at Bloomberg.
Q. So you're also unaware that Bloomberg reported in February of 2023, that you were laid off from Google?
MS. LEE: Objection to form.
A. Yeah. I wasn't aware of the article.
Q. Were you laid off from Google?
A. Yes.
Q. When?
A. About a year and a half ago.
Q. And why were you laid off from Google?
A. It was part of a large -- their first round of significant layoffs.
[redacted]
MS. LEE: Objection to form.
[redacted]

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

MS. LEE: Objection to form.

[redacted]

Q. Okay. I am going to move on to my final document and then you'll be done with me.

MS. LEE: Chris, I just want the make sure you're still good, considering we've been going for about an hour.

MR. GOODNOW: Should I finish this up

real quick and then we'll...
MR. COHEN: How fast is real quick?
MR. GOODNOW: I'm hoping it will be about five minutes.
(Exhibit 11, Document Bates labeled GOOG-AT-MDL-010668643 - 656, marked for identification.)
Q. I just marked as Exhibit 11, a document that Google produced in this litigation, and it has Bates numbers GOOG-AT-MDL-010668643 through GOOG-AT-MDL-010668656.
Mr. Spencer, you can take a second to familiarize yourself with the document.
MS. LEE: While the witness is looking at the document, could I trouble you to get the time on record.
THE VIDEOGRAPHER: Sure. One moment. Roughly 3 hours 35 minutes so far.
MR. GOODNOW: Okay. Thanks.
Q. Have you finished reviewing the document, Mr. Spencer?
A. Yes.
Q. Is the [redacted] listed here [redacted]?
A. I believe so, yes.

Q. Who is [redacted]?

A. He was the last manager that I had at Google.

Q. And SCI, does that stand for support check-in?

A. Yes.

Q. What is a support check-in?

A. A support check-in is when you have someone that you want to change how they're behaving.

Q. And did you have an SCI with [redacted] around November 2022?

A. I did.

Q. You see here there's, "[redacted] e-mail summary to Scott post SCI"?

A. Yes.

Q. Did you receive this e-mail?

A. I believe I did.

MS. LEE: Objection to form.

Q. If we go a little bit further down on the next page, 644, it says "talking," but it says, "Prepared TPs for [redacted]/Scott SCI."

Do you see that?

A. Yes, I see that.

Q. And did you ever receive these talking points?
A. Not in written form.
Q. Okay. So you see the first bulleted talking point there under talking points?
A. Yes.
Q. And then in the middle, there's sort of off to right-hand side, it says, "based on my assessment"?
A. Based on -- I'm sorry. No, I don't see where that is.
Q. Four lines down in this, off to the right?
A. Oh, yes, I see it.
Q. It reads, "Based on my assessment, [redacted]
Do you see that?
A. Yes, I see that.
Q. Did [redacted] tell you that?
A. Not in quite these terms, but yes.
Q. In what terms?
A. He communicated that [redacted]

[redacted]

Q. And if you go down to the bullet point -- you see Q3 expectations?
A. Yes.
Q. And there's an A?
A. Yes.
Q. And then there's a bullet point?
A. Yes.
Q. And then the last clause of that starts, [redacted]
A. Yes.
[redacted]
Do you see that?
A. Yes, I see that.
Q. Did [redacted] tell you that?
MS. LEE: Form.
A. The general concepts that are listed here he communicated, but not the specific words.
Q. And if we go to the APaS strategy there.
A. Yes.
Q. Do you understand what APaS stands for?
A. Yes, that APaS.

Q. What is APaS?
A. Ads privacy and safety.
Q. All right. You see the first bullet point there?
A. Yes.
[redacted]
A. I see that, yes.
Q. And did [redacted] tell you that?
MS. LEE: Object to the form.
A. Again, some version of it. These are his internal talking points.
Q. If we go a little bit further down, you see off to the right-hand side, it starts, "you're currently"?
A. Yes.
[redacted]
Do you see that?
A. Yes.
Q. [redacted] tell you that?
MS. LEE: Objection to form.
A. Again, these are his internal talking

points. They weren't exactly how he communicated to me.

Q. Did he communicate that sentiment to you?

A. For certain areas, yes.

Q. Okay. And then it goes on, "you haven't."

Do you see that?

A. Yes.

Q. And then it continues on, [redacted]

A. Yes.

Q. Did [redacted] tell you that?

MS. LEE: Objection to form.

A. Again, these are his talking points. He tried to communicate that.

Q. Did he communicate that to you?

MS. LEE: Objection to form.

A. He did communicate that to me. [redacted]

Q. Okay. All right. With that, Mr. Spencer, I am at rest and propose we take a break.

THE VIDEOGRAPHER: We are now going off

the record. The time is 1:16 p.m.

(Proceedings interrupted at 1:16 p.m. and reconvened at 2:06 p.m.) THE VIDEOGRAPHER: We are now going back on the record. The time is 2:06 p.m.

EXAMINATION

BY MR. EARNHARDT:

Q. Hi, Mr. Spencer. My name is Izaak Earnhardt. I work for the law firm of Boise Schiller Flexner LLP, and I represent the publisher class plaintiffs in this litigation, and I'll be representing their interests here in this deposition.

I think my colleague Mr. Goodnow went through a number of ground rules earlier this morning. And do we need to repeat those, or are we all good?

A. I recall the ground rules.

Q. Okay. Great.

So in that case let's dive in. I'd actually like to go back to Spencer Exhibit 1, which was your LinkedIn profile. And go to page number 2. For the entry that says "director product management." I'll let you take a second

to review that again.

A. Sorry. Need my eyes.

Yes.

Q. And for the last line of that, does that say, "Responsibilities include setting the strategic direction for the product, P&L, contract development, and general product management"?

A. That's correct.

Q. And what were your responsibilities related to the P&L?

A. We would look at the overall revenue and costs associated with the set of products.

Q. And what set of products was that?

A. At the time we did the P&L, it was done for the Ad Exchange, and I think I stopped owning the P&L when it became joint with Ad Manager.

Q. And when did it to become join with Ad Manager?

A. I can't remember the specific date.

Q. Would it have been at the time of the merger of the two products?

MS. ELMER: Object to form.

A. It would be when the AdX and DFP products

were both put in the same interface for Ad Manager.

Q. And was that in approximately 2018?

A. That sounds about right.

Q. And so after 2018 you no longer owned the P&L for that product?

A. I think I stopped owning it in 2017, but about that time.

Q. Okay. So as part of your work on the P&L, what were your responsibilities?

A. To look at and understand the overall profit and loss so that we could properly manage investments for the product.

Q. And what factors would you consider in trying to properly manage investments for the product?

A. Are these features and functionality that will help get more customers or get customers able to better use the product?

Q. And were there any financial factors that you examined to properly manage investments for the product?

A. Sure. You don't want to develop a feature that's going to take millions of dollars

to develop but that only marginally helps customers so that they don't want to use the product.

Q. And you mentioned the costs associated with that, with the set of products. What costs were associated with AdX that were addressed in the P&L?

A. One of the biggest costs was the development costs. There's also the actual servers and operating elements required for it. There's the cost of the sales team, but that's fractional because it was shared sales team, cost of service, whether or not you can create help center articles versus people, that sort of thing.

Q. Are there any other costs?

A. It's a big product. There's thousands of elements to the cost.

Q. And how did AdX allocate the development costs?

A. Many costs were allocated to AdX as opposed to AdX allocating the costs. So for example, there's a data center, the fraction of the usage for the data center would be allocated

back to the product.
Q. And were those data centers only used by AdX?
MS. ELMER: Object to form.
A. The data centers were shared infrastructure, so some machines would go to AdX, some machines would go to others.
Q. How were AdX's P&L structured?
MS. ELMER: Object to form.
A. I can't remember all the elements for the P&L, but it was an attempt to understand the revenue associated with the product, the costs associated with the product, and the major factors associated with that.
Q. Were there particular elements of the revenue that you focused on?
A. I'm not sure what you mean by "elements."
Q. Was the revenue on the P&L broken out in any way between line items?
MS. ELMER: Object to form.
A. I don't remember all the ways the revenue piece was broken. I believe that one way it was cut was by large publisher and small publisher.
Q. Do you recall any other cuts in the

revenue breakout?
MS. LEE: Same objection.
A. If a new feature was launched, we'd track the revenue for that feature until it was just part of the product.
Q. And how would you track the revenue for a new feature when it was launched?
A. Depending on the feature, we could see the usage of it and the revenue that was going through that feature.
Q. Do you recall any specific features for which the revenue was tracked?
A. I think, for example, Programmatic Direct was tracked separately when Programmatic Direct was launched.
Q. And do you recall any others?
A. Programmatic Direct would be separate, Private Exchange Deals, and Preferred Deals.
Q. And do you recall any other product features for which revenue was tracked?
A. It would depend on the time frame. Early on in the exchange, when it was first created, we tracked overall exchange revenue.
Q. Are you familiar with a feature called

"sell side dynamic revenue share"?
MS. ELMER: Object to form.
A. At a high-level, yes.
Q. Would Google have tracked the revenue impact of a feature like sell side dynamic revenue share when it was launched?
MS. ELMER: Objection to form.
A. A feature like that would be looked at to understand the impact on how much money it was making publishers, how it was working before it was launched.
Q. And how would that be looked at to understand the impact on how much money it was making publishers?
A. To make sure that it was a good feature.
Q. My question was how would it be looked at to understand the impact of how much money it was making, not why.
A. Well, if you're developing a feature like that, you'd have to look at the impact of the feature to understand how much it's adding or not adding to the product.
Q. And what systems would Google have for analyzing those kinds of revenue impacts?

A. There were systems where we could test how much -- test the impact of a particular feature to understand its impact.

Q. Would those systems include systems like RASTA?

MS. ELMER: Object to form.

A. So RASTA was a feature -- was a system that would show you the impact of a feature or change to the system.

Q. And are those systems in your appraisal generally reliable?

MS. ELMER: Object to form.

A. As far as I understood, yes.

Q. Let's go back a little bit. You mentioned a moment ago shared sales costs and shared server infrastructure. Were there any other shared costs that were allocated to AdX?

A. Facilities would be allocated, the buildings, the food.

Q. And what would go into a line item for facilities?

A. So I would get a line item for facilities saying here's what facilities has allocated to your product group.

Q. And were there any other shared costs that you recall that were allocated to AdX?
A. Again, the P&L had hundreds of line item elements that would be part of it. I don't remember the breakdowns of the pieces of it.
Q. Were there any other major items that were allocated to AdX that you recall?
MS. ELMER: Object to form.
A. Not off the top of my head.
Q. Do you recall how those shared cost line items were allocated to AdX versus other elements of Google's business?
MS. ELMER: Object to form.
A. No. That was done by a different team. I would just get the results.
Q. Okay. Which team would conduct that analysis?
A. I think it was finance.
Q. And which individual in finance would have worked on that?
MS. ELMER: Object to form.
A. I don't know.
Q. And set that aside and we'll move on to an exhibit that we're going to mark as Spencer

Exhibit 12. For the record, it's a document produced by Google bearing the document identification number GOOG-DOJ-15600216.

(Exhibit 12, Document Bates labeled GOOG-DOJ-15600216 - 218 and attachment, marked for identification.)

A. Okay.

Q. And what is this document?

A. It looks like an e-mail between [redacted] and me.

Q. And --

A. I'm sorry. [redacted].

Q. And who is [redacted]?

A. I think [redacted] was a salesperson.

Q. And was he a salesperson in the Benelux countries we talked about earlier with Mr. Goodnow?

A. Yes. It looks like he is head of partner business solutions Benelux.

Q. I'm going to direct you to the second page of this with the Bates number ending 217. The first line says, contact at TMG is, as you're aware, exploring opportunities with Rubicon to replace Admeld (AdX).

Was Admeld acquired by Google prior to this e-mail?
A. I don't remember the exact dates, but it would appear that Admeld was acquired around this time.
Q. And the second paragraph reads, "He's been asking us about the option of running AdX in Rubicon."
Do you have any understanding of what it means to ask about the option of running AdX in Rubicon?
MS. ELMER: Objection to form.
A. In general.
Q. Yes.
A. Yes, in general.
Q. And what is that understanding?
A. They'd be asking about putting AdX inside Rubicon's yield management.
Q. And why would they want to put AdX inside Rubicon's yield management?
MS. ELMER: Object to form.
A. They may want to try and get more revenue by putting two different exchanges in competition with each other, but that would break the

auction.

Q. Why would it break the auction?

A. So AdX at this time is a second price auction. And so to be a proper second price auction, you're going to pay the price of the second highest bid and you bid your highest value for that inventory. But if it's competing in a yield manager trying to pull other bids from other exchanges, then in a yield manager it passes the information back and forth and you no longer have a second price auction.

Q. And does the next line read: "In response, we sent him the program guidelines which, to my best knowledge, does not explicitly disallow TMG to give their own AdX tag to Rubicon. I'm also aware that we are looking to close this loophole, but for the sake of the conversations with TMG, I deliberately didn't tell him this."

A. Yes. I see that.

Q. And in your earlier testimony today, did you discuss policies prohibiting AdSense from integrating with other yield managers?

MS. ELMER: Object to form.

A. I believe earlier we talked about AdX not being put into other yield managers.

Q. And we're going to go to the next page with your response. It's on December 6, 2012, at 4:26. Suppose you read the first paragraph for me?

A. I'm sorry. Which page are we on?

Q. The first page.

A. The first page.

And you want me to read the first paragraph?

Q. The first paragraph of the section with the message starting "On December 6th," so the paragraph that reads "AdSense prohibits publishers."

A. Okay. "AdSense prohibits publishers from putting them through a yield manager. Technically, we don't allow scraping of AdSense. We don't allow comparison of our CPMs, and we don't provide APIs to third parties. Of course, we have not enforced these policies and, therefore, the industry has started the practice of putting AdSense through yield managers."

Q. Was that accurate at the time you wrote

it?
A. I believe so.
Q. Okay. And can you read the second paragraph, the one that starts "AdX prohibits"?
A. "AdX prohibits publishers from putting it through a yield manager, and there are network partners involved. As you pointed out, we are planning to change this in Q1 with the launch of network revenue optimization. Once in place, AdX will explicitly not be allowed to be operated via another yield manager. We'll enforce this policy once rolled out."
Q. And was that accurate at the time that you wrote it?
A. As far as I know.
Q. And was that policy enforced once it was rolled out?
A. I believe it still proved to be very hard to enforce the policy.
Q. Was the policy enforced once it was rolled out?
A. In instances where it could be detected, I believe it was enforced, but I believe it was nearly impossible to detect.

Q. And why would it have been nearly impossible to detect?
A. Because when being yield managed, there's no indication that you're being yield managed.
Q. And why is that?
A. There's no flag passed to the system that would let you know.
Q. And go down to number 4 in the list that you have down there, so will you read number 4 at the bottom of that page?
A. Okay. "It goes against our commitments to buyers that AdX is a transparent second price auction."
Q. And what were those commitments to buyers?
MS. ELMER: Object to form.
A. The commitment to the buyer was that AdX was a second price auction.
Q. And who would have made those commitments to the buyers at Google?
MS. ELMER: Object to form.
A. When buyers sign up to use AdX, they ask what kind of auction it's using. It was well known we were a second price auction with a floor

and that was documented, that's what the system did.

Q. And why would it have been important for buyers to know what kind of auction was being used for?

MS. ELMER: Object to form.

A. The bid strategy you'll use depends on the auction. In a first price auction, your goal is to bid as low as you can until you achieve the inventory you want. In a second price auction, you can bid higher because you're only going to pay the second highest price.

Q. And do you recall any products at Google that would have gone against that commitment to a transparent second price auction?

MS. ELMER: Object to form.

A. Only once it was switched to a first price auction after I left, and that was clearly notified to buyers that it was switching.

Q. So there were no projects prior to the switch to a first price auction, that you recall, that would have gone against that commitment?

MS. ELMER: Object to form.

A. To my knowledge, we always maintained a

second price auction with floors.
Q. What makes an auction transparent?
A. The auction is transparent when the rules of the auction are clear and understood.
Q. And how would people ensure that the rules of the auction are clear and understood?
A. We documented the way the system worked.
Q. Let's go up to the very first e-mail in this thread at the very top. Can you read the second paragraph, the one that says "In terms of your deployment question"?
A. The one starting with "In terms"?
Q. Yes.
A. Terms of your deployment question, this seems like different attempts to circumvent the policy. Our goal should be all or nothing. Use AdX as your SSB or don't get access to our demand. It's a key feature and we need to use it while it's still proprietary to AdX.
Q. Was the goal of the policy to ensure that publishers would use AdX all or nothing?
MS. ELMER: Object to form.
A. No. The goal of the policy was to protect the integrity of the auction.

Q. Then what does it mean to say, goal should be all or nothing, use AdX as your SSP or don't get access to our demand?

A. If you start to enable the auction to be yield managed, you break the concept of a second price auction and so that doesn't work as a means to maintain an exchange.

Q. You write, "It's a key feature and we need to use it while it's still proprietary to AdX."

What key feature were you referring to?

A. A clean second price auction.

Q. The sentence before reads "use AdX as your SPP or don't get access to our demand"; is that right?

MS. ELMER: Object to form.

A. That's part of the prior sentence.

Q. The sentence before reads, "Our goal should be all or nothing. Use AdX as your SSP or don't get access to our demand"; is that right?

A. Yes.

Q. Is AdX's demand a key feature?

MS. ELMER: Object to form.

A. I mean, the demand is part of what you

have as a solution.

Q. Is "exclusive demand" a key feature?

MS. ELMER: Objection to form.

A. To the extent that any demand is exclusive but advertisers can buy anywhere they want.

Q. Is it conceivable that publishers might want to break a second price auction, that they don't like Google's second price auction?

MS. ELMER: Object to form.

A. It's lots of things are possible.

Q. Is it -- in conversations with publishers at that time, would publishers have emphasized that they didn't want a second price auction?

MS. ELMER: Object to form.

A. Publishers trying to yield manage. It's not that they didn't want a second price auction, they wanted to gain the second price auction to get more revenue for themselves while buyers kept buying as if it was a second price auction. If you can break the auction, then you're going to get extra.

Q. So breaking the auction would maximize revenue for publishers?

MS. ELMER: Object to form.
A. In a very short term, yes, you get extra revenue, but then buyers can't bid their full price anymore and so you break the auction for everyone.
Q. But ultimately, Google switched to a first price auction; isn't that right?
A. Yes, Google moved to a first price auction.
MR. EARNHARDT: Okay. We'll move on to another exhibit. Mark this Spencer 13.
(Exhibit 13, Document Bates labeled GOOG-DOJ-15616116 - 117 and attachment, marked for identification.)
MR. EARNHARDT: And for the record, exhibit marked as Exhibit 13 is a document produced by Google bearing the Bates number GOOG-DOJ-15616116.
Q. And Mr. Spencer, what is this document?
A. It's an e-mail chain with myself, [redacted], and Aparna.
Q. And who [redacted]?
A. [redacted] was the head of engineering for the exchange.

Q. And who was Aparna?
A. Aparna was -- at the time Aparna was, I think, the head of both PFP and the exchange. I forget who reported to who at that point.
Q. Let's start with the very first e-mail in the thread, the one on February 13th, 2014, at 8:41 p.m.
A. Yes.
Q. And can you read the paragraph starting "I heard you mention"?
A. "I heard you mention that we might consider hard bundling DFP and AdX in the meeting with Sridhar today. I would love to talk through this as it's been something we've been looking at for a long time, but has significant operational, technical, and legal considerations to resolve."
Q. And do you recall what the meeting with Sridhar in that first sentence was?
A. The question was how to offer and if we should offer DFP and AdX in some combination.
Q. And who was [redacted]? .
A. [redacted] was the head of ads.
Q. That's [redacted]?
A. Correct.

Q. And what did you mean by "hard bundling" in that sentence?

A. There was a question mentioned about how to potentially offer DFP and AdX together as either a single contract or a single product or some combination.

Q. And what was your understanding of what hard bundling meant?

A. At this time, it wasn't defined. We were figuring it out.

Q. What were the significant operational, technical, and legal considerations that you said needed to be resolved?

MS. ELMER: And I caution the witness not to reveal the subject of any attorney-client discussions about legal issues, but you may answer to the extent that you would not reveal privileged information.

MR. RODRIGUEZ: Counsel, I believe you meant to say substance, not subject.

MS. ELMER: You're right. I said "substance."

A. Sure.

So the operational question is that there

were two separate teams that needed to be figured out. Technically they were on different stacks, and from a legal perspective, one of the questions was contracts.

Q. Are there any other legal questions at a high-level?

MS. ELMER: Same objection and same precaution to the witness. You may answer to the extent that you do not reveal the substance of communications with counsel.

A. I guess the contract was the real question.

Q. Let's go down to the next paragraph. Can you read the sentence that says "That said"?

A. PRODUCTS said, the modular approach has been a practical consideration that has helped us gain traction in the market. We would need to carefully plan out how we drive unification to make sure it gets us to the desired goals.

Q. And what was the modular approach that you refer to there?

A. That they were separate modules.

Q. And how did having separate modules help you to gain traction in the market?

A. The market was -- this is 2014, so the market was complicated with many publishers having many different technologies. Some would have setups where using an ad server from us would make sense. Some would have setups where using an exchange would make sense. Some setups where both would make sense. Publishers were potentially putting -- sharing ad servers. There was lots of complexity in the market in 2014.

Q. How did having separate modules help Google to gain traction in the market?

A. By having separate modules, we could be able to provide a product for whatever the publisher situation was.

Q. But how does that gain -- help to gain traction in the market?

A. If we can't offer the product configuration that a publisher wants, they may decide to use somebody else.

Q. Does hard bundling two products make it harder for publishers to use product configurations that they might want --

MS. ELMER: Object to form.

Q. -- involving other products?

MS. ELMER: Object to form.
A. What we ended up offering maintained modular approach so that you could always use one or the other or both.
Q. How did it maintain the modular approach?
A. What we ended up providing was a single contract where publishers had terms for both products but could use one or the other or both.
Q. Did Google later integrate the two products into a single product, GAM or Google Ad Manager?
MS. ELMER: Object to form.
A. Ad Manager was the unified user experience level that had access to both AdX and DFP in a single login interface.
Q. Did Google later integrate the two products into Google Ad Manager?
MS. LEE: Object to form.
A. So the product was Ad Manager and Ad Manager was basically an integration layer where you could see and get your login to your AdX elements and your DFP elements. And eventually things like reporting became consolidated when you used both or admin became consolidated when

you used both, so it simplified the experience for publishers.

Q. Like to go up to the top of the first page of this where you write, have lots of concerns with this but I think it's a good thing to discuss.

What were those concerns?

A. That we do it the right way.

Q. And did others share those concerns?

A. It was a big company. Some I'm sure did, some didn't.

Q. Was there anyone that didn't share those concerns?

A. I'm sure someone didn't. I don't know who.

Q. Was there anyone that you recall that didn't share the concerns?

A. There were many discussions with people on various sides and elements of this. I don't know.

Q. And do you recall having any disagreements with others on the AdX management team about the hard bundling of the two products?

MS. ELMER: Object to form.

A. In the development of Ad Manager and how the integration was done, there were many discussions and debates to try and figure it out.

Q. And do you recall the substance of any of those discussions and debates?

A. There were many. No.

Q. Do you recall antitrust concerns associated with hard bundling of the two products?

MS. ELMER: Object to form.

A. In terms of the term, I mean, there were many concerns, and in terms of how I would be advised about something with antitrust, that would probably be privileged.

MS. ELMER: It would, and I instruct you not to reveal discussions with counsel about privileged topics.

Q. Were there any antitrust concerns that were not aired with counsel regarding the hard bundling of the two products?

MS. ELMER: Object to form, and same instruction.

A. No.

Q. Did you ever have any discussions with

Jonathan Bellack about the integration of the two products?

MS. ELMER: Object to form.

A. Jonathan Bellack was the lead for DFP. We had many discussions about this topic.

Q. And do you recall the substance of any of those discussions?

A. We probably talked about this 30 times. It's hard to know the substance of any of this.

Q. Do you recall what his position was on hard bundling of the two products?

MS. ELMER: Object to form.

A. He had certain thoughts about what kind of integration made sense. I had at times different thoughts and different perspectives.

Q. And how were your thoughts and perspectives different than the ones that you understood him to have?

A. We had debates about many aspects like the engineering architecture, the -- what does it mean for the interface, what does it mean for contracts, lots of questions.

Q. Are there any other debates that you recall with him?

A. I'm sorry, it's 2014. It's hard to recall every discussion I had with Jonathan on the topic.

Q. And do you recall any discussions on the effect on publisher revenue?

MS. ELMER: Object to form.

A. It shouldn't have an effect on publisher revenue, so that doesn't really make sense.

Q. Do you have any recollection of any conversations with Jonathan Bellack about effects on -- effects on Google's revenue?

MS. ELMER: Object to form.

A. Again, it shouldn't have any effect on Google's revenue other than operationally streamlining it as more products used -- more customers use both products.

Q. Do you recall having any discussions with Eyal about the effect on -- of the hard bundling on Google's revenue?

MS. ELMER: Object to form.

A. Eyal was within engineering. Most of our conversations would be about how technically one could do an integration.

Q. Did you have any discussions other than

how technically one could do an integration?

A. With whom?

Q. With [redacted]. Sorry.

A. [redacted] and I would talk all the time about the development of the product and the engineering of the product.

Q. Did you ever talk about the revenue effects of the product?

A. Certainly with regards to features that were being developed to try to improve publisher revenue.

Q. Did you ever talk about the revenue effects of hard bundling the two products?

MS. ELMER: Object to form.

A. Again, the integration between DPF and AdX wasn't expected to have an impact on the publisher revenue.

Q. How about any impacts on Google's revenue?

MS. ELMER: Object to form, asked and answered.

A. At the time when we were looking at the integration of DFP and the exchange, most customers were using both products and

operationally were annoyed at logging in twice.

Q. Did you have any discussions with anyone on the AdX product team about whether integration would help or whether integration of DFP with AdX would help to add more traffic to AdX?

A. I'm sure there were conversations about the impact on traffic.

Q. Were there any -- and do you recall the content of those conversations?

A. No.

Q. Was there an expectation that integrating DFP and AdX would cause users of DFP to also use AdX?

MS. ELMER: Object to form.

A. At the time the integration was being worked on, the vast majority of customers were using both products.

Q. How about for customers who weren't using both products?

MS. ELMER: Object to form.

A. So if a customer wasn't using both products, then the integration meant that they would have access to the other product should they want to use it.

Q. What was your position on whether hard bundling of the two products would cause users of DFP to also have to use AdX?

MS. ELMER: Object to form.

A. As stated here, I think the question was how to make sure these are two modules.

Q. So is it fair to say that you wanted to keep the two products separate?

MS. ELMER: Object to form.

A. No. There were operational benefits to integrating them. It made it easier for a client to use both and they could still use one part or the other.

Q. Was it your position that it was preferable for clients to be able to use only one or the other or use both?

MS. ELMER: Object to form.

A. Can you repeat that?

MR. EARNHARDT: Strike that. That was a bad question.

Q. Was it your position that it was preferable for clients to be able to use them as separate products?

MS. ELMER: Object to form.

A. Even post Ad Manager UI integration they were able to use one or the other.

Q. And was that desirable from your viewpoint?

MS. ELMER: Object to form.

A. I thought flexibility was a good thing.

Q. Does hard bundling the two products reduce that flexibility?

MS. ELMER: Object to form.

A. I don't know what you mean by the question.

Q. Does placing the two products on a single contract make it harder for publishers to maintain the flexibility you just mentioned?

MS. ELMER: Object to form.

A. I think the way that it was rolled out allowed customers the flexibility to use one part or the other.

Q. Was it rolled out over time?

A. I believe so, but I'm not sure the exact rollout plan.

Q. Did you play a role in the rollout plan?

A. Most of the rollout of Ad Manager was not something that I did.

Q. And who did do that?
A. That would be Jonathan Bellack's team at the time.
Q. And do you recall how Jonathan Bellack came to be selected to lead that team?
A. At the time, he was managing both products.
Q. Do you recall how he came to be managing both products?
A. Well, at one point, I reported to him and then I left the team to work on other projects.
Q. At what point in time?
A. Always the date test. I don't recall the particular dates.
Q. Prior to 2014, did Jonathan Bellack have responsibility for AdX?
A. I think in 2014, I had AdX, Jonathan had Ad Manager. At one point I reported to Jonathan, then I left the team to go work on the coalition for better ads.
MR. EARNHARDT: I'd like to take five minutes if that's okay.
THE VIDEOGRAPHER: We are now going off the record. The time is 3:03 p.m.

(Proceedings interrupted at 3:03 p.m. and reconvened 3:22 p.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 3:22 p.m.

BY MR. EARNHARDT:

Q. So a couple minutes ago, we talked about the modular approach. I want to understand a little bit more about what you mean by "modular." How do you define a module?

MS. ELMER: Object to form. I'm defining a module as being the Ad Exchange and a module being the publisher, ad serving product.

Q. Does each module have a set of distinct features?

A. Yes.

Q. And would it be desirable for -- or would publishers desire to obtain that set of distinct features on its own?

MS. ELMER: Object to form.

A. The set of distinct features aren't harmed by the fact that you can use both products. The set of distinct features are available either way.

Q. I'm asking you whether it would be

desirable on the part of a publisher to obtain one module on its own without respect to whether it is integrated with other mod -- with the other module?

MS. ELMER: Object to form.

A. They could use either part of As Manager when they were in the same interface.

Q. In your experience, would publishers find it desirable to be able to use the publisher ad server with other exchanges?

MS. ELMER: Object to form.

A. In my experience, publishers who used our ad server, originally, there was only one exchange, so they would use our exchange. Over time, the market got very complicated and cluttered with lots of entrants of different variants. So publishers used lots of solutions.

Q. My question is whether publishers would find it desirable to be able to use multiple solutions?

MS. ELMER: Object to form.

A. Publishers did use multiple solutions.

Q. Okay. I'd like to use another exhibit. It's marked Spencer 14.

(Exhibit 14, Document Bates labeled GOOG-DOJ-14257049, marked for identification.)

MR. EARNHARDT: Sorry, I only have one copy. And while he's taking a moment to review that, for the record, it's a Google produced document bearing the Bates number GOOG-DOJ-14257049.

A. Yes.

Q. And Mr. Spencer, what is this document?

A. It looks like a chat between [redacted] and myself.

Q. Is this chat from March 4th, 2014?

A. Yes.

Q. Was that at the time you were having discussions about the hard bundling of DFP and AdX?

A. It was at the time we were discussing if and how to integrate the AdX and DFP products.

Q. And here you ask thoughts, correct?

A. That's how the chat starts.

Q. And were you asking [redacted] thoughts about the integration of the two?

MS. ELMER: Object to form.

A. I believe I was asking him thoughts about

a meeting that had just transpired.
Q. And what meeting was that?
A. Some meeting discussing the integration between DFP and AdX.
Q. Do you recall which meeting that was?
A. No.
Q. And [redacted] writes, "The whole approach is very disappointing," and then you write, "Which aspect?" Right?
A. That's correct.
Q. And can you read the sentence beginning, "everyone"?
A. "Everyone seemed in agreement with it but me."
Q. In agreement with what?
A. Whatever the particular integration approach was that was talked about at this meeting.
Q. And what did you disagree with?
A. I don't remember the specifics of what proposal was discussed at this particular meeting.
Q. Is it possible that the meeting discussed the contractual bundling of the two products?

MS. ELMER: Object to form.
A. The question is how they were put together. There's millions of ways to do that.
Q. And you had a view of how they should be put together, correct?
A. I had many views on how to put them together.
Q. And what were those views?
A. The view was that they needed to be offered in a way that you could use them separately.
Q. And when you say, use them separately, what do you mean?
A. That if you wanted to use DFP with another exchange or AdX with another ad server, you could configure it that way.
Q. And would a unified contract make it more likely that customers would use the two products together?
MS. ELMER: Object to form.
A. Depending on how things are structured, the contract could do -- the integration could do different things. It was eventually done so that they could be used still separately.

Q. In your view, does a contract that covers both products make it more likely that the two products are going to be used together?
MS. ELMER: Object to form.
A. The way the contract ended up being created made it so that publishers could easily use both or not.
Q. That wasn't my question. Does it make it more likely that two products would be used together by publishers?
MS. ELMER: Object to form.
A. It depends how that contract is structured.
Q. And did you have a view as to how that contract should be structured?
A. Yes.
Q. What was that view?
A. My view was that they needed to be offered so that publishers could use either piece separately.
Q. And why was that?
A. So that they had flexibility.
Q. And why is flexibility important?
A. Because some publishers have different

situations than others.

Q. Did others at Google believe flexibility was less important?

A. I don't know.

Q. Did you have disagreements with others at Google about how much flexibility should be available in the contract?

A. There were many conversations about how to design the integration between DFP and the exchange.

Q. But did you have disagreements with others at Google about how much flexibility should be allowed for publishers to use the product separately?

A. Disagreements, no. We had many discussions about different approaches to do it, some of which I agreed with more than others. I don't know what to call that.

Q. Why was everyone else disagreeing with you?

MS. ELMER: Object to form.

A. I said everyone seemed in agreement with it but me.

Q. Why did everyone else seem in agreement

with it but not you?

MS. ELMER: Object to form.

A. I was trying to read the room, again, this was about the meeting. So that was my assessment of the conversation.

Q. What positions would you have taken at meetings like the one you were discussing here?

MS. ELMER: Object to form.

A. I would try to understand the different approaches and work to figure out what the best option was.

Q. And in your view, what would make the best option?

A. I think the solution we ended up with, where you could have an easy to access interface across the two products and use whichever part you wanted.

Q. And [redacted] responds, "They're tossing revenues for strategy," correct?

A. That's his response, yes.

Q. Do you have any understanding as to what he meant when he said that they tossing revenues?

MS. ELMER: Object to form.

A. No. I don't quite understand what he

means by that.
Q. Do you have any understanding of what he meant by strategy?
MS. ELMER: Object to form.
A. Again, I don't understand the statement.
Q. And approximately two minutes later, you responded to him, correct?
A. I don't respond to that particular sentence.
Q. What was your response?
MS. ELMER: Object to form.
A. My response is the next line.
Q. Will you read the next line?
A. "If we hard bundle contractually, I think it's tail wagging the dog. AdX shouldn't be the reason to get someone onto DFP. If DFP is really the strategic and sticky item, it needs to stay on its own."
Q. Do you have any recollection of what you meant by "hard bundle contractually" when you wrote in it this sentence?
A. Again, we were discussing many ways to eventually do the integration and there are lots of flavors of the way one could put a contract

together to make it so that the systems are more tied together.

Q. But you wrote hard bundle contractually, correct?

A. Yes.

Q. What was your understanding of what that meant at the time?

A. So if it was designed so that they were a single product, that was not each part useable, and there's no option, then that would be a tighter bond contractually.

Q. And the next line you say, "AdX shouldn't be the reason to get someone on to DFP." What did you mean when you wrote that?

A. That the use of AdX shouldn't be a reason to get someone to use DFP.

Q. And then can you read the next sentence?

A. "If DFP is really the strategic and sticky item, it needs to stay on its own."

Q. And what does it mean for DFP to stay on its own?

A. To be offered as an independent solution.

Q. What do you mean by "independent solution"?

A. That someone could use the ad server without having to use the exchange.
Q. And in the sentence you used the term "sticky," correct?
A. Yes.
Q. What does sticky mean in this context?
A. I think it means that people like the product and stay with it.
Q. Does it mean that it's hard for publishers to switch from the product?
MS. ELMER: Object to form.
A. No. It had low churn, people who used the product liked it.
Q. Can there be any other reasons for low churn other than people liking it?
A. Given there were so many other solutions in the market, I don't know.
Q. You don't know whether there are any other reasons for low churn other than people liking a product?
A. I think the primary reason and what I was referring to when they're saying -- when I was saying that it was sticky is that it had low churn. People who used the product kept the

product for many years.
Q. Are there costs associated involved with switching a publisher ad server?
MS. ELMER: Object to form.
A. Early on in the development of ad serving, it was probably more challenging to switch, but in 2014, publishers used many ad servers, they used yield managers, they used networks, they had them interoperating separate, different sections of their site.
Q. And further down [redacted] writes, "Instead of betting on the future, we are enforcing the past"; is that correct?
A. Yes, that's what he wrote.
Q. And what did you respond to there?
A. "Wish you said that during the meeting."
Q. Does that indicate you agreed with the sentiment?
A. I thought it was a nice talking point he could have used during the meeting.
Q. Why did you think it was a nice talking point that he could have used during the meeting?
A. I thought it encapsulated the concept that programmatic was new and traditional ad

serving was older.

MR. EARNHARDT: No further questions.

MS. VASH: May we please go off the record.

THE VIDEOGRAPHER: We are now going off the record. The time is 3:42 p.m.

(Proceedings interrupted at 3:42 p.m. and reconvened 3:50 p.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 3:50 p.m.

EXAMINATION

BY MS. VASH:

Q. Good afternoon, Mr. Spencer. My name is Serina Vash, I'm an attorney with Herman Jones LLP and I represent my client named, Inform, Inc., formally, known as News Distribution Network or NDN.

A. Hello.

Q. How are you doing?

A. I'm doing well.

Q. Been a long day so far, huh?

A. I guess so.

Q. Mr. Spencer, before you worked for Google, you worked for DoubleClick; is that

right?
A. That's correct.
Q. And you went to Google with the acquisition of DoubleClick; is that right?
A. Yes. I transferred as part of the acquisition.
Q. Am I correct that you helped to build the DoubleClick ad server while you were at DoubleClick?
A. Yes. It was the first product that I was the product manager for.
Q. When you were at DoubleClick --
MS. VASH: Strike that.
Q. Did you design the DoubleClick ad server?
A. I was a product manager, so I helped develop features for it, but I didn't design the fundamental ad server.
Q. Who designed the fundamental ad server?
A. The ad server was used by the DoubleClick network first and then was created as a standalone product.
Q. Do you know who -- when it was created as a standalone product?
A. The standalone product was released, I

think, in '98, '99 time frame, just before I joined.

Q. You just testified that you helped develop certain features for the DoubleClick ad server; is that right?

A. That's correct.

Q. What features did you help develop?

A. Many over the course of the years, for example, Rich Media.

Q. What's Rich Media?

A. Rich Media is the ability for an ad server to serve things other than a static image.

Q. And you developed that feature?

A. As the product manager, I didn't code it. I helped design the features and functionality, what they needed to do.

Q. And did Rich Media assist in serving video advertising?

A. At the time Rich Media was developed, there was no video ad serving contemplated.

Q. Approximately what was that time frame, when Rich Media was developed?

A. 2001, '2, somewhere in that range.

Q. To the best of your knowledge, when was

video ad serving contemplated?

A. Video ad serving started off as video ads on non-video inventory that came shortly after the first concepts of Rich Media, once video could be created. I couldn't give you a specific time frame.

Q. In addition to Rich Media, what were some of the other features that you developed while you were working as product manager at DoubleClick?

A. I helped develop the forecasting system, innovations and reporting, changes to the trafficking UI.

Q. By "UI," do you mean user interface?

A. Yes.

MS. VASH: Can I ask the court reporter to please read back that answer for me.

(Whereupon, the record was read as follows: Answer: "Yes.")

MS. VASH: The answer before that, please.

(Whereupon, the record was read as follows: Answer: "I helped develop the forecasting system, innovations, and reporting

changes to the trafficking UI").

Q. What is the forecasting system? What did that entail in the DoubleClick ad server?

A. In DFP, the forecasting system would help publishers understand how much inventory was available to sell over time in the future.

Q. What about innovations and reporting, what did that that entail?

A. At the time, reporting for ad serving was just starting to come into its own, so figuring out how to define an impression, when do you want to show click-through rates, a lot of things that are basic today were just being figured out.

Q. Tell me what you worked on in terms of changes to the trafficking UI.

A. We released a complete change to how trafficking was done for DFP, making it much easier for people who manually entered these creatives to enter them. For example, we introduced the first batch change across multiple line items.

Q. What do you mean by batch change across multiple line items?

A. So you can imagine if you were working in

Excel and you had to modify ten rows and you had to click on each cell, open up the cell contents and change it, that would be a single entry, versus being able to make a change that you can sort of drag across multiple cells at once, that would be a batch chance.

Q. Understood. Thank you so much.

When you were working at DoubleClick, what was the purpose and the functionality of the ad server?

A. At DoubleClick, there were many ad servers, there was an ad server for publishers, there was an ad server for advertisers, there was the ad server for the network, and then over time there was mobile ad serving and things like that. So they were all separate and then eventually came back together.

Q. Was there mobile ad serving while you were at DoubleClick?

A. Yes.

Q. Let's focus on the ad server for publishers, what was the purpose and functionality of the ad server for publishers?

A. The purpose of DFP was to help a

publisher that wanted to sell inventory to multiple advertisers, to be able to manage the contracts they had with each of those advertisers for what inventory they wanted, where it should deliver, how many impressions were delivered against their goal, how much the advertiser owed them, things like that.

Q. Was one of the functions to assist the publisher with billing?

A. Yes, one of the features would be to create an invoice for the advertiser from the product, though initially, it was only the data and then I think over time, the ability to directly create invoices came about.

Q. Now, what about pacing, did the ad server assist the publisher in pacing ad campaigns?

A. Yes. That was one of the features of the ad server.

Q. I think you also mentioned forecasting was one of the features, correct?

A. Yes. One of the features was forecasting.

Q. When you were at DoubleClick, do you recall --

MS. VASH: Strike that, please.

Q. Do you recall how DoubleClick billed for clients who used their publisher ad server?

A. I'm sorry, I don't understand the question.

Q. Was it a flat fee? Was it a per impression fee? Do you have an understanding of how clients were billed?

A. In general, although there were some features that were different over time, it was charged on a CPM basis.

Q. And that's cost per thousand or cost per relay, right?

A. That's correct.

Q. And was it a flat fee for the CPM?

A. No. The fee would be tiered based off of usage.

Q. Did the publisher ad server collect data from the publisher websites?

MS. ELMER: Object to form.

A. The publisher ad server -- we're talking about -- which ad server?

Q. I can -- I'm still on DoubleClick, I'm still with your time at DoubleClick. Okay? So

the publisher ad server while you were DoubleClick, when they served an ad or when they filled an impression, would they collect information from the publisher's website about the individual visiting that website?

MS. ELMER: Object to form. Ads it was the other way around. The publisher would pass the information to the ad server so that they would have it in their reporting.

Q. When you say the publisher would pass that information, is that sort of -- and forgive me if this is not technical enough -- is that sort of pushed from the publisher or is it extracted from the ad server?

MS. ELMER: Object to form.

A. Without the publisher, the ad server doesn't do anything. The publisher has to put calls for the ad server on their page so when their page runs, they call the ad server.

Q. Does the ad server collect the data that it received from the publisher?

MS. ELMER: Object to form.

A. The ad server would pull in the data that was passed to it from the ad server -- or from

the publisher side. Sorry.
Q. Did it score the data that it pulled from the publisher?
A. Sure. For example, to provide a report back to the publisher.
Q. And when it provided a report back to the publisher, was there an additional fee attendant to that report?
A. Again, there were features over time that were developed that were, for example, specialized reports that I think at one point had a fee. But for most of the reporting it was included as part of the product.
Q. Thank you.
Do you know who DoubleClick's publisher ad server competitors were in or around 2008 before they were acquired by Google?
A. In 2008, there were many publisher ad servers on the market, but you're now asking about an older time period. I think PubMatic and Admeld existed then. I think Au Feminine and Smart AdServer existed then. I forget when Faulk was around.
Q. Are there any of those that you just

mentioned, are they no longer around?
A. Faulk is not around and others are not around, but I don't think Smart AdServer is around anymore. I think, you know, they may have gotten bought. I don't remember.
Q. When the ads -- when DoubleClick was acquired by Google, did the publisher ad server lose any functionality?
A. Features would always change, but there was nothing specific in the acquisition of Google by DoubleClick -- or sorry-- DoubleClick by Google.
Q. Thank you.
MS. VASH: I'd like to ask the document technician if you could mark as Exhibit 15 what is tab 21.
(Exhibit 15, Document Bates labeled GOOG-DOJ-08479873, marked for identification.)
MS. VASH: We'll just be very quick on this.
Q. I'm going to show you what's been marked for identification as Exhibit 15, Bates numbered GOOG-DOJ-08479873.
Mr. Spencer, have you ever seen this

slide before?
A. No.
Q. Have you ever seen the cartoon before?
A. No.
Q. So take a look at it for a second where it says "rebrand" and then it has a number of acronyms below it.
Do you see that?
A. Yes. I see them.
Q. What is DART, that's our smallest fish there? What is DART?
A. DART was the name of the ad server that DoubleClick had.
Q. And was that the ad server that was purchased by --
MS. VASH: Strike that.
Q. What is XFP?
A. XFP was the internal code name for the building of the publisher ad serving product within Google.
Q. And what was the time frame that that acronym was used?
A. Roughly in the 2015, '17 range.
Q. What about DRX, what is DRX?

A. So DRX was the team that had both the exchange and ad server teams together.

Q. Is it fair to say that Google combined DFP and AdX and unified the teams under DRX?

MS. ELMER: Object to form.

A. The teams were brought together in terms of a pub side team, but the products didn't become one product until Ad Manager, which was both products, were available within.

Q. And during what time frame were the teams combined before AdX and DFP were combined under GAM?

A. I'm sorry. I'm not good with the particular dates of when each organizational change happened.

Q. Right.

When AdX and DFP were combined --

MS. VASH: Strike that, please.

Q. GAM, was that an original name for the combination of AdX and DFP, or had that been used internally by Google before?

A. The name GAM had been used externally by Google to refer to its Ad Manager product, sorry -- its ad server product and then it was

referred to as ad manager typically without the Google when it was the combination of the exchange and DFP.

Q. When they referred to as GAM externally, that was early on, right? That was in or around 2008; am I right about that?

MS. ELMER: Object to form.

A. My understanding is that GAM was available in around 2008.

Q. You testified earlier, I believe you were talking about the Exhibit 8. You testified earlier regarding reductions and discrepancies.

Do you remember that testimony?

A. No.

Q. Okay. I'll come back to that then.

And before the unification of AdX and DFP, were there significant discrepancies between the reporting of AdX and DFP?

MS. ELMER: Object to form.

A. No. The ad serving technology wasn't changed there. We lost the exhibit.

MS. VASH: Can I ask the court reporter to please read my question back?

(Whereupon, the record was read as

follows: Question: "Before the unification between of AdX and DFP, were there significant discrepancies between the reporting of AdX and DFP?")

Q. My question, Mr. Spencer, is were there discrepancies between the reporting of the number of impressions that had been served between -- as between AdX and DFP before they were unified?

MS. ELMER: Object to form.

A. So when Ad Manager was created to put the two products into a single UI, the ad serving infrastructure was unchanged.

Q. I don't think that answers my question, but I'm going to move on.

Are you familiar with News Distribution Network?

A. Not by that name, no.

Q. Are you familiar with Inform, Inc.?

A. I may have seen the name, but I'm not sure.

Q. Have you seen the name recently?

A. No.

MS. VASH: I'm going to ask the document technician to please provide and mark as

exhibit -- I believe we're on 16, what is tab 6.

(Exhibit 16, Document Bates labeled GOOG-DOJ-32031835, marked for identification.)

Q. Just give you a moment to take a look at that.

MS. VASH: Marking as Exhibit 15 document Bates number GOOG-DOJ-32031835.

MS. ELMER: I think we're on Exhibit Number 16, counsel.

MS. VASH: Thank you.

Mr. Exline, is it possible to put the -- when you put the exhibit into the chat, is it possible to include the exhibit number on it?

THE TECHNICIAN: I can rename the source document before I drop them in. It will take a few more --

MS. VASH: I appreciate that.

THE TECHNICIAN: Okay. I will do that.

MS. VASH: Thank you so much.

Q. Have you had a minute to take a look at that document?

A. It's jumping around a bit but I'm trying.

Q. Okay. Sure.

A. Okay. Yes.

Q. Mr. Spencer, is this an e-mail dated November 12th, 2012 by [redacted] of Google to other Google employees including yourself?
A. Yes. It appears to be an e-mail from [redacted] to a whole bunch of people.
Q. Have you seen this document before?
A. Apparently, as I was in the "to" line, but I don't remember it.
Q. Any reason to believe that you did not receive this document in the ordinary course of your business at Google?
A. No, no reason to believe I didn't get it.
Q. And the subject is "Agenda November 12, 2012," and the first line says "Hello Innovation Council."
Did I read that correctly?
A. Yes.
Q. What is the innovation council?
A. I don't know if the innovation council was an official anything.
Q. And do you see that the deal here as is respecting the distribution network XFP video pricing?
A. Yes, I see that.

Q. And under "Summary" it indicates "in addition to discounted pricing, we're seeking approval of two free months of ad serving for the customer to lower their eCPM, which will help our pricing in line with other vendors in the market that are vying for their business."

Did I read that correctly?

A. Yes.

Q. And it indicates "This is strategic video opportunity in that NDN is twice as large as any current partner of our XFP video solution."

Did I read that correctly?

MS. ELMER: Object to form.

A. I believe you read that correctly.

Q. The XFP video solution?

A. I'm sorry. Was that a question?

Q. Yes. I'm sorry. I'll say it again.

What was the XFP video solution?

A. I'm not a hundred percent sure because this is using a bunch of phrases that are not standard, but my guess is it's referring to the DFP for video.

Q. Back in November of 2012, to the best of your knowledge, was DFP for video referred to as

XFP video?
A. XFP was sort of the name everyone was using when they were talking about both DFP and the exchange. So it looks like this is both DFP and the exchange for video.
Q. Thank you.
And do you have an understanding of what the term "eCPM" means in this e-mail?
A. Yes.
Q. What does it mean?
A. ECPM would mean the estimated or average CPM.
Q. It indicates here in the third bullet point "They have premium video inventory across major news sources, which they would like us to also use AdX to help them monetize."
Did I read that correctly?
A. "They have premium video inventory across major news sources, which they'd like to also use AdX to help monetize." Yes.
Q. And does this refresh your recollection as to whether or not you've heard previously of News Distribution Network?
MS. ELMER: Object to form.

A. Clearly there was an e-mail referencing News Distribution Network that crossed my path.

Q. Thank you.

MS. VASH: I'd like the document tech, if you could, please, to mark as Spencer Exhibit 17 what is tab 3 that I previously sent.

(Exhibit 17, Document Bates labeled GOOG-AT-MDL-015997478, marked for identification.)

MS. VASH: And Ms. Elmer, I have printed this document out and provided it, it is in native and it does not come up with a Bates number. So I can provide the native sheet -- slip sheet that has the Bates number if you'd like.

MS. ELMER: Yes, please do.

MS. VASH: I'd like to ask the court reporter -- I'm sorry -- the document tech to please mark as Spencer Exhibit -- are we on 17?

THE TECHNICIAN: Yes.

MS. VASH: -- 17 what was tab four?

THE TECHNICIAN. 17 was the printout of the spreadsheet. Did you want 18 to be tab 4?

MS. VASH: Yes. Thank you.

(Exhibit 18, Document Bates labeled, GOOG-AT-MDL-015997478 (slipsheet for Ex. 17), marked for identification.)

MS. VASH: And I will indicate for the record that the Bates number of the document produced, which did not print out on this Exhibit 17, is GOOG-AT-MDL-015997478.

Q. Mr. Spencer, I'm just going to ask you to take a look at Exhibit 17. And you can page through it, but we're just going to look at the very top of the first page.

THE TECHNICIAN: If you'd let me know when you need to page through it and I can navigate for you.

THE WITNESS: If we're only looking at the top page, that's fine.

MS. VASH: Thank you.

MS. ELMER: I'm sorry. I don't have the document yet. Can you please wait until I have the document?

MS. VASH: Yes. Can we go off the record, please?

THE VIDEOGRAPHER: Stand by, please. Sorry. One moment. We are now going off the

record. The time is 4:20 p.m.

(Proceedings interrupted at 4:20 p.m. and reconvened at 4:21 p.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 4:21 p.m.

BY MS. VASH:

Q. Mr. Spencer, have you seen this document before?

A. Potentially, but not that I recall.

Q. And am I correct that this document is "Comscore's Video Metrics Key Measures Top 400 Video Properties" dated August 1st, 2012?

A. That looks correct.

Q. Thank you.

I'm going to direct you to number 6. And am I correct that number 6 is NDN?

A. Yes. Number 6 is NDN.

MS. VASH: If we could just take look -- N as in Nancy, D as in David, N as in Nancy or News Distribution Network for the court reporter.

And if we could -- if I could trouble you now to -- please, to the document tech, if you could please include the column categories and which is -- yes, all the way down to NDN.

Q. In or around August 1st, 2012, does this document indicate that NDN was the top six Comscore video property?

A. It looks like it's listed as row 6, based on unique viewers.

Q. And what are the other metrics that this looks at as important for being a top video property?

MS. ELMER: Object to form.

A. I don't know how to define a top property.

Q. Well, the document indicates that these are the top 400 video properties, correct?

A. Yes.

Q. So what metrics does this document look at?

A. The document looks at unique viewers, average daily unique viewers, and index for unique viewers. I think it's number of videos but I'm not sure. Videos per viewer, minutes viewed, minutes per video, total minutes, percent ads, and ads per content video.

Q. And am I correct out of the top six in terms of minutes per video, NDN actually scores

highest over and above the other five?
A. I can't see the full document with the view I have. So the minutes per -- what's your question? I'm sorry.
MS. VASH: If I can ask the court reporter to please read my question back.
(Whereupon, the record was read as follows: Question: "And am I correct out of the top six in terms of minutes per video, NDN actually scores highest over and above the other five?")
A. Yes. Of the top six, it appears to have the highest minutes per video.
Q. What are the other top five video properties besides NDN, who is number six, but what are the top five?
MS. ELMER: Object to form.
A. According to this Comscore video properties listing, they have Google sites, Yahoo! sites, Facebook.com, Vivo, Viacom Digital.
Q. Thank you.
Mr. Spencer, do you know what a TrueView ad is?
A. Yes. I know what TrueView is.

Q. What is TrueView?

A. TrueView ads are ads that -- are video ads that are only charged for when they are seen beyond a certain time and not skipped.

Q. And what is that time? Do you know?

A. I don't know.

Q. And does every video advertisement have the ability to be a TrueView ad?

A. No. I think there's limits in terms of the duration of the creative, for example.

Q. Are there other limits?

A. I'm not an expert in the TrueView format.

MS. VASH: I'm going to ask the --

Q. But before I do, the TrueView format, is that a Google construct?

MS. ELMER: Object to form.

A. The TrueView ad format was created, I believe, by Google.

Q. Do you know when?

A. Not exactly, no.

Q. Do you have an approximate time when Google created the TrueView ad format?

A. I don't want to misstate the timing, but it was probably after 2012 and before 2017,

somewhere in that range.

(Exhibit 19, Document Bates labeled GOOG-AT-MDL-0003083652 - 003083655, marked for identification.)

MS. VASH: All right. I'm going to ask the document tech to please mark as Spencer Exhibit Number 19 what I have as tab 1, which has been produced in the litigation to plaintiffs as GOOG-AT-MDL-0003083652 through 003083655.

THE WITNESS: Can I see the next page?

MS. ELMER: Yeah, please take all the time you need to scroll through the whole document.

THE WITNESS: Is there another page? Thank you.

Is there another page?

A. Thank you. So I've looked at the document.

Q. Thank you, Mr. Spencer.

Does the witness not have the ability to scroll through the document himself?

A. No.

THE TECHNICIAN: That's correct in this configuration.

MS. VASH: Okay. Thank you.
Q. Mr. Spencer, have you seen this document before?
A. I don't recall it.
Q. I will represent to you that the metadata on this document indicates that you were custodian of this document and that the date created was 8/19/2011. The title of this document is "GVN TrueView Beta Eligibility Requirements and TrueView Policies."
Have I read that correctly?
A. Yes.
Q. Does this document set forth the TrueView policies as you understood them when you were working at Google?
MS. ELMER: Object to form.
A. This document appears to set forth the first set of policies for TrueView inventory and creatives when it was being initially betaed.
Q. And what does it mean to be white listed?
A. That was the term for inclusion in something like this beta.
Q. I would like to direct you to the second page, please.

A. I think that's what's showing.
Q. Okay. Do you see your name down on the indication and network policies?
A. Yes. I see my name there.
Q. And to the best of your knowledge, Mr. Spencer, who designed the TrueView general policies?
A. I believe the primary designer was Woojin.
Q. When you say Woojin, do you mean Woojin Kim?
A. Yes.
Q. And was he a Google employee at the time that he designed the TrueView policies?
A. Yes.
Q. To the best of your knowledge, Mr. Spencer --
MS. VASH: Strike that, please.
Q. I direct your attention to the third page under "Who is eligible." And if we go a little further up, that has "Who is not eligible." We're going to go to "Who is eligible."
A. Okay.
Q. You see that it indicates content

networks such as Grab Media, NDN, or Springboard? Do you see that, as who is eligible?

A. Yes. I see that.

Q. It indicates there are players who aggregate video content and distribute it via a proprietary player. They typically own a hundred percent of the sales rights for that content and control of the player experience.

Did I read that correctly?

A. Yes. You read that correctly.

MS. ELMER: Counsel, I'd like to have the witness have the ability to scroll through the documents himself, so if there's a way that we can change the setup to where the documents are being dropped in the chat for the witness to view, I'd like to do that, please.

MS. VASH: Sure. Let's go off the record, please.

THE VIDEOGRAPHER: We are now going off the record. The time is 4:36 p.m.

(Proceedings interrupted at 4:36 p.m. and reconvened at 4:37 p.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 4:37 p.m.

BY MS. VASH:
Q. I want to direct you to the third page ending Bates number 3654, "Who is not eligible." It indicates that ad networks are not eligible, correct?
A. The document specifies that certain types of ad networks are not eligible.
Q. Does the document also indicate that there's an exception?
A. This document has a set of things that are --
Q. I'm directing you to the bottom.
A. I'm sorry.
Q. Directing you to bottom of the page.
A. But no, I see that. This document has a -- what is listed as a set of exceptions.
Q. And is there a particular ad network that is accepted here?
A. It's unclear. These are exceptions to eligible or not eligible. I'm not quite sure.
Q. Okay. Under the term "exceptions," it indicates "J.W. Longtail is a player and ad network. They have been grandfathered in for TrueView and we will continue to keep them

enabled."
Did I read that correctly?
A. Yes.
Q. Is it fair to say that J.W. Longtail was white listed for TrueView?
MS. ELMER: Object to form.
A. It appears J.W. Longtail was kept as a beta partner for TrueView.
Q. Thank you.
MS. VASH: I would like to ask the document custodian to mark as Exhibit 20 what is tab 5.
(Exhibit 20, Document Bates labeled GOOG-AT-MDL-014624939 through 014624940, marked for identification.)
MS. VASH: Tab 5 is a document produced in the litigation, Bates number GOOG-AT-MDL-014624939 through 014624940.
A. I have the document.
Q. If you could take a minute to take a look at that.
A. Yes. I see it.
Q. And am I correct this is an e-mail thread in which -- which includes you and other members

of Google?

A. This looks like an e-mail from me to [redacted] and cc'ing some other people.

Q. And is this a document that you would have sent in the ordinary course of your business at Google?

A. Yes.

Q. Do you recognize it?

A. No.

Q. You see the question that you ask, Mr. Spencer, on the very top?

A. Yes. I see the question.

Q. And it says -- can you please read that into the record?

A. Yes. O three questions are: How do we tell the difference between these two networks? Is it a judgment call? Is there hard criteria we can add to this?

Q. Do you know whether or not there were any hard criteria added to the TrueView policy?

A. I believe over time --

Q. I'm sorry. To -- the difference between a content network and an ad network?

MS. ELMER: Object to form.

Counsel, could you rephrase your question. I think you broke up.

Q. Yeah. I'm happy to. Thank you.

To the best of your knowledge, were there any hard criteria developed for the TrueView policy in order to tell the difference between these two networks as you have asked here?

MS. ELMER: Object to form.

A. I believe the policies for TrueView continued to be updated over time to improve their enforceability and comprehension.

Q. And to the best of your knowledge, who were they updated by?

A. It's been around for many years. I'm not quite sure who does that.

Q. Would it be someone within Google?

A. Yes. It would be someone within Google.

Q. When you say "improve enforceability," how was the TrueView policy enforced?

A. As stated when it was first done as a beta, enforceability was very hard to do. Over time I think more technologies and techniques were developed to ensure the quality of the inventory being monetized.

Q. The inventory being monetized would be video ad inventory, correct?
A. Well, the inventory being monetized is the inventory coming from the networks or the publishers on those networks.
Q. And with the TrueView policy this would be video ad inventory, yes?
A. Yes. TrueView was talking about video ad inventory.
Q. What is the view through rate?
A. View through rate is the percentage of consumers who actually view the entirety of a creative typically.
Q. And do you know whether the TrueView policy was enforced by looking at how high a TrueView -- I'm sorry -- how high a view through rate was for a particular publisher?
A. No. I don't think that that was a criteria for enforcement.
Q. Was it a criteria for flagging that there may be a violation?
A. An abnormal view through rate could be an indicator of fraud.
Q. And what would be an abnormal view

through rate?

A. Well, a hundred percent would be clearly abnormal.

Q. That's at the high end, yes?

A. Yes.

Q. What about at the low end, what would be abnormal?

A. I forget the normal expected view through rate, but zero would be clearly abnormal on the other end.

Q. Do you know whether there was a threshold at which the view through policy would be flagged for violation?

MS. ELMER: Object to form.

A. No. My guess is it was probably based off of some statistical difference from average.

Q. To the best of your knowledge, what would happen if a publisher violated or was alleged to have violated the TrueView policy?

A. If a publisher was found -- alleged to violate it, then they would be looked at, and if they were confirmed to violate it, then they would not be eligible for TrueView creatives.

Q. And who would undertake the process of

confirming whether they, in fact, had violated the TrueView policy?

A. There were multiple people who looked at the policies, some within the YouTube team or the video team at the time and some within the policy team.

Q. And the YouTube team and the policy team, are those all Google LLC employees?

A. There could be third-party people employed to assess for fraud, for example.

Q. Well, that's not my question.

MS. VASH: If I could ask the court reporter to please read back my question.

(Whereupon, the record was read as follows: Question: "And the YouTube team and the policy team, are those all Google LLC employees?")

A. So fraud is a policy, not having fraud, and so there are people who would look at fraudulent impressions that the could be non-Google LLC people, that would be part of the policy requirements.

Q. That still wasn't my question. The YouTube team, are those all Google LLC employees?

A. Again, the policy review that you're asking about, that review could happen by people on a policy team which would include things like fraud, which could include outsourced vendors.

Q. My question was very simple, Mr. Spencer. Was the YouTube team all employees of Google LLC?

MS. ELMER: Object to form.

A. Well, the YouTube team, in general, would include things like fraud and abuse teams, which would include vendors.

Q. And to the best of your knowledge, which vendors did YouTube employ to police the TrueView policy?

A. I couldn't tell you the names of the vendors used.

Q. But you can tell me that vendors were, in fact, used?

A. Yes. There was a team just dedicated to managing vendors for manual review of different aspects of inventory.

Q. And who would know the answer as to which vendors were employed to determine whether or not there were violations of the YouTube -- I'm sorry -- of the TrueView policy?

A. Someone within the trust and safety team at that time.

Q. Do you have an understanding of who was in the trust and safety team at that time?

A. No.

Q. Were you later on part of the trust and safety team?

A. Yes.

Q. And so who did you employ to -- as vendors to police the YouTube -- I'm sorry -- the TrueView policy violations?

A. Not specific to anything related to TrueView. When I was working in the privacy and safety team and dealing with the policy, we had contractors in many languages around the world to look at inventory quality or assess the compliance with the whole bunch of different policy elements.

Q. Not specific to TrueView?

A. It would include, but not be specific to TrueView.

MS. ELMER: Serina, we've been going about an hour, if you have a logical point for a quick break.

MS. VASH: Sure. This is a logical point for a quick break. Thank you, Julie.

THE VIDEOGRAPHER: We are now going off the record. The time is 4:50 p.m.

(Proceedings interrupted at 4:50 p.m. and reconvened at 5:02 p.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 5:02 p.m.

BY MS. VASH:

Q. Mr. Spencer, I'm going to ask the document tech to please drop into the chat as Exhibit 21, what is tab 10.

(Exhibit 21, Document Bates labeled GOOG-DOJ-32039637, marked for identification.)

A. I have it open.

Q. If you could take a moment to look at that.

MS. VASH: I've marked for identification as Spencer Exhibit Number 21, a document produced in this litigation and Bates numbered GOOG-DOJ-32039637.

Q. If I could please have you take a look at that.

A. Yes.

Q. Mr. Spencer, have you seen this document before?

A. I vaguely recall it as an e-mail I wrote.

Q. And what's the date of the e-mail that would you wrote?

A. It is September 15th, 2014.

Q. What's the subject of the e-mail?

A. Project Ming enabling Google's ad serving products for a Flashless future.

Q. And I'm just going to question you, I think the subject says, "Project Ming - enabling Google's advertising products for a Flashless future." Did I say that correctly?

A. I think that's what I said, but yes.

Q. Mr. Spencer, is this a document that you wrote in the ordinary course of your business at Google?

A. Yes.

Q. What's Project Ming?

A. Project Ming was the effort to ensure our products were able to support Rich Media when Flash was being deprecated by browsers.

Q. To the best of your knowledge, when did Project Ming start?

A. A little before this e-mail.
Q. What was your role in Project Ming?
A. In part, I was coordinating across products to ensure they were ready and in part, I was helping specifically with DFP and AdX.
Q. What were products being readied for?
A. I'm sorry. You cut off a little bit there. Can you say that again.
Q. I think your testimony was that you were assuring that Google products were ready, am I correct?
A. Yes.
Q. What were they getting ready for?
A. So Flash was being deprecated as a supported format for creatives by browsers, given security concerns, and we needed to make sure our products were able to support the formats that would be supported.
Q. You say it was being deprecated for security concerns, what security concerns?
A. Flash was created as a -- almost programming language for the Web, but it was highly insecure and Adobe moved to deprecate it.
Q. Thank you.

Does it indicate here that your goal was to enable Flashless future for Google products by the end of 2016?
A. Yes. The end of 2016, was the goal when we wanted to make sure we were no longer -- had anything dependent on Flash.
Q. And to the best of your memory, when did Adobe move to deprecate Flash?
A. I don't remember when Adobe gave up on Flash, but many of the browsers had started to remove it by the time of this e-mail.
Q. In or around September 15th, 2014, did Google announce externally that it was enabling its products to deprecate Flash?
A. Part of this project was to figure out how to communicate the changes that were being done to ensure we were ready for not supporting Flash anymore.
Q. Was it fair to say Google prepared its own products beginning in or around September 2014, for a Flashless future?
MS. ELMER: Objection to form.
A. This e-mail kicked off the effort that would be about a two-year effort.

Q. And which products are named in this e-mail?
A. The e-mail names AdWords, AdSense, DoubleClick Campaign Manager, DoubleClick Bid Manager, DoubleClick Rich Media, DoubleClick For Publishers, DoubleClick Ad Exchange, Swiffy, and Google Web Designer.
Q. And did those products include both buy side and sell side products?
A. Yes. There are buy side and sell side products listed here.
Q. What's Swiffy?
A. Swiffy was a Swift file creator.
Q. To the best of your understanding, how did Swiffy function and what did it do?
A. If I recall, Swiffy helped people who used Swift, which was a Flash based file format in their ad campaigns and, therefore, impacted by the loss of Flash.
Q. How did it help them, to the best of your knowledge?
A. Made it easier to use and manage the creatives.
Q. Did it make it easier to use and manage

the creatives in any particular way?

A. I believe it was, part of it was to help create the creatives.

Q. Was it creating the creatives not in Flash but in fact in HTML5?

A. So Swiffy was -- Swiffy might have been the tool used to convert them over to start to make them HTML5, that sounds correct.

Q. Was Swiffy a Google tool?

A. Yes. Swiffy was a Google tool.

Q. What is Google Web Designer?

A. I can't quite remember which part Google Web Designer did.

Q. Does this e-mail indicate that you were responsible for the -- rather the owner of the DoubleClick For Publishers and the DoubleClick Ad Exchange in connection with the Project Ming effort?

A. So this is indicating that I'm the point person for those two products and there weren't yet point people for the other ones.

Q. To the best of your recollection, what did you do for those two products, DFP and AdX, in connection with Project Ming?

A. I worked with other product managers on those products to understand where Flash was used to help determine how we could make changes in terms of the elements that were reliant on or integrated with Flash and replace them with alternatives.

Q. And why were you doing that?

A. Because browsers had started to drop support for Flash.

Q. What's the effect of browsers and Google dropping these -- the support of Flash?

A. Well, browsers stopping supporting Flash meant that if you had a Flash creative, it wouldn't run and it could result in a bad experience for a consumer. In the browsers where it was still available, it was notoriously insecure and, therefore, could be a vector for malware or fraud or other problems for people's computers.

Q. When you announced the deprecation of Flash, and by "you," I mean Google, did they state that it was because of security concerns?

A. I don't recall how the positioning was for the Flash deprecation.

MS. VASH: I'm going to ask the document tech to please drop into the chat what is tab 11 and mark that, please, as Spencer Exhibit 22.

(Exhibit 22, Document Bates labeled GOOG-DOJ-13327124 - 131, marked for identification.)

Q. I'm only going to ask you about the first page.

MS. ELMER: But, Scott, take the time you need to review the whole document.

MS. VASH: For the record, Exhibit 22 is a document Bates number GOOGDOJ13327124 through 13327131. In this litigation, the entire document is included for completeness, but only the first page will be discussed.

A. I've taken a look at the document.

Q. Okay. Thank you.

Is this a document -- do you recognize this document?

A. It looks like an e-mail that I was part of.

Q. And this is an e-mail chain that you would have been part of in the ordinary course of your business at Google?

A. Yes.
Q. And directing you to the e-mail that you sent at the very top.
A. Okay.
Q. The date of that e-mail is October 27, 2014, correct?
A. That looks correct.
Q. "Subject, re Flash auto play audio, pubs turning off AdX."
Did I read that correctly?
A. Yes.
Q. It indicates, asterisk, "strictly confidential, do not share outside of Google," asterisk.
Did I read that correctly?
A. Yes. You read that correctly.
Q. Does this e-mail indicate that you're working to deprecate Flash across all of your products by the end of 2017, and that that information is not to be shared outside of Google?
MS. ELMER: Object to form.
A. This was sharing part of the work that was going on to deprecate Flash support and it

was not yet ready for external communication.
Q. It indicates here, "As part of this effort, we want to start proactively shift buyer's creatives off of Flash in 2016, the effort is expected to take all of 2016."
Did I state that correctly?
A. Almost. Proactively shift buyer's creatives off of Flash.
Q. Thank you.
MS. VASH: Ask the document tech to please mark as Spencer Exhibit number 23, tab 12, which is Bates number GOOGDOJ03756034 and is a document that we received in connection with this litigation.
(Exhibit 23, Document Bates labeled GOOG-DOJ-03756034, marked for identification.)
Q. Mr. Spencer, can you please take a look at the document?
A. Just arrived. One second.
Q. Sure. Thank you.
A. Yes. I see it.
Q. Was this a document sent by Eisar Lipkovitz on or about February 4th, 2005, with the subject, "Preparing for reduced Flash

Support"?

A. Yes. It's an e-mail from Eisar.

Q. Okay. And do you know whether you received this e-mail?

A. I believe I received this e-mail.

Q. Is this an e-mail you would have received in the ordinary course of your business at Google?

A. Yes.

Q. It indicates, "Display ads team, consumer support for Flash has been steadily decreasing as users move to mobile and desktop browsers progressively reduce support. Indeed, confidentially, our own Chrome is well on this path. Chrome M43 will play non-essential Flash for one second and then pause them."

Did I read that correctly?

A. Yes.

Q. And am I correct that in February 2015, this was still confidential within Google?

A. I believe that there was no external coms yet.

Q. Thank you.

MS. VASH: Like to ask the document tech

to mark as Exhibit 24, tab 14, which is a document received in this litigation Bates stamped GOOGDOJ14271324 through 14271328.

(Exhibit 24, Document Bates labeled GOOG-DOJ-14271324 - 14271328, marked for identification.)

Q. If you could take a minute to please read it. And I find, Mr. Spencer, that sometimes it's easier to read an e-mail from the end and read each e-mail sequentially backwards.

A. Okay. Yes.

Q. Mr. Spencer, is this an e-mail chain that you're on with other members of Google?

A. I was certainly on for part of it.

Q. It's dated April 23rd, 2015, correct?

A. Yes.

Q. The subject is "AdX Services Buy Re Project Ming and the Gradual Ramp Down of Flash."

Did I read that correctly?

A. That's a forward and the r-e, re, is regarding Project Ming and the gradual ramp down of Flash.

Q. Thank you.

Direct your attention to the second

sentence where you say, "It's worth noting that unlike the SSL change, this impacts everyone, all SSPs, all direct sales, all buyers, everyone."

Did I read that correctly?

A. Yes. I believe you did.

Q. I'm going to direct you about two-thirds down the page, an e-mail from [redacted] at Google. Do you know who [redacted] is?

A. I don't recall [redacted] role.

Q. But he was an employee of Google at the time?

A. Yes. He was an employee of Google.

Q. Halfway down, he indicates, "[redacted] - please hold off on telling customers about this specific Chrome feature until we confirm that it is externally safe."

Did I read that correctly?

A. Yes. You read that correctly.

Q. Is it fair to say that it still would not have been externally communicated in April 2015?

MS. ELMER: Object to form.

A. I believe he's talking about the Chrome feature, which was the reference of the version 43, I think it was.

Q. And that that had not been externally communicated yet?

A. Chrome doesn't typically communicate its releases.

MS. VASH: I would like to ask the document tech to drop into the chat what is tab 25.

(Exhibit 25, Chrome Blog article, "Better Battery Life for Your Laptop," marked for identification.)

THE TECHNICIAN: This be will be Spencer 25 as well.

MS. VASH: Yes, it will.

Q. I'm going to ask you to take a look at this document and ask me -- tell me if you've seen it before?

A. This looks like a Chrome blog post from 2015, that I probably saw at one point.

Q. It's a Chrome blog post, June 4th, 2015?

A. That appears correct.

Q. And the title is Better Battery Life For Your Laptop?

A. That's correct.

Q. To the best of your knowledge, was this

the first external communication about the deprecation of Flash by Google?

MS. ELMER: Object to form.

A. This blog post is talking about a change that Chrome is making to how Flash is loaded in their browser. The change is going on to reduce dependency on Flash so that advertisers and publishers are not impacted was going on in parallel.

Q. And to the best of your knowledge, before June 4th, 2015, was there any other external communication about the deprecation of Flash from Google?

MS. ELMER: Object to form.

A. Again, this isn't the deprecation of Flash by Google. This is the use of Flash by Chrome and how Chrome works with Flash.

Q. Understood. But prior to this date, to the best of your knowledge, was there external communication that Google was working to deprecate Flash?

MS. ELMER: Object to form.

A. I don't know when the coms were done for the changes being done to reduce dependency of

Flash in the ad serving infrastructure.

Q. Thank you. If you could take a look at this blog post and let me know if it -- you see anywhere where there is a notable security concern?

A. This is focusing on the usage of battery life.

Q. So am I correct that there is no reference to any security concerns regarding Flash?

MS. ELMER: Object to form.

A. There's no reference to security in this blog post.

MS. VASH: I'm going to ask the document tech to please pull tab 17 and mark that as Spencer Exhibit 26.

I apologize. Mr. Spencer, I'm going to go a little out of order here. I'm going to ask the document tech also to pull what is tab 51 and mark that as Spencer Exhibit 27 and that is the one we'll look at first.

(Exhibit 26, Document Bates labeled GOOG-DOJ-02849873 - 9874, marked for identification.)

(Exhibit 27, Document Bates labeled GOOG-DOJ-07482759 - 2761, marked for identification.)

MS. VASH: Marked as Exhibit 26 is a document Bates number GOOGDOJ-02849873 through 02849874, which is a document we received in connection with this litigation. And I have marked as Exhibit 27, a document Bates numbered GOOG-DOJ-07482759 to 07482760, also a document received in the course of this litigation.

If I could ask you to please look at what's been marked Exhibit 27 and read that through.

A. I'm familiar with 27.

Q. To the best of your knowledge, Mr. Spencer, did you receive this document in the ordinary course of your business at Google?

A. No. I don't think I was on this.

Q. Is this a document dated July 1st, 2015, and sent between members of employees of Google?

A. Yes.

Q. Okay. Were you part of the mod squad?

A. I don't think I was part of the mod squad.

Q. What about [redacted], were you part of that group?

A. I'm not familiar with that distribution list either.

Q. Do you know who [redacted] is?

A. I think he was one of the people on the Ming team, based on this e-mail.

Q. Do you know if he was on the buy side or the sell side?

A. I don't recall offhand.

Q. Was this an internal communication for the buy side employees of Google regarding Project Ming?

MS. ELMER: Object to form.

A. This appears to be an e-mail internally, which is sharing information in coms docs around various aspects of Flash deprecation.

Q. Does it also indicate that it attaches an externally safe e-mail?

A. Yes. It indicates that.

Q. Okay. Going to the third paragraph, begins, "Your advertiser may have seen this blog post that announces that Chrome will begin to intelligently pause content like Flash

animations."

Did I read that correctly?

A. I'm sorry. Where are you in the doc?

Q. The third paragraph. I'm including the first sentence as its own paragraph.

A. Yes.

Q. Into that paragraph it says, "However, this will also have a huge negative impact on CTR, conversion and other performance metrics, as Flash ad impressions will still be logged as served and billed as applicable. That's because starting in September, Flash ads will be auto paused on a frame within the first 2 to 3 seconds of animation unless users click to play the ad, meaning an additional click beyond the ad play will be required to click through to landing pages."

Did I read that correctly?

A. Yes, I believe you did.

Q. The next sentence says, "Only about 1 percent of paused content is click to play (internal only)."

Did I read that correctly?

A. Yes.

Q. What does that mean, only about 1 percent of paused content is click to play?
A. I believe it's referring to the percentage of times that once the Flash creative was paused, that someone would then click to unpause it.
Q. Thank you. Does this indicate that Flash ads will still be logged as served and still billed even though in fact they won't be playing?
MS. ELMER: Object to form.
A. This is cautioning the advertisers or the sales team to work with advertisers that the Flash ads will be auto paused after the first 2 to 3 seconds of play and, therefore, will be impacted in terms of their performance.
Q. Because the advertisers would still be billed, correct?
MS. ELMER: Object to form.
A. Well, the ad is delivered, so the advertiser's going to be billed for the delivery of an ad, but the ad, if it's an auto playing Flash creative, will pause after 2 to 3 seconds.
Q. Means the user will not actually be able to watch the ad, correct?

A. No. The user can watch the ad, they just have to unclick or click the unpause button.

Q. Which they would do 1 percent of the time, correct?

A. Yes.

Q. This is pretty important for an advertiser to know, yes?

MS. ELMER: Object to form.

A. The implications on the Flash creatives were enough that we put out a coms doc.

Q. To the advertisers?

A. I believe the linked doc went to the advertisers.

Q. Do you know if the coms docs that went to the advertisers were the same as the coms docs that went to the publishers?

A. It would depend on the feature or the change.

Q. To the best of your knowledge, did Google offer Swiffy as a way for advertisers to change Flash ads into HTML ads?

A. Google worked to provide many ways to help transition creatives over or away from Flash as the remaining few creatives were left. Some

of them would use Swiffy, others would stop. It depended.

Q. Swiffy was one of those ways, yes?

A. Swiffy was a tool for transitioning creatives from Flash to HTML5.

Q. And was it an advertiser tool?

A. I believe Swiffy was available to move creatives that were in publisher ad server or creatives that were in the advertiser ad server.

Q. Thank you. I'm going to direct you down to five -- the fifth paragraph, it says, "The good news is that Google is very well positioned with multiple HTML solutions."

Did I read that correctly?

A. No. It's multiple HTML5 solutions.

Q. Thank you. That's exactly what it says. "The good news is that Google is very well positioned with multiple HTML5 solutions," correct?

A. That's correct.

Q. There are various tools your advertiser can use to build new HTML 5 ads comparable to their current interactive Flash ads. Detailed next steps for AdWords and YouTube ad formats can

be found in this coms doc. Each section is linked below.

Did I read that correctly?

A. I believe so.

COURT REPORTER: I need to go off the record.

THE VIDEOGRAPHER: We are now going off the record. The time is 5:39 p.m.

(Proceedings interrupted at 5:39 p.m. p.m. and reconvened at 5:51 p.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 5:51 p.m.

MS. VASH: Thank you.

BY MS. VASH:

Q. Mr. Spencer, we were looking at Exhibit 27.

A. Yes.

Q. The fifth paragraph. The fifth paragraph has six bullets.

Do you see that?

A. Yes.

Q. Okay. The last bullet says "YouTube masthead." What is YouTube masthead?

A. YouTube masthead is the top of the

YouTube, I think, landing page at the time.

Q. Thank you.

I'm going to direct you to Exhibit 26, which we did not have an opportunity to look at yet. If you could please take a look at that.

A. Yes.

Q. Exhibit 26, with the Bates number N, is an e-mail from [redacted] on August 4th, 2015, to Brad Bender, Woojin Kim, and [redacted], "Subject: Update on Chrome PPS preparedness/Project Ming."

Did I read that correctly?

A. It's [redacted] but yes.

Q. Oh, thank you. [redacted].

Are [redacted], Mr. Bender, Mr. Kim, and [redacted] all employees of Google?

A. I believe they were at that time.

Q. Do you know if you ever saw this document?

A. I don't recall if I saw this.

Q. How about the substance of the document, are you familiar with the substance of the document?

MS. ELMER: Object to form.

A. At a high-level.
Q. It indicates on the third paragraph, "Chrome PPS overview: Chrome will add pause buttons to all Flash ads, effectively dropping their CTR by 99 percent. Ads teams have all been working on migrating advertisers to HTML 5 and preparing our products for this shift."
Did I read that correctly?
A. You read that correctly.
Q. Now, two paragraphs down it indicates, "In the long term, we expect this to become a net positive. Advertisers will shift their Flash ads to HTML5 generating a neutral impact on desktops, and in doing so, the ads will be eligible for mobile inventory doubling their potential reach."
Did I read that correctly?
A. Yes. You read that correctly.
Q. It continues. "We will also be in a better position competitively. Chrome PPS hits all ad networks, our Flash to HTML conversion tools and other HTML ready solutions provide us with a unique selling point to advertisers looking to find refuge in a post Flash world."
Did I read that correctly?

A. Close. It was HTML5 again.
Q. Sorry. Thank you.
Did you discuss the contents of this e-mail, the subject matter of this e-mail with Mr. Kim?
MS. ELMER: Object to form. The witness has already testified he's not familiar with the e-mail, he's never seen it.
MS. VASH: I think his testimony --
MS. ELMER: But you may answer if you know.
MS. VASH: -- I believe is at a high-level. I believe that his testimony is that at a high-level he was familiar with the substance of and the contents of the e-mail.
MS. ELMER: The testimony is what it is, Counsel.
You may answer if you know.
MS. VASH: Thank you, Ms. Elmer.
A. I'm sorry. Could you read back the question.
Q. Did you discuss --
MS. VASH: Go ahead, please, if you would, Court Reporter.

(Whereupon, the record was read as follows: Question: "Did you discuss the contents of this e-mail, the subject matter of this e-mail with Mr. Kim?")

MS. ELMER: Same objection.

A. So the specific wording and verbiage used here, no. The aspects that there were -- was Flash deprecation occurring and when PPS hit the reaction to PPS, yes.

Q. Did you also discuss pausing Flash ads would effectively drop their CTR by 99 percent?

MS. ELMER: Object to form.

A. The Chrome change of adding pause buttons meant that that the click through rate was impacted.

Q. Effectively dropping it by 99 percent, correct?

MS. ELMER: Object to form.

A. I think as we said before, it was about a 1 percent of consumers would continue to unpause.

Q. Thank you.

MS. VASH: I'd like to ask the document tech to mark as Exhibit 28 what is tab 15.

(Exhibit 28, GOOG-DOJ-03064429 - 3064439,

marked for identification.)
MS. VASH: Which is a document produced in the course of this litigation as GOOG-DOJ-03064429 through 03064439.
Q. You have a minute to please page through this document. I'll also represent to the record that the metadata indicates this document was created May 5th, 2015 and that you are the custodian on this document.
A. Yes.
Q. Is this a PowerPoint that you would have received in the ordinary course of your business at Google?
A. This is a presentation that I would have received.
Q. Do you recognize it?
A. It looks like a Project Ming update plan.
Q. It's entitled "Project Ming Product Plans," correct?
A. Yes.
Q. Any reason to believe you did not receive this PowerPoint as respect if you were a custodian?
A. No.

Q. I'm going to direct you to the second page, please. It says, "Coms Milestones." What are coms?

A. Coms are communications to internal or external teams.

Q. And does the second bullet point indicate that in or around May 25th coms to sales will go out in a sales bulletin?

A. This is indicating on 5/25 that coms will go to the buy side and sell side.

Q. Is it also -- does it also include the Chrome blog post announcement announcing PPS going live?

A. It has an estimated --

MS. ELMER: Object to form.

A. There's an estimated date for when a Chrome blog post would happen.

Q. And what is the last bullet point? Can you read that, please?

A. It says, "Each product launches their own external coms following Chrome's announcement."

Q. Okay. And if I could just ask you to page through the remainder of the document and ask you a quick question about that.

A. Okay.

Q. Is it fair to say that this document provides for plans concerning when internal and external communications will be made in connection with Project Ming?

A. The document outlines multiple milestones including coms related to the deprecation of Flash.

Q. Thank you.

MS. VASH: I'd like to ask the document custodian to please mark as Exhibit 29 -- I think we're on 29 -- what is tab 18.

(Exhibit 29, GOOG-DOJ-14367640 - 14367643, marked for identification.)

MS. VASH: Which is a document produced in this litigation at GOOG-DOJ-14367640 through 14367643.

Q. I'll ask you to take a look at it, please.

A. Okay.

Q. Directing you to the first page about two-thirds of the way down. Well, first, Mr. Spencer, is this an e-mail chain between you and other employees of Google in or around

August 7th, 2015?
A. Looks like an e-mail chain that at some point I was forwarded and included on.
Q. And is the subject "Re: Flashless Chrome experiment impact on AdX and mitigations"?
A. Yes.
Q. And is this a document that you would have received and sent in the ordinary course of your business at Google?
A. It looks like I received the forward and I added a comment.
Q. Directing you to the bottom of the first page, there is an e-mail by you August 6th, 2005 at 7:06 p.m. It says, "We just met with Neal and [redacted]."
Who are Neal and [redacted]?
A. That's Neal Mohan and [redacted].
Q. It indicates, "Decision was made to block, don't bid on Flash ads on Chrome desktop when buyer is AdWords. Block, don't bid on Flash ads on Chrome desktop when buyer is DVM. Allow Flash ads on Chrome when buyer is AdX, even on AdSense's inventory."
Did I state that accurately?

A. Yes.
Q. Who made that decision?
A. The decision was made in the meeting with Neal, [redacted], myself, and probably others.
Q. Any recollection of anybody else who was in that meeting?
A. No. I don't remember who else was in the room.
Q. I'm going to direct your attention to the very top of this e-mail. It says, "plus [redacted]." Who is [redacted]?
A. [redacted] was I think an engineer.
Q. And two lines down it says, "[redacted], is there someone on the ad serving team that can look at the proposed blocking logic once it's drafted? Scott."
Did I read that correctly?
A. Yes.
Q. What's blocking logic?
A. The logic -- the decision here was to as a bidder, as a buyer of ads, not bid on ads when Chrome was the browser, and so the, quote-unquote, blocking logic is to not bid on inventory that is indicating from Chrome for

AdWords in DBM.
Q. And would that blocking logic be found in the source code, Google source code?
MS. ELMER: Object to form.
A. I assume the code the that indicates to stop bidding on inventory from Chrome at this time would be found in the source code or the logic of the system.
Q. Thank you.
Now, Mr. Spencer, what is Project Magnolia?
A. Project Magnolia was an effort to improve ad experiences across the Web.
Q. Like how, if at all, did Project Magnolia utilize the Chrome browser to do that?
A. Project Magnolia worked with multiple browsers to block publishers when their ads were not compliant with the better ad standard.
Q. What is the better ad standard?
A. The better ad standard was a standard developed by the coalition for better ads that helped identify what were the most annoying ad experiences for consumers.
Q. I'm going to direct, before I forget, you

back to Exhibit 29. And I'm moving back to a prior subject matter. With respect to subject -- with respect to Exhibit 29, the decision that was made to block Flash ads, was that communicated to Google's publisher clients?

MS. ELMER: Object to form.

A. I don't know what communication there was about AdWords and DBM no longer bidding on the Chrome inventory for Flash creatives.

Q. To the best of your knowledge, was the blocking of Flash ads communicated -- I'm sorry -- the blocking --

MS. VASH: Strike that, please.

Q. Was the decision not to bid on Flash ads in Chrome desktop when the buyer's AdWords, was that communicated to publishers?

MS. ELMER: Object to form.

A. I don't know.

Q. To the best of your knowledge, was it communicated to advertisers?

MS. ELMER: Same objection.

A. I don't know.

Q. To the best of your knowledge, was the decision not to bid on Flash ads on Chrome

desktop when the buyer's DBM was that communicated to publisher clients?

MS. ELMER: Object to form.

A. I don't know what the coms were for that change.

Q. Is it fair to say that with respect to the decisions listed here you do not know what communications were with respect to publisher or advertiser clients?

MS. ELMER: Object to form.

A. I don't recall the coms for these decisions.

Q. Thank you.

THE VIDEOGRAPHER: We're at that 15-minute mark.

MS. VASH: Terrific. Thank you.

I'm going to ask the document tech to please mark as Exhibit 30, tab 22.

Exhibit 30 is a document received in the ordinary course of this litigation.

Wow, strike that, please.

Document Exhibit 30 was received by plaintiffs in connection with this MDL litigation. It is marked GOOG-DOJ-13357360

through 13357363.
(Exhibit 30, GOOG-DOJ-13357360 - 13357363, marked for identification.)
Q. I'd ask you to take a look at it. I'm going to ask you some questions.
A. Okay. Yes.
Q. Mr. Spencer, do you recognize this document?
A. It looks like an e-mail.
Q. It's an e-mail sent by and between you and Jonathan Bellack at Google?
A. It's a forward of some content that I then sent to Jonathan.
Q. And is the document that you sent and received in the ordinary course of your business at Google?
A. Yes.
Q. Okay. What is the IAB?
A. The IAB is the Internet Advertising Bureau.
Q. Does this document indicate that the IAB is opposing a charter concerning online advertising?
A. This is talking about the IAB looking at

the issue of ad blocking and proposing changes in approach to deal with ad blocking.

Q. And does the e-mail indicate that you did not like their approach to changes in ad blocking?

A. I thought that we could do something better than what they were proposing.

Q. And the top e-mail from you indicates there's a separate thread with [redacted]. Who are [redacted]?

A. I believe that they were the liaisons for -- the official liaisons to industry organizations.

Q. It then says, "We are looking to co-opt the IAB. Neal met with [redacted] Tuesday and is confident we will get alignment. Fingers crossed."

Did I read that correctly?

A. I'm sorry. Where are you?

Q. After it says there's a separate thread with [redacted], will you please read the sentences that follow?

A. Okay. "We are looking to co-opt the IAB. Neal met with [redacted] Tuesday and is confident we

will get alignment. Fingers crossed."
Q. What did you mean by "co-opt the IAB"?
A. It's a bad choice of terms. I meant that we would convince them that there was a better path.
Q. To the best of your knowledge, did Jonathan Bellack or any other employee at Google ever write an external communication for the IAB and present it to them?
A. I'm sure there were many communications done to the IAB on behalf or by Googlers.
Q. To the best of your knowledge, did Jonathan Bellack or others at Google ever draft external communications to be sent out by the IAB as if on behalf of the IAB that were, in fact, drafted by Google?
MS. ELMER: Object to form.
A. As a member of the IAB, member organizations would commonly draft communications that would then come out from the IAB.
Q. To the best of your knowledge, did anyone at Google ever draft communications for the IAB and delete any references to Google so as to make it look like Google had not drafted the

communications?

MS. ELMER: Object to form.

A. In working with the IAB, the IAB would know who they were talking to, so the communication may come out from the IAB that was drafted by us or by other members.

Q. Thank you.

MS. VASH: Can we go off the record, please.

THE VIDEOGRAPHER: Sure. Stand by, please. We are now going off the record. The time is 6:17 p.m.

(Proceedings interrupted at 6:17 p.m. and reconvened at 6:23 p.m.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 6:23 p.m.

EXAMINATION

BY MR. KELSTON:

Q. All right. Good afternoon. Mr. Spencer, my name is Henry Kelston. I represent the class of Google advertisers in the multidirect litigation. I'm just going to have a few questions because we just have a couple of minutes left.

You testified earlier today that the transparent auction is one in which the rules of the auction are clear and understood.

Do you recall saying that?

A. Yes. That sounds correct.

Q. Now, is it accurate to say that Google changed from first price option -- from second price options to first price options around 2019; is that right?

A. That was after my time working on the Ad Exchange.

Q. So during your time working on the Ad Exchange, Google was running second price auctions, correct?

A. With exceptions of programmatic guaranteed and programmatic direct, yes.

Q. Were the second price auctions that Google ran during your time there always transparent so that the rules were clear and understood?

A. We strive very hard to ensure that they were.

Q. Are you familiar with the phrase "reserve price optimization"?

A. At a high-level.
Q. What's your understanding about how that -- how reserve price optimization worked?
A. I believe reserve price optimization was a feature that addressed publisher floor prices.
Q. And in that feature did Google alter the floor prices that were submitted by the publisher?
MS. ELMER: Object to form.
A. The feature was a feature publishers could use to change their floor prices.
Q. And to change them in automated fashion; is that correct?
A. Yes. It had an automated component.
Q. And were the rules regarding reserve price optimization clear and understood by advertisers?
MS. ELMER: Object to form.
A. I believe they were communicated. As to how they were understood, you'd have to ask advertisers.
Q. Were you aware of any communication from Google to advertisers about reserve price optimization?

A. I don't recall the specific coms that were done around that feature.

Q. Are you familiar with something called "Project Bernanke"?

A. I'm familiar with the term.

Q. Were the rules -- the option rules affected by Project Bernanke made clear to advertisers?

MS. ELMER: Object to form.

A. I don't believe Project Bernanke modified the auction rules.

Q. What did Project Bernanke do?

A. Project Bernanke, if I recall, was modifying the revenue share taken as a buy side bidder to help advertisers win more bids.

Q. And were those changes made clear to advertisers?

A. I don't know the -- I don't recall the coms that were done for advertisers on the feature.

Q. You said earlier that the AdX revenue share was 20 percent during the time you worked on AdX, correct?

MS. ELMER: Object to form.

A. So the revenue share for the open auction would be 20 percent on the exchange.
Q. And I think you said that GDN had a revenue share of 15 percent; is that right?
A. No. Not GDN. The revenue share would be for AdWords buying on AdX inventory.
Q. Now, what other project -- what other products related to display advertising had a revenue share associated with them?
A. I'm not sure I could recall all pricing of all products and whether or not they were rev share.
Q. For the products that had rev --
MR. KELSTON: Strike that.
Q. For AdX and AdWords, how, if at all, were Google's rev share disclosed to advertisers?
A. The AdX rev share was publicly disclosed as 20 percent, and AdWords, I don't remember how the AdWords disclosures were done. I think there was a help center or some post about it.
Q. When you say "publicly disclosed," what does that mean?
A. Shared on a public site or forum.
Q. And do you recall where that was?

A. I don't re -- I believe somewhere in the help center.

Q. Now, are you familiar with the term "elasticity analysis"?

MS. ELMER: Object to form.

A. I know what an elasticity analysis is.

Q. During your time at Google, did you see or are you aware of any elasticity analyses done regarding demand for Google products?

MS. ELMER: Object to form.

A. I don't know of any price elasticity analysis done, not that I recall.

Q. And now, do you recall any -- any elasticity analysis done for AdX?

A. I'm sure at some point somebody did some analysis of supply and demand.

Q. And if you received such an elasticity analysis, is that something you would have kept in your files?

MS. ELMER: Object to form.

A. I believe all my files that I ever received were kept.

Q. Okay. So you don't recall specifically ever seeing an elasticity analysis for AdX?

A. I don't recall any specific elasticity analysis.

Q. Okay.

MR. KELSTON: If we to can, let's look at exhibit labeled B, please. Exhibit B. I believe my live feed just stopped working.

THE TECHNICIAN: And that will be marked as Spencer 31.

MS. ELMER: Yeah, I think we're at time. That's seven hours on the record.

MR. KELSTON: Let me just ask one or two questions here and we'll be done.

MS. ELMER: We're at time, Henry. We're going off the record, Counsel.

MR. KELSTON: So I can't ask him whether this is an e-mail he sent?

MS. ELMER: No, sir. We're at seven hours.

MR. KELSTON: Great. Thanks for your cooperation.

MS. VASH: So I would just note that I think they -- that the videographer was going to tell us when we're at seven hours, and we had counsel tell us based on her own calculation what

seven hours was?

THE VIDEOGRAPHER: Sorry. This is -- this is the videographer. Yes, we did just hit seven hours. My apologies.

MS. VASH: So I do think that we probably would have had time for another question or two had we not been interrupted?

MS. LEONARD: It was the videographer who gave us the nod that we had hit seven. It wasn't counsel's calculation.

THE VIDEOGRAPHER: Okay. Is it okay to take us off the record?

MS. ELMER: Yeah. Go off the record.

THE VIDEOGRAPHER: This marks the end of today's deposition of Scott Spencer. We are now going off the record. The time is 6:32 p.m.

(Whereupon, this deposition was concluded at 6:32 p.m.)

CERTIFICATE

Commonwealth of Massachusetts

Suffolk, ss.

I, Dana Welch, Registered Professional Reporter, Certified Realtime Reporter, do hereby certify that SCOTT SPENCER, the witness whose deposition is hereinbefore set forth, was duly sworn by me before the commencement of such deposition, and that such deposition was taken before me and is a true record of the testimony given by such witness.

I further certify that the adverse party was represented by counsel at the deposition. I further certify that I have no disqualifying interests, personal or financial, in any party in this action.

I further certify that the deposition of SCOTT SPENCER, occurred IN PERSON on June 25th, 2024 in Cambridge, Massachusetts, commencing at 9:12 a.m. and concluding at 6:32 p.m.

Dana Welch

Dana Welch, CSR, RPR, CRR
Notary Public
My Commission Expires:
September 13, 2024

DEPOSITION ERRATA SHEET

Assignment No. 944400

Case Caption: Google Digital Advertising

DECLARATION UNDER PENALTY OF PERJURY

I, SCOTT SPENCER, declare under penalty of perjury that I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me, and the same i true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ____ day of

__________________, 2024.

_____________________________________

SCOTT SPENCER

ERRATA SHEET

Page _____ Line _____ Change to _____

________________________________________________

Reason for change: ______________________________

Page _____ Line _____ Change to _____

________________________________________________

Reason for change: ______________________________

Page _____ Line _____ Change to _____

________________________________________________

Reason for change: ______________________________

Page _____ Line _____ Change to _____

________________________________________________

Reason for change: ______________________________

Page _____ Line _____ Change to _____

________________________________________________

Reason for change: ______________________________

Page _____ Line _____ Change to _____

________________________________________________

Reason for change: ______________________________

Page _____ Line _____ Change to _____

________________________________________________

Reason for change: ______________________________

SIGNATURE: __________________DATE: ______________

ERRATA SHEET

Page _____ Line _____ Change to _____

_______________________________________________

Reason for change: ____________________________

Page _____ Line _____ Change to _____

_______________________________________________

Reason for change: ____________________________

Page _____ Line _____ Change to _____

_______________________________________________

Reason for change: ____________________________

Page _____ Line _____ Change to _____

_______________________________________________

Reason for change: ____________________________

Page _____ Line _____ Change to _____

_______________________________________________

Reason for change: ____________________________

Page _____ Line _____ Change to _____

_______________________________________________

Reason for change: ____________________________

Page _____ Line _____ Change to _____

_______________________________________________

Reason for change: ____________________________

SIGNATURE: ____________________ DATE: ______________

$

**$500,000** 183:18,22

0

**0** 107:1 184:24

**0.5** 151:22

**003083655** 264:3,9

**014624940** 269:14,18

**02849874** 293:6

**03064439** 304:4

**07482760** 293:9

**09** 169:23

**095** 170:2

**096** 175:10

1

**1** 22:23 23:3 41:20 42:3 66:10 84:24 85:1 98:17 99:10 173:9,12 175:12 177:5 185:1 193:21 264:7 295:21 296:1 297:3 303:20

**1/2** 170:3

**10** 66:11 71:14,16 72:5 84:10 151:21 169:2,6 277:12

**10,000** 22:3,7 184:14 185:1

**10:17** 66:22,23

**10:32** 66:24 67:2

**11** 29:2 187:5,8 284:2

**117** 212:13

**11:26** 109:6,7

**11:27** 109:8,10

**12** 202:1,4 255:13 286:11

**12:04** 142:18,19

**12:17** 142:20,22

**12th** 255:2

**13** 212:11,12,16

**131** 284:5

**13327131** 284:13

**13357363** 312:1,2

**13th** 213:6

**14** 228:24 229:1 288:1

**14271328** 288:3,5

**14367643** 306:13,17

**15** 95:6,10,18,23 96:7 107:23 108:6 249:15,17,22 254:6 303:23 319:4

**15-minute** 311:15

**15th** 278:6 280:12

**16** 19:8 254:1,2,9

**17** 250:23 258:5,7,19,21,22 259:2,7,9 292:15

**18** 258:23 259:1 306:12

**1830** 77:23

**19** 264:2,7

**1:16** 193:1,2

**1s** 177:1,3,4

**1st** 161:14 260:12 261:1 293:19

2

**2** 23:23 41:19,24 48:19,22 49:2 50:7 138:10 170:6 193:23 241:23 295:13 296:13,22

**20** 9:9 59:5 93:18 94:16 95:18,22 107:22 108:4,5 269:11,13 318:22 319:2,18

**2000** 23:24

**2001** 241:23

**2005** 286:23 307:13

**2006** 24:15

**2008** 24:16 26:18 27:15,22 28:3,9,16 29:3 30:18,21 31:3,4 34:19 35:1,14 94:22 248:16,18 252:6,9

**2012** 205:4 255:2,14 256:23 260:12 261:1 263:24

**2013** 62:24 76:8 93:20,22 95:13 110:6 127:21,24 138:4

**2014** 213:6 216:1,9 221:1 226:15,17 229:12 238:7 278:6 280:12,21 285:6

**2015** 19:8,20 80:5 87:1 161:14,15 162:14,24 250:23 287:19 288:15 289:20 290:18,19 291:11 293:19 300:9 304:8 307:1

**2016** 19:20 280:3,4 286:4,5

**2017** 39:8,15 40:6,9 95:1,3,13 120:11,12 126:1 127:23,24 138:5,8 195:7 263:24 285:19

**2018** 20:1 39:4 195:3,5

**2019** 27:23 28:3,9,17 29:3,9 34:19, 21,23 35:2,3,8,9,14 39:15 40:6,15 41:2 94:22,23 120:11 316:8

**2021** 10:22 11:1 12:17

**2022** 188:12

**2023** 41:3 120:11 181:16 182:7

**2024** 9:7

**21** 10:22 249:16 277:12,13,19

**217** 202:21

**218** 202:5

**21st** 11:1

**22** 284:3,4,11 311:18

**23** 286:11,15

**23rd** 288:15

**24** 147:1 151:3 288:1,4

**25** 149:11,15,21 150:2 152:20 153:3 159:1 290:7,8,12

**25th** 9:7 305:7

**26** 292:16,22 293:4 300:3,7

**27** 285:5 292:20 293:1,8,12,14 299:16

**27598** 108:11

**2761** 293:2

**28** 303:23,24

**2832** 67:8

**29** 306:11,12,13 310:1,3

**299** 143:7 156:2

**29th** 161:12

**2:06** 193:3,5

3

**3** 67:6,7,16 175:24 176:13,14,21 177:19 187:18 258:6 295:13 296:14, 22

**30** 220:8 311:18,19,22 312:2

**301** 156:20

**302** 158:24

**304** 160:4,7

**3064439** 303:24

**31** 321:8

**314** 168:6

**32** 91:20 95:19,23 102:4 108:6

**35** 187:18

**360** 47:23 48:5 58:15,16

**3654** 268:3

**37** 91:22 92:7,10,17

**3:03** 226:24 227:1

**3:22** 227:2,4

**3:42** 239:6,7

**3:50** 239:8,10

**3s** 176:16,17

**4**

**4** 77:22 78:2 207:8,9 258:23

**400** 260:11 261:13

**43** 289:24

**4314** 143:10

**4:20** 260:1,2

**4:21** 260:3,5

**4:26** 205:5

**4:36** 267:20,21

**4:37** 267:22,24

**4:50** 277:4,5

**4th** 229:12 286:23 290:19 291:11 300:8

**5**

**5** 92:24 93:4 96:11 178:1 269:12,16 298:22 301:6

**5/25** 305:9

**50** 84:11

**51** 292:19

**5101** 169:3

**55** 88:1

**5757** 93:1

**597** 110:11 111:4

**598** 110:12,13

**5:02** 277:6,8

**5:39** 299:8,9

**5:51** 299:10,12

**5:52** 80:5

**5th** 304:8

**6**

**6** 22:19 80:4 108:9,10,15 109:12 205:4 254:1 260:15,16,17 261:4

**643** 121:21

**644** 121:7 188:21

**65** 88:5

**656** 187:6

**6:17** 315:12,13

**6:23** 315:14,16

**6:32** 322:16,18

**6th** 205:13 307:13

**7**

**7** 120:14,15,21

**755** 96:11 99:13

**756** 96:13 97:1

**79** 88:18,20 89:1,4,5 90:12,14,21 91:4 92:7,10,11

**7:06** 307:14

**7th** 307:1

**8**

**8** 143:2,3,6,16,17,20 144:6,11 161:13 252:11

**8/19/2011** 265:8

**827** 80:2

**828** 79:7

**8:41** 213:7

**9**

**9** 143:2,4,9,16,21 144:7 145:13 146:1,9 156:19

**9644** 120:16 121:1

**98** 241:1

**9874** 292:23

**99** 241:1 301:5 303:11,16

**9:12** 9:8

**9:56** 49:23,24

**9:57** 50:1,3

**@**

**@paul** 289:13

**A**

**a.m.** 9:8 49:23,24 50:1,3 66:22,23,24 67:2 109:6,7,8,10

**ability** 32:11 100:5,10 241:11 245:13 263:8 264:20 267:12

**abnormal** 272:22,24 273:3,7,9

**abroad** 23:21

**abuse** 275:9

**accept** 129:1 130:11,23,24 131:1

**accepted** 268:18

**access** 57:14 87:6 209:17 210:3,14,20 217:14 223:23 234:15

**accommodate** 14:19

**accounted** 88:1

**accurate** 23:7,8 129:4 130:19 131:17 138:16 155:18 156:15 205:24 206:13 316:6

**accurately** 155:22 307:24

**achieve** 208:9

**acquired** 26:17 108:3 122:15 203:1,4 248:17 249:7

**acquisition** 24:14 26:20,23 27:2,15,17 29:12,16 240:4,6 249:10

**acronym** 18:1 147:19 250:22

**acronyms** 17:21,23 250:7

**act** 51:7

**actual** 196:9

**ad** 11:21,24 12:12 19:10,11,12,14,18,19 20:6,8,10,13 25:4,18,20,22 26:1,3,5,6,15 29:5,6,11,16,18,19,20,23,24 30:5,8,11,14,22,23 31:3 32:13,23 33:4,9,20 34:3,10,15 35:16 36:16,20,21,22,23 37:2,4,5 38:2,6,12 39:13,16,

17,20 40:4,7,10,23 41:1,7,12,16,24 42:9,12,17 43:9,20,23 48:10,11 51:13,18 57:3,6,11,13 58:20 61:1,7,9, 11,17,19,21,22 62:3,10,11 77:7 94:21,24 96:18 103:19 118:13 119:13,15,17,20,22,23 120:3,5 122:12,13,14,16 126:9,17,20 127:16, 19 128:6,24 129:9 130:10,15,16 132:15,23 134:17,18 135:6,10,13,15 136:8,20,23 137:1,3 140:11,14,18 141:2,3,6,8,10 155:10 160:18 161:6 162:4,10,15,18 176:1 194:16,17,18 195:1 216:4,8 217:10,13,17,19 219:1 225:1,23 226:18 227:11,12 228:9,13 231:15 237:1 238:3,5,7,24 240:8,14, 17,18,19 241:4,11,20 242:1,2 243:3,9 244:10,11,12,13,14,15,18,21,23 245:15,16,18 246:3,18,21,22 247:1,2, 8,14,16,18,19,20,23,24 248:16,18 249:7 250:12,14,19 251:2,8,23,24 252:1,20 253:10,11 256:3 262:23 263:8,17,22 268:4,7,17,22 270:23 272:2,7,8 278:8 281:6,18 282:16 292:1 295:10,14,15 296:19,21,24 297:1 298:8,9,24 301:20 308:14 309:13,18,19,20,22 313:1,2,4 316:10, 12

**add** 99:17,18 223:5 270:18 301:3

**added** 270:20 307:11

**adding** 199:21,22 303:13

**addition** 49:10 134:13,16 242:7 256:2

**additional** 248:7 295:15

**addressed** 196:6 317:5

**Admeld** 202:24 203:1,4 248:21

**admin** 217:24

**Adobe** 279:23 280:8,9

**adopted** 154:10

**ads** 18:6 31:16,19 34:16,19,22 35:1, 3,4,7 39:6 40:24 41:5 45:3 46:11 57:2 135:1 166:21,22 191:2 213:22 226:20 242:2 247:6 249:6 261:22 263:2,3 287:10 295:12 296:8,13 297:21 298:22,23 301:4,5,12,14 303:10 307:19,21,22 308:21 309:17,21 310:4,11,14,24

**Adsense** 56:5,8,14,17 64:1,4,12 100:2,5,11 101:6 103:13 106:7,9,13, 16,22,24 108:6 126:21 204:22 205:14,16,18,23 281:3

**Adsense's** 307:23

**Adserver** 248:22 249:3

**advantage** 104:11 170:12,22,24 171:1,8 174:4,7,8,17,22 175:2,13,20 176:2,7,11 177:9,21,24 178:5,8

**advantages** 171:12,19 172:3,10,12, 19 175:15

**advertised** 63:16,20

**advertisement** 263:7

**advertiser** 60:5,8 105:3 116:13 138:21 245:6,11 294:22 297:7 298:6, 9,21 311:9

**advertiser's** 99:6 296:20

**advertisers** 30:13,19,24 31:1 32:3, 24 54:6 56:19,24 57:1,18,19,20 59:5, 8,13,19,22,24 75:17,23 76:10 80:17 100:14,15,22,24 110:19 116:11,12 139:10 211:5 244:13 245:2,3 291:7 296:11,12,16 297:11,13,15,20 301:6, 12,22 310:20 315:21 317:17,21,23 318:8,15,17,19 319:16

**advertisers'** 98:11

**advertising** 9:11 11:4,7 12:18 44:6,8 46:15,21 48:2,4,6 64:1,3 178:22 241:18 278:12 312:19,23 319:8

**advise** 38:1,5 42:19,20,24 43:5,10,21

**advised** 42:22 219:13

**advisor** 39:17 40:7 43:9

**Adwords** 31:14 50:21 52:22 53:11, 17 54:6,14 55:4,8,11,14,15,16,18,20, 22 56:6,14,22 57:4,15,17,18 58:18, 20,22 59:3,12,13,20 60:13,16,18 61:3 62:15 64:18,21 65:7,10,16,20 66:2 70:10,21 71:3,8,21,22 72:2 82:12 83:16 103:14,17 106:24 281:3 298:24 307:20 309:1 310:8,15 319:6,15,18, 19

**Adx** 38:18 50:23 52:17,19,24 53:10, 16 54:13 55:3,10 65:21,23 66:1,3 77:5,7 79:18 80:8,21 81:3,8,11 83:1, 11,19 84:5,14,20 85:7,23 87:9,11,12, 13,14,16,18,22 88:2,14,21 89:1,3,6, 21 90:1,9,14,17 91:2,3,5,13 92:3,4, 12,18 93:18 94:15 95:18 97:14 98:22 99:2,7 100:3,5,11,24 101:7,16,19,22 103:11,12,15,24 106:10 107:6,10,14 115:14,19 117:7,10,14,16,17,19,21 118:1,3,7,11,12,18,22 119:8,10,11, 14,17,19,21,22 120:1,5 124:20,24 125:1,10,18 126:10,17,20,22,23 127:2,3,9,13,19 128:5,24 129:22,24 130:2,10 131:18 132:8,11 133:7,10, 16,22,23 134:2,6,7,17,22 135:7,14, 18,19,21 136:3,15 137:15,17 138:12 139:15 141:16 168:13,16 173:16 174:3,13,18,21 194:24 196:6,19,21, 22 197:3,6 200:17 201:2,7,11 202:24 203:7,10,17,19 204:3,15 205:1 206:4, 5,9 207:12,17,22 209:17,19,21 210:2, 10,13,19 213:12,20 214:4 217:14,21 218:22 222:16 223:3,4,5,12,13 224:3 226:16,17 229:16,18 230:4 231:15 235:15 236:12,15 251:4,11,17,20 252:16,18 253:2,3,8 257:16,20 279:5 282:23 285:9 288:17 307:5,22 318:21,23 319:6,15,17 320:14,24

**Adx's** 138:22 197:8 210:22

**affect** 105:16,17

**affected** 185:14 318:7

**afternoon** 239:13 315:19

**agencies** 30:23 31:2 32:4 33:1,2

**Agenda** 255:13

**aggregate** 267:5

**agree** 15:5,9,16 16:1

**agreed** 233:17 238:17

**agreement** 182:19,22 183:2,3,6,7 184:2,10,18 185:6,7,10,14 186:1 230:13,15 233:22,24

**agreements** 186:13

**ahead** 35:20 302:23

**aired** 219:19

[redacted] 289:7,8

[redacted] 289:9

**Alegre** 68:22

**alleged** 273:18,20

**allocate** 167:12 196:19

**allocated** 167:15 196:21,24 200:17, 18,23 201:2,7,11

**allocating** 196:22

**allocation** 128:7,10 158:21 163:15, 18,19,20 166:1

**allowed** 33:8 79:23 125:7,9 126:7 128:17 206:10 225:17 233:13

**alluding** 166:20

**alter** 317:6

**alternatives** 283:6

**am-tips** 294:1

**America** 159:12,13

**amount** 104:24 183:20 184:4,6

**analogy** 60:11

**analyses** 320:8

**analysis** 176:22 177:19 201:17 320:4,6,12,14,16,18,24 321:2

**analyst** 79:15

**analyzing** 199:24

**animation** 295:14

**animations** 295:1

**announce** 280:13

**announced** 283:20

**announcement** 305:12,21

**announces** 294:23

**announcing** 305:12

**annoyed** 223:1

**annoying** 309:22

**answering** 179:14

**answers** 13:11,17 253:13

**antifraud** 40:23

**antitrust** 9:12 219:7,13,18

**anymore** 212:4 249:4 280:18

**Aparna** 212:21 213:1,2

**APAS** 190:21,23,24 191:1

**APIS** 205:20

**apologies** 102:18 322:4

**apologize** 39:23 292:17

**app** 26:7

**Apparently** 255:7

**appearing** 60:24

**appears** 23:8 67:21 88:23 146:12,23 161:3 169:16,21 255:4 262:12 265:17 269:7 290:20 294:15

**applicable** 295:11

**applied** 136:20,23 137:3

**applying** 101:13

**Appnexus** 122:9,11,12,14 125:9 126:9,17,20 128:24 130:10 131:6,18 137:16 138:1,24 140:7,9 161:17 162:22

**Appnexus's** 138:13

**appraisal** 200:10

**approach** 215:15,20 217:3,5 227:7 230:7,17 313:2,4

**approaches** 233:16 234:10

**approval** 256:3

**approximate** 263:21

**approximately** 22:11 29:10 40:9 195:3 235:6 241:21

**April** 169:20 288:15 289:20

**architecture** 220:20

**area** 82:19 126:1

**areas** 189:17 192:4,11

**argue** 178:17

**argument** 99:2

**arise** 68:6

**arising** 178:21

**Aristotle** 58:1,2

**arrived** 286:19

**article** 182:10 290:8

**articles** 38:10 196:14

**ascertained** 155:22

**aspect** 230:9

**aspects** 48:9 82:22 220:19 275:20 294:17 303:7

**assess** 112:21 274:10 276:16

**assessed** 129:7

**assessment** 189:9,15 234:5

**assets** 22:12

**assist** 241:17 245:8,16

**assume** 13:23 54:20 73:9 90:6 97:15 150:19 154:18 158:14 168:15 186:13 309:5

**assumed** 129:8

**assumes** 129:18 132:15

**assuming** 122:24 130:15,17

**assuring** 279:10

**asterisk** 285:12,14

**Attached** 145:7,21

**attaches** 294:18

**attachment** 143:4,22 145:19,24 146:5 202:5 212:13

**attempt** 65:16,20 197:11

**attempts** 209:15

**attend** 148:4

**attendant** 248:7

**attention** 121:21 266:19 288:24 308:9

**attorney** 9:17 14:6,11 21:18 239:14

**attorney-client** 214:15

**attorneys** 12:7 17:12,16

**attribute** 82:2,4

**attributes** 112:20

**Au** 248:21

**auction** 29:23 38:19,21,24 56:3 65:24 66:3,6 93:19 94:3,8,11,15 118:4 129:13,22,24 130:2 134:2,5 138:18,24 139:10,11,14,15,20 204:1, 2,4,5,11 207:13,18,23,24 208:4,8,10, 15,18,21 209:1,2,3,4,6,24 210:4,6,12 211:8,9,14,17,18,20,21,23 212:4,7,9 316:2,3 318:11 319:1

**auctions** 94:7 138:20 316:14,17

**audible** 13:10

**Audience** 122:3,5,6,8 123:5,9 128:13,21,23 130:10 131:5

**audio** 15:23 285:8

**August** 10:22 11:1 12:17 62:24 260:12 261:1 300:8 307:1,13

**Australia** 141:8

**auto** 131:21 285:8 295:12 296:13,21

**automated** 317:12,14

**automatic** 60:13

**availability** 76:17

**average** 88:6 257:11 261:18 273:16

**awarded** 184:18

**aware** 39:1 51:18 52:7 53:15,18,20, 22 120:4 125:22 126:19 138:8,9 140:11 142:3 150:21,24 166:18 180:9 181:15,19 182:10 202:23 204:16 317:22 320:8

**Awbid** 50:17,19,20 51:21,24 52:4,8, 10 53:10,14 54:17 64:21 68:19 70:6 73:7,10,12,14,16,19,21 74:2,8 75:17, 24 76:2,5,10 77:14 96:2,5

B


**bachelors** 23:11,14

**back** 50:2 67:1 76:20 89:12 109:9 114:5 131:22 135:7 142:21 149:5 151:2 161:10 162:6 167:7 171:17 190:1 193:4,21 197:1 200:14 204:10 227:3 239:9 242:17 244:17 248:5,6 252:15,23 256:23 260:4 262:6 267:23 274:13 277:7 299:11 302:20 310:1 315:15

**backfill** 123:15,21,24 124:4,13,19,22 125:2,5

**background** 23:11 93:17

**backwards** 288:10

**bad** 224:20 283:14 314:3

**balance** 107:16,19,24 108:2

**based** 30:4 53:11,17 54:13 55:4,11, 14,15,18,23 56:6,11,22 57:4,14 76:7 91:10 92:1 105:15 140:18 142:4 147:10 149:9,14 153:7 189:8,10,15 246:16 261:4 273:15 281:17 294:7 321:24

**baseless** 21:21

**basic** 243:13

**basically** 106:16 217:20

**basis** 14:12 246:11

**batch** 243:20,22 244:6

**Bates** 48:19,23 49:3,7,11,15 67:7,14, 17 77:22 78:3 79:7 92:24 93:6 108:10,16 120:15,22 121:4,7 143:6,9, 15,18 169:2,7 187:5,10 202:4,21 212:12,17 229:1,6 249:17,22 254:2,7 258:7,12,14 259:1,5 264:2 268:3 269:13,17 277:13,20 284:4,12 286:12,15 288:2,4 292:22 293:1,5,8 300:7

**battery** 290:9,21 292:6

**BCG** 145:2,8,14 146:10,21 147:15 150:6 152:19 172:15 173:5,8 174:3,6, 11,17,20 175:1,7,15,18 177:21,23 178:7

**BCG's** 172:13

**BDM** 58:7

**bearing** 202:2 212:17 229:6

**beat** 18:13

**begin** 294:23

**beginning** 9:17 95:9 112:23 122:21 184:11 230:11 280:20

**begins** 294:22

**behalf** 314:11,15

**behaving** 188:10

**behaviors** 65:17,21

**Belgium** 72:18

**bell** 170:19

**Bellack** 19:4 40:4 99:17,18 220:1,4 221:10 226:4,15 312:11 314:7,13

**Bellack's** 226:2

**Bender** 300:9,15

**beneath** 160:21 164:9 170:8

**benefit** 161:1

**benefits** 160:15,17 161:4 167:8 224:10

**Benelux** 72:16,18,20,21 73:2 202:15,19

**Bernanke** 318:4,7,10,12,13

**beta** 265:9,22 269:8 271:21

**betaed** 265:19

**betting** 238:12

**biassing** 105:18

**bid** 31:12 32:24 33:9 53:11,17 54:13 55:4,11,14,15 56:11 58:13,21 64:18, 21 65:8,10 86:9,11 101:5 129:1,7,8,9, 11,14,18 130:11,23,24 131:1 133:6 135:15,18,21,22 136:2,6,7 204:6 208:7,9,11 212:3 281:4 307:19,20 308:21,23 310:14,24

**bidder** 32:19,20 59:10 104:3 122:13 125:10 130:1 142:2 161:18,21,22 162:4 308:21 318:15

**bidders** 32:2,3,4,5 59:6 133:20

**bidding** 31:24 33:3 50:21 52:22 55:17,21 103:17,18 112:17,18,19 133:6 309:6 310:8

**bids** 103:19 129:13 204:8 318:15

**big** 142:7,9 158:8 196:17 218:10

**biggest** 196:8

**billed** 246:2,8 295:11 296:9,17,20

**billing** 245:9

**bit** 23:10 39:22 110:7 156:18 164:1 168:5 188:20 191:13 200:14 227:8 254:22 279:7

**black** 64:17 65:4 178:15

**block** 307:19,20 309:17 310:4

**blocking** 308:15,19,23 309:2 310:11, 12 313:1,2,5

**blog** 290:8,17,19 291:4 292:3,13 294:22 305:12,17

**Bloomberg** 181:15 182:5,6

**Boies** 9:23

**Boise** 193:9

**bold** 160:9

**bolded** 164:5

**bond** 236:11

**boss** 45:17

**Boston** 149:7 157:3 158:2 159:5,8 164:23 171:24 172:2,6

**bottom** 41:20 42:3 69:5 80:2,4 88:5 90:13 96:10 111:6 121:19 122:2 156:20 175:10 177:2 207:10 268:12, 14 307:12

**bought** 96:1,5 118:1 249:5

**box** 156:24 158:6 170:6,8

**Brad** 300:9

**break** 14:15,16,18 66:13,18,20 131:3 134:4 135:1 138:20 142:15 192:23 203:24 204:2 210:5 211:8,21 212:4 276:24 277:2

**breakdowns** 201:5

**breaking** 211:23

**breakout** 148:9 198:1

**breaks** 132:19,20 139:11,13

**broad** 140:17

**broadly** 74:14,16,20,22 75:6,9

**broke** 271:2

**broken** 34:21 130:15,18,24 138:3 197:18,22

**brought** 251:6

**browser** 291:6 308:22 309:15

**browsers** 278:22 279:15 280:10 283:8,10,12,15 287:12 309:17

**Bruckhaus** 10:3

**BS** 23:15

**budget** 51:11

**build** 26:9 175:12 240:7 298:22

**building** 250:19

**buildings** 200:19

**bullet** 60:17 64:17 65:3,4,15 145:19 146:7,15 147:13,22 153:9 158:8 160:14 162:8 167:8 175:7 190:3,8 191:3 257:13 299:22 305:6,18

**bulleted** 189:4

**bulletin** 305:8

**bullets** 299:19

**bunch** 48:9 172:16 255:5 256:20 276:17

**bundle** 235:14,20 236:3

**bundling** 213:12 214:1,8 216:20 218:23 219:8,20 220:11 221:18 222:13 224:2 225:7 229:15 230:24

**Bureau** 312:20

**business** 19:10,11,12 29:5 34:3,10 35:16 42:18 44:15,18,23 77:3,5,6 78:23 79:5 98:22 99:2 126:4 148:13 178:22 201:12 202:19 255:11 256:6 270:5 278:16 284:24 287:7 293:17 304:12 307:9 312:15

**button** 297:2

**buttons** 301:4 303:13

**buy** 30:14,20,23 32:11 33:12 48:7 57:2 58:20 59:8 71:21 74:2,7 97:6,9, 11 98:15 99:3,6 100:24 101:4 102:3 104:17,18 105:8 106:10,13,17,21,22 107:2,4,7,11,15,23 116:15,18 117:18, 21 161:23 162:1 211:5 281:8,10 288:17 294:8,12 305:10 318:14

**buyer** 32:7 89:21 90:9 94:12 105:14 112:21 118:5,20,22 119:1 125:18 129:14 207:17 307:20,21,22 308:21

**buyer's** 286:4,7 310:15 311:1

**buyers** 29:24 30:5,8,11 31:5 32:13, 14,18 94:13 112:8 123:20 207:12,15, 20,22 208:4,19 211:19 212:3 289:3

**buying** 30:22 57:18 70:7,11 72:2 104:9,10 116:4,7,13,16 119:2 211:20 319:6

**buys** 31:2

## C

**calculation** 321:24 322:10

**calendar** 181:14

**call** 26:3 89:10 113:20 118:12 119:14,17,21 124:2,5 125:9,18 126:10,17,20,21,22 127:13,19 128:2 132:18 134:17 135:12,18,19 136:18 137:11 156:21 233:18 247:19 270:17

**call-out** 133:2,5,12,17,23 134:7

**call-outs** 133:19 134:3

**called** 20:9 28:19 29:18 31:12 109:22,24 125:17 128:5 132:16 135:6,21,24 137:15 178:24 179:2 198:24 318:3

**calling** 64:12 130:17 135:11 165:24

**callouts** 138:13

**calls** 128:24 130:10 135:14,15 136:9, 12 138:19 247:18

**Cambridge** 9:10

**Campaign** 281:4

**campaigns** 245:16 281:18

**candid** 15:11

**captured** 174:15

**car** 60:12

**care** 104:20

**carefully** 215:18

[redacted] 313:10,21

**cartoon** 250:3

**case** 9:21 11:10,13,16,19 12:15,19, 21,24 15:7 30:3 52:21 107:14 124:10 127:15 139:4 179:5,8,12,20 180:15, 20 181:17 185:21,24 193:20

**cash** 183:11,12,15,18

**categories** 260:23

**caucus** 142:15

**caution** 214:14

**cautioning** 296:11

**cc'ing** 270:3

**ccs** 50:13

**cell** 244:2

**cells** 244:5

**center** 38:10 196:14,23,24 319:20 320:2

**centers** 197:2,5

**chain** 78:17,19,22,24 79:3,4 212:20 284:22 288:12 306:23 307:2

**challenged** 137:22

**challenges** 115:12 190:1

**challenging** 238:6

**chance** 23:6 78:14 108:21 169:12 244:6

**change** 20:7 28:2,8 30:17 35:11,12 52:14 65:13 93:24 95:13 125:19 127:22,24 138:4 188:9 200:9 206:8 243:16,20,22 244:3,4 249:9 251:15 267:14 289:2 291:4,6 297:18,20 303:13 311:5 317:11,12

**changed** 19:24 20:1 30:9,15 76:2 94:19 95:3,11,16 125:23 138:7,8 252:21 316:7

**changing** 97:17

**channel** 59:22 60:7 105:18,20

**channels** 166:17

**charge** 100:14,15,17 101:4 104:9

**charged** 93:18 94:15 95:5 100:19 104:2,3 107:2 246:11 263:3

**charges** 95:17,18

**charging** 100:22,23 104:13

**chart** 168:6,7,11

**charter** 312:22

**chat** 229:10,12,20 254:12 267:15 277:11 284:2 290:6

**cheaper** 103:15

**check-in** 188:5,7,8

**chirps** 15:19

**choice** 47:13 141:15 314:3

**choose** 57:1 59:6,7

**chose** 57:7,12,14

**Chris** 9:19 186:21

[redacted] 109:15,19 110:15,22 115:13

**Chrome** 287:14,15 289:15,22 290:3, 8,17,19 291:5,17 294:23 300:10 301:3,19 303:13 305:12,17 307:4,19, 21,22 308:22,24 309:6,15 310:9,15, 24

**Chrome's** 305:21

**chunk** 160:10

**chunks** 164:4

**churn** 237:12,15,19,24

**circulating** 75:5,9

**circumstances** 166:14

**circumvent** 209:15

**claim** 171:22

**claiming** 175:1

**claims** 146:23

**Claire** 10:4

**clarify** 14:4

**class** 193:11 315:20

**clause** 185:15,20 186:10,15,18 190:10

**clean** 210:12

**clear** 13:14 15:22 76:17 92:3 106:17 152:19 160:15,17 167:7 209:4,6 316:3,19 317:16 318:7,16

**click** 244:2 295:14,15,16,21 296:2,5 297:2 303:14

**click-through** 243:12

**client** 224:11 239:15

**clients** 54:3,11 224:15,22 246:3,8 310:5 311:2,9

**close** 204:17 302:1

**closed** 26:19 117:4,5

**cluttered** 228:16

**co-opt** 313:14,23 314:2

**coalition** 34:16,18,22 35:4 39:6,11,12 226:19 309:21

**code** 50:20 58:6 241:14 250:18 309:3,5,7

**Cohen** 10:7 187:2

**cohesive** 35:24

**coincided** 35:12

**colleague** 193:14

**colleagues** 142:16 154:13

**collect** 246:18 247:3,20

**colloquial** 113:20,23

**Colloquially** 113:10

**color** 172:24 173:2

**column** 87:8 88:13 89:24 91:12 260:23

**columns** 86:6

**combination** 61:4 162:15 213:20 214:6 251:20 252:2

**combined** 56:14 95:22 251:3,11,17

**combining** 163:6

**comment** 307:11

**commercialization** 154:7

**commissioned** 150:12 152:20 155:13 157:17,19

**commitment** 207:17 208:14,22

**commitments** 207:11,14,19

**common** 186:12

**commonly** 314:19

**communicate** 149:16,22 151:7 192:3,16,17,19 280:16 290:3

**communicated** 54:18 147:7 150:7,21 151:1 152:4 153:17,21 189:24 190:20 192:1 289:20 290:2 310:4,11,16,20 311:2 317:19

**communication** 286:1 291:1,12,20 294:11 310:7 314:8 315:5 317:22

**communications** 12:6 21:20 179:15,17 215:10 305:4 306:4 311:8 314:10,14,19,22 315:1

**companies** 142:8,10

**company** 44:3 66:4 162:3 218:10

**comparable** 298:22

**compare** 134:4

**comparison** 205:19

**compensation** 183:8,9

**compete** 140:18

**competes** 141:3,16

**competing** 58:23 59:15 60:6 141:1 204:7

**competition** 61:14 133:1,11,16 138:24 139:9 203:23

**competitive** 82:18,19

**competitively** 301:19

**competitor** 103:11,12

**competitors** 85:3 248:16

**compilation** 24:22

**complaint** 11:12 12:15

**complete** 13:17 16:6 243:16

**completeness** 284:14

**complex** 135:4

**complexity** 216:9

**compliance** 137:8 276:17

**compliant** 309:18

**complicated** 62:8 216:2 228:15

**component** 317:14

**comprehension** 271:11

**computed** 138:23

**computers** 283:19

**coms** 287:21 291:23 294:16 297:10,14,15 299:1 305:2,3,4,7,9,21 306:7 311:4,11 318:1,19

**Comscore** 261:3 262:18

**Comscore's** 260:11

**conceivable** 211:7

**concept** 70:15 106:15 107:13 123:24 210:5 238:23

**concepts** 190:19 242:4

**concern** 74:21 75:8 77:2 292:5

**concerned** 75:1 85:17

**concerns** 218:5,7,9,13,17 219:7,12,18 279:16,20 283:22 292:9

**concluded** 322:17

**conduct** 157:3 201:16

**conducted** 149:10,15

**conference** 147:21

**confident** 313:16,24

**confidential** 285:13 287:20

**confidentially** 287:14

**configuration** 216:18 264:24

**configurations** 216:22

**configure** 231:16

**confirm** 68:12 83:24 84:4,6,15 289:15

**confirmed** 273:22

**confirming** 274:1

**confused** 119:1

**connection** 183:1 282:17,24 286:13 293:7 306:5 311:23

**considerable** 73:24

**consideration** 215:16

**considerations** 97:22 98:21 99:2 213:16 214:12

**considered** 73:21 162:5

**consolidate** 173:24 174:3

**consolidated** 178:3 217:23,24

**constrained** 51:2,5,10,11 70:7,13, 16 71:7,15 77:10,15,19

**construct** 71:20 263:15

**consulting** 42:11,18 126:4 149:7 157:3 158:2 159:6,8 164:23 172:1,2,6

**consumer** 283:15 287:10

**consumers** 44:6,7,9,12 46:5,9,10,14 47:11 272:12 303:20 309:23

**contact** 202:22

**contemplated** 241:20 242:1

**content** 26:8 159:15 223:9 261:22 266:24 267:5,7 270:23 294:24 295:21 296:2 312:12

**contents** 244:2 302:3,15 303:3

**context** 114:21 118:21 156:24 237:6

**continue** 41:1 63:14 68:4 111:18 166:23 268:24 303:20

**continued** 271:10

**continues** 192:9 301:18

**contract** 182:19 186:7 194:7 214:5 215:11 217:7 225:13 231:17,22 232:1,5,12,15 233:7 235:24

**contractors** 276:15

**contracts** 215:4 220:22 245:3

**contractual** 230:24

**contractually** 235:14,20 236:3,11

**control** 44:10 46:12 47:12 94:13 168:9 267:8

**controls** 137:16

**conversation** 114:22 115:9 234:5

**conversations** 37:6 53:21,23 110:16 204:18 211:12 221:10,22 223:6,9 233:8

**conversion** 30:4 295:9 301:20

**convert** 282:7

**convince** 314:4

**cooperate** 185:11,16 186:3

**cooperation** 185:7,21 321:20

**coordinating** 279:3

**copies** 49:10 67:12

**copy** 49:8 173:2 178:15 229:4

**correct** 21:6,7 28:22 31:17 35:2 41:8,22 50:24 59:14 65:10,12 70:14 88:9 90:19 99:19 110:22 115:14 117:23 125:14 126:14 129:23 130:4, 12 131:2,21 132:13 133:14 134:10 137:18,19 144:20 152:21,24 155:7 171:9 176:8 177:1,15 194:9 213:24 229:19 230:10 231:5 234:19 235:7 236:4 237:4 238:13 240:2,7 241:6 245:20 246:14 260:10,13,16 261:13, 23 262:8 264:23 268:5 269:23 272:2 279:11 282:8 285:6,7 287:19 288:15 290:20,23 292:8 296:17,24 297:4 298:19,20 303:17 304:19 316:5,14 317:13 318:23

**correctly** 118:19 174:16 184:15 255:16 256:7,12,14 257:17 265:11 267:9,10 269:2 278:13 285:10,15,16 286:6 287:17 288:19 289:4,17,18 295:2,18,23 298:14 299:3 300:12 301:8,9,16,17,24 308:17 313:18

**corresponded** 79:4

**cost** 147:6 196:11,12,18 201:10 246:12

**costs** 194:13 196:4,5,8,9,16,20,21,22 197:12 200:15,17 201:1 238:2

**council** 255:15,18,19

**counsel** 9:14,15 10:11 49:5,17,18 67:12 68:2 78:8 93:9 120:24 121:8 144:6 154:1 180:19,23 214:19 215:10 219:16,19 254:9 267:11 271:1 302:17 321:14,24

**counsel's** 322:10

**counted** 108:14

**counter** 65:16,20 66:1 190:2

**countries** 140:16,17,19,24 141:2,4, 7,17,19,20 202:16

**country** 140:6 142:4

**couple** 93:17 111:15 139:21 227:6 315:23

**court** 9:5 10:9 13:6,19 14:22 15:3,12 242:16 252:22 258:17 260:20 262:5 274:12 299:5 302:24

**covers** 232:1

**CPM** 61:13 132:18 137:15,16 139:4,5 147:5,6 246:11,15 257:12

**CPMS** 147:2 151:3 168:20 205:19

**crazy** 45:21,23,24

**create** 38:9,10 81:12,16 104:11 196:13 245:11,14 282:3

**created** 30:9,12 62:22 198:22 232:6 240:20,22 242:5 253:10 263:17,22 265:8 279:21 304:8

**creates** 80:9 135:12

**creating** 172:6 282:4

**creative** 51:10 52:3 263:10 272:13 283:13 296:4,22

**creatives** 26:7 54:7 55:16 243:19 265:19 273:23 279:15 281:23 282:1, 3,4 286:4,8 297:9,23,24 298:5,8,9 310:9

**creator** 281:13

**Criteo** 141:21

**criteria** 270:17,20 271:5 272:19,20

**cross** 70:7,10 156:3

**cross-reference** 121:22

**crossed** 258:2 313:17 314:1

**crossing** 101:9

**CTR** 295:9 301:5 303:11

**current** 125:16 256:11 298:23

**custodian** 265:7 269:11 304:9,23 306:11

**customer** 55:7,9 141:7 223:21 256:4

**customers** 36:9 37:24 46:20 59:21 140:5,23 195:18 196:2 221:16 222:24 223:16,18 225:17 231:18 289:14

**cut** 197:23 279:7

**cuts** 197:24

D

**daily** 9:20 261:18

[redacted] 9:3

[redacted] 10:10

[redacted] 68:22,23 69:1,6

**DART** 25:5,11,13,17,18 26:10,21 250:10,11,12

**dash** 76:22 122:2 156:2,19 158:23 169:22 175:10

**data** 79:23 84:17 85:19,20 89:10 91:9,11 92:15 149:10,14 152:23 153:3,15 154:4 155:4 172:24 176:12 177:11,12 196:23,24 197:2,5 245:12 246:18 247:20,23 248:2

**date** 9:6 10:24 39:10 194:20 226:13 265:7 278:4 285:5 291:18 305:16

**dated** 80:4 255:1 260:12 288:15 293:19

**dates** 20:5 34:20,21 62:21 117:6 161:14 203:3 226:14 251:14

[redacted] 79:10,14

[redacted] 79:15 90:6 260:19

**day** 44:1 47:5 239:21

**DBM** 58:11,12,18,21,24 59:4,11,16, 17,18,20 60:11,15 86:5,8 89:21 90:9 109:19 309:1 310:8 311:1

**deal** 37:23 117:18 129:6 255:21 313:2

**dealing** 276:14

**deals** 94:6 198:18

**debates** 102:7 219:3,5 220:19,23

[redacted] 68:20,21,24 69:6

**December** 205:4,13

**decide** 102:7 216:19

**decided** 73:18,22

**deciding** 104:17 132:18 173:24

**decision** 62:2 128:10 138:14 164:16, 21 168:2 174:2 175:24 176:5 307:18 308:2,3,20 310:3,14,24

**decisioning** 163:8,11,14 167:11

**decisions** 18:20 20:16,17,20 40:12 311:7,12

**deck** 156:18 161:11

**decks** 148:21 154:20 155:16

**decrease** 102:5

**decreased** 168:20

**decreasing** 287:11

**dedicated** 275:18

**defending** 49:1,18

**define** 227:9 243:11 261:10

**defined** 90:8 214:9

**defining** 162:20 227:10

**definition** 57:17 112:7 113:15,17,19 162:23,24

**definitions** 115:18

**degree** 106:10

**delay** 18:11 39:22

**delete** 314:23

**deliberately** 204:18

**deliver** 26:9 132:23 136:1 137:24 245:5

**delivered** 130:16,17 245:5 296:19

**delivering** 132:16 138:1

**delivery** 189:16 296:20

**demand** 31:8,9 53:11,17 54:14 55:4, 8,11,14,15,18,23 56:6,22,24 57:5,15, 17 103:15 167:12,16 173:5,17 174:9, 13,18,21 209:18 210:3,14,20,22,24 211:2,4 320:9,16

**demonstrating** 191:17

**Department** 10:22 11:5

**departure** 182:20

**depend** 198:21 297:17

**depended** 298:2

**dependency** 291:7,24

**dependent** 280:6

**depending** 52:2 167:2 198:8 231:21

**depends** 208:7 232:12

**depicting** 168:11

**deployed** 94:1,4

**deployment** 209:11,14

**deponent** 9:12

**deposed** 10:21,23 12:17,20

**deposition** 9:5,9 11:3 16:10 17:9,17 180:4 193:13 322:15,17

**Depot** 104:10

**deprecate** 279:23 280:8,14 285:18, 24 291:21

**deprecated** 278:22 279:14,19

**deprecation** 283:20,24 291:2,12,15 294:17 303:8 306:7

**Deringer** 10:3

**describe** 70:6 71:6 153:12 155:2

**description** 24:18,19

**design** 233:9 240:14,16 241:15

**designed** 25:19,21 236:8 240:18 266:6,14

**designer** 266:8 281:7 282:11,13

**desirable** 225:3 227:16 228:1,9,19

**desire** 227:17

**desired** 215:19

**desks** 31:6 32:23

**desktop** 79:18 86:21 87:24 91:20 287:12 307:19,21 310:15 311:1

**desktops** 301:13

**Detailed** 298:23

**details** 11:11 186:8

**detect** 206:24 207:2

**detected** 206:22

**determine** 275:22 283:3

**determined** 129:14,19 137:16

**determining** 36:1

**develop** 195:23 196:1 240:16 241:4, 7 242:11,23

**developed** 29:6 37:22 154:10 161:18,20 222:10 241:13,19,22 242:8 248:10 271:5,23 309:21

**developing** 32:15,19 199:19

**development** 25:4 29:4 194:7 196:9,19 219:1 222:5 238:5

**developments** 41:11

**device** 87:2

**DFP** 40:11 103:13 127:8,12,18 128:5, 9 136:24 140:3,5,18 141:1,3,9 155:10 194:24 213:12,20 214:4 217:15,22 220:4 222:23 223:4,12 224:3 229:15, 18 230:4 231:14 233:9 235:16 236:13,16,18,20 243:4,17 244:24 251:4,11,17,20 252:3,17,18 253:2,4,8 256:22,24 257:3,4 279:5 282:23

**difference** 29:19,22 61:6,16 105:2 110:4 179:24 270:16,22 271:6 273:16

**differentiates** 87:5

**differentiating** 105:14

**differentiation** 76:4 106:17,20

**differentiator** 52:17,19 53:1,4

**differently** 116:15,18

**difficult** 13:19

**digital** 9:11 48:1,3,6 69:2,15,18,24 178:21 262:20

**direct** 30:24 31:1 48:8 61:14,20 62:4, 10 94:7 117:14,16,17 118:7,11,12,18, 23 165:3,20 166:12 167:13,16,20 198:13,14,17 202:20 260:15 265:23 266:19 268:2 288:24 289:3,6 298:10 300:3 305:1 308:9 309:24 316:16

**directing** 268:12,14 285:2 306:21 307:12

**direction** 33:17 34:6 35:14,15 194:6

**directly** 19:2,5 30:14,20 119:3,19 163:22 245:14

**director** 27:18,21 28:6,11,18,19,20, 21 33:15,23 35:5 37:14,18 123:9,10 193:23

**disagree** 230:19

**disagreeing** 233:19

**disagreements** 218:22 233:5,11,15

**disallow** 33:3 204:15

**disappointing** 230:8

**Dischler** 45:16

**disclosed** 129:9,12 319:16,17,21

**disclosing** 157:11,13,15

**disclosures** 319:19

**discounted** 256:2

**discrepancies** 151:21 160:22,24 161:3 252:12,17 253:3,6

**Discrepancy** 176:21 177:19

**discuss** 20:11 45:20 155:11 204:22 218:6 302:3,22 303:2,10

**discussed** 70:16 86:10 137:9 175:4 178:20 179:10,18 180:18 184:12 230:21,23 284:15

**discussing** 126:24 153:10 229:17 230:3 234:7 235:22

**discussion** 73:24 74:4 109:21 180:21,23 221:2

**discussions** 214:16 218:18 219:3,5, 16,24 220:5,7 221:4,17,24 223:2 229:15 233:16

**display** 58:14,16 96:19,21 154:24 287:10 319:8

**displayed** 134:18

**dispute** 153:2

**distance** 41:14

**distinct** 227:13,17,20,22

**distorts** 104:4,5

**distribute** 267:5

**distribution** 239:16 253:15 255:22 257:23 258:2 260:20 294:3

**District** 9:5,6

**dive** 193:20

**DLS** 148:21,24 154:19 155:16

**doc** 295:3 297:10,12 299:1

**docs** 294:16 297:14,15

**document** 20:19,23 23:2 47:15 48:17,19 49:2,6,18 50:6,9 67:5,6,7, 16,20 68:1,3,10,15,17 77:20,22 78:2, 7,9,16 92:22,24 93:5,10,11 99:14 108:7,10,15,22 109:1 117:12 120:13, 15,21 121:2,8,12 139:22 143:6,9,17 144:12 169:1,2,6,11,15 178:10,12 186:20 187:5,8,13,15,20 202:1,2,4,8 212:12,16,19 229:1,6,9 249:14,17 253:23 254:2,6,15,21 255:6,10 258:4, 7,11,18 259:1,5,19,20 260:7,10,22 261:2,12,15,17 262:2 264:2,6,13,18, 21 265:2,6,7,9,13,17 268:6,8,10,15 269:11,13,16,19 270:4 277:11,13,19 278:1,15 284:1,4,10,12,14,16,18,19 286:10,13,15,18,22 287:24 288:2,4 290:6,15 292:14,19,22 293:1,5,6,8,9, 16,19 300:19,21,23 303:22 304:2,6,7, 9 305:23 306:2,6,10,15 307:7 311:17, 19,22 312:8,14,21

**documented** 208:1 209:7

**documents** 17:3,6,8,13,15,19 21:2 49:14 76:7 143:2 144:2,8 267:13,14

**dog** 235:15

**DOJ** 178:20 179:1,5,12,19 180:15,20 181:17 185:24

**DOJ's** 185:21

**dollars** 22:10 183:15 195:24

**Doubleclick** 20:9,10,12,13 23:24 24:3,5,9,11,23 25:5,12,15 26:17,21 27:6,7,8,12 28:5 29:5,6,7 33:20 34:3, 10 35:16 38:2,6 45:3,4 58:13 86:9,11 108:3 148:8,11,13 149:1 239:24 240:4,8,9,12,14,19 241:4 242:10 243:3 244:8,11,19 245:23 246:2,23, 24 247:2 249:6,11 250:13 281:4,5,6 282:16

**Doubleclick's** 248:15

**doubling** 301:15

**DPF** 222:15

**draft** 169:16,18 171:22 172:15 314:13,19,22

**drafted** 308:16 314:16,24 315:6

**drafts** 73:16

**drag** 244:5

**drive** 215:18

**driver** 60:14

**driving** 60:12,13

**drop** 100:5,11 101:6,16 254:15 277:11 283:8 284:2 290:6 303:11

**dropped** 101:14 267:15

**dropping** 283:11 301:4 303:16

**DRX** 155:10 250:24 251:1,4

**DRX-PM** 144:14 155:5

**DSP** 31:7,8,19 32:8,16,20

**DSPS** 31:6,22 32:3,7,23

**due** 173:16 174:13,21

**duration** 263:10

**DV360** 19:18 31:13

**DVM** 307:21

**dynamic** 26:15 128:6,10 163:15,18, 19,20 165:24 199:1,5

## E

**e-mail** 49:18 50:10,11,12 55:22 57:21 62:23 67:21,22 68:18,24 69:5, 8,11 70:4 71:12 73:9 78:17,19,22,24 79:8,9 80:3 93:14 96:12 99:15,20 102:19 109:14,15 110:11,13 111:4 121:13,19 131:23 139:23 143:3,5,22 144:4,10,13,16,19,21 145:1,5,24 146:14 148:19 149:5 150:8 151:2 153:9 155:5 156:2 161:12,14 188:14, 17 202:9 203:2 209:8 212:20 213:5 255:1,4 257:8 258:1 269:23 270:2 278:3,4,7 279:1 280:11,23 281:2,3 282:14 284:20,22 285:2,5,17 287:2,4, 5,6 288:9,10,12 289:7 294:7,15,19 300:8 302:4,8,15 303:3,4 306:23 307:2,13 308:10 312:9,10 313:3,8

321:16

**e.g.** 164:18 167:13

**earlier** 14:22 70:17 86:10 126:24 178:19 193:15 202:16 204:21 205:1 252:10,12 316:1 318:21

**early** 149:10 198:21 238:5 252:5

**Earnhardt** 9:22,23 193:7,9 212:10, 15 224:19 226:21 227:5 229:3 239:2

**easier** 128:1,3,4 178:2 224:11 243:18 281:22,24 288:9

**easily** 232:6

**easy** 115:4 234:15

**economics** 23:12,13,15,16

**ecosystem** 47:23 48:2

**ecosystems** 110:6

**ecpm** 138:23 139:3 256:4 257:8,11

**EDA** 147:2 164:18,20 165:2,6,9,12, 17,19 166:5,7,14 167:2,6,15,19 168:9,18 175:11,23 177:6,11

**effect** 221:5,7,13,18 283:10

**effectively** 107:4 128:2 301:4 303:11,16

**effects** 221:10,11 222:8,13

**effort** 278:20 280:23,24 282:18 286:3,5 309:12

**Eisar** 18:3,4,18,22 19:7 286:22 287:2

**either/or** 138:14

**elasticity** 320:4,6,8,11,14,17,24 321:1

**electronic** 49:8

**Electronically** 17:14

**elements** 48:10 54:8 56:2 62:10 196:10,18 197:10,15,17 201:4,11 217:22 218:19 276:18 283:4

**Eligibility** 265:9

**eligible** 266:20,21,22 267:2 268:3,4, 7,20 273:23 301:14

**Elmer** 10:1 18:11 21:2 49:17 67:12 194:23 197:4,9,20 199:2,7 200:6,12 201:8,13,21 203:12,21 204:24 207:16,21 208:6,16,23 209:22 210:16,23 211:3,10,15 212:1 214:14, 21 215:7 216:23 217:1,12 218:24 219:10,15,21 220:3,12 221:6,12,20 222:14,20 223:14,20 224:4,9,17,24 225:5,9,15 227:10,19 228:5,11,21 229:23 231:1,20 232:4,11 233:21 234:2,8,23 235:4,11 237:11 238:4 246:20 247:6,15,22 251:5 252:7,19 253:9 254:8 256:13 257:24 258:10,16 259:18 261:9 262:17 263:16 264:11 265:16 267:11 269:6 270:24 271:8 273:14 275:7 276:22 280:22 284:9 285:22 289:21 291:3,14,22 292:11 294:14 296:10,18 297:8 300:24 302:6,10,16,19 303:5,12,18 305:15 309:4 310:6,17,21 311:3,10 314:17 315:2 317:9,18 318:9,24 320:5,10,20 321:9,13,17 322:13

**EMEA** 160:1

**emphasized** 211:13

**employ** 275:12 276:9

**employed** 21:5 274:10 275:22

**employee** 266:13 289:10,12 314:7

**employees** 255:3 274:8,17,24 275:6 293:20 294:12 300:16 306:24

**enable** 46:24 210:4 280:2

**enabled** 112:13,24 113:7 269:1

**enabling** 278:8,11 280:13

**encapsulated** 238:23

**end** 35:5 40:12 58:7 59:10 60:5 70:23 76:8,21 78:13 93:13 110:7 123:6 273:4,6,10 280:3,4 285:19 288:9 322:14

**ended** 58:4 73:14 217:2,6 232:5 234:14

**ending** 202:21 268:3

**ends** 169:22

**enforce** 63:7,8 135:2,5 137:20,23 206:11,19

**enforceability** 271:11,18,21

**enforced** 63:23 205:21 206:16,20,23 271:19 272:15

**enforcement** 272:19

**enforcing** 238:12

**engaged** 157:2

**engine** 164:16,21

**engineer** 308:12

**engineering** 212:23 220:20 221:21 222:6

**enhanced** 163:15,18,19

**enlist** 150:2

**enlisted** 149:20

**ensure** 35:23 37:20 154:9 165:23 209:5,20 271:23 278:20 279:4 280:17 316:21

**entail** 181:5 243:3,8

**enter** 243:19

**entered** 243:18

**entire** 53:13 284:13

**entirety** 24:24 68:10 272:12

**entities** 33:8 63:17,20

**entitled** 304:18

**entity** 33:11 112:8

**entrants** 228:16

**entry** 88:1 193:23 244:3

**equals** 170:11 171:7 175:12

**established** 192:10

**estimate** 61:12 139:7

**estimated** 139:4,5 257:11 305:14,16

**estimating** 61:1 132:17

**estimation** 61:24

**events** 44:11

**eventually** 78:20 79:1 103:10 217:22 231:23 235:23 244:16

**evolved** 110:6

**exact** 203:3 225:20

**examination** 10:15 68:5 193:6 239:11 315:17

**examined** 195:21

**Excel** 244:1

**exception** 268:9

**exceptions** 268:16,19,21 316:15

**exchange** 20:10,13 29:5,6,12,16,18, 20,23 30:6,14 32:8 33:4,9,12,21 34:3, 10,15 35:16,23 36:3,17,21,23 37:3 38:2,6,11,22 39:13,16,17 40:5,10 41:2,12 53:10,17 54:13 55:4,10 56:7, 12 61:15 62:11 70:7,11 82:2,4,23 90:15,17,23 94:21,24 95:20 101:1,6 103:10,20,23 104:3 105:13,21,22,24 108:3 109:22 110:8 111:12,16,21,24 112:5,7 113:13 114:14,17 115:1,4,5, 7,10,11,14,16,20,22 116:7,24 117:8 118:3 119:6 122:12,16 123:15,18,19,

22 124:2,11,12,18 125:2,5,10,17,18 129:6,17 130:14 131:3 132:15,19,21, 22 133:20,24 134:8 135:1,7,11,16,24 136:9,16 137:24 138:2,18 139:8,9 141:15,16,23 142:3 155:10 162:4,16 165:24 166:3 194:16 198:18,22,23 210:7 212:24 213:3 216:6 222:23 227:11 228:14 231:15 233:10 237:2 251:2 252:3 257:4,5 281:6 282:17 316:11,13 319:2

**exchanges** 30:8,11,22,24 31:3 32:13,15,24 37:5 48:8 50:21,22,23 51:14,17,19 52:3,23 55:17 58:23 59:11,16 60:18 64:19,22 65:5,7,11,16 82:20 90:19 96:1 97:4,12,14,18 98:16 101:15,22 103:17 136:19 141:11,14, 17 142:6,10 161:23 162:1 168:21 203:23 204:9 228:10

**excluding** 180:18

**exclusive** 211:2,5

**excuse** 22:5 80:22 161:11 167:17

**Executive** 160:5

**exhibit** 22:21,23 23:3 48:19,22 49:2, 9 50:7 67:6,7,16 77:22 78:2,11 92:24 93:4 96:11 108:9,10,15 109:12 120:14,15,21 143:2,3,4,6,9,16,17,20, 21 144:6,7,11 145:13 146:1,9 156:19 161:13 169:2,6 187:5,8 193:21 201:24 202:1,4 212:11,12,16 228:23 229:1 249:15,17,22 252:11,21 254:1, 2,6,8,12,13 258:5,7,19 259:1,7,9 264:2,7 269:11,13 277:12,13,19 284:3,4,11 286:11,15 288:1,4 290:8 292:16,20,22 293:1,4,8,12 299:16 300:3,7 303:23,24 306:11,13 310:1,3 311:18,19,22 312:2 321:5

**exhibits** 108:19

**exist** 19:19

**existed** 63:2 248:21,22

**existing** 183:10

**Exline** 254:11

**expect** 81:17 116:14 139:10 151:16 157:22 178:24 179:4 180:13,14 191:19 301:11

**expectation** 86:15 130:1 138:20 139:19 152:14 153:24 154:4 158:3 180:16 189:16 223:11

**expectations** 190:4

**expected** 81:10 152:10 222:16 273:8 286:5

**expects** 137:24

**experience** 157:23 217:14 218:1 228:8,12 267:8 283:15

**experiences** 309:13,23

**experiment** 307:5

**expert** 263:12

**explain** 53:6 74:1,7 165:19 166:7

**explaining** 130:21

**explanation** 111:18

**explicit** 184:4

**explicitly** 167:19 204:14 206:10

**exploring** 202:23

**expressed** 172:13

**extent** 12:5 41:4 103:13 178:13 179:14 211:4 214:17 215:9

**external** 80:18 286:1 287:21 291:1, 11,19 305:5,21 306:4 314:8,14

**externally** 73:19,22 75:15 79:23 80:8,12,21 81:3 251:22 252:4 280:13 289:16,20 290:1 294:19

**extra** 211:22 212:2

**extracted** 247:14

[redacted] 212:20,22,23 221:18,21 222:3,4 229:10 230:7 234:18 238:11

[redacted] 229:21

**eyes** 194:2

F

**Facebook** 109:22 110:7 113:7,9 114:13 116:23

**Facebook's** 115:10 117:2

**Facebook.com** 262:20

**facilities** 200:18,21,22,23

**fact** 52:21 113:6 115:7,24 227:21 274:1 275:17 282:5 296:9 314:15

**factor** 81:21,24 82:1 168:3

**factoring** 97:22 98:21 99:1

**factors** 104:22 105:8 166:19,20,24 167:2,5 195:14,20 197:14

**fair** 97:11 224:7 251:3 269:4 280:19 289:19 306:2 311:6

**fairly** 114:3

**fall** 151:21

**familiar** 13:3 22:22 31:14 38:14 117:14 119:8 141:21 198:24 253:15, 18 293:14 294:3 300:22 302:7,14 316:23 318:3,5 320:3

**familiarize** 78:7 120:18 144:2 187:13

**familiarizing** 73:2

**fashion** 317:12

**fast** 187:2

**fast-forward** 168:5

**Faulk** 248:22 249:2

**FBX** 109:24 110:2,18 111:1,2,11,16 114:13,17 115:1,3,16,20 116:24 117:2

**feature** 54:17 166:12 176:4 195:24 198:3,4,7,8,10,24 199:5,8,15,19,21 200:3,7,8 209:18 210:8,11,22 211:2 241:13 289:15,23 297:17 317:5,6,10 318:2,20

**features** 35:22 36:1 37:10,21 54:4, 11,12 94:1,3,6 195:17 198:11,20 222:9 227:14,18,20,22 240:16 241:4, 7,15 242:8 245:10,17,20,21 246:10 248:9 249:9

**February** 181:16 182:7 213:6 286:23 287:19

**fee** 246:6,7,15,16 248:7,12

**feed** 321:6

**feel** 68:11

**felt** 45:21

**Feminine** 248:21

**figure** 35:21 59:22 102:2 219:3 234:10 280:15

**figured** 215:1 243:13

**figuring** 214:10 243:10

**file** 281:13,17

**filed** 178:20

**files** 320:19,21

**filled** 247:3

**final** 74:13 186:19

**finance** 201:18,19

**financial** 195:20

**find** 137:12 169:24 228:8,19 288:8 301:23

**finding** 51:7 147:8,14 151:6,11,14, 15,19,24 152:2,5

**findings** 145:8,14,20,22 146:1,20,24 148:8 150:22 153:8,12,16,18 156:11

**fine** 259:16

**Fingers** 313:16 314:1

**finish** 13:15 93:12 186:24

**finished** 24:2 68:15 93:14 187:20

**firm** 9:19 10:2 193:9

**fish** 250:10

**fist** 97:24

**fit** 85:12,14

**flag** 207:6

**flagged** 172:17 173:5 273:12

**flagging** 272:20

**Flash** 278:22 279:14,21 280:6,8,10, 14,18 281:17,19 282:5 283:2,5,9,11, 12,13,21,24 285:8,18,24 286:4,8,24 287:11,15 288:18,22 291:2,5,7,12,16, 17,21 292:1,10 294:17,24 295:10,12 296:4,7,13,22 297:9,21,23 298:5,23 301:4,12,20,23 303:8,10 306:8 307:19,20,22 310:4,9,11,14,24

**Flashless** 278:9,12 280:2,21 307:4

**flat** 246:6,15

**flavors** 235:24

**flexibility** 225:6,8,14,17 232:22,23 233:2,6,12

**Flexner** 9:23 193:10

**flip** 121:20

**floor** 131:17 136:3 166:2 207:24 317:5,7,11

**floors** 209:1

**flowed** 51:14,16,19

**focus** 39:14 62:3 121:21 244:21

**focused** 40:10 43:7,18 61:19 110:9 197:16

**focusing** 292:6

**follow** 135:20 137:7 313:22

**food** 200:19

**footnote** 173:9,10,12 174:18,20

**footnoting** 174:6

**forecasting** 242:11,24 243:2,4 245:19,22

**foreign** 142:4

**forget** 118:8,10 213:4 248:22 273:8 309:24

**forget all** 24:8

**forgive** 247:11

**form** 11:9 12:2 15:10,21 18:9 19:22 20:3,14 21:16 22:15 25:23 27:4,10 29:14 30:7 31:18,20 32:9,17 33:5,10 35:17 36:13,19,24 37:8 38:7,20 39:21 40:8 41:10,15 43:3,14,17,24 44:20 45:2,6 46:3,16,22 47:2,8 48:15 51:15 52:1,11 53:12,19 54:15,19 55:5,12,19 56:10,18,23 57:8,16 58:17,19 60:2,10 62:5,18 63:1,6,11 64:6,13,23 65:22 70:9,19 71:5,9,13,24 72:9 73:8,17,23 74:9 75:4,7,12,19 76:6,11 77:12 80:19,24 81:4,13,19 82:6,10,17 83:3, 13,21 84:2,8,16,22 85:8,16,21 86:17 87:19 88:22 90:5,10,16 91:1,6,23 92:9,13,19 93:21 94:5 95:8,21 96:3 97:5,19 98:3,18 99:11 100:12 101:2, 8,17,24 103:16 104:1,14,19 105:10, 23 106:14,23 107:9,21 110:23 111:17 112:3,6 113:5,14 114:1,15,20 115:2, 8,17,21 116:10,19 117:1 118:2,9,14 119:5,24 122:23 123:7,11,23 124:14, 21 125:3,13,15,24 126:6,15 127:1,14, 20 128:8 129:5 130:3,6,13 131:12,15 133:13 134:1,11,23 135:3,9,17,23 136:11,17,22 137:2,10,21 138:6,17 139:18 140:1,8,13,22 141:5,12 142:5, 11 145:17 146:3,22 147:9,18 149:3, 18,23 150:5,16,23 151:8,13,17 152:1, 7,11,16 153:1,5,11,20 154:1,17,21 155:14,19,23 156:7,13 157:24 158:13,19 159:11,18 161:2,9 162:2, 19 163:12,16 164:22 165:1,7 166:6, 16 167:4,18 168:1,14,22 169:19 170:15,23 171:3,13,21 172:5,14 173:6,22 174:5,10,19,24 175:5,17,22 176:3,9 177:10,17,22 178:6 179:23 180:6,11,22 181:2,7,18,24 182:9,23 183:9,14,16,19,24 184:3,7,19,22 185:2,8,12,18,22 186:5,11,16 188:19 189:3 190:18 191:10,23 192:14,18 194:23 197:4,9,20 199:2,7 200:6,12 201:8,13,21 203:12,21 204:24 207:16,21 208:6,16,23 209:22 210:16,23 211:3,10,15 212:1 216:23 217:1,12,18 218:24 219:10,21 220:3, 12 221:6,12,20 222:14,20 223:14,20 224:4,9,17,24 225:5,9,15 227:10,19 228:5,11,21 229:23 231:1,20 232:4, 11 233:21 234:2,8,23 235:4,11 237:11 238:4 246:20 247:6,15,22 251:5 252:7,19 253:9 256:13 257:24 261:9 262:17 263:16 265:16 269:6 270:24 271:8 273:14 275:7 280:22 285:22 289:21 291:3,14,22 292:11 294:14 296:10,18 297:8 300:24 302:6 303:12,18 305:15 309:4 310:6,17 311:3,10 314:17 315:2 317:9,18 318:9,24 320:5,10,20

**formally** 239:16

**format** 263:12,14,17,22 279:15 281:17

**formats** 54:7 279:17 298:24

**forms** 30:1

**forthcoming** 15:12

**forum** 18:8,10,14,15,16,19 19:3,17 20:13 319:23

**forward** 77:2 80:3 154:15 160:3 288:20 307:10 312:12

**forwarded** 69:1 79:1 307:3

**forwarding** 144:18

**found** 273:20 299:1 309:2,7

**fraction** 196:23

**fractional** 196:12

**frame** 19:23 198:21 241:1,21 242:6 250:21 251:10 295:13

**Framework** 170:2

**France** 121:17 140:2 141:8

**fraud** 272:23 274:10,18 275:4,9 283:18

**fraudulent** 274:20

**free** 68:11 256:3

**French** 122:5,6,22 139:24

**Freshfields** 10:3,6

**front** 15:3 109:12 191:6

**full** 16:6 24:24 25:14 74:16 89:18 161:17,24 162:5 212:3 262:2

**function** 31:24 132:23 281:15

**functional** 156:3

**functionality** 35:22 36:2 37:11,22 54:4,11 60:4 62:11 139:15 195:17 241:15 244:9,23 249:8

**functions** 245:8

**fundamental** 240:17,18

**future** 44:21 45:1 181:13 238:12

243:6 278:9,13 280:2,21
**FYI** 150:9

G

**G00g-doj-0991660** 49:4
**gain** 211:18 215:17,24 216:11,15
**GAM** 217:10 251:12,19,22 252:4,8
**Gannett** 9:20 159:14,16
**garden** 113:9,12,16,18,20,24
**gave** 27:20 280:9 322:9
**GDN** 71:14,16,19,20,22 72:1,5,7 79:18 80:8,9,22 81:3,8,11,12,18 82:5, 7,9 83:2,8,12,20 84:1,6,7,14,20 85:7, 24 87:9,15 88:1,13,20 89:4,5,21,24 90:9,13,22 91:4,13 92:6 95:5,9,17,20 97:11,17 98:11 99:24 101:4,5,14,21 103:22 104:12 319:3,5
**GDN's** 95:12,15,24 97:4 99:3
**general** 44:14 46:18 53:22 76:14 190:19 194:7 203:13,15 246:9 266:6 275:8
**generally** 51:23 200:11
**generating** 301:13
**generic** 185:13 186:1,2
**get alignment** 313:16 314:1
[redacted] 308:11
**give** 13:10 44:9 49:19 57:9 63:13 75:10 88:10 106:2 143:12 150:3 204:15 242:5 254:4
**giving** 16:6
**global** 149:11,15,21 152:20 156:3
**goal** 105:12 208:8 209:16,20,23 210:1,18 245:6 280:1,4
**goals** 215:19
**good** 9:18 10:17 39:23 66:13 78:12 79:24 151:19 154:19 186:22 193:17 199:15 218:5 225:6 239:13 251:13 298:12,17 315:19
[redacted] 79:14,15,17 91:17
**Goodnow** 9:18,19 10:16 15:24 20:22 21:4,21 22:5 49:12,20 50:4 66:8,12, 17,19 67:3,13 68:2,13 78:1 100:20 109:3,11 121:6 133:8 142:14,23 169:5,24 171:17 178:16 179:16 186:24 187:3,19 193:14 202:17

**GOOG-AT-MDL-0003083652** 264:3,9
**GOOG-AT-MDL-004344298** 143:7, 19
**GOOG-AT-MDL-004344299** 143:20
**GOOG-AT-MDL-004344300** 143:10,23
**GOOG-AT-MDL-004344314** 143:24
**GOOG-AT-MDL-010668643** 187:6, 10
**GOOG-AT-MDL-010668656** 187:11
**GOOG-AT-MDL-013405085** 169:3, 8
**GOOG-AT-MDL-013405101** 169:9
**GOOG-AT-MDL-014082831** 67:8, 18
**GOOG-AT-MDL-014082832** 67:19
**GOOG-AT-MDL-014515755** 93:1,7
**GOOG-AT-MDL-014515757** 93:8
**GOOG-AT-MDL-014624939** 269:14,18
**GOOG-AT-MDL-014627597** 108:11,17
**GOOG-AT-MDL-014627598** 108:18
**GOOG-AT-MDL-015997478** 258:8 259:2,7
**GOOG-DOJ-02849873** 292:23
**GOOG-DOJ-03064429** 303:24 304:4
**GOOG-DOJ-03756034** 286:16
**GOOG-DOJ-07482759** 293:2,9
**GOOG-DOJ-08479873** 249:18,23
**GOOG-DOJ-09916600** 48:20
**GOOG-DOJ-13327124** 284:5
**GOOG-DOJ-13357360** 311:24 312:2
**GOOG-DOJ-14257049** 229:2,7
**GOOG-DOJ-14271324** 288:5
**GOOG-DOJ-14271826** 77:23 78:4
**GOOG-DOJ-14271830** 78:5

**GOOG-DOJ-14367640** 306:13,16
**GOOG-DOJ-14849643** 120:16,23 121:1,6
**GOOG-DOJ-14849644** 120:23
**GOOG-DOJ-15600216** 202:3,5
**GOOG-DOJ-15616116** 212:13,18
**GOOG-DOJ-32031835** 254:3,7
**GOOG-DOJ-32039637** 277:14,21
**GOOGDOJ-02849873** 293:5
**GOOGDOJ03756034** 286:12
**GOOGDOJ13327124** 284:12
**GOOGDOJ14271324** 288:3
**Google** 9:11 10:2,5,8 11:6,20,24 12:11 18:6 20:6,8 21:5,13,23 22:12 26:17,20 27:1,3,5,8,14,19 28:4,9,16 29:7,11 31:9,14,16,19 33:3,7,9 34:14 42:20,22,24 43:5,10 44:16,19,24 45:9,11,13 46:17,19,20,23 47:1,3,5 49:3 51:12 54:5 55:10 56:7 59:21,24 62:14 63:8 64:5,11 67:16 74:6 75:6, 10,16,23 76:9 78:2,18 80:14,20,21 81:2 84:13 85:13,20 93:5 96:19,20 98:14 100:9 103:21 108:16 120:21 124:23 125:1,20 134:21 135:2 137:20,22 141:16 143:18 147:7 149:16,20 150:2,12,14,18,20,21 151:6,12,16 152:4,20 153:16,17 155:12,17,21 156:6,9 157:2,10,11,13, 14,16,17 158:4,15 159:3 161:6 162:21 169:6 170:12 171:2,8,11,15, 20 172:4,9,12,18 173:15 174:11,23 175:2,12,16 176:10 177:9,24 178:5,8, 21 179:7,10,18 180:18 182:8,11,15, 18 184:12 185:11,16 186:3 187:9 188:3 199:4,23 202:2 203:1 207:20 208:13 212:6,8,17 216:11 217:9,10, 16,17 229:5 233:2,6,12 239:24 240:3 248:17 249:7,10,12 250:20 251:3,21, 23 252:2 255:2,3,11 262:19 263:15, 18,22 265:15 266:13 270:1,6 271:16, 17 274:8,16,24 275:6 278:17 279:10 280:2,13,19 281:7 282:9,10,11,12 283:10,21 284:24 285:13,21 287:8,20 288:13 289:8,10,12 291:2,13,16,20 293:17,20 294:12 297:19,22 298:12, 17 300:16 304:13 306:24 307:9 309:3 312:11,16 314:7,13,16,22,23,24 315:21 316:6,13,18 317:6,23 320:7,9
**Google's** 12:7,18 19:14 40:24 41:1 46:14 60:7 130:5 133:10 158:17,22 164:18 201:12 211:9 221:11,14,19 222:18 278:8,12 310:5 319:16

**Google.com** 155:6 294:1
**Googlers** 314:11
**Gordon** 79:10,12,16 300:8,15
**Gotcha** 23:22
**Grab** 267:1
**gradual** 288:18,21
**grand** 88:4,6,17 91:21,22
**grandfathered** 268:23
**granted** 184:9
[redacted] 121:14,16
[redacted] 121:18 125:14 139:23
**gray** 173:4
**great** 23:9 50:5,9 77:20 78:15 151:14,24 153:8,12,15 169:14 178:9 193:19 321:19
**ground** 13:4 193:15,18
**group** 110:16 149:7 155:20 157:3 158:2 159:6,8 164:23 172:1,2,6 200:24 294:2
**groups** 36:8
**guaranteed** 94:7 316:16
**guess** 64:14 92:21 173:23 215:11 239:22 256:21 273:15
**guidelines** 204:13
[redacted] 144:22 149:5
[redacted] 145:4
**GVN** 265:9

**H**

**half** 21:9 22:10 24:13 182:14 184:21 186:7
**Halfway** 289:13
**handed** 23:2
**handful** 13:4
**handing** 48:21
**Hansen** 9:20
**happen** 79:17 273:18 275:2 305:17
**happened** 53:3 251:15
**happening** 39:1 46:13,15,21 74:23
**happy** 98:15 100:15,17 271:3
**hard** 20:4 63:7 181:8 206:18 213:12 214:1,8 216:20 218:23 219:8,19 220:9,11 221:1,18 222:13 224:1 225:7 229:15 235:14,20 236:3 237:9 270:17,20 271:5,21 316:21
**harder** 216:21 225:13
**harm** 77:2
**harmed** 227:21
**Harrison** 79:10,12,13,16 300:8
**head** 13:11 22:18 201:9 202:18 212:23 213:3,22
**hear** 182:4
**heard** 12:14 14:6 213:10,11 257:22
**hearing** 15:18 18:12 108:13 181:20
**held** 9:9 18:19 180:10
**helped** 215:16 240:7,15 241:3,15 242:11,23 281:16 309:22
**helping** 154:9 279:5
**helps** 144:4 163:21 196:1
**Henry** 315:20 321:13
**Herman** 239:14
**heterogenous** 116:6
**high** 11:17 173:1 272:15,16 273:4
**high-end** 86:21,23,24 87:4
**high-level** 11:18 54:16 199:3 215:6 301:1 302:13,14 317:1
**higher** 75:14 83:5 99:9 167:1 208:11
**highest** 204:6 208:12 262:1,10,13
**highlight** 115:13 172:21
**highlighted** 172:18,22 173:7 175:18,23 177:14,21,23 178:5,7,14
**highlighting** 176:10
**highlights** 153:13 170:12 171:8 175:12
**highly** 82:18 279:23
**historical** 52:16,19,24
**history** 23:11
**hit** 303:8 322:3,9
**hits** 301:19
**hold** 100:20 184:12 289:14
**holdings** 184:8 185:5
**holds** 107:13
**Home** 104:9
**honest** 16:6
**hoping** 187:3
**hour** 66:10,14,18 186:23 276:23
**hours** 16:9 43:22 187:18 321:10,18, 23 322:1,4
**HTML** 297:21 298:13,22 301:6,20,21
**HTML5** 282:5,8 298:5,15,18 301:13 302:1
**huge** 295:8
**hundred** 27:13 163:13 256:19 267:6 273:2
**hundreds** 59:6 201:3
**Hyoun** 96:12,16,17
**hypotheticals** 102:1

**I**

**i.e.** 160:18 162:10
**IAB** 312:18,19,21,24 313:15,23 314:2,8,11,14,15,18,20,22 315:3,5
**ID** 44:6,8,9 45:5 47:12
**idea** 22:6,11 45:21 65:14 83:16 84:4, 23 85:9 86:14 95:4 97:20 98:1,5,8,9 124:7 129:7 140:9 155:24 159:3 179:6
**ideas** 84:12,15
**identification** 22:24 48:20 67:9 77:24 93:2 108:12 120:17 143:8,11 169:4 187:7 202:3,6 212:14 229:2 249:18,22 254:3 258:9 259:3 264:4 269:15 277:14,18 284:6 286:16 288:6 290:10 292:24 293:3 304:1 306:14 312:3
**identified** 10:13 161:1 174:17 175:15 176:2,15 177:8
**identifies** 171:19
**identify** 9:16 57:22 158:9,17 176:4,7 309:22
**identifying** 172:3
[redacted] 187:23 188:1
[redacted] 188:14
[redacted] 188:22
**image** 241:12
**imagine** 243:24

**impact** 52:14 110:18 189:17 191:7 199:5,9,13,17,20 200:2,3,8 222:16 223:7 295:8 301:13 307:5

**impacted** 281:18 291:8 296:15 303:15

**impacts** 139:14,17,19 199:24 222:18 289:2

**implemented** 124:5

**implication** 72:10 159:19

**implications** 297:9

**implies** 91:10 92:16 108:6

**important** 15:5,11 111:11 114:13,16, 19,24 115:6,19,24 167:5 208:3 232:23 233:3 261:7 297:6

**impossible** 206:24 207:2

**impression** 61:13 98:15 99:6 130:2 132:16 136:1 138:1,2,12 243:11 246:7 247:3

**impressions** 92:18 147:6 167:12,16 245:5 253:7 274:20 295:10

**improve** 158:9,17,22 222:10 271:10, 18 309:12

**Improved** 69:2,15,17,24

**improvement** 163:20

**in-house** 10:7 180:19

**include** 31:5 36:21 185:7 194:5 200:4 254:13 260:23 275:3,4,9,10 276:20 281:8 305:11

**included** 18:21 183:7 248:13 284:14 307:3

**includes** 70:12 269:24

**including** 25:5 29:9 80:15 124:24 136:24 137:1 175:11,23 255:3 295:4 306:7

**inclusion** 265:21

**inconsistent** 189:17

**incorporate** 168:24

**incorporated** 168:23

**incorrectly** 115:11

**increase** 101:19,22 102:6 168:11

**increased** 168:20

**indented** 164:9

**independent** 157:3,8,9,12,17 158:1 236:22,23

**index** 261:18

**indicating** 282:19 305:9 308:24

**indication** 207:4 266:3

**indicator** 272:23

**individual** 116:5 201:19 247:5

**industry** 46:18 205:22 313:12

**Inform** 239:15 253:18

**information** 75:15 120:19 143:15 204:10 214:18 247:4,8,11 285:20 294:16

**infrastructure** 197:6 200:16 253:12 292:1

**initial** 76:2

**initially** 245:12 265:19

**innovation** 255:14,18,19

**innovations** 120:7 242:12,24 243:7

**insecure** 279:23 283:17

**inside** 203:17,19

**instance** 81:6

**instances** 206:22

**instruct** 219:15

**instruction** 219:22

**instructs** 14:11

**integrate** 120:2,5 217:9,16 229:18

**integrated** 160:18 161:6 162:10,18 228:3 283:5

**integrating** 204:23 223:11 224:11

**integration** 217:20 219:2 220:1,14 221:23 222:1,15,23 223:3,4,15,22 225:1 229:22 230:3,16 231:22 233:9 235:23

**integrations** 120:8

**integrity** 209:24

**intelligently** 294:24

**intent** 30:13

**interactive** 298:23

**interchangeably** 71:23

**interest** 42:4 43:8,19 44:2,15 45:10 51:8 98:11

**interests** 193:12

**interface** 119:12 195:1 217:15 220:21 228:7 234:15 242:14

**interject** 12:3

**internal** 50:20 129:21 147:20 191:12, 24 250:18 294:11 295:22 305:4 306:3

**internally** 73:21 251:21 294:15

**Internet** 23:5 87:6 312:19

**interoperating** 238:9

**interpretation** 87:21

**interpreting** 92:15

**interrupt** 68:4

**interrupted** 49:24 66:23 109:7 142:19 193:2 227:1 239:7 260:2 267:21 277:5 299:9 315:13 322:7

**interviews** 149:10,15 153:4,15

**introduced** 243:20

**inventory** 30:2 40:23 55:17 56:2,4 61:1 63:16,19 71:20 72:2 77:7 79:18 87:14 90:23 91:3,4 94:12 99:7 105:1, 6 112:13,20,22 113:1,3,4,7 116:4,14, 16 117:3,8,11,19,21 118:1,20,22 119:2 124:1,13,17 129:17 133:19 167:17 168:9 204:7 208:10 242:3 243:5 245:1,4 257:14,18 265:18 271:24 272:1,2,3,4,7,9 275:20 276:16 301:15 307:23 308:24 309:6 310:9 319:6

**investments** 195:13,15,21

**invoice** 245:11

**invoices** 245:14

**involved** 40:11 41:21 42:7 94:20 156:10 206:7 238:2

**involving** 216:24

**iphone** 87:2

**iphones** 87:3

**issue** 313:1

**issues** 36:9 138:5 214:16

**italics** 145:5

**item** 200:20,22 201:3 235:17 236:19

**items** 197:19 201:6,11 243:21,23

**Izaak** 9:22 193:8

## J

**J.W.** 268:22 269:4,7

**January** 41:3

[redacted] 121:14,16,17 122:24

[redacted] 45:16

[redacted] 308:10,11,12,13

[redacted] 96:12,16,17

[redacted] 300:9,13,14

**join** 194:18

**joined** 23:24 24:4 25:12 27:14,16,18, 20 79:3 241:2

**joint** 194:17

**Jonathan** 19:4 40:4 99:17 220:1,4 221:2,10 226:2,4,15,17,18 312:11,13 314:7,13

**Jones** 239:14

**judge** 15:3 180:4,7

**judges** 180:10

**judgment** 270:17

**Julie** 10:1 277:2

**July** 293:19

**jumping** 254:22

**June** 9:7 161:14 290:19 291:11

**junior** 23:21

**jury** 15:3

**Justice** 10:22 11:6

**Justin** 10:7

### K

[redacted] 144:18 154:5

**keeping** 48:12

**Kellogg** 9:19

**Kelston** 121:4 315:18,20 319:14 321:4,11,15,19

**Kenina's** 18:12

**key** 57:22 81:21,24 82:1 209:18 210:8,11,22 211:2 260:11

[redacted] 202:12,13,14

**kicked** 280:23

[redacted] 96:12,16 266:11 300:9,15 302:5 303:4

**kind** 51:13 60:8 87:2 110:11 151:11, 15 170:21 182:19 207:23 208:4 220:13

**kinds** 37:10 51:18 186:13 199:24

[redacted] 202:9

**knew** 65:23 66:5 81:10 83:19

**knowing** 83:23 119:1

**knowledge** 15:17 16:3 92:14 95:14 180:8 204:14 208:24 241:24 256:24 266:5,16 271:4,12 273:17 275:11 278:23 281:21 290:24 291:10,19 293:15 297:19 310:10,19,23 314:6, 12,21

### L

**labeled** 48:19 67:7 77:22 92:24 108:10 120:15 143:6,9 169:2 187:5 202:4 212:12 229:1 249:17 254:2 258:7 259:1 264:2 269:13 277:13 284:4 286:15 288:4 292:22 293:1 321:5

**laid** 182:7,11,15

[redacted] 300:9,14,16

**landing** 295:16 300:1

**language** 164:5 279:22

**languages** 276:15

**Laptop** 290:9,22

**large** 32:3,23 114:2 146:13 156:3 159:1,4,8 182:16 197:23 256:10

**larger** 92:7

**launch** 206:8

**launched** 198:3,7,15 199:6,11

**launches** 305:20

**law** 193:9

**lawsuits** 178:20

**lawyer** 16:22,24 49:1 179:17 180:12

**lawyers** 12:7 16:18 21:10,13

**layer** 217:20

**layoffs** 182:17

**lead** 220:4 226:5

**leader** 190:13

**leaders** 72:16,21 73:2 148:12

**leadership** 72:24 145:9,16 147:23 148:1,3,5,8,11 149:1 154:24 190:14 192:10

**Leading** 191:6

**leads** 18:5,19 19:7,9

**leak** 74:17,21 75:1,10

**leaked** 75:15

**learn** 36:11,14,22 37:4,9

**learned** 37:1,10

**leave** 21:8

**Led** 149:6

**LEE** 11:9 12:2,13 15:10,15,21 18:9 19:22 20:3,14 21:16 22:15 25:23 27:4,10 29:14 30:7 31:18,20 32:9,17 33:5,10 35:17,20 36:13,19,24 37:8 38:7,20 39:21 40:8 41:10,15,17 43:3, 6,11,14,17,24 44:20 45:2,6 46:3,16, 22 47:2,8,10 48:15 49:5 51:15,20 52:1,11 53:12,19,24 54:15,19 55:5, 12,19 56:10,18,23 57:8,16 58:17,19 60:2,10 62:5,18,20 63:1,6,11,13 64:6, 13,23 65:22 66:16 67:23 68:8 70:9,19 71:5,9,13,17,24 72:9 73:8,17,23 74:9 75:4,7,12,19 76:1,6,11,16 77:12,17 78:8 80:19,24 81:4,13,19 82:6,10,17 83:3,13,21 84:2,8,16,22 85:8,16,21 86:17 87:19 88:10,22 89:8 90:5,10,16 91:1,6,23 92:9,13,19 93:9,21 94:5 95:8,21 96:3,8 97:5,19 98:3,6,18 99:11 100:12 101:2,8,17,24 103:16 104:1,14,19 105:10,23 106:2,14,23 107:9,12,21 108:1,19 109:1 110:23 111:17 112:3,6 113:5,14 114:1,15,20 115:2,8,17,21 116:2,10,19 117:1 118:2,9,14 119:24 120:24 121:8 122:23 123:7,11,23 124:14,21 125:3, 13,15,24 126:6,15 127:1,14,20 128:8 129:5 130:3,6,13,20 131:12,15 133:13 134:1,11,23 135:3,9,17,23 136:11,17,22 137:2,10,21 138:6,17 139:18 140:1,8,13,22 141:5,12 142:5, 11 144:6 145:17 146:3,22 147:4,9,18 148:18 149:3,18,23 150:5,16,23 151:8,13,17 152:1,7,11,16 153:1,5, 11,20 154:1,17,21 155:14,19,23 156:7,13 157:24 158:13,19 159:11, 18,22 161:2,9 162:2,19 163:12,16 164:22 165:1,7 166:6,16 167:4,18 168:1,14,22 169:10,19 170:15,23 171:3,13,21 172:5,14 173:6,22 174:5, 10,19,24 175:5,17,22 176:3,9 177:10, 17,22 178:6,11 179:13,23 180:6,11, 22 181:2,7,18,24 182:3,9,23 183:14, 16,19,24 184:3,7,19,22 185:2,8,12, 18,22 186:5,11,16,21 187:14 188:19 190:18 191:10,23 192:14,18 198:2 217:18

**left** 45:11 86:20 91:13 94:23 120:8,10 126:1 168:6 177:13 182:18 208:18

226:11,19 297:24 315:24

**left-hand** 170:5

**legal** 15:7 213:16 214:12,16 215:3,5

[redacted] 10:4 294:5 322:8

**lesser** 106:10

**level** 11:17 217:14

**leveraging** 163:8

**Lexitas** 9:4

**liaisons** 313:11,12

**license** 44:10

**life** 290:9,21 292:7

**liking** 237:15,20

**limiting** 123:20

**limits** 263:9,11

**lines** 189:12 308:13

**linked** 297:12 299:2

**Linkedin** 22:23 23:4 28:12 33:13 40:17 193:22

**Lipkovitz** 286:23

**list** 64:18 161:4 207:8 294:4

**listed** 23:16 28:11 153:13 159:14,20,24 171:23 174:7 187:23 190:19 261:4 265:20 268:16 269:5 281:11 311:7

**listing** 262:19

**lists** 40:14

**LISTSERV** 155:8

**litigation** 9:12,24 20:24 21:3 49:3 67:17 78:3 93:6 108:16 120:22 143:18 169:7 185:11,17 186:4 187:9 193:11 264:8 269:17 277:20 284:13 286:14 288:2 293:7,10 304:3 306:16 311:20,24 315:22

**live** 305:13 321:6

**LLC** 274:8,16,21,24 275:6

**LLP** 193:10 239:15

**loaded** 291:5

**logged** 295:10 296:8

**logging** 223:1

**logic** 124:7 128:10 308:15,19,20,23 309:2,8

**logical** 276:23 277:1

**login** 217:15,21

**Lohaus** 9:3

**London** 23:13,16 147:15

**long** 11:22 24:7,10 44:21,24 66:8 131:4 213:15 239:21 301:11

**longer** 21:5 38:22 195:5 204:11 249:1 280:5 310:8

**Longtail** 268:22 269:4,7

**looked** 52:3,6 63:24 68:14 92:20 167:1,19 199:8,12,16 264:17 273:21 274:3

**loophole** 204:17

**lose** 165:23 166:3 249:8

**loss** 192:11 195:12 281:19

**lost** 128:15 172:24 192:20 252:21

**lot** 166:11 243:12

**lots** 62:13 85:3 211:11 216:9 218:4 220:22 228:16,17 235:23

**love** 213:13

**low** 173:1 208:9 237:12,14,19,23 273:6

**Lowe's** 104:10

**lower** 83:6,12 99:3 104:13 167:22 256:4

**lowered** 101:21

**Luxembourg** 72:19

**lying** 66:5

**M**

**m-i-n-s** 131:20

**M43** 287:15

**machines** 197:6,7

**made** 52:8 75:23 128:1,3 151:6 153:16 166:1,2 167:21 207:19 220:14 224:11 232:6 281:22 306:4 307:18 308:2,3 310:4 318:7,16

**Magnolia** 309:11,12,14,16

**Mail** 9:20 159:21,24

**maintain** 173:16 174:13 210:7 217:5 225:14

**maintained** 29:7 108:5 208:24 217:2

**major** 69:12 197:13 201:6 257:15,19

**majority** 223:16

**make** 13:5,10,14,16 15:6,12 54:8 66:17 67:23 68:5,9 85:12,14 102:7 137:12 139:12 152:18 155:17,21 186:21 199:15 215:19 216:5,6,7,20 221:8 224:6 225:13 231:17 232:2,8 234:12 236:1 244:4 279:16 280:5 281:24 282:8 283:3 314:23

**makes** 13:18 102:5 161:24 168:17 209:2

**making** 55:16 101:20 104:24 110:7 174:2 199:10,14,18 243:17 291:5

**malware** 283:18

**manage** 26:6 46:12,15,21 52:10 61:9 134:4 195:12,15,21 211:16 245:2 281:22,24

**managed** 25:12 118:3 132:10,12,19 133:11 207:3,4 210:5

**management** 24:1,11,13,19,21 27:19,21 28:12,18,21 33:15,24 35:6 37:15,19 38:8 40:15 60:19,23 61:7,8,17 62:10,15 193:24 194:8 203:18,20 218:22

**manager** 19:18,19 20:6,8 24:6,7 31:12 58:13 61:12 63:24 64:3,8,11 68:23 79:13 86:9,11 96:17 103:9 105:24 109:19 132:8 162:16 188:2 194:17,19 195:2 204:8,9 205:17 206:6,11 217:11,13,17,19,20 219:1 225:1,23 226:18 228:6 240:11,15 241:14 242:9 251:8,23 252:1 253:10 281:4,5

**managers** 61:23 132:17 155:9,11 204:23 205:2,23 238:8 283:1

**managing** 58:21 123:9,10 226:6,8 275:19

**manner** 31:21

**manual** 60:12 275:19

**manually** 243:18

**March** 24:16 229:12

**margin** 158:9,12,14,15,18,22

**marginally** 196:1

[redacted] 313:9,10,21

**mark** 169:5 201:24 212:11 249:15 253:24 258:5,19 264:6 269:11 284:3 286:11 288:1 292:15,20 303:23 306:11 311:15,18

**marked** 22:24 23:3 48:20,21 49:2 50:6 67:5,8,15 77:23 78:1 93:1,3 96:11 108:11,15 120:16,20 143:7,10

145:24 161:13 169:3 187:6,8 202:5 212:13,16 228:24 229:2 249:18,21 254:3 258:8 259:3 264:3 269:15 277:14,18 284:5 286:16 288:5 290:9 292:23 293:2,4,8,12 304:1 306:14 311:24 312:3 321:7

**market** 104:4,6 163:6 215:17,24 216:1,2,9,11,16 228:15 237:17 248:19 256:5

**marketing** 38:10 115:3 152:12,15

**marking** 143:1 254:6

**marks** 322:14

**Massachusetts** 9:10

**masthead** 299:23,24

**match** 56:2 89:16,19 91:17

**matched** 88:14,24 89:20 90:1,3,4,8

**materials** 37:21 38:9,10

**math** 22:18

**matter** 9:11 90:23 116:12 136:19 302:4 303:3 310:2

**matters** 116:9,11

**maximize** 164:16,21 165:9 166:5,9, 15,17 167:3 168:2 211:23

**maximized** 167:24

**maximizes** 165:18

**MD** 123:6,10,13

**MDL** 311:23

**meaning** 88:6 146:5 295:15

**means** 46:7 59:16 95:19 116:6 124:8 138:2 154:3 162:17 173:21 203:10 210:6 235:1 237:7 257:8 296:23

**meant** 131:11 214:8,20 223:22 234:22 235:3,20 236:7 283:13 303:14 314:3

**Measures** 260:11

**mechanism** 132:22

**Media** 241:9,10,11,17,19,22 242:4,7 267:1 278:21 281:5

**meet** 36:9

**meeting** 18:15 20:15 122:19 123:2 145:9,16 147:23 148:1,3,5,15 213:12, 17 230:1,2,3,5,18,22,23 234:4 238:16,20,22 308:3,6

**meetings** 234:7

**member** 314:18

**members** 269:24 288:13 293:20 315:6

**memory** 280:7

**mention** 50:17 52:16 69:14 73:1 107:6 213:10,11

**mentioned** 45:16 83:7 94:23 100:22 139:23 162:21 182:5 196:4 200:15 214:3 225:14 245:19 249:1

**mentions** 47:22 69:2 103:5

**merged** 62:6

**merger** 194:22

**message** 205:13

**met** 36:12,14 307:14 313:15,24

**metadata** 265:5 304:7

**methodology** 156:11

**methods** 137:11

**metrics** 260:11 261:6,15 295:9

[redacted] 294:5

**mid** 24:15

**middle** 14:17 69:12 76:21 106:5 111:20 128:19 132:1 189:7

**migrated** 38:18

**migrating** 301:6

**milestones** 305:2 306:6

**million** 22:10 183:15

**millions** 195:24 231:3

**min** 94:14 128:11 131:18 136:5,6,14 137:15,16,23

**mind** 43:13 136:4

**mines** 131:5,9

**Ming** 278:8,11,19,20,24 279:2 282:17,24 288:18,21 294:7,13 300:11 304:17,18 306:5

**minimum** 97:9

**mins** 131:11,13,16,19

**minute** 49:19 144:1 254:20 269:20 288:7 304:5

**minutes** 66:11 92:21 187:4,18 226:22 227:6 235:6 261:20,21,24 262:3,9,13 315:24

**misconstrue** 82:14 84:19 85:6

**misconstrued** 84:18 85:5

**misstate** 263:23

**misunderstand** 85:18

**MIT** 23:12

**mitigations** 307:5

**mixing** 61:2

**mobile** 79:19 86:21,23,24 87:4 178:2 244:15,18 287:12 301:15

**mod** 228:3 293:22,23

**moderate** 189:18

**modern** 87:7

**modified** 318:10

**modify** 244:1

**modifying** 318:14

**modular** 215:15,20 217:3,5 227:7,8

**module** 227:9,11,13 228:2,4

**modules** 215:22,23 216:10,12 224:6

**Mohan** 19:1,2,4,5 307:17

**moment** 48:22 49:22 78:6 102:4 169:24 187:17 200:15 229:4 254:4 259:24 277:16

**monetize** 257:16,20

**monetized** 271:24 272:1,3

**money** 101:20 102:7 104:24 105:12 163:21 165:24 166:3 183:1 199:9,13, 17

**monitor** 9:8

**month** 36:10,12 44:1

**months** 256:3

**morning** 9:18 10:17 193:16

**move** 21:1,22 38:21 77:1,21 80:3 143:1 186:19 201:23 212:10 253:14 280:8 287:12 298:7

**moved** 35:9 39:12 212:8 279:23

**moving** 39:6 310:1

**mow** 15:22

**multidirect** 315:21

**multiple** 29:24 30:5 32:4 52:4,6 61:1, 9 62:12 112:8 115:22 116:8,16 134:3 173:4 228:19,22 243:20,23 244:5 245:2 274:3 298:13,15,18 306:6 309:16

**multiproperty** 110:8

[redacted] 255:2

## N

**named** 33:8 239:15 281:1

**names** 275:14 281:3

**Nancy** 260:19

**native** 258:12,13

**nature** 28:7

**navigate** 160:11 259:14

**NDN** 239:17 256:10 260:16,17,24 261:2,24 262:9,15 267:1

**Neal** 18:3,4,18,21 19:1,2,4,5,6 307:14,16,17 308:4 313:15,24

**necessarily** 166:9

**needed** 53:7 214:13 215:1 231:9 232:18 241:16 279:16

**negative** 295:8

**NES** 18:1,2

**net** 99:4 158:9,12,14,17,22 301:11

**Netherlands** 72:19

**network** 29:18,20,24 56:13,15,17,19, 20,21 57:4,7,12,13 58:21 59:9 61:7, 24 96:18,19,21 105:22,24 206:6,9 239:17 240:20 244:14 253:16 255:22 257:23 258:2 260:20 266:3 268:17,23 270:23

**networks** 31:6,21 32:2,6,13,14,18, 23 57:19 59:7 61:1,4,10,11,21 62:11 64:2,4 238:9 267:1 268:4,7 270:16 271:7 272:4,5 301:20

**neutral** 301:13

**news** 239:16 253:15 257:15,19,23 258:2 260:20 298:12,17

**nice** 238:19,21

**nod** 322:9

**nominal** 98:16 99:10

**non-bid** 55:18,23 56:6,22 57:4,14

**non-budget** 51:2,5,9 70:7,13,15 71:6,15 77:9,15,19

**non-disparagement** 186:14,17

**non-essential** 287:15

**non-google** 51:14,17,19 274:21

**non-second** 65:17,21

**non-video** 242:3

**nondisclosure** 186:9

**nondisclosures** 186:12

**normal** 273:8

**North** 159:12,13

**notable** 292:4

**note** 20:22 78:8 111:11 114:13 115:1, 7 321:21

**noted** 9:14

**notified** 208:19

**noting** 289:1

**notion** 84:6

**notoriously** 283:16

**November** 27:23 28:3,9,17 29:9 35:1,9 40:15 41:2 188:12 255:2,13 256:23

**number** 48:23 49:3,7,11 50:11 81:21 83:23,24 84:3,5 85:2,11,14 88:18,23 90:12,21 91:20 93:6 121:5 138:10 169:7 170:6 173:12 175:11,24 176:1, 5,13,14,16,17,21 177:1,3,4,5,19 178:1 193:15,23 202:3,21 207:8,9 212:17 229:6 250:6 253:6 254:7,9,13 258:13,14 259:5 260:15,16,17 261:19 262:15 264:7 268:3 269:17 277:19 284:12 286:11,12 293:5 300:7

**numbered** 249:22 277:20 293:8

**numbers** 49:16 67:17 78:3 82:13 85:4 86:12 108:17 120:22 143:18 187:10

## O

**oath** 10:13 15:1

**object** 14:7 21:17 40:2 51:20 55:19 57:10 60:2,10 63:14 71:24 72:9 73:8 74:9 88:11 106:3 145:17 148:18 162:2 163:12 166:16 179:13 191:10 194:23 197:4,9,20 199:2 200:6,12 201:8,13,21 203:21 204:24 207:16,21 208:6,16,23 209:22 210:16,23 211:10,15 212:1 216:23 217:1,12,18 218:24 219:10,21 220:3,12 221:6,12, 20 222:14,20 223:14,20 224:4,9,17, 24 225:5,9,15 227:10,19 228:5,11,21 229:23 231:1,20 232:4,11 233:21 234:2,8,23 235:4,11 237:11 238:4 246:20 247:6,15,22 251:5 252:7,19 253:9 256:13 257:24 261:9 262:17 263:16 265:16 269:6 270:24 271:8 273:14 275:7 285:22 289:21 291:3, 14,22 292:11 294:14 296:10,18 297:8 300:24 302:6 303:12,18 305:15 309:4 310:6,17 311:3,10 314:17 315:2 317:9,18 318:9,24 320:5,10,20

**objected** 15:21

**objecting** 15:20

**objection** 11:9 12:2,13 15:15 18:9 19:22 20:3,14 21:16,21 22:15 25:23 27:4,10 29:14 30:7 31:18,20 32:9,17 33:5,10 36:13,19,24 37:8 38:7,20 39:21 40:8 41:10,15,17 43:3,6,11,14, 17,24 44:20 45:2,6 46:3,16,22 47:2,8, 10 48:15 51:15 52:1,11 53:12,19,24 54:15,19 55:5,12 56:10,18,23 57:8,16 58:17,19 62:5,18,20 63:1,6 64:6,13, 23 65:22 70:9,19 71:9,13,17 73:17,23 75:4,7,12 76:1,6,11,16 77:12,17 80:19,24 81:4,13,19 82:6,10,17 83:3, 13,21 84:2,8,16,22 85:8,16,21 86:17 87:19 88:22 89:8 90:5,10,16 91:1,6, 23 92:9,13,19 93:21 94:5 95:8,21 96:3,8 97:5,19 98:3,6,18 99:11 100:12 101:2,8,17,24 103:16 104:1, 14,19 105:10,23 106:14,23 107:9,12, 21 108:1 110:23 111:17 112:3,6 113:5,14 114:1,15,20 115:2,8,17,21 116:2,10,19 117:1 118:2,9,14 119:24 122:23 123:7,11,23 124:14,21 125:3, 15,24 126:6,15 127:1,14,20 128:8 129:5 130:3,6,13,20 131:15 133:13 134:1,11,23 135:3,9,17,23 136:11,17, 22 137:2,10,21 138:6,17 139:18 140:1,8,13,22 141:5,12 142:5,11 146:3,22 147:4,9,18 149:3,18,23 150:5,16,23 151:8,13,17 152:1,7,11, 16 153:1,5,11,20 154:1,17,21 155:14, 19,23 156:7,13 157:24 158:13,19 159:11,18,22 161:2 162:19 163:16 164:22 165:1,7 166:6 167:4,18 168:1, 14,22 169:19 170:15,23 171:3,13,21 172:5,14 173:6,22 174:5,10,19,24 175:5,17,22 176:3,9 177:10,17,22 178:6,12,17 179:23 180:6,11,22 181:2,7,18,24 182:3,9,23 183:14,16, 19,24 184:3,7,19,22 185:2,8,12,18,22 186:5,11,16 188:19 191:23 192:14,18 198:2 199:7 203:12 211:3 215:7 280:22 303:5 310:21

**objections** 18:12 68:6 108:13

**objectives** 158:16

**Objects** 158:5

**obtain** 227:17 228:1

**occurred** 24:9

**occurring** 303:8

**October** 181:12 285:5

[redacted] 109:16,18

**off-site** 147:14,17

**offer** 117:11 118:20 129:17 166:3 213:19,20 214:4 216:17 297:20

**offered** 56:3 91:3,5 99:7 141:7 162:22 231:10 232:19 236:22

**offering** 87:14 118:22 162:21 217:2

**offers** 94:12

**offhand** 64:15 75:18,20 294:10

**official** 73:13 255:20 313:12

**older** 239:1 248:20

**ongoing** 20:15

**online** 46:8,11 159:21,24 312:22

**open** 93:19 94:3,8,11 244:2 277:15 319:1

**opened** 117:3

**operate** 48:13 140:12

**operated** 140:15 206:10

**operates** 140:9

**operating** 140:2 196:10

**operational** 213:15 214:11,24 224:10

**operationally** 221:14 223:1

**opportunities** 202:23

**opportunity** 78:12 93:12 178:2 256:10 300:4

**oppose** 178:16

**opposed** 196:22

**opposing** 312:22

**optimization** 30:4 206:9 316:24 317:3,4,16,24

**optimize** 165:3

**option** 203:7,10 234:11,13 236:10 316:7 318:6

**options** 183:4,5 316:8

**orange** 170:9,11 171:7,23 177:14

**order** 124:6 271:6 292:18

**ordinary** 78:22 79:5 255:10 270:5 278:16 284:23 287:7 293:17 304:12 307:8 311:20 312:15

**organizational** 251:14

**organizations** 313:13 314:19

**original** 30:13 144:21 251:19

**originally** 14:9 30:9,12 55:20 149:5 165:21 228:13

**outlines** 306:6

**outsource** 30:2

**outsourced** 275:4

**outsourcing** 61:21

**overlap** 62:8,13

**overlapping** 60:3

**overreliance** 80:9 81:12,18,22 83:8, 15,19 84:1

**overrereliance** 84:7

**oversight** 29:8 37:13

**overview** 301:3

**owed** 245:6

**owned** 66:4 195:5

**owner** 42:12 282:15

**ownership** 46:7 191:18

**owning** 194:16 195:7

## P

**P&I** 194:6,11,15,17 195:6,10 196:7 197:8,11,18 201:3

**p.m.** 80:5 142:18,19,20,22 193:1,2,3, 5 213:7 226:24 227:1,2,4 239:6,7,8, 10 260:1,2,3,5 267:20,21,22,24 277:4,5,6,8 299:8,9,10,12 307:14 315:12,13,14,16 322:16,18

**pacing** 245:15,16

**pages** 295:17

**paid** 105:3 150:14,19 183:1

**paragraph** 47:16 50:14 52:13 70:24 72:13,14 74:13 76:20 77:11 96:22 97:21,24 98:7,10,20 102:9,15,20,24 106:6 111:6,20 112:12 114:6,9 121:23 123:6 128:16,19 132:1 137:5 149:4,6 203:6 205:5,11,12,14 206:4 209:10 213:9 215:13 294:21 295:4,5, 7 298:11 299:18 301:2

**paragraphs** 122:18 301:10

**paralegal** 49:8

**parallel** 133:21,24 134:3,8 135:12 138:19 291:9

**parameters** 118:10

**parens** 131:4 148:20

**parentheses** 74:12

**part** 27:16 31:13 39:18,19 63:9 74:4 121:19 126:3 129:2 180:3 182:16 183:3,6,10 184:2,9,18 195:9 198:5 201:4 210:17,24 224:12 225:17 228:1,6 234:16 236:9 240:5 248:13 274:21 276:6 279:3,4 280:15 282:2, 12 284:20,23 285:23 286:2 288:14 293:22,23 294:2

**participant** 159:17

**parties** 205:20

**partner** 191:18 202:18 256:11 269:8

**partners** 206:7

**party** 96:1

**pass** 247:7,10

**passed** 112:20 135:7 207:6 247:24

**passes** 131:5 204:10

**passing** 128:11

**past** 238:13

**patent** 12:24

**path** 258:2 287:15 314:5

**pause** 39:24 287:16 294:24 296:22 301:3 303:13

**paused** 295:13,21 296:2,5,13

**pausing** 303:10

**pay** 204:5 208:12

**paying** 21:10,13 107:4

**payout** 99:4

**PBS** 145:9,15 147:23 148:1,2,4

**penalty** 15:13

**people** 25:24 44:14 45:11 50:12,13 75:13 76:18 80:14 85:2,18 114:16 156:8 166:24 196:14 209:5 218:18 237:7,12,15,19,24 243:18 255:5 270:3 274:3,9,19,21 275:2 281:16 282:21 294:6

**people's** 283:18

**perceive** 81:22 83:15

**perceived** 80:9 81:12 83:7

**percent** 22:19 27:13 71:14,16 72:5 80:8,21 81:3,8 83:1,11,19 84:5,10,11, 14,24 85:1 87:9,15 88:1,5,13,18,20 89:1,4,5 90:1,12,14,21 91:4,13,20,22 92:17 93:18 94:16 95:6,10,18,19,23 96:7 98:17 99:10 102:4 107:22,23 108:4,5 147:1 151:3,21,22 163:13 256:19 261:21 267:7 273:2 295:21 296:1 297:3 301:5 303:11,16,20 318:22 319:2,4,18

**percentage** 22:12,17 43:22 71:11 81:11 84:20 85:7,23 86:12 87:16,22 88:24 89:3 90:22 92:2 94:18 104:7 185:4 272:11 296:4

**percentages** 88:8

**perception** 81:15,17 83:18,22 84:1

**performance** 295:9 296:15

**period** 11:22 18:18 19:6,16,17 25:1 28:3 29:3 33:16 34:19 35:14 40:6,13 41:2,12 82:21 161:7 248:20

**periodically** 36:8

[redacted] 187:23 188:1,11 189:21 190:17 191:9,22 192:13

**perjury** 15:13

**person** 110:17 282:20

**perspective** 47:23 48:5 62:9 215:3

**perspectives** 37:1 85:2 220:15,17

**PFP** 213:3

**phone** 17:24

**phones** 87:5

**phrase** 316:23

**phrases** 256:20

**piece** 110:8 133:18 197:22 232:19

**pieces** 105:13 163:1,3 201:5

**place** 18:17 102:5 126:11 206:9

**placement** 26:7

**placing** 225:12

**plaintiffs** 9:21,24 193:11 264:8 311:23

**plan** 215:18 225:21,22 304:17

**planning** 121:20 206:8

**plans** 181:11 304:19 306:3

**platform** 31:8 72:3 178:3

**platforms** 31:9

**play** 225:22 285:8 287:15 295:14,15, 21 296:2,14

**player** 267:6,8 268:22

**players** 32:1 267:4

**playing** 296:9,21

**PMG** 147:14,17,19

**point** 30:15 53:2 54:17,21 55:3 60:17 64:17 65:3,4,15 84:3 99:4 103:19 115:19,24 117:4 127:22 137:14 138:10,22 142:6 147:13,22 158:8 160:14 162:8 167:8 170:18 175:7 177:13 189:5 190:3,8 191:4 213:4 226:10,12,18 238:19,22 248:11 257:14 276:23 277:1 282:19,21 290:18 301:22 305:6,18 307:3 320:15

**pointed** 206:7

**points** 57:22 73:3,6,11,14,16 74:24 75:21 76:3,13,14 137:4,5 145:19 146:7,15 153:10 164:9 172:16,20 189:2,5 191:12 192:1,15

**police** 275:12 276:10

**policies** 62:22 137:8 204:22 205:21 265:10,14,18 266:3,7,14 271:9 274:4

**policy** 33:7 62:14,19 63:2,5,7,9,22 64:9 125:16,19,22 130:5,7 132:2,4,5, 7,11 133:10,22 134:6,16,21,24 135:2, 5,8,16 136:10,13,16,18,20,23 137:3, 13 206:11,16,19,20 209:16,20,23 270:20 271:6,19 272:6,15 273:12,19 274:2,5,7,16,18,22 275:1,3,13,24 276:11,14,18

**polled** 91:9

[redacted] 144:18 154:5,6

**portion** 92:5

**position** 74:10 102:11,17 103:3,22 220:10 224:1,14,21 301:19

**positioned** 298:12,18

**positioning** 283:23

**positions** 234:6

**positive** 152:3,5 301:12

**possibility** 43:15,16 45:7 47:5,9 85:18 179:11,19

**possibly** 92:21

**post** 188:15 225:1 290:17,19 291:4 292:3,13 294:23 301:23 305:12,17 319:20

**potential** 75:14 170:12,24 171:1,8, 12 172:18 175:13,20 176:7,11 177:24 178:8 301:15

**potentially** 61:14 84:3 101:18 104:15 148:20 157:15 158:22 172:17 214:4 216:8 260:9

**Powerpoint** 304:11,22

**PPS** 300:10 301:3,19 303:8,9 305:12

**practical** 215:16

**practice** 205:22

**precaution** 215:8

**preconceived** 84:6,12,15

**preconception** 82:24

**preconceptions** 82:11,15

**precursor** 58:14

**predict** 152:12

**prefer** 68:3

**preferable** 224:15,22

**preferred** 94:6 198:18

**premium** 257:14,18

**preparation** 16:14 17:1,9,16

**prepared** 150:18,20 188:22 280:19

**preparedness/project** 300:11

**preparing** 16:9 286:24 301:7

**Preread** 145:1

**present** 9:15 17:1 314:9

**presentation** 146:10,12 147:14 169:17 172:7 304:14

**presentations** 155:1

**presented** 145:15

**presenting** 145:9

**president** 23:24 24:10,12 35:9

**press** 74:23 75:2,11

**pretty** 297:6

**prevent** 16:5

**previously** 257:22 258:6

**price** 38:19,21,24 66:6 103:18,20,23 104:2 105:2,3 128:11 129:9,12,15,18, 19,24 131:10,14,17 134:2,5 136:3,5,6 138:18,21 139:10,11,14,15,20 166:1 167:22 204:3,4,5,11 207:12,18,24 208:8,10,12,15,18,21 209:1 210:6,12 211:8,9,14,17,18,20 212:4,7,8 316:7,

8,13,17,24 317:3,4,16,23 320:11

**prices** 94:14 317:5,7,11

[redacted] 255:2,5

**pricing** 38:14,16 65:17,21 255:23 256:2,5 319:10

**primary** 39:14 237:21 266:8

**print** 259:6

**printed** 23:5 258:10

**printout** 258:22

**prior** 112:10 123:6 169:18 185:5 203:1 208:20 210:17 226:15 291:18 310:2

**privacy** 34:17 35:1,3,7 39:7 40:15,24 41:5 48:9 191:2 276:13

**private** 94:7 123:15,18,19,21 124:2, 10,12,15,17 125:2,5 198:18

**privilege** 14:12

**privileged** 12:6 21:19 47:20 179:15, 16 214:18 219:14,17

**proactively** 286:3,7

**problem** 128:16 137:23

**problems** 283:18

**proceed** 10:11 68:11

**proceedings** 49:24 66:23 109:7 142:19 193:2 227:1 239:7 260:2 267:21 277:5 299:9 315:13

**process** 61:22 273:24

**processes** 62:2

**produced** 20:23,24 21:3 49:2 67:16 78:2 93:5 108:16 120:21 141:19 143:17 169:6 187:9 202:2 212:17 229:5 259:6 264:8 269:16 277:19 304:2 306:15

**product** 20:10,12 24:1,6,7,11,12,19, 21 25:11 27:19,21 28:5,6,12,18,19, 20,21 29:8,12,15,16,17 33:15,17,20, 23 34:7,9 35:5 37:15,18 38:8 40:15 51:9 53:6 54:9 56:7 58:21 61:7,8,17 68:23 79:13 96:17 101:12 109:19 124:23 125:1,5 155:9,11 193:24 194:6,7 195:6,13,16,19,22 196:3,17 197:1,12,13 198:5,19 199:22 200:24 214:5 216:13,17,21 217:10,19 222:5, 6,8 223:3,23 227:12 233:14 236:9 237:8,10,13,20,24 238:1 240:10,11, 15,21,23,24 241:14 242:9 245:12 248:13 250:19 251:8,23,24 283:1 304:18 305:20

**production** 173:3

**products** 19:13,15 25:5 34:12,13 40:24 41:5 48:8 54:5,12 60:24 101:9 154:9 155:2,3 194:13,14,22,24 196:5 208:13 215:15 216:20,24 217:8,10,17 218:23 219:9,20 220:2,11 221:15,16 222:13,24 223:17,19,22 224:2,8,23 225:7,12 226:7,9 227:22 229:18 230:24 231:18 232:2,3,9 234:16 251:7,9 253:11 278:9,12,21 279:4,6, 10,17 280:2,14,20 281:1,8,9,11 282:20,23 283:2 285:19 301:7 319:8, 11,13 320:9

**profile** 22:23 23:4 28:12 193:22

**profit** 195:12

**profitability** 145:2,15 146:13

**program** 204:13

**programmatic** 62:4 119:5 146:13 165:4,20,22 166:13 167:13,16,22 168:8,12,13,16 198:13,14,17 238:24 316:15,16

**programmatically** 119:4 163:23

**programming** 279:22

**progressively** 287:13

**prohibiting** 204:22

**prohibits** 205:14,16 206:4,5

**project** 50:17,19 58:1,2 278:8,11,19, 20,24 279:2 280:15 282:17,24 288:18,21 294:13 304:17,18 306:5 309:10,12,14,16 318:4,7,10,12,13 319:7

**projects** 208:20 226:11

**prominent** 120:1

**promote** 55:10 80:7 84:13 85:23

**promoted** 28:24 80:20 81:1

**proper** 204:4

**properly** 132:24 195:12,15,21

**properties** 260:12 261:13 262:15,19

**property** 261:3,8,11

**proposal** 230:21

**propose** 66:12 72:13 192:22

**proposed** 308:15

**proposing** 313:1,7

**proprietary** 209:19 210:9 267:6

**prospects** 37:24

**protect** 209:24

**protocol** 112:19

**prove** 85:10

**proved** 206:18

**provide** 17:12 38:8 44:6,7 46:4 49:8, 10 50:15 82:21 205:20 216:13 248:4 253:24 258:13 297:22 301:21

**provided** 17:16 75:21 152:23 153:3 248:6 258:11

**providing** 41:5 49:11 178:14 217:6

**provision** 153:14 186:2

**pub** 87:23 88:14 90:1 91:13 92:3 251:7

**public** 319:23

**publicly** 48:16 319:17,21

**publisher** 25:22 26:1 52:17,20 53:1 54:20 61:10 62:9 69:21,24 85:6 87:13,17,18 88:2 89:6 90:15,22 92:2, 4 94:11 99:5,7 103:14,22 105:4,5,13 110:9 112:12,24 116:5,15 117:20,22, 24 118:7,19,22 122:5,7 127:12,18 145:2,14 146:13 165:16 166:19 167:6,24 168:4 173:15 175:3 193:11 197:23 216:14,18 221:5,7 222:10,17 227:12 228:1,9 238:3 245:1,9,16 246:3,18,19,21 247:1,7,10,13,16,17, 21 248:1,3,5,7,15,18 249:7 250:19 272:17 273:18,20 298:8 310:5 311:2, 8 317:5,8

**publisher's** 26:7 116:22 153:14 174:12 247:4

**publishers** 20:9,12 25:6,11,14,17, 18,19,21 26:4,5,21 36:3,5,11,14,22 37:11 38:1,5 53:7,9,16 54:18,24 55:3 56:5 57:3,6,11 61:9 69:23 75:17,23 76:10 80:15 81:2,7,10,18,20,23 82:3, 11,16,19,24 83:4,5,11,14 84:19,23 85:13 87:11 90:18 92:18 100:16 104:12,16,20 105:11 112:1 114:3 115:23 116:9,17,23 117:7,10 139:23 140:3 146:16 147:8 148:4,14 149:11, 15,17,21 150:3,22 151:7,12,16 152:3, 5,6,21,23 153:3,18 157:18 159:1,4,9, 15 160:10 163:21 164:6 165:3,5,11, 21 166:4,7 167:1 199:10,14 205:15, 16 206:5 209:21 211:7,12,13,16,24 216:2,7,21 217:7 218:2 225:13 227:17 228:8,12,17,18,22 232:6,10, 19,24 233:13 237:10 238:7 243:5 244:12,22,23 272:5 281:6 282:16 291:8 297:16 309:17 310:16 317:10

**Publishes** 27:7

**Pubmatic** 103:5,8,9,15 104:12 163:3 248:20

**pubs** 87:9,11,13,16 285:8

**pull** 119:12 120:13 144:7 204:8 247:23 292:15,19

**pulled** 86:19 248:2

**pulling** 169:10

**purchase** 112:22

**purchased** 56:12,13,16 250:15

**purpose** 244:9,22,24

**pushed** 247:13

**pushing** 85:3

**put** 35:23 36:2 48:17 55:16 60:18 61:14 62:14 71:11 90:6 91:24 92:16 106:15 119:12,19,20 127:13,15,19 128:9 133:1,11,16 139:8 153:9 165:20 172:15 195:1 203:19 205:2 231:2,5,6 235:24 247:17 253:10 254:11,12 297:10

**putting** 62:12 85:4 119:22 127:9,16 155:1 166:12 203:17,23 205:17,23 206:5 216:8

## Q

**Q1** 206:8

**Q2** 149:10

**Q3** 190:4

**qualified** 71:10

**quality** 40:23 52:2 54:5 271:23 276:16

**queries** 88:14,20,24 89:1,3,5,19,20 90:1,3,4,8,14 91:14,18 92:2,3

**query** 86:18

**question** 12:9 13:18,22 14:2,8,9,10 16:1 33:6 40:2 43:4 46:19 47:14 55:6, 9 63:22 65:1 90:18 100:17 101:10,14 107:17 119:16 124:16 133:15 135:20 141:1 167:19 171:5 174:16 180:15 199:16 209:11,14 213:19 214:3,24 215:12 224:5,20 225:11 228:18 231:2 232:8 246:5 252:23 253:1,5,13 256:16 262:4,6,8 270:10,12 271:2 274:11,13,15,23 275:5 278:10 302:21 303:2 305:24 322:6

**questioning** 12:4 21:18 178:12

**questions** 11:20 13:15 14:7 37:23 68:6 86:4 93:17 139:22 215:4,5 220:22 239:2 270:15 312:5 315:23 321:12

**quick** 187:1,2 249:19 276:24 277:2 305:24

**quote-unquote** 308:23

**quotes** 106:16

## R

**r-e** 288:20

**race** 60:12

[redacted] 213:23

**ramp** 288:18,21

**ran** 316:18

[redacted] 313:15,24

**range** 185:1 241:23 250:23 264:1

**RASTA** 200:5,7

**rate** 92:11 95:19,24 104:8 272:10,11, 17,22 273:1,9 303:14

**rates** 89:16,19 91:17 243:12

**rationalization** 174:12

**rationalizing** 173:16,21 175:3

**re-ask** 174:16

**reach** 166:23 301:15

**reached** 78:20

**reaction** 110:18 303:9

**read** 11:12 12:15 48:23 67:14 86:5 93:4 120:19 143:15 144:8 204:12 205:5,10 206:3 207:9 209:9 213:9 215:14 230:11 234:3 235:13 236:17 242:17,18,22 252:23,24 255:16 256:7,12,14 257:17 262:6,7 265:11 267:9,10 269:2 270:13 274:13,14 285:10,15,16 287:17 288:7,9,19 289:4,17,18 293:12 295:2,18,23 298:14 299:3 300:12 301:8,9,16,17, 24 302:20 303:1 305:19 308:17 313:18,21

**readied** 279:6

**reading** 49:6 68:15,16 93:14 158:20

**reads** 106:9 111:10 128:23 137:14 145:1,7,21 173:15 189:15 203:6 205:14 210:13,18

**ready** 93:13 121:9,10,11 279:4,10,13 280:17 286:1 301:21

**real** 187:1,2 215:11

**real-time** 49:10 112:17,18,19 133:6 174:15

**realization** 30:18

**reason** 153:2 156:16 235:16 236:13, 15 237:21 255:9,12 304:21

**reasons** 81:14 237:14,19

[redacted] 270:3

**rebrand** 26:21 58:16 250:6

**rebranded** 27:1,5,6 31:16

**rebranding** 26:22

**recall** 10:21 14:23 16:21 17:23 20:17 26:12 27:9,11 29:11 38:16,18 51:22, 23 52:9 62:21 68:21,22 73:18 74:10 95:24 96:6 136:15 179:22 183:13 184:11 185:19 193:18 197:24 198:11, 16,19 201:2,7,10 208:13,21 213:17 218:16,21 219:4,7 220:6,10,24 221:2, 4,17 223:8 226:4,8,13 230:5 245:24 246:2 260:9 265:4 278:3 281:16 283:23 289:9 294:10 300:20 311:11 316:4 318:1,13,18 319:10,24 320:12, 13,23 321:1

**recalling** 184:15

**receive** 188:17 189:1 255:10 293:16 304:21

**received** 78:9 105:3 247:21 286:13 287:4,5,6 288:2 293:6,10 304:12,15 307:8,10 311:19,22 312:15 320:17,22

**recently** 122:19 253:21

**recognize** 270:8 284:18 304:16 312:7

**recollection** 17:20 73:15,20 221:9 235:19 257:21 282:22 308:5

**recommend** 164:1,5 165:11

**recommended** 165:5

**recommending** 165:8

**reconvened** 50:1 66:24 109:8 142:20 193:3 227:2 239:8 260:3 267:22 277:6 299:10 315:14

**record** 9:3,15 10:18 13:14 20:22 48:24 49:7,20,23 50:3 66:9,22 67:2, 15 93:4 109:3,6,10 120:20 142:15,18, 22 143:16 178:18 187:16 193:1,4 202:1 212:15 226:24 227:4 229:5 239:4,6,10 242:18,22 252:24 259:5, 22 260:1,5 262:7 267:18,20,24

270:14 274:14 277:4,8 284:11 299:6, 8,12 303:1 304:6 315:8,11,16 321:10, 14 322:12,13,16

**recruit** 159:4,8

**Recruited** 158:24

**reduce** 225:8 287:13 291:6,24

**reduced** 286:24

**reduction** 160:24

**reductions** 252:12

**refer** 25:24 87:13 119:11 162:14 163:14 215:21 251:23

**reference** 51:1 72:15,17 74:21 123:5 124:20 147:23 289:23 292:9,12

**referenced** 77:10 86:5 146:2

**references** 314:23

**referencing** 83:10 258:1

**referrals** 30:3

**referred** 77:13 82:16 113:11 127:2 252:1,4 256:24

**referring** 50:23 52:21 59:13 72:23 73:10 74:19 77:9 80:13 82:1 87:1,21 97:15 105:8 113:6 117:17 122:24 123:8 131:16 145:18 158:14,21 170:21 173:13 176:23 177:12 210:11 237:22 256:21 296:3

**refers** 34:9 51:10 71:3 72:20 77:5,6 87:11 90:3 122:21 147:20

**reflected** 86:13 147:2 172:10

**reflects** 90:13,21

**refresh** 17:20 257:21

**refuge** 301:23

**region** 72:16,18,22 73:2

**regular** 87:5

**related** 21:19 25:5 40:24 182:19 194:11 276:12 306:7 319:8

**relationship** 37:17,20 44:16,19,24

**relay** 246:13

**released** 76:5,8,10 240:24 243:16

**releases** 290:4

**reliable** 200:11

**reliant** 283:4

**relying** 116:21 132:23

**remainder** 305:23

**remaining** 297:24

**remark** 68:8

**remarketing** 51:2,6,7 70:8,13,16 71:7,15 77:10,16,19

**remarks** 68:5

**remember** 19:21,23 20:5 26:22 28:1, 24 34:20 35:11 39:9 58:2,4,6 69:19 73:13 75:18,20,22 76:4,5,9,12,14,19 117:6 121:24 183:20 184:4,5 185:4 186:8,9 194:20 197:10,21 201:5 203:3 230:20 249:5 252:13 255:8 280:9 282:12 308:7 319:18

**remembered** 17:22

**remind** 20:19

**remote** 9:14 18:12

**remove** 280:11

**rename** 254:14

**renewal** 69:12

**repeat** 121:4 193:16 224:18

**rephrase** 22:5 271:1

**replace** 202:24 283:5

**replied** 78:20

**report** 26:9 156:12 170:2 248:4,6,8

**reported** 19:1,4 39:18 181:15 182:7 213:4 226:10,18

**reporter** 10:9 13:7,19 14:22 242:16 252:22 258:18 260:20 262:6 274:13 299:5 302:24

**reporting** 26:15 217:23 242:12,24 243:7,9 247:9 248:12 252:18 253:3,6

**reports** 76:18 248:11

**represent** 9:17,20,24 10:1 22:13 23:3,20 143:3 193:10 239:15 265:5 304:6 315:20

**representation** 30:1

**representations** 15:6 75:22

**representing** 10:5 116:7 193:12

**represents** 23:21 91:22 113:23

**repurposing** 130:22

**request** 133:6

**require** 101:16,18 185:10

**required** 15:16 16:2 196:10 295:16

**requirements** 265:10 274:22

**requiring** 134:24 185:16,20 186:3

**research** 145:2 157:4,8 158:20

**reserve** 316:23 317:3,4,15,23

**resolve** 213:16

**resolved** 214:13

**respect** 12:4 39:16 228:2 304:22 310:2,3 311:6,8

**respecting** 255:22

**respond** 131:23 235:8 238:15

**responded** 70:5 235:7

**responding** 99:15

**responds** 234:18

**response** 14:8 64:5 70:3 111:4 204:13 205:4 234:20 235:10,12

**responsibilities** 24:20 40:20 194:5, 10 195:10

**responsibility** 25:10 37:13 226:16

**responsible** 25:4,13 29:4 40:22 282:15

**rest** 192:22

**restate** 14:8 119:16

**result** 135:19 283:14

**results** 95:23 149:16,22 150:4 155:12,21 201:15

**retained** 9:4

**retention** 21:18

**return** 134:17 135:14 136:7

**returned** 136:2

**returns** 129:24 135:22

**rev** 94:2 95:15,22,23 96:4 97:4,7,11, 17 98:16 99:3,9,10 100:14,16,18,19, 22,23 102:2 104:17,21 105:7,9,15 106:18,24 107:1,3,14 108:4,5 319:11, 13,16,17

**reveal** 12:6 179:15 214:15,17 215:9 219:16

**revenue** 87:9,15,17,22,23 88:2 93:18,23 94:16 95:2,6,10 99:21 100:1,6,10,11 101:5,7,15,16,19,21,23 102:20 104:13 105:5 164:16,21 165:3,9,18 166:5,8,9,15 167:3,24 168:9,12,13,16 194:12 197:12,16,18, 21 198:1,4,6,9,12,20,23 199:1,4,6,24 203:22 206:9 211:19,24 212:3 221:5, 8,11,14,19 222:7,11,12,17,19 318:14,

21 319:1,4,5,9

**revenues** 234:19,22

**review** 17:3,6,20 18:1,2,3,7,8,10,14, 15,16 23:7 48:22 50:6 67:11,24 68:3, 10 78:12,14 93:13 148:8 169:12 194:1 229:4 275:1,2,19 284:10

**reviewed** 17:8,13,15

**reviewing** 18:20 187:20

**Rewarded** 42:4 43:7,18 44:2,15 45:10

**Rich** 241:9,10,11,17,19,22 242:4,7 278:21 281:5

**right-hand** 160:1 176:12,19 189:8 191:14

**rights** 267:7

**ring** 170:18

**rise** 75:10

**risk** 75:10

**rival** 37:4,5

**RODRIGUEZ** 214:19

**role** 35:10,12,18,21 37:14 39:15 40:21,22 43:9 48:11 225:22 279:2 289:9

**rolled** 206:12,17,21 225:16,19

**rollout** 225:21,22,23

**room** 68:14 180:5,7 234:3 308:8

**rough** 184:5

**roughly** 22:8,14 24:13 39:4 66:10 76:8 187:18 250:23

**round** 182:17

**route** 60:24

**row** 261:4

**rows** 244:1

**RTB** 112:13,16 113:1,8 133:2,5,12, 16,19 138:13

**Rubicon** 161:18,24 202:23 203:8,11 204:16

**Rubicon's** 203:18,20

**rule** 138:4

**rules** 13:5 38:15,16 137:7 193:15,18 209:3,6 316:2,19 317:15 318:6,11

**run** 283:14

**running** 203:7,10 316:13

**runs** 247:19

## S

**S-C-O-T-T** 10:19

**S-P-E-N-C-E-R** 10:20

**safe** 289:16 294:19

**safety** 34:17 35:1,3,8 39:7 41:6 191:2 276:1,4,7,14

**sake** 204:17

**sales** 30:3 37:14,17,20 48:9 52:17,20 53:1,4,6,9,13,15,21 54:3,10 61:15,20 62:4 72:23 121:17 122:22 147:20 148:2 152:12,14 155:12 165:20 166:12 196:11,12 200:15 267:7 289:3 296:12 305:7,8

**salespeople** 54:24 55:2

**salesperson** 202:14,15

**sat** 153:4

**scale** 173:4,17 174:8,13,18,21

**scared** 165:22

**scenario** 139:6

**Schiller** 9:23 193:10

**School** 23:13,16

**SCI** 188:4,11,15,22

**score** 248:2

**scores** 261:24 262:10

**Scott** 9:12 10:12,19 18:3,4,19,21,22, 23,24 19:6 22:23 188:15 284:9 307:17 308:4,16 322:15

**scraping** 205:18

**scroll** 264:12,21 267:12

**searched** 173:1

**seated** 16:18 21:11,14

**seconds** 295:13 296:14,22

**section** 205:12 299:1

**sections** 238:10

**security** 279:16,20 283:22 292:4,9, 12

**seeking** 256:2

**selected** 226:5

**sell** 48:8 74:2,7 77:2,5,6 95:20 102:3 104:16 105:9 106:18,21 107:2,3,15, 22 117:8 119:12 124:3 127:3 163:22 166:2 167:20,21 199:1,5 243:6 245:1 281:9,10 294:9 305:10

**sellers** 112:9

**selling** 30:2 170:18 301:22

**semantics** 175:6

**send** 49:14

**senior** 190:14

**sense** 66:17 102:5 139:12 216:5,6,7 220:14 221:8

**sentence** 47:19 52:13 58:8 69:11 70:20,23 72:4,8 80:10 89:15,18 90:4 91:16 102:10,12,15 103:5 111:9,19 112:10,24 127:4 128:12,14,20,23 134:12 145:7,11,21 146:2 149:13 210:13,17,18 213:18 214:2 215:14 230:11 235:9,21 236:17 237:3 289:1 295:5,20

**sentences** 111:15 313:22

**sentiment** 192:3 238:18

**separate** 143:1 198:17 215:1,22,23 216:10,12 224:8,23 238:9 244:16 313:9,20

**separately** 111:7,10 114:10 157:10, 13 198:14 231:11,12,24 232:20 233:14

**separation** 182:22

**September** 181:11 278:6 280:12,21 295:12

**sequentially** 288:10

**Serina** 239:14 276:22

**serve** 40:7 130:2 241:12

**served** 247:2 253:7 295:11 296:8

**server** 25:22 26:1,3,5 36:23 38:12 39:20 40:4,7 41:7,16 61:18 118:13 119:13,15,18,20,22,23 120:3,6 122:13,14 126:10,18,20 127:17,19 128:6,24 130:11 135:6,10,11,14,15 136:8,23 141:8,10 160:18 161:6 162:4,10,15,18 200:16 216:4 228:10, 13 231:15 237:1 238:3 240:8,14,17, 18,19 241:5,12 243:3 244:10,12,13, 14,21,23 245:15,18 246:3,18,21,22 247:1,8,14,16,18,19,20,23,24 248:16 249:7 250:12,14 251:2,24 298:8,9

**servers** 26:6 37:5 61:19 62:3 136:21 137:1,3 140:15,18 141:2,3,6 196:10 216:8 238:8 244:12 248:19

**serves** 45:3

**service** 140:11 196:13

**Services** 288:17

**serving** 11:21 12:1,12 19:10,11,12, 14 25:4,18,21 26:15 36:20 37:2 48:10 62:10 77:7 122:16 227:12 238:6 239:1 241:17,20 242:1,2 243:9 244:15,18 250:19 252:20 253:11 256:3 278:8 292:1 308:14

**session** 16:14,16 17:1,4,10,13 148:9

**sessions** 16:12

**set** 33:16 35:15,22 36:1 55:20 57:17 67:4 71:21 72:2 77:20 92:22 94:14 108:7 116:4 117:12 118:10 123:20 129:6,20 131:5 136:3,5 137:17 169:1 176:1,5 178:10,11 194:13,14 196:5 201:23 227:13,17,20,22 265:13,17,18 268:10,16

**setting** 34:6 194:5

**setup** 267:14

**setups** 216:4,5,6

**severance** 183:6,7 184:2,9,18 185:5,6,10,13,24

**shakes** 13:11

**share** 79:17,23 81:14 93:18,23 94:16 95:2,6,10,15,23 96:4 97:4,7,17 98:17 99:3,9,10,21 100:1,10,14,16,18,19, 22,23 101:5,15,16,19,21,23 102:2,21 104:13,21 105:7,15 106:18,24 107:1, 3,14 108:4,5 151:12,16 199:1,6 218:9,12,17 285:13 318:14,22 319:1, 4,5,9,12,16,17

**shared** 196:12 197:5 200:15,16,17 201:1,10 285:20 319:23

**shares** 21:23 22:2,7,13 94:2 95:22 100:6,11 101:7 104:17 105:9 184:1, 12,15

**sharing** 216:8 285:23 294:16

**sheet** 258:13,14

[redacted] 68:20,21 69:1

**shift** 286:3,7 301:7,12

**short** 212:2

**shortly** 242:3

**show** 200:8 243:12 249:21

**showed** 161:13

**showing** 266:1

**shown** 21:2 129:8,10

**shows** 168:8

**shut** 43:20

**side** 31:8,9 48:7,8 58:20 68:5,8 74:2, 3,7 77:3,5,6 97:7,9,11 99:3 101:5 102:3,16 104:17 105:9 106:10,13,18, 21,22 107:2,3,5,7,11,15,16,23 112:11 119:12 127:3,5 156:2 160:1 170:5 176:12,18,19 189:8 191:14 199:1,5 248:1 251:7 281:9,10 294:8,9,12 305:10 318:14

**sides** 218:19

**Sidney** 9:10

**sign** 112:1 182:18 207:22

**significant** 182:17 213:15 214:11 252:17 253:2

**Silence** 17:24

[redacted] 18:23,24 307:15,16,17 308:4

**similar** 62:2

**simple** 275:5

**simplified** 218:1

**simplistic** 60:15

**simply** 128:11

**simultaneously** 61:10

**single** 214:5 217:6,10,15 225:12 236:9 244:3 253:11

**sir** 321:17

**sit** 49:13

**site** 26:7 51:8 166:24 238:10 319:23

**sites** 51:9 262:19,20

**sitting** 153:15

**situation** 130:21 216:14

**situations** 233:1

**size** 166:22

**skeptical** 111:1,2

**skepticism** 110:17

**skipped** 263:4

**slide** 156:18,21 160:4,6 161:11 164:4 168:6 169:22 171:19,22 172:15 174:20 175:9,16 250:1

**slip** 258:14

**slipsheet** 259:2

**small** 71:7,11 77:1,8 98:16 102:15 123:20 197:23

**smallest** 250:10

**Smart** 248:22 249:3

**smartphone** 87:7

**sold** 90:14 92:18 124:1,7,8,9,17 165:3 167:20

**solution** 25:19,21 47:11 60:19 62:15 211:1 234:14 236:22,24 256:11,15,18

**solutions** 37:12 105:15 202:19 228:17,20,22 237:16 298:13,15,18 301:21

[redacted] 69:2,14,17,21

**sophisticated** 31:5 60:14

**sophistication** 30:19 32:11,15

**sorry--** 249:11

**sort** 33:14 63:16,20 64:17 79:8,9 102:14 147:21 160:9 164:8 189:7 196:14 244:5 247:11,13 257:2

[redacted] 289:7,8

**sound** 13:20 14:20 20:2

**sounds** 11:2 24:17 27:24 195:4 282:8 316:5

**source** 173:5 254:14 309:3,7

**sources** 257:15,19

**Southern** 9:6

**speak** 53:13 111:15

**special** 117:19,22 118:6 171:15,20 172:3

**specialized** 248:11

**specific** 53:20 76:12 166:12 183:20 185:23 190:20 194:20 198:11 242:5 249:10 276:12,19,20 289:15 303:6 318:1 321:1

**specifically** 14:11 61:24 70:12 165:2 279:5 320:23

**specifics** 39:9 51:22 52:5 65:23 66:2 230:20

**specifies** 268:6

**speculate** 153:7

**spell** 10:18

**spencer** 9:13 10:12,17,19 12:4 21:17,19 22:20,24 23:1 47:14 49:1 50:5 66:14 67:4,20 68:16 78:6,15 93:3,12,15 106:3 108:8,14,22 109:12

120:18 121:9 142:24 144:1,8 174:14 178:9,13,15,19 187:12,21 192:22 193:8,21 201:24 212:11,19 228:24 229:9 239:13,23 249:24 253:5 255:1 258:5,19 259:8 260:7 262:22 264:6, 19 265:2 266:6,17 270:11 275:5 277:10,19 278:1,15 284:3 286:11,17 288:8,12 290:11 292:16,17,20 293:16 299:15 306:23 309:10 312:7 315:19 321:8 322:15

**spend** 16:9 51:2,6,13,19 58:22 59:3, 9,12,15 61:3 70:8,13,16 71:1,8,15,16 72:1,7,11 76:18 77:1,8,10,13,16,19 82:7,9,12 83:16,17 97:12 105:18 112:22 156:17

**spending** 71:7 97:17

**spent** 43:23 58:18

**spills** 110:12

**split** 107:15 135:1

**SPP** 210:14

**spreadsheet** 258:23

**Springboard** 267:1

**squad** 293:22,24

**Square** 122:3,5,6,8 123:6,9 128:13, 21,24 130:10 131:5

[redacted] 213:13,18,21,22,23

**SSB** 209:17

**SSL** 289:2

**SSP** 160:19 161:6 162:11,13,14,18 210:2,19

**SSPS** 173:16,21 175:3 176:1,5 289:3

**stack** 151:22 160:18 161:1,17,24 162:5,7,17,22,23 165:16 176:1,5

**stacks** 161:15 215:2

**stakeholders** 191:19

**stamped** 288:3

**stand** 14:9 18:2 26:10 148:24 188:4 259:23 315:10

**standalone** 240:21,23,24

**standard** 256:21 309:18,19,20

**stands** 58:10 123:10,13 190:23

**start** 13:4 22:21 30:21 62:19 77:18 96:12 97:22 113:18 121:18 133:8 144:3,10 177:2 210:4 213:5 278:24 282:7 286:3

**start-up** 44:3

**start-ups** 42:19 43:21

**started** 30:23 34:22 35:3,8 58:4 61:19 144:3 172:23 205:22 242:2 280:10 283:8

**starting** 24:19 59:7 62:7 169:8 172:22 205:13 209:12 213:9 243:10 295:12

**starts** 50:15 52:13 65:5 67:22 69:12 70:21,24 72:13 74:13 79:8,10 93:6 96:23 97:8 98:2,10 102:16 110:11 111:7 112:11 114:10 121:23 122:19 127:4 128:17,20 132:2,7 143:22 146:16 149:6 150:9 160:15 164:11 170:9 177:5 190:10 191:14 206:4 229:20

**state** 9:16 10:18 11:23 12:11 53:14 283:22 286:6 307:24

**stated** 81:6 224:5 271:20

**statement** 98:19 99:8 125:14 126:14 129:4 130:19,22 138:16 235:5

**statements** 15:12

**states** 140:19 174:20,22

**static** 241:12

**stating** 83:14

**statistical** 273:16

**stay** 137:8 235:17 236:19,20 237:8

**staying** 102:8 106:5

**steadily** 287:11

**stenographic** 9:15

**step** 171:17

**stepped** 190:11,13

**steps** 298:24

**sticky** 235:17 236:19 237:4,6,23

**stock** 21:24 183:10 184:1 191:18

**stood** 26:12

**stop** 39:13 64:11 298:1 309:6

**stopped** 138:5 194:16 195:7 321:6

**stopping** 283:12

**stories** 85:4

**story** 74:22 85:12,14 156:11

**strategic** 33:16 34:6 35:13,15 43:9 114:21 175:24 176:4 194:6 235:17 236:18 256:9

**strategically** 111:10 114:6,11,12,18, 24 115:6

**strategist** 42:1

**strategists** 42:9,13,17 43:10,20,23 48:11

**strategy** 190:21 208:7 234:19 235:3

**streamlining** 221:15

**street** 9:10 44:14

**strictly** 98:10 285:12

**strike** 100:20 133:8 224:19 240:13 246:1 250:16 251:18 266:18 310:13 311:21 319:14

**strive** 316:21

**struck** 107:24 108:2

**structured** 197:8 231:21 232:13,15

**study** 145:2,8,14 146:21 149:9,16,21 150:3,6,11,14,20,22 152:19,24 153:4 154:15 155:13,18 156:11 157:4,8,18, 19 158:5,16 159:17 165:5 168:19,23

**subject** 144:24 214:15,20 255:13 278:7,11 285:8 286:24 288:17 300:10 302:4 303:3 307:4 310:2

**submitted** 317:7

**subpoints** 171:23

**subsection** 71:8,12

**subsequent** 163:20

**subsidize** 106:13,16,22

**subsidizes** 106:10 107:7,10

**subsidizing** 107:17

**substance** 96:13 110:12 214:20,22 215:9 219:4 220:6,9 300:21,22 302:15

**substantially** 92:7

**substantive** 156:21

**sued** 11:6,24 12:11

**suggesting** 85:22 155:15

**suite** 54:5,12

**summary** 47:16 69:9 145:8,13,20,22 146:1,5,6,7 160:5 188:15 256:1

**summit** 148:9,11 149:1 154:24

**supply** 320:16

**support** 177:12 188:4,7,8 278:21 279:17 283:9,11 285:24 287:1,11,13

**supported** 54:8 279:15,18

**supporting** 280:17 283:12

**Suppose** 136:2 205:5

**surprise** 20:4

**surprised** 181:23 182:4

**survey** 153:6,7 155:20,22

**swear** 10:10

**Swiffy** 281:6,12,13,15,16 282:6,9,10 297:20 298:1,3,4,7

**Swift** 281:13,17

**switch** 208:21 237:10 238:7

**switched** 208:17 212:6

**switching** 208:19 238:3

**swore** 14:22

**sworn** 10:13 15:2

**system** 55:21 200:7,9 207:6 208:1 209:7 242:11,24 243:2,4 309:8

**systems** 199:23 200:1,4,10 236:1

**T**

**tab** 249:16 254:1 258:6,21,23 264:7 269:12,16 277:12 284:2 286:11 288:1 290:6 292:15,19 303:23 306:12 311:18

**table** 21:11,14 86:2,5 87:20 88:3 89:11,13 90:6 91:10,24 92:15,20,23

**tablet** 86:21

**tag** 119:8,10,11,14,17,19,22 126:10, 23 127:2,9,13,15,16,19 128:2,5,9 204:15

**tags** 120:1

**tail** 35:4 235:15

**taking** 9:17 55:15 143:14 229:4

**talk** 13:18 36:3,5 37:21 54:3,10 127:23 213:13 222:4,7,12

**talked** 45:9,11,12 100:13 102:1 165:15 202:16 205:1 220:8 227:6 230:17

**talking** 33:15 44:13 46:17,18 48:1,3 72:7,11 73:3,6,11,14,16 74:24 75:5, 20 76:3 91:2 97:3,6,16 98:7 99:24 100:2,21,23 101:3,12 114:23 120:11 124:22 129:21 139:14 156:6 167:8 171:11,14 173:23 175:6 188:21 189:1,5 191:12,24 192:15 238:19,21 246:21 252:11 257:3 272:8 289:22 291:4 312:24 315:4

**talks** 98:21

**targeted** 46:8,11,15,21

**targeting** 26:16 44:11 116:21,22

**tax** 104:8

**team** 18:6 27:13 30:3 38:8 39:18 49:9 52:17,20 53:1,5,6,9,13,15,21 54:3,10 61:21 63:10 122:22 123:1 144:14 148:2 152:13,15 156:4,6 192:11 196:11,12 201:14,16 218:23 223:3 226:2,5,11,19 251:1,7 274:4,5,6,7,15, 16,24 275:3,6,8,18 276:1,4,7,14 287:10 294:7 296:12 308:14

**teams** 37:14,18 155:12 215:1 251:2, 4,6,10 275:9 301:5 305:5

**tech** 42:1,9,12,17 43:10,20,23 48:11 176:5 258:4,18 260:22 264:6 277:11 284:2 286:10 287:24 290:6 292:15,19 303:23 311:17

**technical** 213:16 214:12 247:12

**technically** 205:18 215:2 221:22 222:1

**technician** 249:15 253:24 254:14,18 258:20,22 259:12 264:23 290:11 321:7

**techniques** 271:22

**technologically** 64:10

**technologies** 48:13 216:3 271:22

**technology** 11:7,21 12:1,12,18 26:6 32:19,20 45:5 130:8 161:23 162:1 163:8,11,14 164:12,15,20 165:2,9 167:12 252:20

**telling** 157:18 289:14

**ten** 50:13 163:5 244:1

**tend** 26:3

**term** 113:21,22,23 162:14 170:16 175:19 212:2 219:11 237:3 257:8 265:21 268:21 301:11 318:5 320:3

**terms** 94:13 117:19,22,24 118:6,24 119:6 189:22,23 209:10,12,14 217:7 219:11,12 243:14 251:6 261:24 262:9 263:9 283:4 296:15 314:3

**Terrific** 311:16

**test** 200:1,2 226:13

**testified** 10:14 241:3 252:10,11 302:7 316:1

**testify** 15:16 16:2 179:4 180:24

**testifying** 15:3

**testimony** 13:7,9 16:6 152:19 204:21 252:13 279:9 302:9,13,16

**Texas** 11:24 12:11 178:20

**text** 89:12 160:9 164:4 170:9,11 171:7,23 173:12 175:12 178:14

**text'** 170:9

**theoretical** 97:20 98:1,4

**theory** 60:3 96:23,24 98:2,10 100:13

**thing** 64:7 74:16 196:15 218:5 225:6

**things** 28:6 62:6,12 171:14 175:18 211:11 217:23 231:21,23 241:12 243:12 244:15 245:7 268:10 275:3,9

**thinking** 116:3 118:18

**third-party** 97:4 101:1,5,15,22 103:23 112:1 113:4 118:13 119:15, 17,20,22 120:5 135:13 136:20 137:1 155:20 274:9

**thought** 58:12 83:11 85:10 114:12, 16,18 154:19 175:19 179:2 225:6 238:19,23 313:6

**thoughts** 68:18 220:13,15,16 229:19,21,24

**thousand** 246:12

**thousands** 54:23,24 57:20 147:6 196:17

**thread** 79:8 80:3 209:9 213:6 269:23 313:9,20

**threshold** 273:11

**tied** 236:2

**tiered** 246:16

**tighter** 236:11

**time** 9:7 11:22 18:6 19:3,16,17,19,23 20:9 24:22 26:11,24 28:16 31:12,24 32:10 34:14 37:18 39:2,3,5,10,18,19 49:17,23 50:3,6 51:12,22,24 52:2 55:22 58:18 59:5 60:23 62:6,7 63:5,9, 13 65:12 66:22 67:2,24 68:3 74:11 76:2 77:18 82:20 86:24 90:20 93:18 94:16,20 95:5,17 96:18 109:6,10,20 113:12 117:2,9 120:1 122:13 125:4 126:16 135:21,24 140:10 141:13 142:18,22 154:6 156:18 161:5,7,19 163:6 181:9,20 187:15 193:1,4 194:15,21 195:8 198:21 203:5 204:3 205:24 206:13 211:13 213:2,15 214:9 222:4,22 223:15 225:19 226:3,6,12,

24 227:4 228:15 229:14,17 236:7 239:6,10 241:1,19,21 242:6 243:6,9 244:14 245:13 246:10,24 248:9,20 250:21 251:10 260:1,5 263:4,5,21 264:12 266:13 267:20,24 270:21 271:10,22 274:5 276:2,4 277:4,8 280:11 284:9 289:11 297:4 299:8,12 300:1,17 309:7 315:12,16 316:10,12, 18 318:22 320:7 321:9,13 322:6,16

**times** 19:5 154:2 220:8,14 296:4

**timing** 263:23

**tired** 92:23

**title** 24:2,4,8 27:20,22 28:1,2,8,20,21 35:11 265:8 290:21

**titles** 28:4,5,15,23

**TLDR** 145:5

**TMG** 202:22 204:15,18

**today** 10:10 13:7 14:7 16:7 21:11,14 30:10 31:21 32:2 46:10,14,20 87:7 110:2 113:11 120:3 122:14 126:3 142:9 204:21 213:13 243:13 316:1

**today's** 9:6 181:20 322:15

**told** 20:1 53:9,16 54:21 55:2,7 81:2, 18

**tool** 59:11 61:8 165:19 282:7,9,10 298:4,6

**tools** 30:20 46:14,23 47:1,4,6 59:11 62:12 298:21 301:21

**top** 33:14,24 41:19,24 47:16 70:4 72:15 79:9 97:1 144:16 148:17 150:9 158:24 160:4 170:3 177:2 201:9 209:9 218:3 259:11,16 260:11 261:2, 7,10,13,23 262:9,12,14,16 270:11 285:3 299:24 308:10 313:8

**topic** 14:17 220:5 221:3

**topics** 219:17

**tossing** 234:18,22

**total** 88:4,6,14,17 89:19 90:1 91:13, 17,21,22 104:20,23 107:14 261:21

**TPS** 188:22

**track** 198:3,6

**tracked** 198:12,14,20,23 199:4

**traction** 215:17,24 216:11,16

**trade** 31:6 32:23

**traditional** 238:24

**traffic** 223:5,7

**trafficking** 242:13 243:1,15,17

**training** 38:3

**transcribing** 13:7

**transcript** 13:10

**transferrable** 59:9

**transferred** 240:5

**transition** 29:8 297:23

**transitioned** 40:5

**transitioning** 298:4

**transmission** 60:12

**transparent** 15:6 207:12 208:15 209:2,3 316:2,19

**transpired** 230:1

**travel** 181:11

**trial** 179:4,11 180:2,3,14,16,20

**trials** 180:9

**trouble** 187:15 260:21

**true** 38:12 39:8,20 54:17 140:7 142:9

**Trueview** 262:22,24 263:1,2,8,12,14, 17,22 265:9,10,13,18 266:6,14 268:24 269:5,8 270:20 271:5,9,19 272:6,8,14,16 273:19,23 274:2 275:12,24 276:11,13,19,21

**trust** 40:16 190:14 192:10,11,20 276:1,4,6

**truth** 15:2

**Tuesday** 313:15,24

**turning** 285:9

**two-thirds** 289:6 306:22

**two-year** 280:24

**type** 33:11 51:10 52:3

**types** 30:8 32:5 54:7 117:18 268:6

**typically** 110:16 118:3 123:12 252:1 267:6 272:13 290:3

**typo** 58:11

## U

**U.S.** 9:5 86:13 142:8,10

**uh-huh** 13:11 69:16

**UI** 225:1 242:13,14 243:15 253:11

**UI"** 243:1

**UIS** 128:4

**ultimately** 75:16 212:6

**um-hum** 13:11

**unaware** 182:6

**unchanged** 253:12

**unclear** 14:3 72:10 268:19

**unclick** 297:2

**underlying** 62:1

**underneath** 65:4 137:4 151:20

**understand** 11:5,8,10,23 12:10 13:6,24 14:1,13,14 15:1 33:6 46:23 64:24 97:16 101:10,11 114:17,22 116:5 123:12 129:16 131:9 171:4 180:2,15 190:23 195:11 197:11 199:9,13,17,21 200:3 227:7 234:9,24 235:5 243:5 246:4 283:2

**understanding** 11:15,18 63:12,15 92:1 112:4 150:1,15,17 157:7 159:5,7 173:20 203:9,16 214:7 234:21 235:2 236:6 246:7 252:8 257:7 276:3 281:14 317:2

**understood** 13:23 14:21 40:3 63:23 200:13 209:4,6 220:18 244:7 265:14 291:18 316:3,20 317:16,20

**undertake** 273:24

**unification** 215:18 252:16 253:1

**unified** 38:14,16,19,23 151:22 160:18 161:1,15 162:6,17,22 217:13 231:17 251:4 253:8

**unique** 47:23 48:5 114:3 170:18 171:15,20 172:3 173:17 174:9,13,18, 21 261:5,17,18,19 301:22

**United** 140:19

**unlike** 289:2

**unpause** 296:6 297:2 303:20

**up-to-date** 41:11 48:12

**upcoming** 145:1

**update** 300:10 304:17

**updated** 271:10,13

**uplift** 147:1 151:3 168:8 177:6,11

**usage** 196:24 198:9 246:17 292:6

**useable** 236:9

**user** 36:8 40:16 45:4 48:9 217:13 242:14 296:23 297:1

**users** 51:7 223:12 224:2 287:12 295:14

**USP** 170:12,14 171:8 175:12,19 176:10 177:24 178:8

**USPS** 171:11 172:18

**utilize** 309:15

**utilized** 154:10

V

**vaguely** 278:3

**variable** 99:21,24 100:9 102:20

**variables** 166:11

**variants** 228:17

**varying** 97:3,6

**Vash** 239:3,12,14 240:13 242:16,20 246:1 249:14,19 250:16 251:18 252:22 253:23 254:6,10,17,19 258:4, 10,17,21,24 259:4,17,21 260:6,18 262:5 263:13 264:5 265:1 266:18 267:17 268:1 269:10,16 274:12 277:1,9,18 284:1,11 286:10 287:24 290:5,13 292:14 293:4 299:13,14 302:9,12,19,23 303:22 304:2 306:10, 15 310:13 311:16 315:8 321:21 322:5

**vast** 223:16

**vector** 283:17

**vendors** 256:5 275:4,10,12,15,16, 19,22 276:10

**ventures** 41:21 42:6

**verbiage** 303:6

**version** 191:11 289:23

**versus** 28:6 119:3 168:9 184:9 185:5 196:14 201:11 244:4

**vetting** 156:10

**Viacom** 262:20

**vice** 23:24 24:10,12 35:9

**video** 9:5,7 58:14,16 178:2 241:18,20 242:1,2,4 255:22 256:9,11,15,18,22, 24 257:1,5,14,18 260:11,12 261:3,7, 13,21,22,24 262:9,13,14,18 263:2,7 267:5 272:2,7,8 274:5

**videos** 261:19,20

**view** 60:7 74:6 82:9 83:1 90:13 108:21 153:16 172:13 231:4,9 232:1, 14,17,18 234:12 262:3 267:16 272:10,11,12,16,22,24 273:8,12

**viewed** 181:16 261:21

**viewer** 261:20

**viewers** 261:5,17,18,19

**viewpoint** 225:4

**views** 231:6,8

**violate** 135:16 136:9,13 273:21,22

**violated** 273:18,19 274:1

**violating** 137:13

**violation** 135:8 272:21 273:13

**violations** 63:4 275:23 276:11

**visited** 51:8

**visiting** 247:5

**Vivo** 262:20

**voices** 110:17

**VP** 24:19,20 29:1 40:15 41:13

**vying** 256:6

W

**wagging** 235:15

**wait** 18:13 259:19

**waiting** 144:7

**walled** 113:9,12,15,17,20,23

**wanted** 56:22 57:1,4 62:9 68:9,12 81:20 82:7 84:13 85:15 126:22 154:18 165:23 211:18 224:7 231:14 234:17 245:1,4 280:5

**wars** 131:10,14

**watch** 296:24 297:1

**ways** 63:23 158:9,17,22 197:21 231:3 235:22 297:22 298:3

**Web** 279:22 281:7 282:11,13 309:13

**website** 247:4,5

**websites** 246:19

**week** 145:10 147:15

**weeks** 13:2

**Welch** 10:10

**whichever** 234:16

**white** 65:3 178:15 265:20 269:5

**win** 89:19,20 91:18 92:11 318:15

**winner** 129:20,21 134:18

**winning** 85:7 88:14 90:1 91:13 129:1,14 130:1,11,23,24 131:1

**wins** 129:9,11

**withheld** 85:20

**won** 79:18 80:8,21 81:3,8,11 83:1,12, 20 84:5,14,20 85:23 88:20,21 89:4,5, 21 90:9,13,22 91:4

**Woojin** 266:9,10 300:9

**word** 25:20 51:13,19 58:6 114:6

**wording** 303:6

**words** 147:3 190:20

**work** 13:12 18:24 34:18,24 35:4,5,8 38:23 41:1 56:20,21 90:18 107:4 122:17 128:4 137:12 154:11 193:9 195:9 210:6 226:11,19 234:10 285:23 296:12

**worked** 34:15,16 48:7 53:8 65:24 66:3 201:20 209:7 223:16 239:23,24 243:14 283:1 297:22 309:16 317:3 318:22

**working** 38:22 39:2,3,5,10,13 40:11 43:22 45:5 61:11 94:24 138:5 155:3 199:10 242:9 243:24 244:8 265:15 276:13 285:18 291:20 301:6 315:3 316:10,12 321:6

**works** 140:3 291:17

**world** 48:10 140:4,12 276:15 301:23

**worldwide** 86:13

**worth** 22:7 289:1

**Wow** 311:21

**wrap** 14:17 139:22

**write** 58:22 59:12 76:24 80:7 100:4 111:4 112:10,23 150:11 210:8 218:4 230:8 314:8

**writes** 69:6 99:1 110:15 230:7 238:11

**written** 13:9 189:3

**wrote** 25:3 174:3 175:8 205:24 206:14 235:21 236:3,14 238:14 278:3,5,16

X

**XFP** 250:17,18 255:22 256:11,15,18 257:1,2

Y

**Yahoo** 262:20

[redacted] 144:22 146:4

**year** 21:9 23:21 24:13,24 29:2 45:19 181:12 182:14 186:7

**years** 24:9 25:14 28:8 140:15 238:1 241:8 271:14

**Yesterday** 16:15

**yield** 60:19,23 61:2,6,8,12,17,22,23, 24 62:10,15 63:24 64:3,8,11 103:9 104:20,23 105:24 132:8,10,11,16,17, 19 133:11 134:4 139:7 162:15,16 167:1 203:18,20 204:8,9,23 205:2,17, 23 206:6,11 207:3,4 210:5 211:16 238:8

**York** 9:6

**Youtube** 274:4,7,15,24 275:6,8,12, 23 276:10 298:24 299:22,23,24 300:1