# Exhibit 18

**Responses to Questions 1, 4-25, 28-36, and 39-52**
**of the Autorité de la Concurrence's Request for Information dated 23 July 2019**
**Case No. 19/0030F**

This submission sets out Google's response to questions 1, 4-25, 28-36, and 39-52 of the Autorité de la Concurrence's (**FCA**) Request for Information relating to the online advertising sector dated 23 July 2019 (**RFI**). The RFI requires Google to provide the responses to these questions by 23 September 2019. Responses to the remaining questions will be provided shortly.

As agreed with the Rapporteur, Mr Clément Chazelas, by email dated 11 September 2019, a French version of Google's response will follow by the end of the week commencing 23 September 2019.

Google's response and its annexes contain sensitive business secrets that should not be disclosed to third parties. Pursuant to Article R463-13 of the Code de Commerce, Google will formulate a request for this purpose and provide a non-confidential version of its responses.

Google does not endorse or validate the content, findings or views expressed in any third party materials, reports or studies referred to in this response.

We hope our responses are helpful. Please let us know if you have any questions.

## Definitions

**Ad network –** a platform that brokers the sale of publishers' ad inventory to advertisers.

**Authenticated users –** users that have created and are signed-in to a Google Account when they interact with Google services.

**Advertising intermediation** – the resale of digital advertising from publishers or the provision of services that facilitate the sale of digital advertising between advertisers and publishers.

**CPM - (Cost per impression) –** the cost to the advertiser of every 1,000 impressions of an ad.

**Digital advertising** – the purchase, sale and serving of advertising either a) displayed on an Internet page viewed through a web browser or b) accessed via an app downloaded onto a device.

**Display advertising** – any digital advertising which isn't search advertising (includes both video and non-video advertising content sold either inside standard display units, integrated into the surrounding content or shown during, before or after other video content).

**Dynamic allocation** – a feature within Ad Manager that allows a publisher to maximise its overall yield by ensuring there is competition for its inventory from multiple demand sources, while also protecting the value of guaranteed inventory/reservations.

**Exchange bidding** – a service offered by Google Ad Manager; this is a server-side unified auction where several Ad Exchanges and supply-side platforms can compete in real time along with Google's Ad Exchange (AdX) to purchase ad impressions.

**Google** – means Alphabet Inc and all of the subsidiaries and businesses within the Alphabet group.

**Header bidding** – an advanced programmatic advertising technique wherein publishers offer inventory to multiple ad exchanges and supply side platforms simultaneously before making calls to their ad servers.

**Inventory** – the number of advertisements or amount of ad space a publisher has available for sale to advertisers.

**Online search services** – user services related to the use of a search engine, including both general search services and specialised search services.

**Privacy policy** (also known as Privacy Notice or Data Use policy) – policy relating to the collection, use, processing, sharing (internally and externally with third parties) and retention/storage of user data by a provider of User Services.

**Publisher** – producer of online content that may be used to support the display of advertising to consumers.

**Search advertising** – advertising related to online search services i.e. where advertisers pay to list and/or link their company site domain name to a specific search word or phrase (includes advertising relating to general search, specialised search and mapping services).

**Unauthenticated users –** users that are not signed-in when they interact with Google services, or who use Google services without a Google Account.

**User services –** the provision of online products or services to consumers, either wholly or partially funded by, or otherwise used to support, the display of advertising to consumers.

## Table of Contents

| | | |
|---|---|---|
| **Part A:** | **The ad servers for website and application publishers** | **5** |
| **Part B:** | **Intermediation platforms for online advertising not related to search for website, application and content publishers** | **27** |
| **Part C:** | **Advertising space purchase platforms** | **34** |

## Index of Annexes

| **Annex** | **Document Title** |
|---|---|
| 1 | French competitors |
| 2 | Data |
| 3 | Ad Manager Terms and Conditions |

**Part A. The ad servers for website and application publishers**

**Q1. Please provide the list and description of ad server services (or advertisement broadcasting services) offered by the Group to the website and application publishers since March 2008 (e.g. Doubleclick for "DFP" Publishers).**

1. Ad servers enable ads to be displayed on publishers' sites and applications. They also allow publishers to manage their ad inventory and deals with advertisers. Google's response focuses on the following services for publishers; Ad Manager, AdSense and AdMob.

Ad Manager

2. Google Ad Manager includes publisher-facing ad serving functionality. Publishers use Ad Manager's ad serving functionality to manage inventory across a range of buyers and serve ads by forecasting the availability of inventory based on historical trends for their inventory, reserve part of that inventory for specific buyers, and sell the remaining inventory to ad networks or through ad exchanges. Ad Manager's ad serving functionality uses the information that publishers provide to select automatically the most relevant, highest-yielding ads available to help publishers monetise their inventory. Ad Manager includes reporting functionality which allows publishers to track the performance of ads displayed on their websites.

3. Ad Manager was introduced in June 2018[1] and provides functionalities that were previously marketed as distinct services, namely ad serving and ad exchange/supply-side platforms (**SSP**) services used by publishers to manage the programmatic sale of their ad inventory. In this response, "**AdX**" means Ad Manager's ad exchange functionality. The Ad Manager ad server and AdX work well together because they share the same technical infrastructure (meaning they can offer lower latency), and the user interface and reporting tools share the same format and design. Although these are now available in a single interface, publishers can still choose whether to use the ad serving or ad exchange functionalities separately. From March 2008 to June 2018, the ad serving function was known as DoubleClick for Publishers (**DFP**). DFP was acquired from DoubleClick in March 2008.

AdSense

4. AdSense connects website publishers to Google Ads advertisers (and other advertisers as backfill via the AdX auction) to allow them to sell advertising space on their websites through an auction process. AdSense has been providing services since before March 2008.

AdMob

5. AdMob serves both as an ad network and a platform for mobile app publishers. It provides ad server services through its platform function, by providing mediation services for publishers wishing to find buyers for their inventory from multiple different ad networks. Mediation increases mobile app revenue by calling a series of third party ad networks to fill an ad request, ordered by expected yield. Each ad network has the

---

[1] See "*Introducing Google Ad Manager*" available at: https://www.blog.google/products/admanager/introducing-google-ad-manager/.

opportunity to fill an ad request. If one ad network does not fill the request, the next ad network in the sequence gains an opportunity to do so. It also allows publishers/developers to promote their other apps and websites for free using reservation or 'house' ads. AdMob currently supports approximately 25 different ad networks for mediation. AdMob was acquired by Google in May 2010.

**Q4. For each one of the services identified in the response to the requests above, please provide the list of your competitors by differentiating them depending on whether they are more active globally, in the EEA or in France.**

6. Annex 1 sets out a list of competitors offering services which compete with the ad serving or advertisement broadcasting services offered by Ad Manager, AdMob and AdSense in France, and identifies where they are active. Please note that this list is not exhaustive but covers the main competitors active in France. A number of competitors active in France do not have a physical presence in France but manage French clients through other locations - this is indicated in column K.

**Q5. For each one of the services identified in response to the requests above, please specify whether the provision thereof is subject to a regulatory framework specific to the EEA or France. In particular, please specify if the regulatory obligations, such as the Sapin Law, have led you to adapt the portfolio of proposals that you offer or the services that you provide (e.g. potential tools to respond to the obligations of transparency).**

7. Google's ad services identified in response to question 1 are designed to comply with all applicable laws and regulations, including those relating to data protection, media, copyright, privacy and technology, at the EEA and French level. Before launching any new product or service, Google ensures that these are compliant with the applicable regulatory requirements, as Google's products and services are intended to be compliant by design. When regulatory obligations change, products and services are adapted accordingly.

8. Since its entry into force, the key regulatory framework that Google has identified as being relevant to these services is the General Data Protection Regulation 2016/679 (**GDPR**). Google made a number of changes to its policies and terms relating to ad services ahead of the entry into force of the GDPR.

9. Ad Manager, AdMob and AdSense services are all subject to the GDPR, acting as controllers of personal data. Following the entry into force of the GDPR, Google made two new sets of data protection terms available: (a) the Google Ads Controller-Controller Data Protection Terms, which apply in respect of those ad services designated as 'controller services';[2] and (b) the Google Ads Data Processing Terms, which apply in respect of those ad services designated as 'processor services'.[3]

---

2 See "*Google Ads Controller-Controller Data Protection Terms*", available at: https://privacy.google.com/businesses/controllerterms/.

3 See "Google Ads Data Processing Terms", available at: https://privacy.google.com/businesses/processorterms/.

10. In practice, Google relies on publishers, in addition to its own compliance efforts, to comply with its policies and GDPR, as users provide data through publisher sites and apps. Publishers using Ad Manager, AdMob and AdSense are controllers of users' personal data. Google provides publishers with a number of tools and help pages to help them comply with GDPR obligations.[4]

11. Google has had a user consent policy in place since 2012. Before May 2018, it required that consents be obtained from users in the EEA for the use of advertising cookies and data collection, sharing and usage, in order to bolster compliance with the EU Data Directive and ePrivacy Directive. Google updated its EU User Consent Policy[5] in May 2018 in order to help ensure publishers' and advertisers' compliance with the GDPR. This policy sets out the responsibilities of Google's partners for making disclosures to, and obtaining consent from, EEA-located users of websites and apps that use Google advertising services. This policy applies to the use of Google's ad services when used on properties visited by users in the EEA. A further adjustment to this policy was made following the publication of CNIL's guidelines on cookies and other trackers dated 4 July 2019.[6] As a result (pursuant to Article 5 of the Délibération), Google reduced the life of its cookies/trackers to 13 months. Compliance with the EU User Consent Policy is a contractual requirement for all publishers and advertisers using any of Google's any ad services. Google now requires that publishers and advertisers using its ad services obtain consent from EEA users for the use of cookies (or other local storage) where legally required and, where applicable, the collection, sharing, and use of personal data for personalised ads, in connection with the use of the ad services on their properties:

- **Consent for personalised ads & cookies/mobile identifiers**. Publishers and advertisers must obtain legally-valid consent from users in the EEA for the collection, sharing, and use of personal data for personalised ads and use of cookies or mobile identifiers where legally required, retain records of consent and provide clear instructions on revocation of consent. The obligation to obtain consent for the collection, sharing and use of personal data for personalisation of ads, only applies where ad services are being used in the serving of personalised ads to users. The obligation to obtain consent to the use of cookies or other local storage applies more generally as, for example, non-personalised ads still use cookies to combat fraud and abuse, for frequency capping, and for aggregated ad reporting. Publishers must also clearly identify each party (including Google) that may collect, receive, or use

[4] See "*Tools to help publishers comply with the GDPR*", available at: https://support.google.com/admanager/answer/7666366?hl=en&ref_topic=28145 and e.g. "*Help with the EU user consent policy*", available at: https://www.google.com/about/company/user-consent-policy-help/

[5] See "*EU user consent policy*", available at: https://www.google.com/about/company/user-consent-policy/.

[6] Délibération n° 2019-093 du 4 juillet 2019 portant adoption de lignes directrices relatives à l'application de l'article 82 de la loi du 6 janvier 1978 modifiée aux opérations de lecture ou écriture dans le terminal d'un utilisateur (notamment aux cookies et autres traceurs).

users' personal data from their websites, apps and other properties as a consequence of the publishers' use of a Google ad service.[7]

- **End-user transparency**: In addition to identifying those parties that may collect, receive, or use users' personal data, publishers are also required to provide users with prominent and easily accessible information about each such party's use of users' personal data. The Privacy Policy[8] comprehensively explains how Google processes user data including for advertising purposes. Google provides transparency to users via a number of informational resources, including dedicated sections in the Privacy Policy describing processing by Google in the context of advertising, and an embedded notice within ads themselves, "Why this ad?".[9] This allows users to see more information about why they are seeing an ad from Google's network. On Google inventory, users are able to click on an "info" icon to receive more info about why the ad is showing, and adjust their settings to control when they see similar ads in the future. When users are visiting non-Google websites and apps that partner with Google to show ads, they are able to obtain the same information, and are able to adjust their settings, by clicking on the "AdChoices" icon.

12. Publishers using Ad Manager, AdMob and AdSense also have the option to select their preferred ad technology providers (**ATPs**) from a list of companies that have provided Google with information about their compliance with the GDPR and that comply with Google's data usage policy to ensure publisher data is protected. This empowers publishers to decide which ATPs they want to allow to operate in connection with their properties, and helps them to understand which vendors they need to disclose to users and seek consent for, in compliance with the EU User Consent Policy.[10]

13. Google has made a number of controls available to users to control ad personalisation and opt-out of ad personalisation entirely:

- Unauthenticated users can switch ad personalisation off for both search and across the web. Opting out turns off all personal data collection, except IP address and turns the advertising cookie into something that is no longer classed as personal data under data protection law. The IP address is still recorded as it is important for counting of impressions, and for general fraud and spam prevention.

- Authenticated users can either use one-stop opt-out, which turns off ad personalisation completely, or select attributes (e.g. age, gender, interests) on

---

7 See "*How Google uses information from sites or apps that use our services*", available at: https://policies.google.com/technologies/partner-sites.

8 See "*Privacy Policy*", available at: https://policies.google.com/privacy?hl=en-GB.

9 See "*Why you're seeing this ad*", available at: https://support.google.com/ads/answer/1634057?p=privpol_whyad&hl=en-GB&visit_id=636771385987568731-1770450169&rd=1

10 See "*Select ad technology providers (for personalised ads)*", available at: https://support.google.com/admanager/answer/7673898.

the basis of which ads are targeted at them and delete this data or opt out of it being used to personalise ads to them.

14. Google also updated its ads data retention policies as part of its ongoing commitment to protecting the privacy of its users, ahead of the entry into force of the GDPR:[11]

- Signed-in Google users can delete past searches, browsing history, and other authenticated activity from their Google Accounts, so that they no longer contribute to that user's signed-in ads profile.
- With regards to non-signed in users, Google stores a record of the ads served. These server logs typically include a user's web request, IP address, browser type, browser language, the date and time of the ad request, and one or more cookies or an advertising ID that may uniquely identify that user's browser or mobile device. Google anonymizes IP addresses in logs by removing part of the address after 9 months, and after 18 months, Google further anonymizes log data by removing cookie or advertising ID information in both logs and ad serving databases. User profile information associated with advertising cookies and advertising IDs is also stored in databases that can be accessed for ads serving in real-time. Data stored in these databases is either deleted or anonymized after 18 months. User data tied to cookies and advertising IDs is also used to detect and prevent ad fraud and ensure that users don't see ads that they've blocked in the past. In these cases, or in cases where Google stores this data on behalf of its customers (e.g. in Google Analytics), data may be stored for periods longer than those specified above.

15. Google's ad serving services set out in response to question 1 are used by publishers and are not directly subject to the Loi Sapin. However, to the extent that AdMob serves not only as a platform for mobile app publishers (platform function, which is the relevant function addressed in response to the questions in this section A), but also as an ad network (a function addressed in response to the questions in Section B), the Loi Sapin does apply to this network function. Similarly, AdSense's intermediation function is subject to the Loi Sapin Details on the application of the Loi Sapin to these functions are provided in response to question 29 below.

**Q6. For each year of the targeted period, please submit your estimates:**

**(i) of the number of publishers using the competitor's ad servers globally and in the EEA;**

**(ii) of the number of impressions used by the ad server providers for the competitors' publisher, globally and in the EEA;**

**(iii) of your share in the global and EEA markets of the ad servers for publishers;**

**(iv) of the market shares of your competitors in the global and EEA markets of the ad servers for publishers.**

---

[11] See "*Google Ads User Data Retention Policy*", available at: https://privacy.google.com/businesses/retention/.

**Please specify the method used to arrive at each one of these estimates.**

16. Google does not routinely track estimates of its competitors' position in the market(s) for ad servers for publishers, nor does it routinely track estimates of the size of the market(s) for ad servers for publishers. Google is not aware of reliable third party estimates of these metrics.

17. Google intends to provide the number of publishers, impressions and revenues applicable to Google's own ad serving products, globally and in the EEA, according to the definitions requested in questions 2 and 3, respectively.

**Q7. Please send the list of publishers who have been users of an identified service in response to request no. 1 and who have put an end to this use (i.e. having terminated or not having renewed their contract with the Group) during the targeted period of this request.**

18. Google has been required to extract data from a number of different systems in order to provide the data requested by the FCA in this RFI. As such, different fields in the data are available for different time periods. The maximum time period of data which is available for each metric is provided. In all cases, however, it has not been possible to provide each of the requested metrics for the full period requested by the FCA. Moreover, where Google is unable to provide data in the exact dimensions requested by the FCA, but Google can offer the requested data in alternative dimensions, Google has done so. These instances are explained in detail in each of the responses to questions requesting data.

19. For the questions requesting data, due to the complex nature of the products in scope, Google has set out in detail how it has interpreted the FCA's question, and following that, the method which was used to generate the data to respond. This is to ensure the FCA is aware of any limitations to the data which may influence how the response is interpreted. If the FCA has any questions on the method used to generate the data in these responses, Google would be happy to assist further.

20. <u>The methodological notes set out in paragraphs 18 and 19 above apply to all questions in this response that request data.</u>

21. Data responsive to question 7 is provided in Annex 2.[12]

22. In Google's view publishers terminating their contracts for Ad Manager (DFP) and AdMob would not be representative of publishers ceasing their use of these products. This is because:

- Ad Manager (DFP) contracts between publishers and Google auto-renew. However, publishers may still cease their use of DFP by no longer offering any inventory for the product to manage, despite having a contractual agreement with Google.

---

[12] Google has provided responses to all data questions in Annex 2, with a separate tab relating to each question. The tabs are labelled with the question number to which the data within is responsive.

- For AdMob, publishers simply accept the terms of service when entering into an agreement with Google for use of the product. As above, publishers may cease their use of AdMob by no longer offering any inventory for the product to manage, but may still technically be bound to the terms of service if they do not explicitly close their AdMob account.

23. For the reasons outlined above, Annex 2 shows a list of publisher accounts, in each year for which data are available, that ceased their use of Ad Manager (DFP) and AdMob. In particular, for a given year, the list shows DFP and AdMob publisher accounts that were served more than 1,000 ad impressions through the products in the previous year, but were served fewer than 1,000 ad impressions in the given year.[13] [14]

24. Given the large number of publishers that have ceased use of their AdMob and DFP accounts, Google has limited this list to the top 1,000 publisher accounts in each year according to the number of impressions served by the product in the previous year. The tables below report the total number of publisher accounts lost, based on the methodology described above.

**Table 7.1: Total number of publisher accounts lost in each year globally, 2014-2018, AdMob**

| Year | Total number of publisher accounts lost |
|---|---|
| 2014 | 1,181 |
| 2015 | 22,007 |
| 2016 | 42,327 |
| 2017 | 67,628 |
| 2018 | 91,441 |

Source: Google

**Table 7.2: Total number of publisher accounts lost in each year globally, 2011-2018, DFP**

| Year | Total number of publisher accounts lost |
|---|---|
| 2011 | 2,550 |

13 In Google's view, fewer than 1,000 impressions is sufficiently low to view an account as being lost or deactivated.

14 Google has defined an impression for DFP as "count on download" for web impressions. An impression is thus counted each time a creative is downloaded in the user's device and has begun to load. Note that the impression is counted before the creative is fully downloaded and viewed by the end user. Mobile app impressions are counted when one or more pixels of the ad creative is visible on a device's screen. For more information on how impressions are counted, please see "*Google Ad Manager Help: Counting Impressions and Clicks*", available at: https://support.google.com/admanager/answer/2521337?hl=en. For AdMob, Google has defined total impressions as the total number of ads shown to users of the app.

| | |
|---|---|
| 2012 | 3,454 |
| 2013 | 3,961 |
| 2014 | 4,938 |
| 2015 | 5,409 |
| 2016 | 5,729 |
| 2017 | 5,715 |
| 2018 | 5,841 |

Source: Google

25. For AdMob, where available, the company name provided to Google by the publisher/developer at the sign-up stage has been included in this list. However, often, publishers/developers signing-up for an account may not provide the company name to Google (or indeed, may not have a company), and, instead, may only provide the contact name of the individual responsible for billing purposes. For DFP, two identifying fields are provided. The first, Display Name, is edited by the publisher, and the second, Name, is edited by Google. On occasions publishers choose not to enter a name and Google also does not enter a name. In these cases both of these identifying fields will be blank.

26. Please note that a particular publisher corporate entity may have multiple associated accounts in Google's systems. As such, this list includes only accounts that ceased their use of DFP and AdMob, even if a publisher (potentially) continued to use these products using a different account.

27. Google is working to supplement this information with a list of publishers lost from AdSense, and will follow-up in the second tranche of submissions with these extra data.

**Q8. Please indicate the date on which the dynamic allocation was incorporated in the DFP. If applicable, please specify the date of introduction of dynamic allocation in each one of the EEA countries.**

28. Dynamic Allocation is one of several features within Ad Manager introduced to help publishers maximise yield from the sale of their inventory. Dynamic Allocation (allowing the ad exchange function of Ad Manager, AdX, to compete based on real-time bids) was an existing feature of DFP (now Ad Manager) when Google acquired DoubleClick in 2008. Similar functionality was rebuilt using Google's infrastructure, post-acquisition, and the equivalent feature for small DFP publishers (who did not use AdX) to connect with AdSense demand via Dynamic Allocation was added. Dynamic Allocation was improved in March 2014 (to create Enhanced Dynamic Allocation, now simply referred to as **Dynamic Allocation**), and then again in April 2018 to create "Exchange Bidding in Dynamic Allocation" (referred to below as **Exchange Bidding**).

29. Publishers sell their inventory in two ways: some inventory is offered to a particular advertiser at a guaranteed price (i.e. "guaranteed" or "reserved" line items) and the remaining inventory is offered to advertisers via auction (i.e. "remnant" line items). In

2014, Enhanced Dynamic Allocation was introduced to enable publishers to allow remnant line items and Google's own line items – such as AdX line items and AdSense line items – to compete simultaneously with the guaranteed reservation line items with no impact to the delivery of reservation line items.

Enhanced Dynamic Allocation

30. Prior to March 2014, Dynamic Allocation did not allow AdX or remnant line items to compete at all with guaranteed line items, to ensure that the guaranteed line items served. But that came with an opportunity cost: the publisher did not maximise its revenue opportunities where an AdX buyer or a remnant line item buyer valued an impression more highly than the guaranteed buyer. Enhanced Dynamic Allocation allows AdX and remnant line items (and more recently, Exchange Bidders) to compete with guaranteed Ad Manager line items - but only where that does not cause under-delivery of the guaranteed line item. This benefits the publisher because it maximises revenue opportunities, without impacting the publisher's direct deals.

31. Enhanced Dynamic Allocation allows a publisher to maximise its overall yield by ensuring there is competition for its inventory from multiple demand sources, while also protecting the value of guaranteed inventory/reservations. This happens through a process of 'dynamically allocating' line items. The remnant line item with the highest cost per impression (**CPM**) competes against each guaranteed line item. The guaranteed line item will win the impression unless the opportunity cost of not serving the guaranteed line item is sufficiently low (i.e. the remnant line item offers enough value to the publisher to be served instead).

Exchange Bidding

32. Exchange Bidding is a server-to-server feature of Ad Manager that builds upon the existing capabilities of Enhanced Dynamic Allocation. There is an equivalent feature in AdMob called Open Bidding. It allows third party ad exchanges to compete with line items booked in Ad Manager and with AdX in a unified real time auction. This innovative and complex technology allows publishers to invite third party ad exchanges and SSPs to submit real time prices with standard real time bidding (**RTB**) calls. This avoids the latency issues publishers sometimes experience when they try to create the same effect manually through a self-implemented solution (e.g. Header Bidding, which is discussed in more detail in Google's response to question 17, below). Bids from third parties are considered along with bids from AdX and the publisher's reservation campaigns: the highest-paying ad will win the impression.

33. The Enhanced Dynamic Allocation process works as follows:[15]

---

[15] See "*Google Ad Manage Help: Dynamic Allocation*", available at: https://support.google.com/admanager/answer/3721872?hl=en.

**Figure 1**
**The Enhanced Dynamic Allocation Process**




Step 1: A publisher makes an ad request to Ad Manager.

Step 2: Ad Manager finds the best guaranteed line item eligible to serve for the ad request and calculates a temporary CPM based on the line item's current delivery.

Step 3: Ad Manager finds an eligible remnant line item with the highest CPM.

Step 4: Ad Manager calls Authorized Buyers and Network Bidders to find ads which can beat the temporary CPM of the guaranteed line item or the CPM of the remnant line item. If Exchange Bidding is enabled, Ad Manager will also call Exchange Bidders during this step.

Step 5: Ad Manager selects the line item with the highest CPM to serve an ad, protecting the value of guaranteed inventory in all cases.

**Q9. For each year of the targeted period, please indicate the number and percentage of DFP users, globally and in the EEA, who have effectively activated the dynamic allocation function.**

34. Data for the number of publishers with Dynamic Allocation (and Enhanced Dynamic Allocation) activated in DFP are only available from 2016. Enhanced Dynamic Allocation was introduced prior to this, and superseded Dynamic Allocation for all publishers. Therefore, the number of publishers with Dynamic Allocation activated in the period for which data are available is the same as the number of publishers with Enhanced Dynamic Allocation activated in the period. These data are provided in response to question 10.

**Q10. For each year of the targeted period, please indicate the number and percentage of DFP users, globally and in the EEA, who have effectively activated the improved dynamic allocation function.**

35. Annex 2 shows the number and percentage of active DFP publisher accounts, globally and in the EEA, that have activated the Enhanced Dynamic Allocation function.[16] Active DFP publisher accounts are defined as those that instigate at least one query in a given year.

36. Publisher accounts are allocated to the EEA based on billing address.

**Q11. For each month since the introduction of dynamic allocation, please indicate the percentage of DFP auctions won by AdX against other intermediation platforms (*SSPs/AdExchanges*) by distinguishing based on whether the DFP user has activated the dynamic allocation function or not In the event where dynamic allocation is activated and the auction won by AdX, please specify the absolute difference and the average relative difference between AdX's winning bid and the second highest bid.**

37. Annex 2 shows the number of Ad Manager (DFP) ad queries won by an AdX auction participant as a percentage of all DFP ad queries that were eligible for competition from AdX and were matched by the AdX auction or other channels, when Dynamic Allocation was activated. This is provided on a monthly basis from March 2016 (which is the earliest month for which these data are available) to July 2019. These data are restricted to publishers that have a billing address in the EEA.

38. Please note that AdX is only eligible to compete with other ad exchanges for a given ad query if the (Enhanced) Dynamic Allocation feature is enabled. As such, Google does not provide AdX's win rate broken down by whether the feature is enabled or not.

39. Google is also unable to identify just the auctions in which AdX competed with third-party SSPs/ad exchanges. This is because the publisher populates the channels that give Google an indication of whether the ad query was filled by a direct reservation, indirect reservation or house ad, meaning Google has no visibility of the accuracy, or method, of this classification. A line item that a publisher has indicated as direct reservation may, for example, be another intermediation provider.

40. Therefore, the numerator in the win rate consists of the matched ad queries won by an AdX auction participant (transacted as Open Auction, Private Auction or First Look Deal) and the denominator in the win rate includes matched ad queries filled by direct reservation, indirect reservation and house ads (as populated by the publisher) as well as ad queries matched by the AdX Auction (i.e. the numerator). Cases when ad queries were unfilled are excluded from this calculation, even when the AdX Auction competed for the ad query (this could result if, for example, the highest bid resulting from the auction was below the floor price set by the publisher).

41. For DFP ad queries filled by the AdX Auction, as requested, Google also provides the mean absolute difference (in USD) and the mean relative difference between AdX's winning bid and the second highest bid on a monthly basis from 9 March 2019 (the

---

[16] Publishers may operate more than one account. Therefore the figures provided may overstate the true number of total publishers, as well as the number of publishers with Enhanced Dynamic Allocation activated.

earliest date for which these data are kept) to 31 July 2019.[17] Google interprets the term "second highest bid" as the clearing price, which represents the actual price paid by the winner of the ad query in the AdX second-price auction.[18] Note that this "second highest bid" price could represent the maximum (plus a small amount, e.g. one cent) of either:

(i) the second highest bid of all participants in the AdX auction;
(ii) the winning bid from an Exchange Bidding participant (i.e. another SSP/ad exchange);
(iii) the floor price set by the publisher.

42. Google also notes that the data tracked on winning bids and clearing prices is typically discretized at the $0.10 level, where the lowest "bin" is $0-$0.10 and the highest bin is $50+. As such, to calculate the absolute and relative difference described above, Google has assumed the actual bid value to be the midpoint of the "bin". For instance, for a bid recorded as $3.40-$3.50, Google has assumed the actual bid value to be $3.45.

43. Finally, in the data described above, Google also notes that:

- The transaction types included are Open Auctions, Private Auctions and First Look Deals.[19]

- Ad queries that are identified to be spam are excluded.

**Q12. Please indicate if it is, or has been, possible for a DFP user to access the request made by AdX without activating dynamic allocation and/or improved dynamic allocation. If applicable, please identify your response during the targeted period.**

44. A publisher can access AdX using any third-party or in-house ad server; there is no need for the publisher to use Ad Manager for ad serving in order to access demand available though AdX. As set out in our response to question 1, although Ad Manager's ad serving function and ad exchange function are available in a single platform, publishers can still choose whether to use the ad serving or ad exchange functionalities separately.

---

17 Data for March 2019 reflect the average over 9 March to 31 March. At the time data was collected, 9 March was the earliest date available. It is impractical for Google to store bid-level data for a long period, therefore these data is available for only approximately 5 months.

18 Note this represents the value seen by publishers (i.e. net of Google's revenue share of the clearing price paid by advertisers).

19 For descriptions of these transaction types, please see "*Google Ad Manager Help: Transaction types in Ad Exchange*", available at: https://support.google.com/admanager/answer/2805834?hl=en.

45. If publishers are using Ad Manager's ad serving functions, then Enhanced Dynamic Allocation is applied to the request made to AdX as this is built into the processes that Ad Manager carries out in delivering ads to publisher pages.

**Q13. Please indicate if the DFP users are, or have been, authorised to deactivate the dynamic allocation and/or the improved dynamic allocation. If so you will describe the consequences of such deactivation. If applicable, please identify your response during the targeted period.**

46. As described above in response to question 12, Enhanced Dynamic Allocation is built into the processes carried out by Ad Manager as an ad server and allows publishers to maximise their revenue opportunities, without compromising their direct deals.

47. It is not possible for publishers using Ad Manager to deactivate Enhanced Dynamic Allocation within the Ad Manager interface. However, it is technically possible for a publisher to use Ad Manager without the Enhanced Dynamic Allocation functionality by creating a separate "AdX Direct" account, linked to a remnant line item in Ad Manager. They can then set an average price at which they want AdX to compete (instead of competing at the dynamic price informed by real-time bids). This would cause Ad Manager to call AdX in the same way as it would call any other ad exchange or ad network, in effect, deactivating Enhanced Dynamic Allocation.

48. The real time competition between AdX and items booked in Ad Manager as either remnant or guaranteed is on an impression-by-impression basis. Publishers using Ad Manager have the ability to disable AdX on any impression by configuring settings in Ad Manager and AdX to control which inventory is eligible to compete.[20] It is possible for a publisher using Ad Manager to exclude the AdX exchange function from its sale process altogether.

**Q14. Please describe why the dynamic allocation was introduced for AdX only, to the exclusion of all others intermediation platforms (*SSPs/AdExchanges*). In particular, please specify if this restriction is justified by technical reasons.**

49. When first launched, Dynamic Allocation did not facilitate competition between multiple exchanges in real time. Third party exchanges could compete only at a fixed price. This was consistent with competing intermediation platforms at that time, which used a waterfall process[21] to offer remnant inventory to demand sources.

50. To facilitate competition between multiple intermediation platforms, AdX would have had to make calls to third party ad exchanges to bid for ad inventory purchased in the auction. This would have added another layer of complexity to the ad serving process, with an associated increase in latency. In addition, such resale of inventory limits the

---

20 See "*Google Ad Manager Help: Dynamic Allocation*", available at: https://support.google.com/admanager/answer/3721872?hl=en.

21 Also known as a "daisy-chain" process. This is a revenue optimisation process used by some publishers to maximise the revenue generated from a set-up with multiple ad buyers. Each ad buyer is in turn given the opportunity to bid on the inventory - if they cannot meet the floor price, then this is passed back to the next buyer in the waterfall.

ability to review the creative that ultimately appears on publisher inventory. This increases the risk of ads being served that do not meet Google's high quality standards.

51. With the introduction of Header Bidding,[22] third-party demand sources were able to compete dynamically in the Ad Manager (then DFP) auction. No changes needed to be made to the Ad Manager auction to facilitate Header Bidding.

52. Following the introduction of Header Bidding, Google optimised its publisher focused tools, including by introducing Exchange Bidding and Enhanced Dynamic Allocation (see the response to question 8). Exchange Bidding enables third party ad exchanges and SSPs to compete with line items booked in Ad Manager and with AdX directly within Ad Manager.

**Q15. Please indicate whether any third-party ad servers are, or have been, able to interact with AdX in real time under the same conditions as those offered by DFP's dynamic allocation function. If so, please list them. If applicable, please identity your response during the targeted period.**

53. Any third party ad server can be used in combination with AdX, but Dynamic Allocation is a technical feature of Ad Manager's ad serving function.

54. AdX operates in combination with third party ad servers through Google Publisher Tag (**GPT**) passbacks and AdX direct tags. The third party ad server can make a call to AdX, using a GPT passback or AdX direct tag, to serve an ad matching specified targeting criteria. The Ad Manager ad server will then return an ad that matches the specified targeting criteria.

55. AdX is an ad exchange, and does not directly bid into auctions run by third party ad servers. A publisher using a third party ad server would have to assign a static CPM price or serving priority to the AdX demand. The third party ad server can then integrate that demand dynamically in to their creative selection decisions. That said, most demand sources (ad networks, ad exchanges and demand-side platforms) that submit real-time bids on AdX, also submit real-time bids on third-party SSPs. As set out in response to question 16 below, some third party ad servers have features equivalent to Dynamic Allocation that they offer their publishers to maximise revenue yield.

**Q16. Please identify the ad servers and the intermediation services of the DFP and AdX competitors who have implemented a technology similar to dynamic allocation during the targeted period.**

56. A number of competing ad servers and advertising intermediation services have introduced new technologies similar to Dynamic Allocation. These include, amongst others:

---

22 Header Bidding is an auction that takes place outside the publisher's ad server and allows publishers to simultaneously offer inventory to numerous SSP and ad exchanges before making calls to their ad servers.

- AppNexus's Publisher AdServer stages "a single, transparent auction across every buyer" using "Forecast-Shaped Pricing", which "increases a publishers yield through Open Dynamic Allocation".[23]

- Smaato's ad server uses "Dynamic Demand" to allow "every demand source to compete for ever ad request".[24]

- Smart's ad server runs "a comprehensive and transparent competition among all demand sources, direct & programmatic".[25]

- Improve Digital's Full Holistic Platform combines the functionality of an ad server and an SSP to allow "programmatic [bidding] to compete with traditional campaigns pushing revenues to the maximum".[26]

- MoPub's monetisation platform is designed to allow mobile app developers to maximise revenues by "bringing together all of your demand sources - direct sold, ad networks, and demand-side platforms (DSPs) - under a single unified auction, in which each ad impression is sold to the highest bidder".[27]

- The InMobi Mediation Platform allows publishers to "maximize [your] ad revenue with a true unified auction across multiple demand sources."[28]

**Q17. Please indicate if the publishers can access the request made by AdX while setting up a system known as "*header bidding*" and under what conditions. If applicable please differentiate the situation of the publishers using DFP from that of the publishers not using DFP but a competitor's ad server.**

57. AdX does not participate directly in the Header Bidding auctions, because Header Bidding takes place before the ad server has been called by the publisher. Similarly, the Header Bidding auction will not have real time access to the AdX auction.

---

23 See "*AppNexus Adserver*", available at: https://www.appnexus.com/sell/appnexus-adserver. See also "*Near-Perfect Pacing & A New Standard for Maximizing Publisher Revenue*", available at: https://productblog.appnexus.com/near-perfect-pacing-a-new-standard-for-maximizing-publisher-revenue/.

24 See "*Super-Auction for Every Mobile Impression: Dynamic Demand Explained*", available at: https://www.smaato.com/blog/dynamic-demand-explained/.

25 *See* "*Smart: Monetization for Publishers. More value. More demand. More revenue*", available at: https://smartadserver.com/publishers/monetization-offers/#section-01.

26 See "*Full Holistic Platform*", available at: https://www.improvedigital.com/full-holistic-platform/.

27 See "*MoPub's platform maximizes your revenue*", available at: https://www.mopub.com/publishers/platform/.

28 *See* "*InMobi Mediation Platform*", available at: https://www.inmobi.com/advertising-cloud/mediation.

58. Header Bidding is an additional, independent, real time auction that takes place outside the publisher's ad server and allows publishers to offer inventory simultaneously to numerous SSPs and ad exchanges *before* making calls to their ad servers.

59. Where a publisher is using Ad Manager as its ad server, it may also call a Header Bidding auction, which will be carried out *before* AdX is called. Ad Manager has no visibility into the Header Bidding auction. The winning bid from the Header Bidding auction is used to target a specific line item that the publisher has booked within Ad Manager (most commonly a remnant line item, the price of which reflects the winning header bidding price). The Header Bidding line item and AdX / Exchange Bidding will compete against other guaranteed and remnant line items for the inventory, based on the Dynamic Allocation process that has been described above.

60. Users are increasingly aware of how their data is being used, and are looking for ways to ensure their data privacy. These concerns are reflected in the work of regulators and other organisations, who are increasingly emphasising the importance of users' ability to control their data. Current privacy best practices (primarily driven by GDPR) include that providers of digital advertising services should (i) commit to less data sharing, not more; (ii) implement practical privacy safeguards, not merely rely on contractual provisions; (iii) obtain clear user consent and improve transparency in relation to how user data is being shared; and (iv) focus on the security of user data.[29]

61. These goals are all compromised to some degree by Header Bidding, as the additional auction results in data being shared with numerous SSPs and ad exchanges. Each additional party makes it increasingly difficult to control data sharing, be transparent as to with whom data is being shared, obtain user consent for the sharing of that data and secure user data. Full integration with header bidding, where publishers could access the AdX request in real time, would make it even more difficult to achieve these aims.

62. For ease of scale, Google builds its products to comply with all prominent and cross-jurisdictional laws. It would not be scalable to offer two versions of our product - one for use outside the EEA that integrates fully with Header Bidding and another for use within the EEA that does not integrate fully with header bidding. As such, Google does not offer a version of Ad Manager that integrates fully with header bidding.

**Q18. For each year since the introduction of *Exchange Bidding*, please indicate the number and percentage of DFP users, globally and in the EEA, who have effectively activated this function.**

63. The number and proportion of Ad Manager (DFP) users globally and in the EEA that activated the Exchange Bidding function since 2016 (Exchange Bidding entered private beta testing in April 2016, followed by open beta testing in June 2017, before being rolled out globally in April 2018) are provided in Annex 2. Users are identified according to internal network IDs associated with each account, and are limited to active DFP publishers. Active DFP publisher accounts are defined as those that instigate at least one query in a given year. Users (network IDs) that instigated at least one query via

---

29 See Information Commissioner's Office, "*Update report into adtech and real time bidding*" 20 June 2019, available at: https://ico.org.uk/media/about-the-ico/documents/2615156/adtech-real-time-bidding-report-201906.pdf.

Exchange Bidding were considered to have effectively activated the Exchange Bidding function in the given year. Note that:

- These data include DFP Premium and Small Business accounts, but exclude any network IDs associated with Google's owned & operated networks.
- EEA accounts are identified according to the publishers' billing address.
- Multiple network IDs may be associated with a given DFP publisher (e.g. if a corporate entity has multiple DFP accounts). As such, the true number of publishers that use DFP and those that have Exchange Bidding activated may be overstated by counting the number of unique network IDs.

**Q19. For each month since the introduction of *Exchange Bidding*, please indicate the percentage of DFP auctions won by AdX against other intermediation platforms (*SSPs/AdExchanges*) by distinguishing based on whether the DFP user has activated the *Exchange Bidding* function or not Should *Exchange Bidding* be activated and when the bid is won by AdX, please specify the absolute difference and the average relative difference between AdX's winning bid and the second highest bid.**

64. Annex 2 shows the number of Ad Manager (DFP) ad queries won by an AdX auction participant as a percentage of all DFP ad queries that were eligible for competition from the ad exchange on a monthly basis from April 2016 to July 2019, based on whether Exchange Bidding was activated or not.[30] These data are restricted to publishers that have a billing address in the EEA.

65. Consistent with the approach taken in question 11, the denominator includes ad requests filled by direct reservation, indirect reservation and house ads (as well as the numerator: the ad requests matched by the auction) but excludes unfilled ad queries. As explained in question 11, these classifications (direct reservations, indirect reservations, house ads) are compiled by the publisher, and therefore, Google does not have the ability to assess their accuracy.

66. For DFP ad queries filled by AdX when Exchange Bidding is activated, Google also provides the mean absolute difference (in USD) and mean relative difference between AdX's winning bid and the "second highest bid" on a monthly basis from 9 March 2019 (the earliest date for which these data are kept) to 31 July 2019. The methodology applied to calculate these differences is the same as the methodology explained in the response to question 11.

**Q20. Please describe the measures taken by the Group to ensure that the auctions held for *Exchange Bidding* take place in a neutral and equitable manner, given the double-role of organizer, and participant played by the Group (particularly, organisational or technical measures which allow preventing information leaks).**

30 The DFP users considered, and the definition of Exchange Bidding being activated, are explained in the response to question 18.

**If applicable, please identify your response during the targeted period to indicate on what dates these measures were effective.**

67. Google buyers (GDN and Display & Video 360 (**DV360**)) broadly receive the same information as third party buyers: the Ad Manager terms and conditions require Google to treat all buyers equally with respect to data provided by the publisher into the Ad Manager user interface.[31] Google's internal processes ensure compliance with these contractual obligations.

68. Google maintains internal data use policies to explain how its personnel can use the data to which they have access (e.g. how data can be used, whether data can be shared with personnel within the same team and / or with personnel in other teams). Any deviation from the data use policy requires approval from Google's legal team (Product Counsel and often Competition Counsel).

69. Google also uses technical measures to control access to and use of data internally. Google builds its logs in such a way that they can only be accessed by personnel that need to know that information. Personnel from other teams (including those of Google buyers) do not have access to Ad Manager data. Where centralised teams (such as teams working on the prevention of fraud and spam, and security teams) need access to data, their access will be granted only for a specified purpose and for a limited duration.

70. Google uses common protocols to ensure all buyers receive broadly the same information and respond to a uniform bid request. Google's RTB technology is underpinned by two frameworks: IAB's OpenRTB protocol (an industry-standard protocol) and Google's Authorized Buyers RTB protocol.[32] Buyers can elect to use either protocol.

71. There are some small differences where third parties may receive less granular information than Google platforms. Examples of this include: location data, where Google only sends imprecise location data to third parties, and IP addresses, where the last octet is scrubbed before Google sends the data to third parties. This reflects the principles of data minimisation and proportionality required by multi-jurisdictional privacy laws including GDPR, whereas the same concerns do not arise for disclosures to DV360 as no third party data sharing occurs. In certain cases, internal requests may be structured slightly differently to external requests, but Google is working to eliminate these small discrepancies.

72. Google has also previously tried to simplify some of the information provided to third parties where it appeared that third party buyers were struggling to process very granular information and this potentially discouraged them from participating in auctions. For example, Google used to provide very detailed information on the different floor prices that applied in an auction. Very few buyers were able to process such information so, based on that feedback, Google took the decision to stop sharing

---

31 *See* "*Service specific terms - Google Ad Manager service*", available at: https://www.google.com/intl/en_us/doubleclick/publishers/dfpadx/terms.html.

32 *See* "*Real-Time Bidding*", available at: https://developers.google.com/authorized-buyers/rtb/start.

some of those fields in bid requests. Google is currently re-introducing some more granular information in connection with the roll out of the first price auction (the move to the first price auction is described in response to question 21 below).

73. A significant benefit of using Google Ads or DV360 in combination with the ad exchange functionality of Ad Manager (AdX) is higher cookie matching.[33] Because Google Ads and DV360 share the same cookie infrastructure as AdX, there is a 100% cookie match rate. In practice, this means that there may be certain impressions where Google Ads and DV360 are able to produce a better targeted ad than some third parties may be able to. However, Google offers a Cookie Matching Service to third party buyers and Cookie Match Assist specifically for Exchange Bidders. These services provide the information that a buyer needs to maintain an association between the buyer cookie and the Google advertising cookie[34] and, where permitted by publishers and users, makes per-buyer encrypted cookie data, or buyer match data available to buyers in the bid request.

74. In addition, the planned migration to a unified first-price auction will ensure that Google buyers and third party buyers are subject to the same pricing rules within the same auction mechanism within AdX.

**Q21. In the event where the publisher has activated the *Exchange Bidding* function, please indicate to what extent the auction organised by AdX will be affected by the change to a unified auction at the first price declared by the group. Please specify if the auction organised by AdX will remain separate from that organised by *Exchange Bidding* or if these are merged, and if the auctions so unified will be organised by DFP.**

75. Google plans to complete the migration of the AdX auction to a unified first-price auction in the first half of 2020.[35] When the migration is complete, all bids from AdX buyers will be treated as first-price bids. This means the buyer that wins the impression will pay the amount they bid into the auction.

76. Migrating AdX to a first-price auction will unify the auction mechanism for AdX and Exchange Bidding. Bids from both AdX and Exchange Bidding will compete in a single stage where the highest first-priced net bid wins the auction. This unified auction will be run by Ad Manager's ad serving functionality. Since Exchange Bidding has always

---

33 *See* "*How Google Ads and Display & Video 360 work with Ad Exchange*" available at: https://support.google.com/admanager/answer/7014770?hl=en&ref_topic=7520097.

34 *See* "*Cookie Matching*" available at: https://developers.google.com/authorized-buyers/rtb/cookie-guide. See also "*Configuring an Open Bidding Integration Cookie Match Assist*" available at: https://developers.google.com/authorized-buyers/rtb/exchange-bidding#cookie-match-assist-cma.

35 The AdX auction is currently run as a "second price" auction, in which the buyer with the highest bid wins the auction, and pays the maximum of the applicable reserve price, and the second highest bid. Ad Manager essentially runs two auctions for a specific ad impression. *First,* a second price, real time bidding auction is run with Authorized Buyers. *Second,* a first price auction compares the winning price from the second price AdX auction with bids from Exchange Bidding buyers.

been a first price auction, it will not be affected by the migration of AdX to a first-price auction.

**Q22. Please send the Group's response to the previous request in the event where the publisher has not activated the *Exchange Bidding* function.**

77. While Exchange Bidding has always involved a unified first price auction, Google is migrating to a first price auction system more generally in AdX. When the migration is complete, all bids from AdX buyers will be treated as first-price bids. This means the buyer that wins the impression will pay the amount they bid into the auction.

78. The move to a first price auction reduces complexity and provides value to Google's partners (with increased opportunities to maximise yield/revenue). It creates a fairer process. All demand sources (including Header Bidding line items) will compete for ad inventory under the same rules. It also increases transparency for advertisers and publishers. All Ad Manager partners will be required to share and receive bid data that allows Google to produce more granular reports. Finally, this change will align with broader industry practice - most other auctions are already partially or entirely first price.

**Q23. In the event where a DFP user chooses to change the ad server solution and opts for a competitor's offer, please specify:**

**(i) if this publisher would still be able to access the request inserted in AdX; and, if yes,**

**(ii) if this publisher would continue to access this request under the same conditions as those of DFP in terms of quality or quantity. In particular, please specify if this publisher would still be able to interact in real-time with AdX in conditions similar to DFP.**

**If applicable, please identify your response during the targeted period.**

79. As explained in response to question 1, publishers are not required to use both Ad Manager's ad serving and ad exchange features. Publishers therefore frequently mix-and-match Google products with third party tools to manage most efficiently the sale of their inventory to buyers. Any third party ad server can be used in combination with AdX, subject to the limitations described in detail in response to question 15 above.

**Q24. Please indicate the types of data collected by the Group through technologies integrated by the publishers on their website or mobile app when using DFP/Google Ad Manager. On each occurrence, please specify how the Group has used this data, and particularly if this data is likely to be used by the Group's ad space purchase platforms (e.g. Google Ads, formerly known as Google AdWords, and Display & Video 360, formerly known as Doubleclick Bid Manager).**

80. Google automatically collects certain user data when its advertising servers receive a request from a user's device (**General User Data**). This request is triggered by the user interacting with a third party website or app that uses a Google advertising service. Depending on the publisher's settings, the user's preferences and the device in question, the collected data may include:

- The request itself, such as the browser's request for an ad to be served on a non-Google website and the ad slot to be filled;
- System and device information, such as the device, browser version, operating system version, default language and screen size;
- IP address;
- Location;
- The date and time of the request;
- In the case of web browsers, the full URL of the page being visited together with the referrer URL;
- In the case of mobile devices, mobile network information;
- In the case of mobile applications, an identifier for the application and a resettable mobile advertising identifier (such as IDFA for iOS or AdID for Android);
- In the case of web browsers, any cookie IDs that Google has previously set on the user's device; and
- Event data such as impression, click or conversion data.

81. Google Ad Manager collects General User Data through tags on the publisher's property or the Google Mobile Ads software development kit (**SDK**) on the user's app. It can also collect publisher-provided IDs.[36] In addition, Google Ad Manager allows publishers to integrate audience data, such as audience lists and lists of cookie IDs with inferred interests, from their own data management platform.[37]

82. Google Ad Manager collects data to provide the relevant service, including:

- To serve and personalise ads (including remarketing) subject to the user's settings;
- To maximise publisher yield through bid optimisation and real time bidding;
- To enable frequency capping (i.e. to ensure that users are not served the same ad multiple times);
- To enable sequential creative rotation (i.e. to show a set of ads to users in a specific sequence);
- To apply publisher configurations and rules, such as protections, blocks and minimum prices;

---

36 See "*About publisher provided identifiers*", available at: https://support.google.com/admanager/answer/2880055?hl=en.

37 See "*Introduction to Audience Solutions*", available at: https://support.google.com/admanager/answer/6073312?hl=en&ref_topic=2423427.

- To forecast available traffic (e.g. the number of potential ad impressions available to an ad campaign targeted to a specific country or device type); and
- To measure ad performance (e.g. how many ads were served and how many clicks those ads received) and provide reporting.

83. Google also uses the data to improve its service, enforce its policies and detect and stop ad fraud.

84. Google's inventory purchase platforms and Ad Manager share the same "cookie pool". As described in response to question 20 above, a significant benefit of using Google Ads or DV360 in combination with the ad exchange functionality of Ad Manager (AdX) is higher cookie matching.

85. If a publisher enables "personalised ads" in its Ad Manager account, visit information recorded by Ad Manager will be associated with users who have consented for their data to be used for ads personalisation.[38] These data can be used by Google's ad inventory purchase platforms to better target personalised ads to signed in users based on their interests, demographics and Google account information and to non-signed in users based on their interests across all opted-in publishers' inventory.

86. Please see the response to question 20 above for more information on how data shared with third party buyers compares to data shared with Google buyers.

[38] An opt-out from this association is available for both Authenticated and Unauthenticated users.

**Part B. Intermediation platforms for online advertising not related to search for website, application and content publishers.**

**Q25. Please provide the list and description of intermediation services for online advertising not related to the searches offered by the Group to website, application and content publishers since March 2008 (e.g. AdX and AdSense for Content).**

87. Advertising intermediation involves the provision of services that facilitate the sale and purchase of digital advertising and digital advertising space between advertisers and publishers. Google has three relevant services; AdX (the exchange functionality of Ad Manager), AdSense and AdMob.

88. AdX is used by publishers to manage the programmatic sale of their ad inventory. As described in the response to question 1, AdX, formerly DoubleClick Ad Exchange, was rebranded as part of Ad Manager in June 2018. Although these are available in a single interface, publishers can still choose whether to use the ad serving or ad exchange functionalities separately. AdX, formerly DoubleClick Ad Exchange, has been providing Google ad exchange services since its acquisition in March 2008.

89. AdSense and AdMob are programmes that Google offers to publishers to help them sell advertising space on their websites (AdSense) or mobile apps (AdMob) through an auction process.

90. AdSense connects website publishers to Google Ads advertisers (and other advertisers as backfill via the AdX auction) to allow them to sell advertising space on their websites through an auction process. AdSense has been providing services since before March 2008. AdSense includes the following services that are not related to search:

- AdSense for Content: This provides publishers with text, display, and video ad related to the content of their website;
- AdSense for Domains: This provides domain owners with ads that they can show on "parked domains" (i.e. domains with no content); and
- AdSense for Video: This provides publishers of web and native app-based video content with an opportunity to monetise their content with video ads.

91. Through its ad network function, AdMob connects app publishers to Google Ads advertisers (and other advertisers as backfill via the AdX auction) to allow them to sell advertising space on their apps through an auction process. AdMob was acquired by Google in May 2010. AdMob also acts as a platform for app publishers. AdMob's platform features are described further in response to question 1.

**Q28. For each one of the services identified in response to request no. 25, please provide the list of your competitors by identifying them based on whether they are more particularly active globally, in the EEA or in France.**

92. Annex 1 sets out a list of competitors offering services which compete with the ad intermediation platform services offered by AdX, AdSense and AdMob in France, and identifies where they are active. Please note that this list is not exhaustive but covers the main competitors active in France. A number of competitors active in France do not

have a physical presence in France but manage French clients through other locations - this is indicated in column K.

**Q29. For each one of the services identified in response to request no. 25, please specify if the provision thereof is the subject of a regulatory framework specific to the EEA or France. In particular, please specify if the regulatory obligations, such as the Sapin Law, have led you to adapt the portfolio of proposals that you offer or the services that you provide (e.g. potential tools to respond to the obligations of transparency).**

93. Google's ad services identified in response to question 25 are designed to comply with all applicable laws and regulations at the EEA and French level, including those relating to data protection, media, copyright, privacy and technology. Before launching any new product or service, Google ensures that these are compliant with the applicable regulatory requirements, as Google's products and services are intended to be compliant by design. When regulatory obligations change, products and services are adapted accordingly.

94. Since their entry into force, the key regulatory frameworks that Google has identified as being relevant to these services are the GDPR and the Loi Sapin.

95. With regards to GDPR and the ad intermediation services covered in question 25, Google and publishers each act as independent controllers of users' personal data. As set out in response to question 5 above, following the entry into force of the GDPR, Google made a new set of data protection terms available in respect of the ad services designated as controller services.

96. Details of the changes made by Google with respect to its ad services to comply with the GDPR and tools it has made available for publishers to comply with these obligations are set out in paragraphs 11 to 14 above.

97. The ad intermediation services provided by the products identified in response to question 25 are also subject to the Loi Sapin and the Decree n°2017-159 of 9 February 2017 relating to the provision of digital advertising services. In the advertising sector, the main purpose of the Loi Sapin is to ensure that advertisers are informed by the seller of the conditions of the purchase of advertising space. Google strongly supports the principle of advertising inventory price transparency for advertisers.

98. Before the entry into force of the Decree n°2017-159, Google performed an internal review of its relevant services in order to make sure that they complied with the requirements of the Decree. Since it is in Google's philosophy to ensure transparency and a customer-oriented service, it appeared following this internal review that its services were already Decree-compliant. Where there were doubts, Google made adjustments. More specifically, Google ensures that clients receive all pricing and service performance information, in compliance with the Loi Sapin and its implementing Decree for digital advertising, as described below:

- AdMob: AdMob's inventory is available for advertisers to purchase through AdWords campaigns. The AdWords contract makes specific reference to the Loi Sapin. All customers who are not advertisers must provide Google with the name and contact details of the advertiser, so that Google is able to send its

invoice for the purchase of advertising space directly to the advertiser and make available the relevant information.

- AdSense: Google issues the invoice directly to the advertiser, and shares detailed information with each of its AdSense publishers and advertisers, which enables them to control and manage the revenue streams achieved by selling advertising space via AdSense (as regards publishers) or their ad spend (as regards advertisers). In particular, Google publishes the share of AdSense revenues paid to publishers: through their client dashboards, publishers participating in the AdSense network have access to sufficient data to determine the value of their advertising inventory and compare the offering of rival advertising networks. As regards buyers, Google provides extensive information on their ads and the costs and successes of their campaigns, as well as possible ways to improve their ROI. Where there were doubts, Google has made adjustments and has explained to advertisers for instance what "anonymous content" means in their reports[39]. Advertisers can choose to place ads on anonymous placements offered by publishers. In so doing, advertisers who choose this option acknowledge and agree that any image and reputation standards that advertisers may have are sufficiently addressed by the policies that Google enforces against publishers.

- AdX: AdX acts as seller to three types of customers: (i) directly to advertisers; (ii) to intermediaries such as advertising agencies, which act on behalf of (disclosed) advertisers and (iii) to intermediaries such as trading desks, which are non transparent as to their own customers downstream (i.e. generally do not disclose their identity). In all three cases, AdX provides, through the customer's dashboard, the information required under the Decree n°2017-159. In the case of direct purchasers and intermediaries (advertising agencies) acting for clearly identified advertisers, Google is in a position to directly provide the required information and thus directly comply with its transparency obligations. In the case of trading desks, Google provides the information and reporting tools so that the trading desks could in turn comply with their obligations vis-à-vis their (undisclosed) customers.

99. The level of transparency required by the provisions of the Loi Sapin and its implementing Decree for digital advertising therefore enables publishers and advertisers to understand and control their revenues achieved through the use of Google intermediation services, which, in turn, fosters competition between networks. In sum, Google considers that the information provided to its advertisers and publishers in compliance with the Loi Sapin and its implementing Decree for digital advertising helps foster competition between players across the advertising industry in France.

**Q30. For each year of the targeted period, please submit your estimates:**

**(i) of your share in the global and EEA markets of intermediation platforms for online advertising not related to the search for publishers;**

---

[39] *See "À propos de la mention "anonymous.google" dans un rapport sur les emplacements"*, available at *: https://support.google.com/google-ads/answer/9357239*

**(ii) of the market shares of your competitors in the global and EEA markets of the intermediation platforms for online advertising not related to the search for publishers.**

**Please specify the method used to arrive at each one of these estimates.**

100. Google does not routinely record estimates of its competitors' position in the market(s) for ad intermediation platforms, nor does it routinely record estimates of the size of the market(s) for ad intermediation platforms. Google is not aware of reliable third party estimates of these metrics.

101. Google intends to provide the number of impressions and revenues applicable to Google's own intermediation services, globally and in the EEA, according to the definitions requested in questions 26 and 27, respectively.

**Q31. Please describe the conditions according to which AdX exercises its discretionary power to '*unilaterally adjust (...) the buyer's bid, in order to optimise the auction process*'.**[40]

102. Once the list of eligible bids are determined, AdX ranks the bids based on net CPM. Google uses net, rather than gross, revenue as it runs the auction on behalf of publishers and therefore is focused on maximising the revenue the publisher receives, rather than total revenues paid by the advertiser.[41] AdX may adjust bids to optimise the auction and increase revenue to the publisher. Despite any optimisations that take place, the publisher will receive their contractual revenue share at the end of every month.

103. There are two common situations where Google may make adjustments to optimise the auction process. First, Google may apply optimisation to video ads in which the billing event that triggers payment occurs later than some other ads (i.e. when the first frame of the video plays). In that case, the likelihood of the publisher being paid depends on the reliability of the server used (as that affects the video being played). A publisher may make more money from a lower bid with a more reliable server than a higher bid using a less reliable server as the latter will pay out less frequently. In that scenario, Google may modify the bids to take that into account and increase the revenue to the publisher.

104. The second typical scenario is where a publisher has elected for optional revenue share optimisation.[42] This provides the flexibility for publishers to accept a lower revenue share in some auctions, if other auctions transact at a correspondingly higher revenue share. Therefore, in a situation where the highest bid would not meet the floor price if

---

40 See "*Guide de formation Ad Exchange: Modèle d'enchères Authorized Buyers*", available at: https://support.google.com/authorizedbuyers/answer/6077702?hl=fr.

41 In practice, this may mean that a lower bid will be selected if it results in a higher effective payment to the publisher (i.e. if Google's revenue share on the lower bid is a smaller percentage).

42 See "*Configure your Ad Exchange revenue share*", available at: https://support.google.com/admanager/answer/7031785?hl=en.

Google took its full revenue share (and the transaction would therefore not happen at all), Google could forego its full revenue share, enabling the transaction to proceed and the publisher to be paid. In a subsequent auction, if the bids were significantly higher and well in excess of the floor price, Google could take a larger revenue share. Overall, the publisher will increase its revenue. This revenue share optimisation is optional and fully within the publisher's control. The vast majority of publishers choose to keep this option turned on.

**Q32. For each year of the targeted period, please indicate the number and percentage of impressions offered on the AdX sold (i) to Google Ads, (ii) to Display & Video 360 (ex-DBM) and (iii) to the other advertising space purchase platforms, globally and in the European Economic Area.**

105. Google's response can be found in Annex 2. These data show the number and percentage of queries (i.e. ad queries that were matched by the AdX auction) offered on AdX (defined as AdX and DFP publisher inventory that was purchased in the AdX auction) sold to Google Ads, Display & Video 360 (DV360) and other advertising space purchase platforms (other third-party buyers) globally and in the EEA (according to user IP address) from 2011[43] to 2019.[44] These data include only ad queries transacted in Open Auction, Private Auction, and Legacy Preferred Deals and exclude queries that were not filled by anyone, and programmatic guarantees.[45] Also, note that the percentages for the three buyer-types (Google Ads, DV360, Others) are calculated such that they add up to 100% for each year.

**Q33. Please identify the differences of interoperability between AdX and Google Ads/Display & Video 360 and between AdX and the competitor's advertising space purchase platforms. If applicable, please identify your response during the targeted period.**

106. Since AdX can be used with any third party demand sources, there are in practice very limited differences in interoperability. Since c. 2016, Google uses industry-standard protocols (Google supports the OpenRTB protocol),[46] which are designed to make it straightforward for demand sources to integrate with AdX in a similar way to how they integrate with other exchanges. Prior to this, Google used its own RTB protocol, which

---

43 Google's tables for the relevant data only extend as far back as 2011.

44 This therefore reflects the publisher-side view of AdX.

45 Programmatic Guaranteed (PG) traffic is excluded since these queries reflect direct reservations that happen to "pass-through" the auction. These are not "offered" or "competed for" on an AdX auction as the buyer will, in general, always buy the impression if it receives the callout. The possible buyers of PG are DV360 and third-party buyers. Google charges a revenue share of between 5-10%, averaging around 6.7% for these transactions. The number of PG impressions over time is due to be provided in response to questions 26 and 27. As with PG, Legacy Preferred Deals may also not be "offered" or "competed for" in the same sense as open and private auction deals. However, these were difficult to exclude in the datasets used to prepare this response. Nonetheless, these represent a very small portion of the overall traffic.

46 See "*OpenRTB Integration*", available at: https://developers.google.com/authorized-buyers/rtb/openrtb-guide.

is similar to the OpenRTB protocol, but following customer feedback also now supports the industry-standard version (i.e. OpenRTB), making it even easier for third parties to integrate with AdX. Google regularly engages with the IAB's OpenRTB Committee to collaborate on standardizing and improving the OpenRTB API that provides standardized field nomenclature for AdX, as well as for other industry SSPs.

107. The main benefit of using Google Ads or DV360 with AdX in terms of effective information use is higher cookie matching.[47] The cookie matching loss that may occur when Google Ads and DV360 buy on other exchanges does not exist when buying on AdX as there is a 100% cookie match rate. This is because Google Ads and DV360 share the same cookie infrastructure as AdX. In practice, this means that there may be certain impressions where Google Ads and DV360 are able to produce better targeted ads than some third parties may be able to. However, Google offers a Cookie Matching Service to buyers (which provides the information that a buyer needs to maintain an association between the buyer cookie and the Google advertising cookie)[48] and, where permitted by publishers and users, makes encrypted cookie data available to buyers in the bid request.

108. Another advantage is lower latency. This can have implications with regard to the time limit for buyers to submit their bids to the auction: Google waits 120 to 300 ms for bidder applications to respond and responses received after this deadline are excluded from the auction.[49] As Google Ads and DV360 are co-located with AdX (often sharing the same data centres), there are no latency issues and therefore they have a very low risk of timing out and missing the auction, assuming that they are eligible to bid.

**Q34. Please indicate if Google is acting as the "principal" or "agent" when it serves the ads on the inventories of a member of the 'Display Network'.[50] Please specify if the answer differs based on whether the member of the 'Display Network' participates in AdX as opposed to AdSense or AdMob.**

109. For ads placed on the properties of members of the Google Display Network, Google evaluates whether it is the principal (i.e., reports revenues on a gross basis) or agent (i.e., reports revenues on a net basis). Generally, Google reports advertising revenues for ads placed on the Display Network members' properties on a gross basis. This answer would not differ based on whether the member of the Display Network participates in Google Ad Manager (formerly known as AdX), AdSense or AdMob. Rather, Google evaluates whether it controls the advertising inventory before it is transferred to customers.

---

47 See "*How Google Ads and Display & Video 360 work with Ad Exchange*" available at: https://support.google.com/admanager/answer/7014770?hl=en&ref_topic=7520097.

48 See "*Cookie Matching*" available at: https://developers.google.com/authorized-buyers/rtb/cookie-guide.

49 See "*Real Time Bidding*" available at: https://developers.google.com/authorized-buyers/rtb/start.

50 See "*Aide Google Ads: Réseau Display : définition*" available at: https://support.google.com/google-ads/answer/117120?hl=fr.

110. In determining whether or not Google controls the advertising inventory, various factors are considered including but not limited to whether:

- there is a "value add" component that involves only Google - Google's "value add" represents optimised targeting technology that enables customers to maximise their return on invested marketing spend by reaching their target audience at the right price;
- Google has the sole ability to monetise the advertising inventory once purchased;
- Google is able to determine what inventory to sell to its customers -- Google's objective is to sell the inventory that is most relevant to its customers; and
- Google is able to determine the bid price for the advertising inventory.

**Q35. The Group has stated that, within its advertising ecosystem, 'more than 70% of the revenue was shared with the publishers'.[51] Please specify if this sharing is also applicable to publishers using AdSense as those using AdX. Also, please specify if this revenue sharing is identical based on whether the Group acts as "principal" or "agent".**

111. Google's revenue sharing arrangement is applicable to all advertisements served on Google Network Members' properties participating in AdMob, AdSense and Google Ad Manager (formerly known as AdX).

112. The portion of the revenues shared with the publishers is included in the traffic acquisition costs (**TAC**) and represents cost of sales. When Google is acting as a "principal" in the arrangement, which is generally the case for ads placed on Google Network Members' properties, Google recognises the ads revenue and the corresponding cost of sales on the income statement on a gross basis. When Google is the agent, the advertising revenue is recognized net of cost of sales. The global TAC to Google Network Members participating in AdMob, AdSense and Google Ad Manager as a percentage of Google Network Members' properties revenues were 69.9%, 71.9% and 70.8% for 2016, 2017 and 2018, respectively.[52]

---

[51] *See "Google plans to share revenues with news publishers"* available at: https://www.ft.com/content/5609bbfe-b4cf-11e7-aa26-bb002965bce8.

[52] Based on US GAAP as reported in Alphabet Inc.'s 10-K filings.

**Part C. Advertising space purchase platforms**

**Q36. Please provide the list and description of the advertising space purchase platforms offered by the Group to the advertisers since March 2008 (e.g. Google Ads and Display & Video 360, formerly known as DBM).**

113. Google has 3 relevant services: Google Ads, DV360 and SA360.

114. Google Ads (previously known as AdWords) is Google's buying interface for advertisers, enabling them to purchase inventory and reach potential customers with text-based search ads, graphic display ads, YouTube video ads or in-app mobile ads.[53] Advertisers use Google Ads to purchase space on both Google-owned inventory (like Google Search and YouTube) and third party websites.

115. Display & Video 360 (DV360) (previously known as DoubleClick Bid Manager, or DBM), is Google's demand side platform (**DSP**). DV360 buys inventory on Authorized Buyers and also bids on third-party ad exchanges. Authorized Buyers is the advertiser-facing part of Google's ad exchange, a real time marketplace that helps buyers, such as ad networks, trading desks and DSPs connect with publishers that are looking to sell their ad inventory. DV360 provides buyers with display ad campaign management and performance services, allowing advertisers to manage the purchasing of ad inventory via a single management interface. DV360 was acquired from Invite Media in June 2010.

116. Search Ads 360 (**SA360**) (previously known as DoubleClick Search) is an advertising management platform that helps advertisers efficiently manage search marketing campaigns across multiple search engines and media channels. SA360 allows advertisers to manage their search ad campaigns across multiple search engines, such as Google Search, Yahoo! Japan and Bing. The initial version of the SA360 product was acquired as part of the DoubleClick acquisition in 2008.

117. DV360 and SA360 were rebranded in June 2018.

**Q39. For each one of the services identified in response to request no. 36, please provide the list of your competitors by identifying them based on whether they are more particularly active globally, in the EEA or in France.**

118. Annex 1 sets out a list of competitors offering services which compete with the advertising space purchase platform services offered by Google Ads, DV360 and SA360 in France, and identifies where they are active. Please note that this list is not exhaustive but covers the main competitors active in France. A number of competitors active in France do not have a physical presence in France but manage French clients through other locations - this is indicated in column K.

**Q40. For each one of the services identified in response to request no. 36, please specify if the provision thereof is the subject of a regulatory framework specific to the EEA or France. In particular, please specify if the regulatory obligations,**

---

[53] *See* "*About Google Ads campaign types*", available at: https://support.google.com/google-ads/answer/2567043?co=ADWORDS.IsAWNCustomer%3Dtrue&hl=en&oco=1.

**such as the Sapin Law, have led you to adapt the portfolio of proposals that you offer or the services that you provide (e.g. potential tools to respond to the obligations of transparency).**

119. Google's ad services identified in response to question 36 are designed to comply with all applicable laws and regulations at the EEA and French level, including those relating to data protection, media, copyright, privacy and technology. Before launching any new product or service, Google ensures that these are compliant with the applicable regulatory requirements, as Google's products and services are intended to be compliant by design. When regulatory obligations change, products and services are adapted accordingly.

120. Since their entry into force, the key regulatory frameworks that Google has identified as being relevant to these services are the GDPR and the Loi Sapin.

121. With regards to GDPR, Google acts as a controller of personal data in Google Ads (excluding certain features where Google acts as a processor).[54] For DV360 and SA360, Google acts as a data processor. As set out in response to question 5 above, following the entry into force of the GDPR, Google made a new set of data protection terms available in respect of the ad services designated as processor or controller services. An example of a change made in light of GDPR to advertising space purchase platforms was the removal of encrypted cookie IDs from Data Transfer Files for DV360 users.[55]

122. As explained in the response to question 5, advertisers that use any of Google's ad services, including Google Ads, DV360 and SA360, must comply with Google's EU User Consent Policy (updated after the GDPR came into force). This sets out the responsibilities of Google's partners for making disclosures to, and obtaining consent from, users of websites and apps in the EEA that use the Ad Services. This policy applies to all use of ad services when used on properties visited by users in the EEA. As described in more detail in paragraphs 11 to 14, publishers and advertisers must obtain legally-valid consent from users in the EEA for personalized ads and use of cookies or mobile identifiers, retain records of consent and provide clear instructions on revocation of consent. For example, advertisers that implement remarketing tags are required to obtain consent from users for the collection of data for personalized ads and advertisers that implement conversion tags for measurement purposes are required to obtain consent for the use of cookies.

123. Google has updated its Help Center pages for Google Ads, DV360 and SA360 to include a significant amount of additional information to explain how Google Services use data to help advertisers comply with the GDPR and to explain how the introduction

---

54 See "*Google Ads Data Protection Terms: Service Information*", available at https://privacy.google.com/businesses/adsservices/.

55 See "*Important changes to Data Transfer*", available at https://support.google.com/dcm/answer/9006418?hl=en.

of Google's ad technology provider controls for publishers may impact customers of Google's advertiser ad services.[56]

124. The advertising space purchase platform services identified in response to question 36 are also subject to the Loi Sapin and its implementing decree for digital advertising (Decree n°2017-159). Before the entry into force of the Decree n°2017-159, Google performed an internal review of its relevant services in order to make sure that they complied with the requirements of the Decree. Since it is in Google's philosophy to ensure transparency and a customer-oriented service, it appeared following this internal review that its services were already generally Decree-compliant. Where there were doubts, Google made adjustments. More specifically, Google has taken the following steps to ensure that advertisers using the services set out in question 36 receive all pricing and service performance information, in compliance with the Loi Sapin and its implementing decree:

- DV360: Google shares a large number of metrics and dimensions with advertisers/agencies in Display & Video 360 reports.[57] Google also shares more granular reporting data via the Data Transfer service with advertisers/agencies using Display & Video 360. DV360 agreements made directly with advertisers do not raise transparency concerns with respect to Loi Sapin, because Google can share the required information directly with these customers. Where agreements are made with agencies, Google had put in place a billing system called "B3" which allows Google to send invoices corresponding to the media cost directly to advertisers. Where agreements are made with trading desks, Google grants access to all required information to the trading desks which commit in such agreements to comply with Loi Sapin.

- SA360: Google shares a large number of metrics and dimensions with customers in Search Ads 360 reports that enable them to comply with their relevant obligations under Loi Sapin and its implementing decree .[58] However, SA360 is not a seller of advertising inventories but a technical platform that consolidates media buys on publishers inventories, helping advertisers to centralise their search media buying. Google only sells a technical service and invoices technical fees only.

---

[56] Google Ads: https://support.google.com/admanager/answer/7666366; Display & Video 360: https://support.google.com/displayvideo/answer/9028179?hl=en; Search Ads 360: https://support.google.com/searchads/answer/9028179?hl=en.

[57] The exhaustive list of metrics and dimensions available to Display & Video 360 customers is available at: https://support.google.com/displayvideo/table/3187025?hl=en&ref_topic=6071464# and at: https://support.google.com/displayvideo/table/9046540?hl=en&ref_topic=6071464 and https://developers.google.com/bid-manager/dtv2/reference/file-format.

[58] The list of reporting columns which display performance metrics and campaign settings in Search Ads 360 reporting tables is available at: https://developers.google.com/search-ads/v2/report-types/, at: https://support.google.com/searchads/topic/4491614?hl=en&ref_topic=1220627 and at: https://support.google.com/searchads/answer/1678436?hl=en.

- Google Ads: Google Ads (previously AdWords) offers advertisers the ability to run advertising on a network of websites and mobile apps, beyond Google's search engine. As direct seller of ad inventory, Google complies with the reporting obligations under the Decree n°2017-159 by providing the relevant information to buyers through their customer dashboards. Google shares a large number of metrics and dimensions with advertisers in Google Ads reports to enable them inter alia to measure ad and keyword performance and to understand ad exposure.[59] Such metrics include, for example, reach and frequency data, impression shares (i.e. the percentage of impressions that an advertiser's ads receive compared to the total number of impressions that this advertiser's ads could get) or click shares (i.e. the number of clicks an advertiser's ads actually received with the maximum number of clicks this advertiser's ads could have received). When selling the inventory through Google Ads partners who act on behalf of Google, advertisers get access to the same information.

**Q41. For each year of the targeted period, please submit your estimates:**

**(i) of the number of advertisers using the competitor's purchase platforms globally and in the EEA;**

**(ii) of the number of impressions purchased by the competitor's purchase platforms globally and in the EEA;**

**(iii) of the share in the global and EEA markets of the advertising purchase platforms offered by the Group.?**

**(iv) your competitors' market shares in the global and EEA markets of the advertising purchase platforms.**

**Please specify the method used to arrive at each one of these estimates.**

125. Google does not routinely record estimates of its competitors' position in the market(s) for buy-side platforms, nor does it routinely record estimates of the size of the market(s) for buy-side platforms. Google is not aware of reliable third party estimates of these metrics.

126. Google intends to provide the number of impressions sold and revenues applicable to Google's own purchase platforms globally and in the EEA according to the definitions requested in questions 37 and 38.

**Q42. Please indicate the date on which the option of buying third party advertising space (i.e. not belonging to the Group) was introduced in Google Ads. If applicable, please specify the date of introduction in each one of the EEA countries.**

---

59 The main type of performance data is available at: https://support.google.com/googleads/topic/3119143?hl=en&ref_topic=3119141,3181080,3126923 and the aggregated performance reporting at: https://support.google.com/google-ads/answer/2472714?hl=fr&ref_topic=3123050

127. Google launched its partner network in 2002, which gave advertisers the ability to purchase advertising space on third-party websites.[60] Google subsequently launched AdSense in 2003, which introduced context-based targeting to ads on third party sites.

**Q43. Please send the list of intermediation services for website, application and content publishers who have effective access to the request inserted in Google Ads. If applicable, please identify your response during the targeted period.**

128. Any publisher intermediation service can have effective access to Google Ads demand. However, only Ad Manager, AdSense and AdMob have real-time access to the request made by advertisers in Google Ads for inventory. In addition, AWBid (an intermediation service for third party exchanges (e.g. Index, Rubicon) through which publishers can access Google Ads demand) also has real-time access to these requests for certain ads.

**Q44. Please describe under what assumptions and according to which terms and conditions the Group is likely to impose "*additional service charges (...) for ads using audience type targeting*"[61] on Google Ads users.**

129. Publishers can choose to enable first or third party audience targeting through the Audience Management tool in Ad Manager. Additional service fees for publishers that use the Audience Management tool in Ad Manager are only charged as part of ad serving fees. These fees do not apply to the revenue share for AdSense, AdMob, or Ad Manager, and publishers are free to use a third party ad server, in which case they will not pay these fees to Google (but may pay similar audience targeting fees to third parties).

**Q45. Please define the notion of "*Google Ads revenue distribution*" to which the Google Ads Help Centre refers,[62] before specifying the terms and conditions according to which this distribution is done.**

130. In relation to Ad Manager, Google - in its role as an ad exchange - receives a revenue share at the end of every auction, which is a percentage of the auction closing price paid by advertisers for ads appearing on the publisher's properties. The revenue share is contractually agreed and may vary according to the type of transaction (Open Auction, Preferred Deal, Programmatic Guaranteed, etc.) and type of ad (web, app, video). Publishers are paid the auction closing price net of Google's revenue share.

131. Publishers can also elect for revenue share optimisation, which is explained in further detail in paragraph 104 above. This allows publishers to allow some auctions to transact at a lower revenue share, if other auctions transact at a correspondingly higher revenue share, thereby allowing the publisher to increase its overall revenue by

---

60 See "*Google Builds World's Largest Advertising and Search Monetization Program*" available at: http://googlepress.blogspot.com/2003/03/google-builds-worlds-largest.html.

61 See "*Google Ads Help: About the Display Network ad auction*" available at: https://support.google.com/google-ads/answer/2996564?h1-fr.

62 See "*Google Ads Help: How Google Ad Manager works with Google Ads*" available at: https://support.google.com/google-ads/answer/2472739?h1-eng.

increasing the number of auctions where a bid (net of revenue share) exceeds the auction floor price.

132. Publishers currently contract for Ad Manager under a legacy AdX contract, legacy DFP contract, legacy unified DFP+AdX order form (which has been available since September 2016) or the Google Ad Manager order form (which is substantially the same as the unified DFP+AdX order form, but with "Ad Manager" branding.

133. The contractual framework is the same for "large account" publishers and other types of customers, save that: (a) large account contracts may contain negotiated bespoke terms; and (b) any publisher using the DFP small business online service would operate under the DFP small business online standard terms and conditions.[63] Please refer to Annex 3.[64]

134. For AdSense for Content, publishers receive 68% of the revenue recognised by Google in connection with the service. For AdSense for Search, publishers that are on standard terms receive 51% of the revenue recognised by Google. These percentages are consistent, regardless of a publisher's geographic location, and are not averaged between publishers. All AdSense for Content publishers have agreed to online terms,[65] so the standard revenue share would apply to all AdSense for Content publishers. AdSense for Search publishers could either be on online terms or direct terms. For publishers on direct contracts (rather than online contracts), the revenue shares would be detailed in their contract. All AdSense for Shopping and AdSense for Domains publishers are on direct contracts, so the revenue share for AdSense for Shopping or AdSense for Domain publishers would be detailed in their respective contracts.

135. The AdSense standard revenue shares do not apply to AdMob. Google does not routinely disclose AdMob revenue shares to publishers. Certain publishers, who are on custom revenue shares, will have their revenue share noted in their contract.

**Q46. For each year of the targeted period, please specify the number and the percentage of campaigns (i) "Search Network only", (ii) "Display Network only", and (iii) "Search Network with display select" created in Google Ads.**

136. Please see Annex 2 for the number and percentage of "Search Network Only", "Display Network Only" and "Search Network with Selective Display" campaigns created in Google Ads in the EEA, each year from 2012 to 2019 (as of 31 July 2019).[66] Google notes the following with respect to the data provided in response to this question:

---

63 See "*DFP Small Business online standard Terms & Conditions*", available at: https://www.google.com/doubleclick/publishers/small-business/terms/.

64 Google has provided examples of the Google Ad Manager order form and legacy DFP+AdX order form. The number of publishers trading on legacy terms is relatively low and declining.

65 See "*AdSense Online Terms of Service*", available at: https://www.google.com/adsense/new/localized-terms?gsessionid=1qY4UlWfQ8d6alck11f1yGe0Vny3SBCP.

66 Data are not available in Google systems before 2012.

- Campaigns are restricted to the EEA based on billing address.

- Only campaigns that received at least one impression in each year are included.

- The proportions do not sum to 100% as there are other campaign types which were not requested (for example, Video, Shopping and Universal App campaigns). The data on the number of Google Ads campaigns therefore include an aggregated "other" category such that the total number of campaigns on Google Ads are provided.

- Campaigns were allocated to the "Search Network with Selective Display" category if the database snapshot at the time of the data extraction indicated that setting (Search+). Therefore, more recent data is likely to have a higher accuracy than the data provided for earlier years.[67]

**Q47. For the "Display Network only", and "Search Network with Display Select" campaigns created in Google Ads, please explain the criteria according to which the Group arbitrates between the allocation of its proprietary inventories or that of the inventories proposed by third parties. Among the inventories proposed by third parties, please specify the criteria according to which the Group arbitrates between the allocation of inventories proposed by AdSense and those proposed by AdX.**

137. Advertisers can choose different types of campaigns in Google Ads based on their advertising goals. In the previous Adwords experience, advertisers could use 'Display Network only' or 'Search Network with Display Select' campaigns. In the new Google Ads experience, campaign types include Search Network campaigns, Display Network campaigns, Shopping campaigns, Video campaigns and App campaigns.

138. In a Display Network campaign, ads will run on Google websites (e.g. YouTube, Gmail) and third-party websites that are part of the Display Network. In a Search campaign, ads will run on Google search sites (e.g. Google Search, Google Maps) and sites operated by Google search partners, i.e. third party websites that are part of the Search Network. However, advertisers can opt out of displaying their ads on search partner sites if they wish to, in which case the ads will run on Google websites only. Advertisers running a Search campaign can also select the Display Network option. For these Search Network with Display Expansion campaigns, ads will show primarily on the Search Network, and may show on the Display Network if advertisers have remaining daily budget. Typically, around 95% of the advertiser's budget will be spent running ads on the Search Network and the remaining 5% will be spent running ads on the Display Network.[68]

---

67 Note that advertisers can switch in and out of these campaigns types, while the campaign is not removed.

68 The allocation between Search and Display for these campaigns is optimised for performance based on the advertiser's bidding strategy and as flagged in the advertiser account interface, ads will appear on the Display Network only if they are predicted to be effective. See "*About Search Network campaigns with Display Expansion*", available at: https://support.google.com/google-ads/answer/7193800.

139. For Search Network campaigns with Display Expansion, Google uses automated bidding tools (which in turn use conversion data) to predict where display ads may be most effective. More generally, advertisers can choose different bidding strategies. They can also select a goal for their campaign, e.g. sales, leads, website traffic, product and brand consideration or brand awareness and reach. Google will show advertisers recommendations for features and settings that can help them meet their campaign's main advertising objective based on these goals. Most advertisers generally focus on clicks, impressions or conversions for Search and Display ads (for more information about how competitive bidding works, see the response to question 48 below). An advertiser's ads will ultimately be placed on the inventory for which that advertiser has won the auction. Among the inventories proposed by third parties, inventories proposed by AdSense are allocated first and if a publisher is not able to fill its inventory with AdSense, then the inventory will be back-filled with AdX.

**Q48. With regard to the competitive bidding for advertisements on the Display network,[69] please indicate the terms and conditions according to which the Group converts the winning bid from CPC basis to CPM basis. Please mention how the Group calculates the *click-Through-Rate* of the advertisement.**

140. Advertisers submit bids on the Display Network using four different metrics, depending on what matters most to their business and the type of campaign they are running:

- Cost per click (**CPC**);
- Cost per impression (**CPM**), or cost per 1,000 impressions (**vCPM**);
- Cost per action (**CPA**); or
- Cost per view (**CPV**), for video ads on YouTube.

141. In practice, many advertisers mix-and-match the type of campaigns they run to reach their target audiences.

142. When CPC and CPA or CPM ads compete for the same impression, these metrics are compared "apples-to-apples" based on how much the advertiser is effectively willing to pay for the impression. With a vCPM bidding strategy, the maximum vCPM bid represents how much the advertiser is willing to pay for each 1,000 viewable impressions. In order to convert a vCPM to a plain CPM bid Google predicts how likely it believes an impression is to result in an active view, and then multiplies the vCPM bid by that factor (e.g. effective CPM = vCPM * pAV where pAV = predicted ActiveView). With a CPC bidding strategy, Google estimates how many clicks the ad is likely to receive across 1,000 impressions.[70] In order to convert a CPC bid to an effective CPM Google predicts how likely the impression will result in a click, and then multiplies the CPC bid by that factor (e.g. effective CPM = CPC * pCTR, where pCTR = predicted click through rate). For some targeting methods Google also applies a "smart pricing"

[69] See "*Google Ads Help: About the Display Network ad auction*", available at: https://support.google.com/google-ads/answer/2996564?h1=fr.

[70] See "*About bidding on impressions*", available at: https://support.google.com/google-ads/answer/2630842?hl=en-GB.

factor[71] to their CPC bids. In some cases this factor is a real time prediction based on a predicted conversion rate model (pConvs), and in some other cases the factor is a simple constant that was chosen so that a targeting method would achieve similar CPD (conversions-per dollar) as other targeting methods.

143. For Google Display Advertisers using a target CPA bidding strategy, Google bids in proportion to how likely it believes an impression is to yield the advertiser's desired business result (e.g. effective CPM = k * pCTR * pConvs^alpha, where pConvs = predicted number of conversions, k is set to so that on average the advertiser will end up paying their CPA for each conversion and alpha is set based on how good a predictor pConvs has been in the past). For advertisers using the maximize conversions bidding strategy k is instead set according to Google's best estimate of which value will spend exactly the advertiser's target daily budget.

144. Google is constantly testing and evaluating many different prediction models for pAV, pCTR, and pConvs. The predictions are calculated in real time based on the features of the impression. All of these models are supervised machine learning models that train using the advertiser's historical data (or pooled data from many advertisers if the advertiser is opted into data pooling). Features can include information about the website or app, information about the user and user's computing device or operating system, and information about the advertiser as well as combinations of all of those features. Google's prediction models often have over 100,000 such feature combinations.

145. Google calculates the click-through-rate (**CTR**) of an ad by dividing the number of clicks an ad receives by the number of times the ad is shown.[72]

**Q49. Please indicate whether the competitive bid for the advertisements on the Display Network is made in real time, i.e. each time an auction request is communicated by AdX.**

146. Google does run the auctions in "real-time", i.e. asks all bidders, including Google demand and third party demand, to submit their bid within at most a few hundred milliseconds (commonly 120 ms, 160 ms, or 300 ms, depending on the nature of the requests), after which point Google will compare all submitted bids, select the winner, and pass through the winning ad to be rendered for the user. In some cases, ads may be requested slightly in advance of "real-time" - for example, when a user is watching long-form video content with an ad-break several minutes into the content, Google may run the auction slightly before the ad break so that the ad is ready to be shown to the user at the appropriate ad break, and does not introduce buffering or latency into the end user experience.

**Q50. Please indicate how the competitive bidding for advertisements on the Display Network will be affected by the change to a unified auction at the first price declared by the group. Please specify if the auction organised by AdX will remain**

---

71 See "*AdSense Help Ad targeting - About bidding on AdSense*", available at: https://support.google.com/adsense/answer/190436?hl=en.

72 See "*Click-through rate (CTR): Definition*", available at: https://support.google.com/google-ads/answer/2615875?hl=en-GB&ref_topic=24937.

**separate from the competitive bidding for advertisements on the Display Network or if these will merged.**

147. As explained in the response to question 21, Google is switching to a unified pricing rules and as part of this change, all publishers on Google Ad Manager and AdMob will move to a first-price auction by the first half of 2020.[73] Under previous pricing rules (which are still available to those who wish to use them during the current transition period), buyers using Google's auction participated in a second-price auction, where the winner paid the "runner up" bid price. In a first-price auction, the winning bidder pays their bid, regardless of the "runner up" bid.

148. With first-price auction, Google demand, third party Authorized Buyers, Open Bidders (previously known as "Exchange Bidders"), and remnant line items all compete on a first-price basis. The Google Display Network will remain separate from AdX, and will have to adjust its own bidding process for the AdX auction in the same way that other buyers will also have to adjust to these new rules.

**Q51. Please send the list and description of the ids used by the Group for advertising targeting purposes (e.g. "Google ID").**

149. The primary IDs used by Google for ad targeting purposes are: Google User IDs, pseudonymous unique IDs stored in advertising cookies, and mobile advertising IDs.[74]

150. Google's Privacy Policy[75] describes the types of data that Google collects, how that information is used, and the controls users have to manage that information. The Privacy Policy explains that the user data that Google collects depends on which Google services are being used. The data collected also depends on whether or not users have created and are signed-in to a Google Account when they interact with Google services. These are called **Authenticated Users**.[76] Additional data are collected for Authenticated Users that are not collected for users that are not signed-in when they interact with Google services, or who use Google services without a Google Account. These are called **Unauthenticated Users**.

151. Google collects two broad categories of user data:

---

73 On the rationale for this change, see also "*Simplifying programmatic: first price auctions for Google Ad Manager*", available at: https://www.blog.google/products/admanager/simplifying-programmatic-first-price-auctions-google-ad-manager/.

74 In certain, limited, cases where specific advertising IDs aren't available, Google may use non-standard hardware-based IDs for ad targeting (e.g. on certain connected TVs and non-Google Play-enabled mobile devices).

75 See "*Google Privacy Policy*", available at: https://policies.google.com/privacy.

76 A Google Account is a Google-wide username and password that can be used to access various Google services. A Google Account contains information that applies across Google services, such as the user's preferred language and some privacy settings. Many Google services do not, however, require the user to create or sign-in to a Google Account (e.g., Search, YouTube).

(i) data tied to a user's Google Account identity (**Google User ID**); and

(ii) pseudonymous data (*e.g.* unique IDs stored in cookies, and mobile advertising IDs such as the Android Advertising ID (**AdID**) and iOS Identifier for Advertisers (**IDFA**)).[77]

152. For historical and policy reasons,[78] Google does not permit direct matching of a Google User ID and pseudonymous data, even when the user is signed-in. While Google may collect both types of data at the same time (e.g. within the same request), it stores and uses them separately or via encryption techniques that do not permit the direct combination of such data.

153. Instead, Google asks users to consent to the use of their Google Account information to inform ad selection on websites and apps that partner with Google to show ads, and to store their ad impression and ad click data within the Google Account rather than store these data against the cookie or mobile advertising ID.

<u>Authenticated Users</u>

154. Google has two fairly distinct approaches to advertising for Authenticated Users: one for ads on Google services like Search and YouTube, and another for the ads Google shows on the websites and apps that partner with Google to show ads (these websites and apps are referred to as the "Google Display Network" (GDN)).

155. Generally, ads on Google services like Search and YouTube are measured and personalized based on the user's activity on those services. When a user is signed-in, their activity is linked to their Google User ID.

156. Ads on the GDN are based primarily on the user's activity on the publishers' properties. If the user has consented to the use of their Google User ID for targeting of display ads, Google stores the user's visits to and interactions with websites and apps that are part of the GDN in their Google Account.

<u>Unauthenticated Users and non-consenting users</u>

157. If the user is not signed-in or did not consent to the use of their Google Account for ads targeting, the information Google records is linked to a unique ID stored in a cookie. Google's principal display advertising cookies are "IDE" on the doubleclick.net domain and "ANID" on the google.com domain. On mobile apps, this works similarly, but the user is identified using their device's mobile advertising ID instead of a cookie. Depending on the user's settings and whether or not they are signed-in, a user might have several different "identities" (cookies or mobile advertising IDs) on the GDN - one for each browser or device they use.

---

[77] Mobile advertising IDs are semi-persistent identifiers which help advertisers identify a mobile device in a similar way to how cookies identify a browser. They can be reset at any time by the user.

[78] Google's internal policy prohibits the direct combination of such data because it is contrary to Google's data access and use controls, data minimisation policies, and user controls (e.g. deletions).

**Q52. Please indicate if the Group provides access to the ids listed in response to the previous request to other online advertising service providers. If so, please send the list of concerned companies and mention under what conditions these ids can be reconciled.**

158. Google does not share the data held about a user within a Google User ID with third party online advertising service providers.

159. Cookies are encrypted, and only readable by the server that set them. Google does not share the information it holds about a certain cookie with third parties, but may share with buyers an encrypted buyer-specific ID derived from that cookie for the purpose of bidding on ad impressions via Authorized Buyers.

160. Mobile advertising IDs can be read from the device by third party advertising providers, but Google does not share the information it holds in respect of a particular mobile advertising ID with third parties.